Kristine Akland (Mont. Bar # 13787)
317 E. Spruce St.
Missoula, MT 59802
(406) 544-9863
Fax (406) 830-3084
kristine@matriumlawgroup.com

Roger Flynn (Colo. Bar # 21078), *Pro Hac Vice Application To Be Filed*
Jeffrey C. Parsons (Colo. Bar. # 30210), *Pro Hac Vice Application To Be Filed*
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
Fax (303) 823-5732
wmap@igc.org

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SAVE OUR CABINETS, EARTHWORKS, and CLARK FORK COALITION; | ) ) ) ) ) |
| Plaintiffs, v. | ) Case No. ) |
| UNITED STATES DEPARTMENT OF AGRICULTURE, U.S. FOREST SERVICE, and CHRISTOPHER S. SAVAGE; | ) **COMPLAINT FOR** ) **DECLARATORY AND** ) **INJUNCTIVE RELIEF** ) |
| Defendants. | ) ) ) ) ) |

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs Save Our Cabinets, Earthworks, and Clark Fork Coalition are non-profit conservation organizations.  None of the Plaintiff organizations has a parent corporation and no publicly held corporation owns a ten percent or greater ownership interest in any of the Plaintiff organizations.

## INTRODUCTION

1.      This case challenges the Record of Decision ("ROD") for the Montanore

Project ("Project" or "Mine") signed by Christopher S. Savage, Forest Supervisor

for the Kootenai National Forest, on February 12, 2016, as well as the Final

Environmental Impact Statement for the Montanore Project issued by the Kootenai

National Forest in March of 2015 ("March 2015 FEIS") and the Joint Final

Environmental Impact Statement for the Montanore Project issued by the Kootenai

National Forest (along with the Montana Department of Environmental Quality) in

December of 2015 ("JFEIS" or "December 2015 JFEIS").  This case also

challenges the July 22, 2015 Combined Response to Objections for the Montanore

Project signed by David E. Schmid, Deputy Regional Forester for the Northern

Region of the U.S. Forest Service ("Forest Service" or "USFS"), which responded

to the administrative Objections filed by Plaintiffs on or about May 14, 2015.

2.      The USFS ROD authorizes the mine proponent, Montanore Minerals

Corporation ("MMC"), to construct and operate the Montanore Project for its full

expected life of roughly 24 years, plus an additional 10 years of post-mining closure

and post-closure operations (with some operations potentially lasting into future

years of unknown duration).

3.      This suit challenges the Forest Service's failure to comply with mandatory

procedural and substantive requirements governing the Forest Service's approval of

mining and other activities on National Forest lands for the Montanore Project. These violations include failure to comply with the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*. ("NEPA"); National Forest Management Act, 16 U.S.C. §§ 1600-1614 ("NFMA"); Forest Service Organic Administration Act of 1897 ("Organic Act"), 16 U.S.C. §§ 478, 551; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the implementing regulations of these laws.

4.      The proposed Montanore Mine would transform a remote landscape in the Cabinet Mountains of northwest Montana into a large-scale industrial operation involving the mining and processing of up to 20,000 tons of ore every day for twenty (20) years during an "operations phase."  Additional Project operations will occur in an initial "evaluation phase" (lasting 2 years) and a subsequent "construction phase" (lasting 3 years).  The ROD also authorizes MMC to conduct "closure" and "post-closure" operations for an additional 10 years or more.  The time required for continued management and treatment of contaminated water generated by the Project is "unknown" and may last for "decades or more."

5.      The Montanore Mine would be located underneath and adjacent to the Cabinet Mountains Wilderness Area ("Wilderness") in northwestern Montana. Project operations within and outside the Wilderness Area contain some of the last remaining undeveloped habitat for imperiled populations of bull trout and grizzly bears in the region, designated as threatened with extinction under the Endangered

Species Act. These lands also contain some of the best remaining remote and wild habitat in the contiguous United States for lynx, westslope cutthroat trout, harlequin duck, wolverines, mountain goats, and other threatened, endangered and sensitive plant and animal species.

6. Remote and picturesque Rock Lake and St. Paul Lake are within the Wilderness above the Mine. Numerous pristine rivers drain the Wilderness on both sides of the crest of the Cabinet Mountains. Libby, Ramsey, Poorman, West Fisher, Cable, and Bear Creeks drain to the northeast and eventually into the Kootenai River. The East Fork of Bull River and East Fork of Rock Creek drain to the west and eventually into the Clark Fork River. These and other waters in the Wilderness are designated as "Outstanding Resource Waters" under Montana law.

7. The stunning beauty and irreplaceable environmental resources of the Cabinet Mountains was first recognized by President Theodore Roosevelt in 1907 when he created the "Cabinet Forest Reserve." In 1935, the Forest Service designated the Cabinet Mountains for the "purpose of inspirational and other recreational enjoyment." Finally, in 1964 following the passage of the Wilderness Act, Congress officially designated the Cabinet Mountains as a wilderness area— making it one of the first ten areas in the nation to receive this designation. All of these invaluable public resources will suffer significant degradation by the Project.

8. As authorized by the Forest Service ROD, the Montanore Project would

construct and operate approximately 14 miles of high-voltage electric transmission line, waste rock storage facilities, a wastewater treatment plant, wastewater holding and seepage collection ponds, pipelines for transporting water and mine tailings, a 600+ acre 120 million ton tailings waste storage facility, as well as pave and widen approximately 13 miles of roads, all with associated clear-cutting of trees and vegetation.

9.     The Project would disturb more than 1,500 acres of land in a remote area of northwest Montana that presently is characterized by pristine expanses of glaciated peaks, forested valleys, and rivers and streams that are among the purest waters in the continental United States.  In addition to threatened bull trout and grizzly bears, the Project area is home to countless species of plants and abundant native wildlife, including Canada lynx, mountain goats, bighorn sheep, pikas, wolverines, elk, moose, deer, mountain lions, and wolves.

10.    Adverse impacts to the local and regional environment resulting from the Project's dewatering of the aquifer (to keep the mine workings dry) are predicted to last for hundreds of years.  The pre-Project hydrologic water balance of the area will never recover.  The Project's dewatering will result in the complete elimination or significant reduction in flows in streams and lakes within and downstream from the Cabinet Mountains Wilderness Area.  These flow reductions are prohibited under Montana water quality laws and regulations yet were authorized by the Forest

Service ROD.

11.     In addition to the adverse effects on water quality and fisheries resulting from the dewatering, as determined by the 2014 Biological Opinion ("Aquatic BiOp") for the Project issued by the U.S. Fish and Wildlife Service ("FWS"), the Project will also release sediment into critical habitat for bull trout – resulting in "severe impacts" from increases in stream sedimentation during the first two to four years of mine development.

http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprd3833932.pdf

12.     Such impacts violate Montana water quality laws and the Administrative Rules of Montana ("ARM") which, among other requirements, mandate that these waters be "maintained suitable for … growth and propagation of salmonid fishes and associated aquatic life" and state that "[n]o increases are allowed above naturally occurring concentrations of sediment or suspended sediment … which will or are likely to … render the waters harmful, detrimental, or injurious to … fish …."  ARM § 17.30.623(1), (2)(f).

13.     Further, the water drained from the Mine will be discharged into bull trout critical habitat at temperatures well above acceptable limits and in violation of state water quality standards.  The authorized discharges of warm water to Libby Creek would occur during "base flow" conditions (when stream levels are at their lowest and the discharges' impact on stream temperatures would be greatest) at a known

bull trout spawning location.  The Aquatic BiOp states that the combination of

reduced base flows during the Mine's operating phase and substantial warm water

discharges thereafter "poses a serious threat to the viability" of the Libby Creek bull

trout population.

14.     The ROD also authorizes MMC to discharge mine water from the processing

mill into local waters in direct violation of federal water quality standards which

state that: "[T]here shall be no discharge of process wastewater to navigable waters

from mills that use the froth-flotation process alone, or in conjunction with other

processes, for the beneficiation of copper, lead, zinc, gold, silver, or molybdenum

ores or any combination of these ores." 40 CFR 440.104(b)(1).

15.     The State of Montana Department of Environmental Quality ("DEQ")

recently determined that the Project as authorized in the USFS ROD and reviewed

in the March 2015 FEIS and December 2015 JFEIS would violate state laws and

regulations designed to protect water quality, fisheries, and fisheries habitat from

degradation.  DEQ Record of Decision issued on February 12, 2016 ("DEQ ROD").

http://test2.deq.mt.gov/Portals/112/Land/Hardrock/Documents/Montonore/Final_EI
S/Final%20DEQ%20ROD.pdf?ver=2016-02-11-165814-
107&timestamp=1455235119984

16.     The USFS's failure to ensure that all aspects and phases of the Montanore

Project comply with all state and federal laws and regulations designed to protect

public land resources including water quality, fisheries, and fisheries habitat,

violates the NFMA, Organic Act, and the implementing regulations of these laws,

including USFS regulations governing mining operations (36 C.F.R. Part 228).[1]

17.    In addition to these substantive violations of federal environmental and

public land laws, the ROD, FEIS, and JFEIS violate the USFS's duties under

NEPA.  As more fully shown below, the FEIS and JFEIS fail to meet the

requirements of NEPA in: (1) failing to adequately analyze the direct, indirect, and

cumulative impacts from the Project; (2) failing to provide for adequate public

review, including analysis and findings found in the JFEIS that were not included in

the FEIS and were never subject to public review under NEPA; (3) failing to

include an adequate mitigation plan, including an analysis of the effectiveness of

mitigation measures relied upon in the FEIS, JFEIS, and ROD; (4) deferral of

critical analysis and gathering of baseline information until the future, long after the

---

[1] In addition to these laws and regulations, Plaintiffs will allege that the USFS's actions noted herein also violate the federal Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* ("CWA").  On February 26, 2016, after issuance of the ROD, Plaintiffs submitted a 60-day notice letter to the USFS and other appropriate agencies pursuant to the citizen-suit provision of the CWA, 33 U.S.C. §§ 1365, notifying them of Plaintiffs' intent to sue the USFS under the CWA.  Unless the USFS withdraws the ROD within 60 days of February 26, 2016, Plaintiffs intend on seeking to amend this Complaint to add claims under the CWA. *See Rock Creek Alliance v. U.S. Forest Service*, 703 F.Supp.2d 1152, 1163-65 (D. Mont. 2010)(60-day notice letter required for suit raising CWA claims against USFS approval of ROD for mining project).

JFEIS was completed and ROD approved; and (5) failing to take the required "hard look" at the Montanore Project as required by NEPA and its implementing regulations.

18.     To remedy these violations, Plaintiffs seek declaratory and injunctive relief to protect public resources, wildlife, public lands, and Plaintiffs' and their members' use and enjoyment of lands and waters adversely affected by the Project.  This relief is necessary to preserve the status quo, to correct illegal final agency action, and to prevent unlawful agency action that will cause irreparable harm to the environment, Plaintiffs and their members, and the public.

## JURISDICTION AND VENUE

19.     Plaintiffs bring this action pursuant to the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-706, which waive the Defendants' sovereign immunity.

20.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question) and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.  There is a present and actual controversy between the parties.  Plaintiffs seek a declaratory judgment and injunctive relief to remedy the violations complained of herein. Plaintiffs also seek an award of costs and expenses, including attorney fees and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412.

21.     Venue lies in the District of Montana (Missoula Division) because Plaintiffs reside and have offices in Montana (including Missoula); the lands at issue in this suit are located in Sanders and Lincoln County, Montana; and a substantial part of the events giving rise to Plaintiffs' legal claims occurred in the District of Montana. Defendant Forest Supervisor Christopher Savage's office is in Libby, Montana, and the regional headquarters of the U.S. Forest Service, which considered and responded to Plaintiffs' administrative Objection, is located in Missoula, Montana. 28 U.S.C. § 1391(e)(1).

## PARTIES

22.     Plaintiff Save Our Cabinets ("SOC") is a Montana non-profit organization dedicated to protecting wild lands, wildlife, and water quality in the Cabinet Mountains of northwest Montana, especially the Cabinet Mountains Wilderness Area and adjacent lands and waters.  Save Our Cabinets is headquartered in Heron, Montana.  SOC's members live and recreate in northwest Montana, including the Cabinet Mountains area affected by the Project.

23.     Plaintiff Earthworks is a non-profit organization dedicated to protecting communities and the environment from the adverse effects of mineral development. Earthworks is headquartered in Washington, D.C., and has field offices across the country, including Missoula, Montana.  Earthworks has a long history of advocacy concerning hard rock mining in the Cabinet-Yaak region of northwest Montana to

protect public health, fish, wildlife, and clean water— including throughout the permitting process for the proposed Montanore Mine.  Earthworks' members live and recreate in northwest Montana, including the Cabinet Mountains area affected by the Project.

24.     The Clark Fork Coalition ("Coalition") is a non-profit organization dedicated to the protection of water quality in the Clark Fork River basin.   The Coalition is dedicated to improving and protecting water quality and restoring stream flow and function in the waterways of the Clark Fork River basin.  The Coalition works to protect the natural ecosystems of the Clark Fork River and its tributaries, including the area impacted by the Montanore Project, particularly due to the significant reduction in flows in waters draining the Clark Fork River caused by the Project's groundwater dewatering.  The Coalition has an office in Missoula, Montana.  The Coalition's members live and recreate in northwest Montana, including the Cabinet Mountains area affected by the Project.

25.     Plaintiffs and their members use the lands in the Cabinet Mountains ecosystem that will be adversely affected by the Montanore Project, including the site of the Project itself, the lands and waters within the Cabinet Mountains Wilderness Area, the lands and waters in the Libby Creek watershed, the lands crossed by the approved transmission line, and the Clark Fork River and its tributaries in Montana and Idaho (including Rock Creek, the East Fork of Rock

12

Creek, and the East Fork of the Bull River), for recreational, scientific, aesthetic, conservation, and commercial purposes.  Plaintiffs and their members derive recreational, scientific, aesthetic, and commercial benefits from these lands, waters, and wildlife.  These uses include hiking, camping, backpacking, wading, viewing and enjoying wildlife and aquatic life such as bull trout and grizzly bears in their natural environment, and enjoying the unspoiled lands and waters of the Cabinet Mountains Wilderness and its adjacent public lands and downstream waters that will be adversely affected by the Project.  Members of Plaintiff groups have visited these lands and waters within the last year and intend on continuing these visits, and their use and enjoyment of these lands and waters, in the Spring, Summer, and Fall of 2016 (and in future years).

26.     The past, present, and future enjoyment of these uses and benefits by Plaintiffs and their members has been, is being, and will continue to be irreparably harmed by the Forest Service's disregard of its statutory duties and by the unlawful injuries imposed by these actions.

27.     In addition, Plaintiffs and their members have been, are being, and will be in future, irreparably harmed by USFS's failure to conduct a proper NEPA analysis and to fully involve the public, and Plaintiffs and their members, in the required NEPA process.

28.    Plaintiffs submitted extensive comments to the Forest Service and the State of Montana during the environmental review and permitting process for the Montanore Project.  Plaintiffs filed an administrative Objection, pursuant to 36 C.F.R. Part 218, challenging the USFS's proposed actions in issuing the ROD and FEIS, and that Objection was substantially rejected by the Defendant U.S. Forest Service, Northern Region, located in Missoula, Montana.  By filing that Objection, Plaintiffs exhausted all available remedies through the Forest Service administrative review process.

29.    Defendant United States Forest Service is an agency of the United States Department of Agriculture.  The Forest Service and its officers are responsible for implementing all laws and regulations relating to the management of the National Forests, including the Kootenai National Forest ("KNF").

30.    Defendant United States Department of Agriculture is a cabinet-level Department within the executive branch of the federal government.  The U.S. Forest Service is an administrative agency within the Department of Agriculture.

31.    Defendant Christopher Savage is the Forest Supervisor for the Kootenai National Forest and is the USFS official that issued and is responsible for the challenged ROD, FEIS, and JFEIS.  The Northern Region's decision denying Plaintiffs' Objection is also a final agency action under the APA, and along with the ROD, FEIS, and JFEIS, are the final agency actions challenged in this case.

14

32.     Plaintiffs have suffered, and will suffer, actual, concrete injuries that are traceable to USFS's conduct and would be redressed by the requested relief. Plaintiffs have no adequate remedy at law.

## THE MONTANORE MINE

33.     As authorized in the ROD, MMC would construct a large copper and silver mine that would bore under the Cabinet Mountains Wilderness area in the Kootenai National Forest approximately 18 miles south of Libby, Montana.  The Mine would operate seven days per week for 20 years, extracting up to 20,000 tons of ore each day.    In addition to the mine adits and tunnels, the Montanore Project would require construction of approximately 14 miles of high-voltage electric transmission line, waste rock storage facilities, a wastewater treatment plant, wastewater holding and seepage collection ponds, pipelines for transporting water and mine tailings, a 120 ton tailings waste storage facility, paving and widening of approximately 13 miles of roads, and associated clear-cutting of trees and vegetation. *See generally* JFEIS S-1 to S-70.

34.     Although the Cabinet Mountains Wilderness was withdrawn from mineral entry in 1984, pursuant to the Wilderness Act, that withdrawal was subject to valid existing rights.  The federal government determined that such rights existed in the subsurface ore body underneath the Wilderness, and along with mining claims

15

outside the Wilderness, these purported rights grant MMC the opportunity to submit a plan of operations to the Forest Service (as the agency responsible for administration of surface lands within the Wilderness and all public lands outside the Wilderness) for consideration.   JFEIS at S-1 to S-4.

35.    The permitting process for the Montanore Project began in 1989 when a predecessor of MMC ("Noranda Mineral Corporation" or "NMC") obtained an exploration license from the Montana Department of State Lands ("DSL") and other associated permits for construction of an exploration adit from private land in upper Libby Creek.  Soon after obtaining the exploration license, the company began excavating the Libby Adit (or tunnel).  JFEIS at S-1 to S-4.

36.    "After constructing about 14,000 feet of the Libby Adit, NMC ceased construction in 1991 in response to elevated nitrate concentration in surface water and low metal prices.  Although exploration adit construction ceased in 1991, the permitting process continued."  JFEIS at S-2.  Permit approvals by the USFS and State of Montana were granted in the early 1990s.  However, outside of the initial work on the Libby Adit, the Mine was never constructed.

37.    "In 2002, NMC notified the KNF [Kootenai National Forest] it was relinquishing the approval to operate and construct the Montanore Project." JFEIS at S-3.  In 2006, "NMC's name was changed to Montanore Minerals Corporation (MMC)." JFEIS at S-2.  MMC is a wholly owned subsidiary of Mines

16

Management, Inc. ("MMI"). JFEIS at S-1.

38.    "In 2004, MMI submitted an application for a hard rock operating permit to the DEQ and a proposed Plan of Operations for the Montanore Project to the KNF." JFEIS at S-4.  The 2004 submittal began the current USFS review and permitting process for the Montanore Project.

39.    The KNF and DEQ issued a Draft EIS for the Montanore Project on February 27, 2009.  The company's proposed Project was labeled Alternative 2 (Alternative 1 was the "no-action alternative" in which the Project would be denied).  "In response to public comment, the agencies revised the mine alternatives (Alternatives 3 and 4) and transmission line alignments (Alternatives C, D, and E) and issued a Supplemental Draft EIS on October 7, 2011.  On April 1, 2015 the KNF issued a Final EIS and Draft ROD pursuant to the Forest Services' predecisional Objection process.  A Joint Final EIS was issued by the KNF and the DEQ for the Montanore Project in December 2015.  The Notice of Availability of the Joint Final EIS for the Montanore Project was published in the Federal Regester [sic] on December 18, 2015."  ROD at 2.

40.    Forest Supervisor Savage signed and issued the challenged ROD on February 12, 2016.  The ROD authorizes MMC to construct and operate Mine Alternative 3, and Transmission Line Alternative D-R.  Alternative 3 is known as the "Agency Mitigated Poorman Impoundment Alternative" because a primary difference

between Alternatives 2 and 3 is the relocation of the proposed tailings impoundment along Poorman Creek, instead of MMC's original chosen location in and along Little Cherry Creek. *See* ROD at 40- 49 (discussing Project Alternatives). For the purposes of this Complaint, the approved Project is the activities authorized under Mine Alternative 3 and Transmission Alternative D-R.

41.     Alternative 3 also reconfigured some water management infrastructure. Under Alternative 3, water from the mine adits (resulting from the dewatering of the aquifer to keep the ore body dry), processing mill, and tailings facility will be directed to and discharged from the Water Treatment Plant into Libby Creek. JFEIS at Figure 58 (Project Water Balance, Operations Phase, Alternative 3).

42.     Because the Montana DEQ also has authority over the Project, under state laws governing water and air quality, water rights, land uses, and other Project aspects, DEQ and USFS jointly prepared the EISs for the Project. JFEIS at S-1. However, each agency issued its own separate ROD for the Project (on the same day of February 12, 2016).

43.     The Project as authorized in the ROD will occur in consecutive and sometimes overlapping phases. The first phase, lasting roughly two years, is known as the Evaluation Phase. "In 2008, the KNF decided the best approach for disclosing the environmental effects of the Libby Adit evaluation program was to consider this activity as the initial phase of the overall Montanore Project in this

EIS.  The Libby Adit evaluation program would be the first phase of the Montanore

Project in Alternatives 3 and 4." JFEIS at 125.

44.    As stated in the JFEIS, at 125-26:

> The objectives of the evaluation program would be to:
> • Expand the knowledge of the mineralized zones of the deposit
> • Assess and define the mineralized zone within established valid existing rights
> • Collect, provide, and analyze additional geotechnical, hydrological, and other information required to finalize a mine plan and to confirm and support the analysis for the Construction and Operation Phases of the mine

45.    During the "Evaluation Phase":

> MMC would dewater the full extent of the existing Libby Adit, extend the adit 3,300 feet to beneath the ore zones, and develop an additional 7,100 feet of drifts and 16 drill stations under the currently defined ore zones. Because drill stations would be located under the deposit, the majority of the drillholes would be drilled upward; a few holes would be drilled below the drill station to test mineralization at depth. During the Evaluation Phase, MMC would drill ahead of the drifts and keep all drill stations 300 feet from the Rock Lake Fault and 1,000 feet from Rock Lake.

JFEIS at 126.  As a result of this excavation, "[a]n estimated 545,000 tons (256,000

cubic yards) of waste rock would be generated and stored" at the Libby Creek adit

site.  JFEIS at 127.  The mine water drained during the Evaluation Phase would be

discharged "to one of three permitted outfalls" into Libby Creek.  JFEIS at 127.

46.    In addition to further drilling/tunneling under the Cabinet Mountains, and

discharge of mine water into Libby Creek, during the Evaluation Phase MMC would

develop various plans for transportation, road use, mitigation and monitoring plans,

water pollution control plans and obtain baseline and other data necessary for the

Project.  JFEIS at 125-141 (discussing Project activities to occur during the

Evaluation Phase).

47.    Importantly, the JFEIS and ROD acknowledge that critical Project

information and designs for major facilities such as the 600+ acre, 120-million-ton

tailings waste impoundment facility have yet to be gathered, and will only be

obtained during the Evaluation Phase.

> The design developed for project facilities in Alternatives 3 and 4, such as the
> Poorman tailings impoundment site, is conceptual and is based on the
> available geotechnical investigations. Additional site information is needed to
> complete a final design. The design process would include a preliminary
> design phase and a final design phase. Site information would be collected
> during geotechnical field studies during final design. MMC would submit a
> tailings impoundment site geotechnical field study plan to the agencies for
> their approval before commencing activities. Once approved, the Site
> Exploration Plan would become a component of the amended Plan of
> Operations. A preliminary site program would be completed to confirm the
> geotechnical suitability of the Poorman Tailings Impoundment Site. A similar
> process would be used for the Libby Plant Site. The field studies would
> include a site reconnaissance and a drilling and sampling program to evaluate:
> • Site geology and foundation conditions
> • Groundwater conditions and water quality
> • Borrow material availability
> • Geotechnical characteristics of foundation and borrow materials
> Site data to be collected would include an assessment of artesian pressures
> and their potential influence on impoundment stability, an assessment of a
> subsurface bedrock ridge between Little Cherry Creek and the effect it may
> have on pumpback well performance, aquifer pumping tests to refine the
> impoundment groundwater model and update the pumpback well design, and
> site geology to identify conditions such as preferential pathways that may
> influence the seepage collection system, the pumpback well system, or
> impoundment stability. Based on these data, a preliminary design of the

facility sites would be completed to confirm the site layout and design/operation feasibility. Field studies would be completed to collect data and material samples necessary for the final design.

JFEIS at 134-35.

48.    The agency further acknowledges that critical Project information, especially regarding the tailings facility, will only be obtained after the ROD is approved and public review under NEPA completed:  "The design process will include a preliminary design phase and a final design phase. Site information will be collected during field exploration programs during the design phase.  MMC will submit a tailings impoundment site exploration plan to the agencies for their approval before commencing activities."  ROD Attachment 1, at 9.

49.    Regarding the lack of substantial data for the tailings waste facility design, the March 2015 FEIS had stated, "The design developed for project facilities in Alternatives 3 and 4, such as the Poorman tailings impoundment site, is conceptual and is based on *limited* geotechnical investigations." FEIS at 132 (emphasis added).

50.    In the December 2015 JFEIS, however, the USFS changed its description of the missing information, and now says that: "The design developed for project facilities in Alternatives 3 and 4, such as the Poorman tailings impoundment site, is conceptual and is based on the *available* geotechnical investigations."  JFEIS at 134 (emphasis added).  This language change was made without gathering any new data

or conducting any new "geotechnical investigations" around and below the Poorman

tailings waste site.

51.     The JFEIS acknowledges that it is "uncertain" whether the Poorman site can

handle the anticipated 120 million tons of tailings.

> The Poorman Tailings Impoundment Site would not provide sufficient
> capacity for 120 million tons of tailings without a substantial increase in the
> starter dam crest elevation if tailings were deposited at a density proposed in
> Alternative 2. The tailings thickener requirements to achieve higher tailings
> slurry density (and hence higher average in-place tailings density) are
> uncertain without additional testing of simulated tailings materials. Such
> testing would be completed during the Evaluation Phase.

JFEIS at 153.  Similar to the "geotechnical investigations" for the Poorman site that

will be conducted during the Evaluation Phase, the "additional testing of simulated

tailings materials" will be conducted during the Evaluation Phase, without any

additional NEPA analysis involving the public.

52.     The USFS provided no credible rationale or explanation as to why the

"geotechnical investigations," "additional testing of simulated tailings materials,"

"field exploration programs," "tailings site exploration plan," and other baseline data

gathering associated with the Poorman tailings waste site could not have occurred

prior to issuance of the FEIS and JFEIS during the public NEPA process.

53.     The second phase of the Project as authorized in the ROD is the "Construction

Phase."  This phase is expected to last roughly three years, during which additional

Project facilities will be constructed such as the ore processing mill (known as the

Libby Plant), Poorman tailings waste facility, electrical transmission line, and other Project roads and infrastructure.  MMC would also relocate the two existing Ramsey adits and construct/drill an additional adit/tunnel (the Upper Libby Adit) to access the ore body.  MMC will also construct a ventilation adit/shaft just outside the boundary of the Cabinet Mountains Wilderness Area.  JFEIS at 141-161 (describing Construction Phase activities).

54.     As with the necessary data-gathering and analysis that will be conducted during the Evaluation Phase (after the ROD and FEIS/JFEIS were completed), the agency admits that critical information for the facilities to be built during the Construction Phase is also lacking.  For example, the JFEIS acknowledges that: "Geotechnical investigations of the Libby Plant Site have not been completed." JFEIS at 150.

55.     The next phase is the Operations Phase, which will involve active mining, processing, and tailings waste disposal, expected to last from years 6-24 of the total mine life. ROD at 47 (Table 6 showing water flows and dewatering rates for the various phases).  *See also* JFEIS at 162-178 (describing Operations Phase).

56.     The ROD also authorizes the "Closure Phase," lasting five years (Project years 25-29), and the "Post-Closure Phase," lasting another five years (Project Years 30-35).  ROD at 47 (Table 6 showing water flows and dewatering rates for the various phases).  *See also* JFEIS at 178-183 (describing Closure and Post-Closure

Phases).  These phases focus on post-mining reclamation, water treatment, and long-term management of the site. *Id*.

57.    The actual duration of the Project is unknown, as the agency does not know how long treatment of the water from the draining adits, and collection of the contaminated seepage from the tailings facility, will last.  In response to public concerns about the potential perpetual nature of the Project's water pollution, the agency admitted that:  "The length of time seepage interception and water treatment would be necessary is unknown and may be decades or more after operations." JFEIS at M-343.

58.    Adverse impacts to water quality, wildlife, and other public resources will result from all phases of the Project.  As described in more detail herein, these impacts will result in violations of federal and state laws designed to protect water quality, fisheries and fisheries habitat, wildlife, and federal public land resources.


Violations of the Forest Service Organic Act and Implementing Regulations

59.    The Forest Service's authority to regulate mining operations is governed in part by the Organic Administration Act of 1897 ("Organic Act"), 16 U.S.C. §551, which authorizes the agency to promulgate rules and regulations for the national forests in order "to regulate their occupancy and use and to preserve the forests thereon from destruction."  The Organic Act "specifies that persons entering the

24

national forests for the purpose of exploiting mineral resources must comply with

the rules and regulations covering such national forests.'" *Clouser v. Espy*, 42 F.3d

1522, 1529, n.7 (9th Cir. 1994), *cert. denied*, 115 S. Ct. 2577 (1995), *and reh'g.*

*denied*, 116 S. Ct. 18 (1995).

60.    USFS mining regulations implementing the Organic Act are found at 36

C.F.R. Part 228.  Under the Organic Act, and the 36 C.F.R. Part 228 regulations, the

agency cannot approve a mining plan unless it can be demonstrated that all feasible

measures have been taken to "minimize adverse impacts" on National  Forest

resources, including all measures to protect wildlife and habitat. 36 C.F.R. § 228.8.

61.    The "operator shall take all practicable measures to maintain and protect

fisheries and wildlife habitat." 36 C.F.R. §228.8(e).  "The operator also has a

separate regulatory obligation to 'take all practicable measures to maintain and

protect fisheries and wildlife habitat which may be affected by the operations.' 36

C.F.R. § 228.8(e)." *Rock Creek Alliance v. Forest Service*, 703 F.Supp.2d 1152,

1164 (D. Montana 2010) (Forest Service approval of mining plan violated Organic

Act and Part 228 regulations by failing to protect water quality and fisheries).

"Under the Organic Act, the Forest Service must minimize adverse environmental

impacts where feasible and must require [the project applicant] to take all

practicable measures to maintain and protect fisheries and wildlife habitat." *Id*. at

1170.

62.    The Part 228 regulations also require the USFS to ensure that no activities authorized in a ROD have the potential to violate any federal or state water quality standard or protective requirement.  Under the heading of "Requirements for environmental protection, Water Quality," the regulations mandate that every "Operator shall comply with applicable Federal and State water quality standards, including regulations issued pursuant to the Federal Water Pollution Control Act, as amended (33 U.S.C. 1151 *et seq*.)[Clean Water Act]."  36 C.F.R. § 228.8(b).  These include a state's policy for nondegradation of water quality.

63.    "A water quality standard defines the water quality goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting criteria necessary to protect the uses." 40 C.F.R. § 131.2 (EPA federal water quality regulations).  "[A] project that does not comply with a designated use of the water does not comply with the applicable water quality standards." *PUD No. 1 of Jefferson County v. Washington Department of Ecology*, 511 U.S. 700, 714-15 (1994).

64.    The operations and Project activities authorized by the ROD fail to meet these requirements and thus violate the Organic Act and the Part 228 regulations.

65.    In its ROD, the Forest Service failed to ensure that the Montanore Mine will comply with all applicable state and federal water quality requirements.  Instead, the Forest Service stated that future permitting actions by the Montana DEQ and U.S.

26

Army Corps of Engineers will "constitute compliance with Clean Water Act requirements." ROD at 58. It was irrational and unlawful for the Forest Service to rely on future permitting actions by other agencies—the contents of which are unknown—to conclude that the Montanore Mine will satisfy all applicable federal and state water quality requirements. For example, the Army Corps of Engineers' forthcoming permitting decision will address only the requirements of CWA § 404, which concerns discharges of dredged or fill material to navigable waters. DEQ's permitting decision will address only water-quality impacts of point-source discharges from the Project's initial phase, while the Forest Service's ROD approves the full multi-decade Project. *Compare* USFS ROD with DEQ ROD. The Forest Service lacked the required rational basis, with evidentiary support in the record, to conclude that the project as authorized in the ROD will comply with the Organic Act and Part 228 regulations.

66. Further, the Forest Service's determination that future state and federal permitting decisions will ensure that the Montanore Mine project complies with the Organic Act and Part 228 regulations was arbitrary and capricious because evidence before the Forest Service—including its own NEPA analysis—demonstrates that the Montanore Mine project will violate the Montana Water Quality Act's nondegradation policy.

67.    Montana's nondegradation policy requires that "[e]xisting uses of state waters and the level of water quality necessary to protect those uses must be maintained and protected."  Mont. Code Ann. § 75-5-303.  Pursuant to that mandate, actions that would significantly impair the quality of waters designated "high quality" by the state are prohibited unless DEQ issues a valid authorization to degrade.  *Id.* § 75-5-303(2)-(3); *see* Admin. R. Mont. § 17.30.705(1) (providing that nondegradation policy applies "to any activity of man resulting in a new or increased source which may cause degradation").

68.    "All of the waters in the analysis area are high quality waters, except surface waters that have zero flow or surface expression for more than 270 days during most years. High quality waters are defined in the Montana Water Quality Act (75-5-103(13), MCA)). The Montana Water Quality Act prohibits degradation of high quality waters unless the DEQ issues an authorization to degrade."  JFEIS at 623. DEQ has not issued an "authorization to degrade" for "flow," (*Id.*) which is a critical water quality parameter that will be significantly degraded by the Project's dewatering.

69.    Actions that would significantly impair the quality of waters designated "outstanding resource waters" by the state are prohibited in **all** circumstances; DEQ may not issue an authorization to degrade outstanding resource waters.  Mont. Code Ann. § 75-5-303(7); *see* Admin. R. Mont. 17.30.705(2)(c) ("For outstanding

28

resource waters, no degradation is allowed …").  "Under the Montana Water Quality

Act, no authorization to degrade may be obtained for outstanding resource waters,

such as surface waters within a wilderness."  JFEIS at 624.

70.     Montana law provides that actions resulting in stream-flow depletions

exceeding 10% of stream base flow constitute degradation.  *See* Admin. R. Mont. §

17.30.715(1)(a) (stating that flow depletions are "insignificant," and do not result in

degradation, only if they involve a reduction of less than 10% of stream base flow

measured as the seven-day ten-year low flow).  "The Montana Water Quality Act

defines 'degradation' as a change in water quality that lowers the quality of high-

quality waters for a parameter, unless the change is nonsignificant. Current

nondegradation rules provide that if an activity increases or decreases the mean

monthly flow of a stream by less than 15 percent or the 7-day, 10-year (7Q10) low

flow of a stream by less than 10 percent such changes are not significant for

purposes of the statute prohibiting degradation of state waters (ARM

17.30.715(1)(a))." JFEIS at 623-24.

71.     The Forest Service's own analysis demonstrates that due to the direct

connection between surface water and groundwater, the Project's groundwater

depletion caused by the dewatering will degrade outstanding resource waters in

violation of Montana's nondegradation requirements.  The JFEIS shows that

groundwater drawdown caused by the mine will substantially reduce or eliminate

29

entirely the base flow of East Fork Rock Creek (EFRC), East Fork Bull River (EFBR), and Libby Creek within the Cabinet Mountains Wilderness. *See* JFEIS Tables 100, 101 (documenting that mine will reduce base flows in East Fork Rock Creek by59-100%, in East Fork Bull River by 97%, and in Libby Creek by 11-19%, depending on Project phase).  JFEIS at 601-02.

72.    "With and Without MMC's modeled mitigation - maximum model predicted baseflow reductions occur at Year 38 for the Rock Creek drainage and Year 52 for the East Fork Bull River drainage. East of the divide, the maximum model predicted baseflow reductions in the Libby Creek watershed would occur between Year 22 (as reported in Table 99) and Year 25 (as reported in Table 100).  Baseflow changes for east slope watersheds in this table are for Year 38."  Table 101 (footnote), JFEIS at 602.

73.    "The effects of groundwater drawdown due to dewatering of the mine and adits are best expressed by estimating changes to baseflow."  JFEIS at 593. According to the updated and revised "3D Model" that was the basis for the JFEIS' analysis, the Project will result in massive groundwater pumping with the resulting dewatering of lakes and streams within the Wilderness:

> The 3D model provides considerable detail concerning predicted inflows during the various phases of mining, providing both average and stabilized dewatering rates. The dewatering rate at full mine build out during the 22-year life of mine (Evaluation through Operations Phases) is predicted by the 3D

> model to be about 370 gpm, with possible short-term inflow peaks of nearly
> 800 gpm during the mine Construction Phase (Figure 71).

JFEIS at 591. *See also* JFEIS at 601-02. A dewatering rate of 370 gallons per

minute equals 194,472,000 gallons per year. Over 22 years, this equals 4.27 billion

gallons of water removed from the area. This does not include the dewatering that

will occur during the initial Evaluation Phase. A dewatering rate of 800 gallons per

minute equals 420,480,000 gallons per year during the mine Construction Phase.

74.    These significant flow reductions in the Wilderness are predicted by the 3D

Model used by the JFEIS even after the mitigation approved in the ROD was

factored-in. Table 101 ("Predicted Changes to Baseflow – Post-Closure Phase

(Maximum Baseflow Change"), JFEIS at 602 (showing flow reductions "with …

[and] without MMC's Modeled Mitigation.").

75.    These stream reaches are designated "Outstanding Resource Waters" under

Montana law. <u>See</u> Admin. R. Mont. 17.30.617(1) (designating all state surface

waters within wilderness areas "outstanding resource waters"). As the USFS

acknowledges, "Under the Montana Water Quality Act, no authorization to degrade

may be obtained for outstanding resource waters, such as surface waters within a

wilderness." JFEIS at 707.

76.     The FEIS makes it clear that dewatering of Outstanding Resource Waters

within the Wilderness will significantly and adversely affect water quality, fisheries,

and fisheries habitat:

> Any changes to baseflow in the East Fork Rock Creek and East Fork Bull
> River within the CMW during and after mining would be an irreversible
> commitment of resources. … All alternatives would irreversibly reduce
> streamflow in the eligible East Fork Bull River and Bull River Wild and
> Scenic River segments.

JFEIS at 1061-62.

77.     The East Fork Bull River and Rock Creek are the two most important bull

trout recovery streams in the Lower Clark Fork River (LCFR) region. According to

the USFWS, "Currently, the East Fork Bull River and Rock Creek are the only bull

trout spawning populations in the Cabinet Gorge reservoir reach in the LCFR.

These two local populations represent the strongest populations in this reach and

maintaining spawning and rearing success in these two local populations is essential

to maintaining the existing survival status and potential for recovery of the LCFR

bull trout core area population." FWS Aquatic BiOp at 122.

78.     The Office of the Secretary of the Interior Department also emphasized the

importance of the East Fork Bull River within and downstream of the Wilderness:

> **The East Fork Bull River is the single-most important bull trout
> spawning and rearing stream in the Lower Clark Fork bull trout core
> area.** The modeling analysis projects base flows to be reduced by 11 percent
> at the Cabinet Mountains Wilderness boundary and by 97 percent within the

32

wilderness at Year 52, and to potentially persist for more than 1000 years. When combined with expected climate change impacts of higher stream temperatures, earlier spring run-off, and the increased frequency of rain-on-snow events, such impacts would adversely impact the value of the upper East Fork Bull River for spawning and rearing habitat, including the possibility of serious population reductions or even extirpation of bull trout from the East Fork Bull River. Currently, 80 percent of observed bull trout redds in the East Fork Bull river occur upstream of the wilderness boundary.

JFEIS at M-59 (emphasis in original).

79. According to the FWS, dewatering from the mine would particularly harm the

EFBR within the Wilderness, where much of the bull trout spawning occurs.

"The bull trout population and designated critical habitat in East Fork Bull River would be negatively impacted by predicted streamflow reductions during low flow conditions (Table 4). Current condition for baseflow is "functioning at risk for bull trout" (see Table 4). Maximum baseflow flow reductions in East Fork Bull River of 13 percent are predicted to occur after mine closure. The most seriously affected reach of the East Fork Bull River currently supports much of the bull trout spawning (and egg incubation) known to occur in the drainage, and the adverse impacts due to predicted flow depletions would extend downstream to the mouth through juvenile bull trout rearing habitats." (Aquatic BiOp at 104)

"Bull trout populations and designated bull trout critical habitat would be negatively impacted by predicted streamflow reductions during low flow conditions. Maximum baseflow reductions in East Fork Rock Creek of 9 percent would occur after mine closure and continue indefinitely (see Table 5). This impact would be significant as this reach supports the known existing spawning habitat for the resident bull trout in Rock Creek." (Aquatic BiOp at 103)

"As indicated above and in the Effects section of this BO, baseflow depletions in the East Fork Bull River and Rock Creek will have permanent consequences to both of these bull trout local populations due to loss of habitat availability, particularly loss of spawning habitat. Also, these adverse effects are likely to be more severe to the adult migratory component of these

33

local bull trout populations, which is the particular life history form that is emphasized in the draft bull trout recovery plan for purposes of recovery." (Aquatic BiOp at 122).

80.   The JFEIS admits to these severe and irreversible adverse impacts:

**Alternatives 2, 3, and 4 could irreversibly reduce bull trout and westslope cutthroat trout habitat in Rock Creek and East Fork Bull River drainages due to decreases in flow.** Mitigation would *slightly* reduce effects on streamflows and aquatic habitat in both streams in Alternatives 3 and 4. **Loss of bull trout habitat in the East Fork Bull River in all alternatives could be detrimental to bull trout populations in the lower Clark Fork River because this stream is considered a primary spawning location in this system.**

…

**3.6.4.14 Unavoidable Adverse Environmental Effects**

**Mining of the ore body would unavoidably reduce streamflow and spring flows, and affect lake levels in Rock and St. Paul lakes. Decreased streamflows would result in the loss of aquatic habitat in the Libby Creek, Rock Creek, and East Fork Bull River watersheds.** Water levels are predicted to reach steady state conditions 1,150 to 1,300 years after mining ceased. The actual time to reach steady state conditions may be shorter or longer and would be reevaluated using the 3D model after additional data were collected during the Evaluation Phase.

JFEIS at 490 (emphasis added). The fact that "mitigation would *slightly* reduce effects on streamflows and aquatic habitat" in Rock Creek and East Fork Bull River does not satisfy the agency's duties to prevent significant degradation to these waters under Montana water quality law, the Organic Act, and the Part 228 regulations.

81.    These adverse impacts will occur not just to fish populations but the supporting environmental conditions in the affected waters:

> Macroinvertebrate populations are present throughout the reaches potentially affected by mine dewatering, and would be affected by the reduction or elimination of flow that would occur during low flow periods.  Headwater streams also perform important ecological functions in terms of transport of organic matter, invertebrates, nutrients, and woody debris to downstream waters (Kline and NewFields 2012).  Reductions in flow could adversely impact the ability of these headwater reaches to perform such functions.

JFEIS at M-86.

82.    As stated in the JFEIS, the "mitigation" plan authorized in the ROD will not prevent these severe impacts and unlawful degradation.  The authorized mitigation to reduce the loss of baseflows from mine dewatering consists of a combination of concrete bulkheads, grouting, and buffers between the overhead waters and actual mining. JFEIS at 162.

83.    The agency admits that, even with the purported bulkhead/pillar mitigation (and even if such mitigation has been shown to be effective, which as noted herein has not been shown), the cumulative changes to baseflow in critical stream reaches will significantly and irreversibly adversely affect aquatic life, fisheries, and fisheries habitat.  JFEIS Tables 100, 101, JFEIS at 601-02.

84.    Yet even these mitigations, incorporated into the USFS/DEQ 3D Model, are acknowledged to be inadequate.  "The agencies' evaluation of the constructed

bulkheads … concluded that man-made concrete bulkheads would **unlikely** provide the necessary mitigation over the long-term."  JFEIS at 162 (emphasis added). "There is limited information on functionality of hydraulic barriers once mining is completed, and there are no data on the design life of these structures." JFEIS at 612.

85.    In the March 2015 FEIS, for the first time, the agency incorporated a new mitigation measure to try to offset the dewatering effects of the proposed mine.  It proposes to possibly consider using barrier pillars with constructed bulkheads in the underground tunnels, concluding that "leaving a 'pillar' of unmined ore with characteristics similar to the constructed bulkheads simulated in the modeling would likely provide the necessary mitigation over the long-term, again assuming the hydrologic modeling was representative of underground conditions."  JFEIS at 162.

86.    The JFEIS concludes that, "Leaving barrier pillars overcomes *some* of the limitations associated with constructed bulkheads, such as long-term effectiveness (Werner 2014).  Although a constructed bulkhead would be made of concrete and grout and a barrier pillar would be made of in-place unmined rock, they both would function in a similar manner to reduce the hydraulic conductivity between sections of the mine void. Consequently, the agencies considered the modeling of the bulkheads to be an equivalent simulation of the agencies' mitigation of leaving one

or more barriers, if necessary, during the Operations Phase and constructing bulkheads at the access openings at closure."  JFEIS at 613-14 (emphasis added).

87.    Yet, the "pillar" part of the bulkhead/pillar mitigation plan has not even been submitted or planned yet.  The USFS and MMC only commit to even begin to consider this plan long after operations have started.  "By the fifth year of operations, MMC would assess the need for barrier pillars to minimize post-mining changes in East Fork Rock Creek and East Fork Bull River streamflow and water quality."  JFEIS at 614.

88.    Under NEPA and the Organic Act, the USFS cannot rely on such a vague and unsupported mitigation plan to supposedly protect bull trout, fisheries, Wilderness lakes and waters, and other critical environmental resources, let alone one that has not even been developed or submitted (i.e., "MMC would assess the need" five years into operations) or that has never been subject to public review.

89.    Even if the future pillar aspect of the bulkhead/pillar mitigation plan was valid under NEPA (which it is not), the only document cited in the JFEIS discussion of the long-term efficacy of the mitigation alternatives categorically states that bulkheads are not proven to be effective in the long-term.  "The long-term effectiveness of constructed low permeability bulkheads is not documented as there are no available data on service life for time horizons commensurate with the Post-Closure modeling scenario."  JFEIS at 614.

90.     The USFS's duty to protect bull trout and aquatic species and habitat is not limited by the ESA's "no jeopardy" standard.  Under the Organic Act, and the Part 228 regulations, the agency cannot authorize a mining project unless it can be demonstrated that the Project will "minimize adverse impacts" on National Forest resources.  "The operator also has a separate regulatory obligation to 'take all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations.' 36 C.F.R. § 228.8(e)." *Rock Creek Alliance v. Forest Service*, 703 F.Supp.2d 1152, 1164 (D. Montana 2010) (Forest Service PoO approval violated Organic Act and 228 regulations by failing to protect water quality and fisheries).  "Under the Organic Act the Forest Service must minimize adverse environmental impacts where feasible and must require [the project applicant] to take all practicable measures to maintain and protect fisheries and wildlife habitat." *Id*. at 1170.  Such protective requirements are not limited to discharges to streams but necessarily include flow reductions, which as shown herein will adversely affect bull trout and other fish species and their habitat and violate Montana water quality laws and regulations.

91.     In order to purportedly comply with its duties to protect water quality, fisheries, and fisheries habitat, the USFS relies on the Montana DEQ's water quality permitting decisions.  USFS ROD at 52, 58.  Yet, the USFS cannot simply defer to

the future DEQ permitting process as a substitute for the USFS's duties under NEPA, the Organic Act, the NFMA and their implementing regulations.

92.    Even if the USFS could completely defer to DEQ on all water quality issues, DEQ has determined that the Montanore Project as authorized in the USFS ROD violates Montana water quality laws and regulations, particularly the prohibition against degradation of outstanding resource waters such as the surface waters within the Wilderness noted above.

93.    Based on the JFEIS's conclusion that these significant baseflow reductions will occur, even with the mitigation plan approved in the USFS ROD, the Director of the Montana DEQ concluded that the Montanore Project cannot be fully approved because implementing the Project's Construction, Operations, Closure, and Post-Closure phases will violate the Montana Water Quality Act.

> *[T]the 3D model results included in the Joint Final EIS do not demonstrate compliance with the nondegradation provisions for the other phases of the Montanore Project*. In regard to the Construction Phase, which as modeled includes two years of mining, the 3D model results do not affirmatively demonstrate compliance with the nondegradation provisions. In regard to the Operation, Closure, and Post-Closure Phases, the 3D model results predict decreases in the baseflow of surface water in the CMW greater than what is considered nonsignificant under ARM 17.30.715. Therefore, the 3D model predicts violations of Montana's nondegradation provisions. Surface waters located within the boundaries of the CMW are outstanding resource waters. Authorizations to degrade may not be issued for state waters that are classified as outstanding resource waters

DEQ ROD at 18 (emphasis added).

94.    Despite this conclusion by the state agency responsible for implementing the applicable state water-quality requirements, the Forest Service arbitrarily approved the full Project based on the unsupported assertion—contradicted by DEQ itself— that future regulatory actions by DEQ will assure compliance with Montana's nondegradation requirements.  USFS ROD 58.

95.    In addition to the significant, and unlawful, degradation of Outstanding Resource Waters in the Wilderness, the analysis by the Forest Service and DEQ also demonstrates that groundwater drawdown caused by the Mine will significantly degrade "high-quality" waters at and downstream of the Cabinet Mountains Wilderness boundary.  Specifically, the JFEIS documents that the mine will reduce base flows by more than 10% in reaches of East Fork Rock Creek and Libby Creek that are designated high-quality waters.  *See* JFEIS Tbls. 99, 100, 101 (predicting base flow reductions of 17-59% in East Fork Rock Creek and 16-20% in Libby Creek, depending on phase of mine project); Admin. R. Mont. § 17.30.715(1)(a) (providing that flow reductions exceeding 10% of base flow constitute significant changes in water quality which cannot be approved).  MMC does not possess an authorization to degrade East Fork Rock Creek or Libby Creek by reducing those streams' base flows.

96.     The Project will also cause significant degradation and loss of flow in other high quality waters due to the groundwater pumping related to the tailings waste facility along Poorman Creek.  There, the ROD authorizes MMC to operate a water collection and pumpback system to capture contaminated water seepage from the tailings.  This seepage is predicted to violate Montana water quality standards.  *See* Table 131, JFEIS at 755 (showing violations of state standards for Antimony and Manganese).  "A pumpback well system would be installed downgradient of the impoundment and designed to capture all seepage from the impoundment that was not collected by the underdrain system. The pumpback well system would consist of a series of groundwater extraction wells designed to provide 100 percent capture of all groundwater moving from beneath the footprint of the impoundment." JFEIS at 596.

97.     "The length of time seepage interception and water treatment would be necessary is unknown and may be decades or more after operations." JFEIS at M-343.

98.     "As a result of lower groundwater levels, the model predicted that operation of the pumpback well system would reduce baseflow in Poorman Creek by 0.18 cfs (81 gpm)."  JFEIS at 596.  Groundwater drawdown due to this pumpback system exceeds 125 feet at the tailings location, and would be roughly 15 feet adjacent to Poorman Creek.  JFEIS Figure 73.

41

99.      Summer flows in Poorman Creek adjacent to the tailings facility location are below 1 cfs, ranging from .91 cfs at monitoring point PM-4 to .77 cfs at point PM-1000.  Table 106, JFEIS at 845.  *See also* JFEIS Figure 76 (showing location of PM monitoring locations).  Thus, a loss of .18 cfs of flow amounts to a loss of flow of 19.7 % (at PM-4) and 23.3% at PM-1000.

100.     The USFS Biological Assessment ("BA") for the Project depicts slightly different numbers, showing a flow reduction in Poorman Creek at monitoring point PM-1200 (downstream from PM-4 and PM-1000) of 12%: "The pumpback wells and any other diversions, such as make-up wells, would reduce streamflow.  For example, at PM-1200 in Poorman Creek, the estimated 7Q10 flow is predicted to be reduced by up to 12 percent."  BA at 53.  Table 5.4.2.1-1 in the BA shows this flow reduction at PM-1200 to be 11.6%.  BA at 102.

101.     The BA acknowledges that this flow loss will adversely affect bull trout: "Maximum 7Q10 flow reductions in Poorman Creek would be 12% and would occur after closure. This would increase low flow challenges to bull trout, including gaining access to the stream due to a seasonally dry lower reach."  BA at 58.

102.     Poorman Creek in the stretch to be partially dewatered by the tailings pumpback system is acknowledged to be "Bull Trout Essential … Habitat and Occupied Stream." JFEIS Figure 55 (Map entitled "Designated Critical and occupied Bull Trout Habitat in the Analysis Area Streams").

42

103.   The BA further details the adverse effect of this dewatering on Poorman

Creek.  BA Table 5.5-17, entitled "Potential impacts of the Proposed Action on the

environmental baseline" describes Poorman Creek moving from its current

condition of  "Functioning Appropriately, A" to "Degrade[d], D" due to this

significant drop in temperature caused by the dewatering.  BA at 120.

104.   No mitigation is proposed to prevent this degradation – defined as

"significant" under Montana water quality law.  *See* Admin. R. Mont. §

17.30.715(1)(a) (stating that flow depletions are "insignificant," and do not result in

degradation, only if they involve a reduction of less than 10% of stream base flow

measured as the seven-day ten-year low flow).

105.   Under Montana water quality law, such significant degradation cannot be

permitted in these waters absent specific review and approval by the Montana DEQ

– something which has not occurred here.  Montana's nondegradation policy

requires that "[e]xisting uses of state waters and the level of water quality necessary

to protect those uses must be maintained and protected."  Mont. Code Ann. § 75-5-

303.  Pursuant to that mandate, actions that would significantly degrade the quality

of waters designated "high quality" by the state are prohibited unless DEQ issues a

valid authorization to degrade.  *Id.* § 75-5-303(2)-(3); *see* Admin. R. Mont.

§ 17.30.705(1) (providing that nondegradation policy applies "to any activity of man

resulting in a new or increased source which may cause degradation").

106.   Accordingly, the predicted flow reductions in East Fork Rock Creek, Libby Creek, and Poorman Creek below the wilderness boundary constitute degradation in violation of the Montana Water Quality Act.  Mont. Code Ann. § 75-5-303(2)-(3).  Thus, the Forest Service's authorization of the Montanore Mine violates the Organic Act and Part 228 regulations.  36 C.F.R. § 228.8(b) (USFS cannot approve mining operations which may violate federal or state water quality laws or regulations).

107.   The USFS ROD also authorizes MMC to conduct activities that are predicted to violate additional Montana state water quality laws and regulations – thus further violating the Organic Act and Part 228 regulations.

108.   Montana water quality standards applicable to the streams and waters affected by the Project mandate, among other requirements, that these waters be "maintained suitable for … growth and propagation of salmonid fishes and associated aquatic life" and state that "[n]o increases are allowed above naturally occurring concentrations of sediment or suspended sediment … which will or are likely to … render the waters harmful, detrimental, or injurious to … fish …."  ARM § 17.30.623(1), (2)(f).[2]

---

[2] The only exception from the water quality standard for sediment applies when DEQ has authorized a short-term turbidity standard pursuant to MCA § 75-5-318, which has not been granted and thus is inapplicable here.  *See* ARM § 17.30.623(2)(f).

109.   Regarding sediment releases from the Project, the ROD does not contain or reference any sufficient information and analysis establishing that the Project will comply with these standards at all times.  Indeed, the Aquatic Biological Opinion establishes that the project will not comply.  *See, e.g.*, Aquatic BiOp at 87-106 (discussing significant adverse impacts to bull trout and its habitat from sediment and warm-water discharges and streamflow reductions caused by the Project).

110.   As summarized in the Aquatic BiOp for the Montanore Mine:

> The effect of suspended and deposited sediment beyond natural background conditions can be fatal [to bull trout] at high levels.  Embryo survival and subsequent fry emergence success have been highly correlated to percentage of fine material within the streambed. Low levels of suspended sediment may result in sublethal and behavioral effects such as increased activity, stress, and emigration rates; loss or reduction of foraging capability; reduced growth and resistance to disease; physical abrasion; clogging of gills; and interference with orientation in homing and migration.  The effects of increased suspended sediments can cause changes in the abundance and/or type of food organisms, alterations in fish habitat, and long-term impacts to fish populations.  Although no absolute threshold has been determined at which fine-sediment addition to a stream is harmless, even at low concentrations, fine-sediment deposition can decrease growth and survival of juvenile salmonids.  Sediment deposition in streams can result in habitat modification (fine substrates) which has been associated with brook trout invasion (Shepard 2004).

Aquatic BiOp at 96.  The JFEIS further acknowledges that:

> Any sedimentation, if it were to occur from sediment pond discharges or other mine activity sources, would have the potential to alter aquatic habitat by decreasing pool depth and habitat complexity, changing substrate composition by filling in interstitial spaces, and increasing substrate embeddedness (Rieman and McIntyre 1993; Waters 1995). These changes to stream habitat

can affect salmonid reproductive success by degrading and decreasing spawning and rearing habitat, and by increasing egg and juvenile mortality.

JFEIS at 441-42.

111.   Even in the absence of the Montanore Mine and the discharges authorized in the USFS ROD, *existing* sediment levels in Libby, Poorman, and Ramsey Creeks are harmful to bull trout.  According to the federal agencies' most recent analysis, due to existing sediment levels, Libby Creek already is functioning at unacceptable risk for bull trout, while Poorman and Ramsey Creeks are functioning at risk/at unacceptable risk. "Kootenai Nat'l Forest, Biological Assessment for Threatened, Endangered, and Proposed Aquatic Species and Designated Aquatic Critical Habitat on the Montanore Minerals Corp. Montanore Project," Tbls. 5.3.1.1-1, 5.3.1.1.5-1, 5.3.1.1.6-1 (Feb. 25, 2013)("Biological Assessment," or "BA").

112.   The FWS Aquatic BiOP details the unacceptable sediment increases caused by the Project, especially during the initial phases.

> Sediment impacts from roads required to implement the Proposed Action and those proposed to be closed under the Wildlife Mitigation Plan were modeled by KNF and DEQ (2013) using the Water Erosion Prediction Project (WEPP) (Elliot 2004). The modeled results represent an estimate of delivery potential from each road based on regional and project-specific variables that were incorporated into the model (Table 6). All streams, with the exception of East Fork Bull River, would be adversely impacted by sediment before the benefits of the Proposed Action were realized. Sediment input would increase during the evaluation phase only (2 years) in Libby Creek, Bear Creek, Cable Creek, Midas Creek, Poorman Creek, and West Fisher Creek.  Sediment input would increase during the evaluation phase and the first two years of construction (4 years) in Big Cherry Creek, Ramsey Creek, and Fisher River. Sediment input

would increase in East Fork Rock Creek and Rock Creek (mainstem) during the first two years of construction.

Aquatic BiOP at 96-97.

113.   The Aquatic BiOp further shows that, even with implementation of BMP (Best Management Practices) mitigation relied upon in the USFS ROD, sediment discharges from the project will violate the fish protection standards by causing severe harm to bull trout.  Bull trout populations in Libby, Poorman, and Ramsey Creeks all will be adversely affected by authorized sediment discharges during the first 2-4 years of the Montanore project. Aquatic BiOP at 96-97.   The most severe impacts will occur in the Libby Creek watershed, but in all affected streams,

> [t]he expected response to predicted short-term increases in sediment input from the proposed mining activities … would be decreased numbers of bull trout …. This negative population response would largely be attributable to reduced survival of incubating eggs and young (small) fish as increased sediment in the affected streams decreases egg survival and fills interstitial spaces in the substrate reducing volume and quality of juvenile bull trout rearing habitats.

Aquatic BiOP at 105-06.  Further, bull trout may enjoy no benefit from long-term sediment reductions achieved through BMPs because (1) local bull trout populations may be extirpated before the benefits of BMPs are realized, and (2) non-native fish that compete with or prey upon bull trout may benefit from the degradation of habitat conditions for bull trout during the initial period of sediment

increases and expand their distribution. Aquatic BiOp at 100, 106.   In other words, the BiOp reveals that BMPs relied upon in the USFS ROD to mitigate sediment impacts will be too little, too late to avoid severe harm to—if not outright destruction of—local bull trout populations in Libby, Poorman, and Ramsey Creeks.

114.   The USFS Biological Assessment (BA) further acknowledged that the Project would result in unacceptable sediment increases during the initial phases of the Project – with harmful effects to bull trout and fisheries habitat.  Discussing the sediment loading from the Project's roads: "Without required BMPs, there would be an overall net increase in sediment loading relative to existing inputs during the evaluation and construction phases, and a net decrease thereafter (Table 5.4.1-1). With required BMPs, there would be an overall net increase only during the evaluation phase (Table 5.4.1-1)."  BA at 42.  Thus, even with the agency-required mitigation measures (BMPs), "there would be an overall net increase" in sediment loading.

115.   The BA noted the "significant impact that was identified for Big Cherry Creek, Bear Creek, Cable Creek, Midas Creek, Fisher River, and West Fisher Creek is [from] temporarily increased input of sediment due to disturbances during road construction, road closures or road use."  BA at 57.

116.   Overall for Project impacted streams, "Sediment input to streams … would be increased at some locations during some of the project phases. This would cause temporary negative impacts to bull trout and designated critical habitat."  BA at 56.

117.   BA Table 5.4.1-1 (entitled "Road sediment input by year and stream") shows that, even with the required BMP mitigation, sediment will increase for **every** stream on the east side of the Cabinet Wilderness during the two-year Evaluation Phase, and for some streams, continuing through the next two years of the Construction Phase.  BA at 101.  The "Cumulative" increase in sediment will last through both phases (i.e., for five years).  *Id*.

118.   Accordingly, the USFS has failed to ensure that all Project waters affected by sediment will be "maintained suitable for … growth and propagation of salmonid fishes and associated aquatic life" and ensure that "[n]o increases are allowed above naturally occurring concentrations of sediment or suspended sediment … which will or are likely to … render the waters harmful, detrimental, or injurious to … fish …." ARM § 17.30.623(1), (2)(f).

119.   This failure also violates the Organic Act and USFS's mining regulations which require the agency to ensure that the "operator shall take all practicable measures to maintain and protect fisheries and wildlife habitat." 36 C.F.R. §228.8(e).  "The operator also has a separate regulatory obligation to 'take all practicable measures to maintain and protect fisheries and wildlife habitat which

may be affected by the operations.' 36 C.F.R. § 228.8(e)." *Rock Creek Alliance v. Forest Service*, 703 F.Supp.2d 1152, 1164 (D. Montana 2010). "Under the Organic Act, the Forest Service must minimize adverse environmental impacts where feasible and must require [the project applicant] to take all practicable measures to maintain and protect fisheries and wildlife habitat." *Id*. at 1170.

120. The fact that the USFS ROD required future mitigation measures for sediment in later phases of the Project does not negate the USFS's duty to ensure that standards are met at all times. "While some adverse effects to successful incubation of bull trout embryos may occur during the Construction Phase, these effects would be expected to be short-term." JFEIS at M-246. "Short-term increases [in sediment] would be expected to occur as a result of road upgrades." JFEIS at M-247.

121. In addition to violations of the Montana fish protection standard for sediment, the Project as authorized in the ROD will violate state water quality standards aimed at protecting sensitive fish populations from harmful increases in temperature.

122. The FWS and the Forest Service have determined that Libby Creek already is "functioning at risk/at unacceptable risk" for bull trout due to elevated stream temperatures. Aquatic BiOp at 50. "Bull trout require water temperatures ranging from 36ºF to 59ºF." JFEIS at 397. "Temperature data indicate that the lower and middle segments of Libby Creek and the lower segment of West Fisher

Creek are warmer than 59ºF, a maximum limit for salmonids, for numerous days

during the summer months and may create thermal barriers for bull trout and other

species." JFEIS at 398.

123.   For the discharges from the Treatment Plant into Libby Creek and related

Project impacts that will result in higher water temperatures:

> The temperature of the discharge of mine and adit water during the
> evaluation, construction and operations phases is expected to be between
> 56º and 65ºF (KNF BA 2013) which exceeds the temperature thresholds
> of bull trout spawning, egg incubation, and rearing, and for generally
> preferred water temperatures of bull trout (see [Aquatic BiOp] section
> III.B., Habitat Characteristics).  Discharges would be to either
> groundwater or surface water from the Water Treatment Plant at the
> Libby Adit Site (KNF BA 2013). These relatively warm water inflows
> would occur at the "existing outfall" [(Outfall 003)] near LB-300 …
> where a significant volume of water augmentation is predicted … to
> occur at baseflow conditions at a known bull trout spawning location.
> ***This water temperature impact in addition to predicted reductions in
> baseflows poses a serious threat to the viability of the Libby Creek bull
> trout population residing upstream of Libby Creek falls***.

Aquatic BiOp at 95 (emphasis added).  These warm water discharges will violate the

state fish protection standards cited above and fail to protect the beneficial uses of

water for fish, especially bull trout.  In addition, under Montana law and regulation,

only "a 1ºF maximum increase above naturally occurring water temperature is

allowed within the range of 32ºF to 66ºF." ARM 17.30.623(2)(e).

124.   The FEIS issued in March 2015 was based on the same finding: "The

temperature of the discharge of mine and adit water is expected to be between 56°

and 65°F based on measurements of the Water Treatment Plant influent (MMC

2008, 2009b, 2010, 2011b, 2012g, 2013)." FEIS at 677.

125.   The USFS Biological Assessment (BA) stated that, for Libby Creek: "Effluent

discharge may increase winter low flow temperatures."  BA at 105 (Table 5.5-2

"Libby Creek effects assessment.").

126.   In the December 2015 JFEIS, however, the Forest Service now relies on a

different statement regarding the warm-water discharges from the Water Treatment

Plant to Libby Creek.  "The temperature of the discharge of mine and adit water is

expected to be between 51° and 60°F based on measured temperatures of the Water

Treatment Plant effluent from February 2014 to May 2015 (DEQ 2015b)."  JFEIS at

756.

127.   "DEQ 2015b" is the Montana DEQ's "Fact Sheet" for DEQ's proposed

renewal and issuance of the MPDES/Clean Water Act discharge permit for the

Montanore Project.

128.   This Fact Sheet was not part of, nor referenced or relied upon, by the USFS

FEIS and Draft Rod issued in March of 2015.  Neither the Plaintiffs nor the public

were made aware of this purportedly new information regarding these warm-water

discharges during the administrative Objection process which concluded in May of 2015.

129.   This new information, and the changed language and findings noted above, first appeared to the public in a USFS document in the December 2015 JFEIS.  It was only first released by DEQ in August of 2015, as part of DEQ's review of the MPDES Permit. Dept. of Envtl. Quality, DEQ Press Release: "DEQ Accepting Public Comments on a Draft Wastewater Discharge Permit for Montanore Mine, http://deq.mt.gov/Public/PressRelease/ArtMID/39110/ArticleID/1643/DEQ-Accepting-Public-Comments-on-a-Draft-Wastewater-Discharge-Permit-for-Montanore-Mine (posted August 3, 2015).

130.   Because the public was never provided this information during the NEPA process, the USFS's use and reliance upon it to support issuance of the JFEIS and ROD violates the public review mandates of NEPA.

131.   Even if the USFS could rely upon (in the JFEIS and ROD) the new DEQ information in the Fact Sheet, this new information does not support the USFS's finding in the JFEIS and ROD that the Project's discharges to Libby Creek will meet all state water quality requirements, and adequately protect bull trout, water quality, and fisheries in Libby Creek, as required by the Organic Act and Part 228 regulations.

132.   The data presented in the DEQ Fact Sheet actually shows that discharges from the Water Treatment Plant have exceeded 60ºF since discharges began in 2007.  For example, the maximum temperature at monitoring point UF-1 was 17.6ºC (which translates into 63.68 ºF.  Fact Sheet at 99, Appendix 6 (Temperature).[3]  "UF-1 is representative of the temperature of the effluent discharged by the wastewater treatment plant as collected at the distribution box."  *Id*.  The data provided in the Fact Sheet does not show the actual temperature readings from 2007 to 2015, as the table only provides a number for the minimum, maximum, and average temperature for the discharge from the Water Treatment Plant, so readers of the JFEIS and Fact Sheet cannot ascertain the actual readings within these ranges.

133.   The new data relied upon by the JFEIS does not mention the temperature reading from the "temperature of the effluent discharged by the wastewater treatment plant as collected at the distribution box."  Instead, it describes the instream water temperature in Libby Creek at monitoring point LB300.  "LB300 is located about 2,536 feet downstream of the Libby Adit and Outfall 003 (a direct discharge to Libby Creek that is not yet constructed)." Fact Sheet at 99, Appendix 6 (Temperature).

---

[3] To calculate ºF from ºC, multiply ºC by 1.8, then add 32.

134.   Thus, LB300 does not represent the "measured temperatures of the Water Treatment Plant effluent" as stated in the JFEIS (at 756).  Rather, it is the instream temperature almost ½ mile downstream from Outfall 003.

135.   In asserting that there will not be any discharge from the Water Treatment Plant into Libby Creek that exceeds 60ºF, or more than 1ºF higher than the receiving stream (to comply with Montana water quality standards), the JFEIS relies on the fact that two of the three permitted discharges from the Water Treatment Plant (Outfalls 001 and 002) will not be directly into Libby Creek, but rather into groundwater connected to Libby Creek via the drainfield and percolation pond.

> Water discharged from the Water Treatment Plant, if discharged to the percolation pond or a drainfield next to Libby Creek, would cool as it flowed via the subsurface to the creek. Heat is not added as part of the facility's wastewater treatment process. Discharges to groundwater (Outfalls 001 and 002) are expected to attenuate any thermal effects. Synoptic temperature data collected in 2014 and 2015 generally indicate less than 1 degree change between monitoring locations LB-200 and LB-300.

JFEIS at 757.  Thus, the JFEIS contends that because warm-water discharges from the Treatment Plant will first travel through groundwater and "would cool as it flowed via the subsurface to the creek," no adverse impacts to Libby Creek and bull trout would occur.

136.   Yet this ignores the undisputed fact that the third discharge point from the Treatment Plant, Outfall 003, would not "cool" because this effluent would go directly into Libby Creek from the surface of the percolation pond.  Outfall 003 is a

"pipeline outlet to Libby Creek" from the Water Treatment Plant facilities.  JFEIS at 750.  The JFEIS also describes Outfall 003 as a "Direct discharge[] to Libby Creek from the percolation pond."  JFEIS at 757.  The 2015 DEQ Fact Sheet describes Outfall 003 as an "end-of-pipe direct discharge from the percolation pond into Libby Creek. … If the pond reaches full capacity then an overflow pipe (Outfall 003) routes water directly into Libby Creek."  Fact Sheet at 5.

137.   The JFEIS does not analyze the temperature of this "direct discharge … into Libby Creek."  The failure to analyze this important Project impact thus violates NEPA.  In addition, because the USFS cannot ensure that these discharges will comply with all Montana water quality requirements and protect bull trout and fisheries in Libby Creek, the ROD and JFEIS fail to meet the requirements of the Organic Act and Part 228 regulations.

138.   The ROD also authorizes MMC to discharge effluent from the processing mill that will violate federal water quality requirements, which the USFS cannot do under the Organic Act and Part 228 regulations.

139.   The USFS failed to require that MMC meet the zero-discharge requirements of EPA's "New Source Performance Standards" for copper milling operations using froth-flotation (the milling method here).  Subject to minor exemptions not applicable here:

[T]here shall be no discharge of process wastewater to navigable waters from

56

mills that use the froth-flotation process alone, or in conjunction with other processes, for the beneficiation of copper, lead, zinc, gold, silver, or molybdenum ores or any combination of these ores.

40 C.F.R. §440.104(b)(1).  As such, any discharge from the mill/plant would violate this federal requirement and cannot be authorized.

140.   In response to Plaintiffs' comments on the Draft EIS, the USFS admitted that this requirement applies here, but relies on the tailings seepage and pumpback system to avoid the zero-discharge mandate:

> Section 3.13.1.2.1 of the SDEIS and FEIS discussed that federal ELGs apply to mine drainage and process wastewater that discharge to surface water. Mine drainage is "any water pumped, drained, or siphoned from a mine" (40 CFR 440.132). Process wastewater is "any water which, during manufacturing or processing, comes into direct contact with or results from the production or use of any raw material, intermediate produce, finished product, by-product, or waste product" (40 CFR 401.11). In terms of the ELG requirements for copper mines that use froth flotation for milling, tailings water is considered process wastewater. Process wastewater from copper mines that use froth flotation for milling is not allowed to be discharged to state surface waters except in areas of net precipitation where precipitation and surface runoff within the impoundment area exceeds evaporation and except for bleed-off water. Because precipitation and surface runoff within the impoundment area would not consistently exceed evaporation, the impoundment in all alternatives would be designed as a zero-discharge facility though the use of a seepage collection system and pumpback wells. The discharge to groundwater beneath the impoundment would be authorized by a DEQ Operating Permit and a seepage recovery zone would encompass the impoundment footprint and extend to the pumpback wells. Compliance wells would monitor groundwater levels and quality at several compliance points upgradient of the permit area boundary to monitor the effectiveness of the pumpback well system (see Appendix C). If monitoring showed

incomplete capture, the pumping rate would be increased and/or an additional
pumpback well or wells would be installed to attain complete capture.

JFEIS at M-378.

141.   One reason for the required collection and pumpback system underneath the

tailings facility is to capture contaminated seepage from the tailings because seepage

from the tailings facility is predicted to violate Montana water quality standards.

*See* Table 131, JFEIS at 755 (showing violations of state standards for Antimony

and Manganese).

142.   Yet simply collecting the discharge/seepage from the mill at the bottom of the

tailings facility and directing them to discharge from the Water Treatment Plant does

not mean that there will be zero discharge as required by 40 C.F.R. § 440.104(b)(1).

It merely redirects the discharge from the mill through the tailings and then through

the Water Treatment Plant before discharging to Libby Creek.

143.   The JFEIS describes these water flows from the mill to the tailings facility, to

the water treatment plant, and then into Libby Creek.  JFEIS Figure 58, titled

"Project Water Balance, Operations Phase, Alternative 3," shows that 1,405 gpm

(gallons per minute) of  "untreated water" will be sent from the mill to the Poorman

Creek tailings facility, and that 395 gpm of "untreated water" temporarily stored in

that facility will then be sent "From [tailings] Impoundment during low flow (8

months [per year])" to the Water Treatment Plant, which will then discharge the

effluent to one of the three authorized Outfalls to Libby Creek.  JFEIS Volume 4, Figure 58.

144.   The USFS ROD Attachment 1, Table 6, "Average Water Balance," shows additional flows to the Water Treatment Plant from "Water from tailings impoundment seepage/runoff collection." ROD Attachment 1 at 47.  Table 6 also shows that the 395 gpm depicted in Figure 58 is "Tailings Impoundment Outflow … To Water Treatment Plant during August-March."  "Discharges during operations [into Libby Creek] would be a mixture of mine and adit water, and water stored in the tailings impoundment." JFEIS at 757.

145.   Outfall 001 from the Water Treatment Plant is a percolation pond that temporarily holds water as it drains into Libby Creek via the alluvial groundwater. Outfall 002 is a similar drainfield with three infiltration zones.  JFEIS at 750.  *See also* JFEIS Figure 58, showing "Percolation to Surface Water via Groundwater" from Outfalls 001 and 002 into Libby Creek.  Outfall 003 is a "pipeline outlet to Libby Creek" from the Water Treatment Plant.  JFEIS at 750.

146.   Thus, by acknowledging that water delivered from the mill to the tailings facility will eventually be delivered to the water treatment plant for discharge into Libby Creek, the ROD and JFEIS admits that effluent from the mill will eventually be discharged into surface waters.  As such, because the Project will violate the

"zero discharge" requirement, the USFS cannot authorize this aspect of MMC's mine plan.

Violation of National Forest Management Act (NFMA)

147.   The USFS ROD and the Project activities it authorizes are not consistent with the Forest Plan for the Kootenai National Forest ("KNF") and thus violate the National Forest Management Act ("NFMA").  NFMA requires the Forest Service to develop and implement a Land and Resource Management Plan ("Forest Plan") for each unit of the National Forest System, 16 U.S.C. § 1604(a).  Such plans must include requirements governing natural resource management.  *Id.* §§ 1604(c), 1604(g)(2)-(3).

148.   The Forest Service has violated the NFMA's requirement that all actions, such as mining, be consistent with the Forest Plan.  NFMA's Forest Plan consistency provision requires that resource plans, authorizations and permits (such as a mining plan or permit) "shall be consistent with the land management plans." 16 U.S.C. § 1604(i); 36 C.F.R. § 219.16(b) and (d).  "The Forest Service has not spotted a statute that excuses the agency from the requirement that it follow its Forest Plan. … [T]he agency's decision will be set aside if the Plaintiffs show that the decision violates the Forest Plan. *See Native Ecosystems Council v. United States Forest Service,* 418 F.3d 953, 962 (9th Cir.2005) ('An agency's position that is contrary to the clear language of a Forest Plan is not entitled to deference.')." *Rock Creek Alliance v.*

*Forest Service*, 703 F.Supp.2d 1152, 1184 (D. Montana 2010).  "Pursuant to the

NFMA, the Forest Service must demonstrate that a site-specific project would be

consistent with the land resource management plan of the entire forest." *Neighbors*

*of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1377 (9th Cir. 1998),

149.   The Kootenai Forest Plan, last revised in 2015 ("KFP") established a number

of "Desired Conditions" ("DCs") to manage and protect forest and public resources.

Of particular importance in this case are the provisions protecting water quality,

fisheries, beneficial uses of waters (such as fisheries), and associated streamflows.

These include:

> **FW-DC-WTR-01.** Watersheds and associated aquatic ecosystems retain their inherent resilience to respond and adjust to disturbance without long-term, adverse changes to their physical or biological integrity.

> **FW-DC-WTR-02.** Water quality meets applicable state water quality standards and fully supports beneficial uses. Flow conditions in watersheds, streams, lakes, springs, wetlands, and groundwater aquifers fully support beneficial uses, and meet the ecological needs of native and desirable non-native aquatic species and maintain the physical integrity of their habitats.

Quoted in JFEIS at 703.

150.   The Forest Service's NMFA regulations detail the agency's duties to meet

these Desired Conditions.

> (d) *Determining consistency.* Every project and activity must be consistent with the applicable plan components. A project or activity approval document must describe how the project or activity is consistent with applicable plan components developed or revised in conformance with this part by meeting the following criteria:

61

(1) *Goals, desired conditions, and objectives.*
The project or activity contributes to the maintenance or attainment of one or more goals, desired conditions, or objectives, or does not foreclose the opportunity to maintain or achieve any goals, desired conditions, or objectives, over the long term.

36 C.F.R. § 219.15(d) (emphasis in original).  Here, due particularly to the severe impacts to water quality, fisheries, and fisheries habitat, the Montanore Project as authorized in the USFS ROD **does not** "contribute to the maintenance or attainment of one or more goals, desired conditions, or objectives," and **does** "foreclose the opportunity to maintain or achieve any goals, desired conditions, or objectives, over the long term."

151.   The JFEIS states that the USFS's approval of MMC's activities in Alternative 3 is in "Compliance with the 2015 KFP [as] described in the following sections." JFEIS at 791.  That page then repeats the FW-DC-WTR-01 and FW-DC-WTR-02 water and fisheries protection provisions.

152.   In describing its compliance with WTR-02, the USFS bases its finding on the statement that:

> Watersheds and associated aquatic ecosystems would retain their inherent resilience to respond and adjust to disturbance without long-term, adverse changes to their physical or biological integrity in the agencies' mine and transmission line alternatives. The agencies' alternatives include appropriate mitigation for all reasonably foreseeable adverse water quality effects on watersheds and associated aquatic ecosystems. The agencies' alternatives would be neutral with regard to progress toward this desired condition.

62

JFEIS at 791.  Yet as shown herein, the USFS cannot credibly assert that the severe effects to water quality and fisheries resulting from the Mine's dewatering does not result in "long-term, adverse changes to their physical or biological integrity in the agencies' mine and transmission line alternatives."

153.   Similarly, the USFS's "mitigation for all reasonably foreseeable adverse water quality effects on watersheds and associated aquatic ecosystems" (JFEIS at 791) is predicted to **not** appreciably reduce these long term dewatering impacts.  As noted above, the significant flow reductions within and downstream from the Wilderness are predicted by the "3D Model" used by the JFEIS even **after** the mitigation approved in the ROD was factored-in. JFEIS at 602 (Table 101"Predicted Changes to Baseflow – Post-Closure Phase (Maximum Baseflow Change)", (showing flow reductions "with … [and] without MMC's Modeled Mitigation.").

154.   Further, the relied-upon mitigation in the JFEIS and ROD (concrete bulkheads, grouting and buffers) are predicted to fail.  "The agencies' evaluation of the constructed bulkheads … concluded that man-made concrete bulkheads would **unlikely** provide the necessary mitigation over the long-term."  JFEIS at 162 (emphasis added).  "There is limited information on functionality of hydraulic barriers once mining is completed, and there are no data on the design life of these structures." JFEIS at 612.

155.  For flow reductions resulting in significant degradation to essential bull trout habitat in Poorman Creek due to the tailings facility water collection and pumpback system, as detailed above, no mitigation is proposed at all.  BA at 58 and 120 (showing 12% reduction in baseflow in Poorman Creek resulting from tailings pumpback system).  "The length of time seepage interception and water treatment would be necessary is unknown and may be decades or more after operations."  JFEIS at M-343.

156.  In describing its compliance with WTR-02, the USFS bases its finding on the statement that:

> The DEQ will discuss compliance with applicable water quality regulations including nondegradation rules in the [DEQ] ROD, the MPDES [state Clean Water Act discharge permit] permit, and the 401 certification.  DEQ's permit decision and associated conditions in the MPDES permit or any other state water quality permit would constitute compliance with Montana water quality requirements and Clean Water Act requirements regarding water quality.

JFEIS at 791.

157.  Yet, as noted above, DEQ's ROD, issued on the same day as the USFS ROD, specifically finds that the Project will **not** be in compliance with the Montana non-degradation requirements for water quality.  "[T]the 3D model results included in the Joint Final EIS do not demonstrate compliance with the nondegradation provisions for the other phases of the Montanore Project."  DEQ ROD at 18.  DEQ

determined that authorization of Alternative 3 (as approved by the USFS ROD) would violate Montana water quality laws.  *Id*.

158.   Further, the DEQ's MPDES permit and 401 certification decisions relied upon by the USFS as proof of compliance with these Forest Plan requirements (and the Organic Act and Part 228 regulations) have not been issued and are not in the administrative record for the challenged USFS decisions in this case (the only evidence the USFS can use to support its actions under the APA).

159.   A similar violation will occur due to the high water temperatures that the Project will cause in area waters, including the discharges into Libby Creek noted above.  The Forest Plan provisions incorporating and implementing the USFS's Inland Native Fish Strategy ("INFISH" or "INFS") require attainment of the following Riparian Management Objective ("RMO") for Water Temperature:

> No measurable increase in maximum water temperature (7 day moving average of daily maximum temperature measured as the average of the maximum daily temperature of the warmest consecutive 7-day period). Maximum water temperatures below 59°F within adult holding habitat and below 48°F within spawning and rearing habitats

Forest Plan at 136.  For the discharges into Libby Creek, there is no analysis in the FEIS or JFEIS regarding whether the discharges will meet the "7 day moving average of daily maximum temperature measured as the average of the maximum daily temperature of the warmest consecutive 7-day period."  The same is true for

Poorman Creek, as there is no analysis showing that the temperature increases due to the dewatering of the tailings area will comply with this standard.

160.    The Project will not achieve these conditions and meet these standards.  The Aquatic BiOp (at 95) and the FEIS (at 677) state that Project discharges into Libby Creek are expected to be between 56º and 65ºF.  The JFEIS now belatedly states that these discharges will not exceed 60ºF.  Yet as detailed above, the JFEIS's new finding not only violates NEPA's public review requirements, but also ignores the likely actual temperature of Outfall 003, is based on instream temperatures almost ½ mile downstream from Outfall 003, and otherwise fails to ensure that these impacts and violations will not occur, as required by the Forest Plan/NFMA, and the Organic Act/Part 228 regulations.

161.    The JFEIS details additional INFISH/INFS, Forest Plan, and NFMA requirements:

> INFS identifies riparian management objectives (RMOs) that guide management of key habitat variables for good fish habitat on National Forest System lands. The RMOs for stream channel conditions provide the criteria against which attainment or progress toward attainment of riparian goals is measured. RMOs, as established by INFS standards and guidelines for forested streams, include pool frequency, large woody debris (LWD) frequency, and width/depth ratio (Table 64). **Actions that retard attainment of these RMOs, whether existing conditions are better or worse than objective values, are considered to be inconsistent with INFS and therefore not in compliance with the 2015 KFP.**

JFEIS at 326 (emphasis added).  According to the KFP (Kootenai Forest Plan): "For the purposes of analysis, to 'retard' would mean to slow the rate of recovery below the near natural rate of recovery if no additional human caused disturbance was placed on the system."  Forest Plan at 136.

162.   The USFS's Biological Assessment ("BA") acknowledges that the RMO for temperature will be violated on a number of streams (including occupied bull trout waters).  This will certainly "retard attainment of this RMO," and "therefore [is] not in compliance with the 2015 KFP."  JFEIS at 326.

163.   For Poorman Creek, which as noted above will suffer significant flow reductions (and associated temperature increases) resulting from the tailings seepage groundwater pumpback system, the BA shows in Table 5.5-17 (entitled "Potential impacts of the Proposed Action on the environmental baseline") that Poorman Creek will move from its current condition of  "Functioning Appropriately, A" to "Degrade[d], D" due to this significant drop in temperature caused by the dewatering.  BA at 120.

164.   Libby Creek will suffer the same impacts, moving to the "Degrade[d], D" condition for the temperature RMO.  Table 5.5-17, BA at 120.

165.   For the RMO of "wetted width/depth" of a stream, the BA determined that Rock Creek, East Fork Rock Creek, and the East Fork Bull River will each become

"Degrade[d], D" from its current condition (Table 5.5-17, BA at 120) and "therefore not in compliance with the 2015 KFP."  JFEIS at 326.

166.   As such, based on the various Project impacts that would not be in compliance with, or will be inconsistent with, the Forest Plan, the Forest Service's authorization of the Montanore Project violates the NFMA and its implementing regulations.

<u>Violation of National Environmental Policy Act (NEPA)</u>

167.   NEPA requires federal agencies to prepare an EIS for any proposed major action that may significantly affect the quality of the environment.  42 U.S.C. § 4332(2)(C).  The CEQ promulgated uniform regulations to implement NEPA which are binding on all federal agencies.  40 C.F.R. §§ 1500.3, 1507.1.

168.   "NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. §1500.1(b).

169.   To comply with NEPA, the Forest Service must analyze all "direct," "indirect," and "cumulative" environmental impacts of the proposed action.  40 C.F.R. §1502.16; 40 C.F.R. §1508.8; 40 C.F.R. §1508.25(c).  Direct effects are caused by the action and occur at the same time and place as the proposed project. 40 C.F.R. §1508.8(a).  Indirect effects are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.  40 C.F.R.

§1508.8(b).  Both types of impacts include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]." *Id*.

170.   A project's "cumulative impact," is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. §1508.7.

171.   Pursuant to the CEQ regulations: "Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analysis in environmental impact statements.  They shall identify any methodologies used and make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement."  40 C.F.R. §1502.24 (Methodology and Scientific Accuracy).  NEPA documents, such as the FEIS and JFEIS, must be supported by evidence that the agency has made the necessary environmental analysis before making its decision (such as the ROD).  40 C.F.R. §1502.1.

172.   Consequently, the Forest Service has a duty to disclose the underlying scientific data and rationale supporting the conclusions and assumptions in the FEIS.  Unsupported conclusions and assumptions violate NEPA.  40 C.F.R. §§1502.1, 24.

69

173.   NEPA requires the Forest Service to "describe the environment of the areas to be affected or created by the alternatives under consideration."  40 C.F.R. §1502.15. The establishment of the baseline conditions of the affected environment is thus a fundamental requirement of the NEPA process.

174.   NEPA requires that an EIS: (1) "include appropriate mitigation measures not already included in the proposed action or alternatives," 40 C.F.R. §1502.14(f); and (2) "include discussions of: . . . Means to mitigate adverse environmental impacts (if not already covered under 1502.14(f))." 40 C.F.R. §1502.16(h).  The Forest Service must evaluate any mitigation measures it adopts and relies upon in approving an agency action for their effectiveness.  The CEQ also has stated that: "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperation agencies. . ." *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18026, 18031 (March 23, 1981).

175.   In addition, under 40 C.F.R. §1505.2(c), the agency is required to: "State whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not.  A monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation."  According to the CEQ, "[a]ny such measures that are adopted must be explained and committed in the ROD."  *Forty Questions*, 46 Fed. Reg. at 18036.

*176.*   In preparing and issuing the FEIS, JFEIS, ROD and related review and approval documents for the Montanore Project, the Forest Service violated these NEPA requirements.

### Failure to Prepare Adequate Mitigation Plan for Public Review and Analyze Its Effectiveness

177.   Regarding the duty to fully review all mitigation measures for the Project's impacts and analyze and disclose the effectiveness of each mitigation measure, the USFS admitted that critical mitigation measures will likely not be successful.  Other mitigation measures relied upon to authorize the Mine will not even be submitted or reviewed if at all, until years in the future.

178.   One of the most fundamental NEPA violations regards the agencies' failure to have any credible plan to prevent the severe loss of flows (and associated elimination or loss of fisheries and fisheries habitat) caused by the dewatering of the Wilderness lakes and streams (and adjacent downstream waters) noted above.

179.   The JFEIS looked at potential mitigation measures to reduce those effects including grouting and bulkheads.  With respect to grouting, the USFS admits that: "the effectiveness of grouting over the long term (i.e., 100 years or more) is uncertain. Fracture grouting of storage facilities typically use a design life of 50 years, and the effectiveness of grouting may decrease beyond 50 years." JFEIS at M-336.

71

180.   "The agencies' evaluation of the constructed bulkheads … concluded that man-made concrete bulkheads would **unlikely** provide the necessary mitigation over the long-term."  JFEIS at 162 (emphasis added).  "There is limited information on functionality of hydraulic barriers once mining is completed, and there are no data on the design life of these structures." JFEIS at 612.

181.   "The effectiveness of grouting over the long term (i.e., 100 years or more) is uncertain. Limited information is available on the functionality of fracture grouting in mines once mining is completed, and there are no data on the design life of grout in an underground flooded environment. The uncertainty of constructed concrete bulkheads also would apply to fracture grouting." JFEIS at 612.

182.   In the March 2015 FEIS, for the first time, the USFS discussed a new mitigation measure to try to offset the dewatering effects of the Mine.  It proposes to use barrier pillars with constructed bulkheads in the underground tunnels, concluding "that leaving a pillar of unmined ore with characteristics similar to the constructed bulkheads simulated in the modeling would likely provide the necessary mitigation over the long-term, again assuming the hydrologic modeling was representative of underground conditions."  JFEIS at 162.

183.   The JFEIS states that:

> Leaving barrier pillars overcomes **some** of the limitations associated with constructed bulkheads, such as long-term effectiveness (Werner 2014). Although a constructed bulkhead would be made of concrete and grout and a

barrier pillar would be made of in-place unmined rock, they both would
function in a similar manner to reduce the hydraulic conductivity between
sections of the mine void. Consequently, the agencies considered the
modeling of the bulkheads to be an equivalent simulation of the agencies'
mitigation of leaving one or more barriers, if necessary, during the Operations
Phase and constructing bulkheads at the access openings at closure."

JFEIS at 613-14 (emphasis added).

184.   The USFS's analysis and conclusions fail to meet the requirements of NEPA
because there is no data to support the agency's conclusion that the barrier pillar
with constructed bulkhead will last longer or be more effective than the constructed
bulkheads.  Importantly, this mitigation measure still ultimately relies on the long-
term effectiveness of bulkheads.

185.   The USFS's reliance on the new "pillar" plan to accompany the original
"bulkhead" plan was not subject to proper public review under NEPA.  The pillar
proposal was only first proposed in the March 2015 FEIS, and was never subject to
EPA or public review in the Draft EIS.  This is especially problematic since the
USFS now admits that the bulkhead plan is inadequate.  The agency cannot rely on
such critical information and mitigation without subjecting it to public and EPA
review in a revised Draft EIS.  An agency must prepare a supplement to the Draft
EIS where, after issuance of the Draft EIS, "[t]he agency makes substantial changes
in the proposed action that are relevant to environmental concerns."  40 C.F.R.
§1502.9(c)(1).  A Supplemental Draft EIS must be circulated for public comment

and filed in the same manner as an original Draft EIS.  40 C.F.R. §1502.9(c)(4).  At

a minimum, the addition of pillars as the means to mitigate against the dewatering,

which the FEIS now relies upon to comply with the various laws protecting fisheries

and water, is a "substantial change … that [is] relevant to environmental concerns"

that the public deserves the opportunity to comment upon in a revised Draft EIS.

186.   Further, the "pillar" part of the bulkhead/pillar plan has not even been

submitted or planned yet.  The USFS and MMC only commit to begin considering

this plan until long after operations have started.  "By the fifth year of operations,

MMC would assess the need for barrier pillars to minimize post-mining changes in

East Fork Rock Creek and East Fork Bull River streamflow and water quality."

JFEIS at 614.

187.   The USFS cannot rely on a vague and unsupported plan to protect bull trout,

fisheries, Wilderness lakes and waters, and other critical environmental resources,

let alone a plan that has not been required (i.e., "MMC would assess the need" five

years into operations) or that has never been subject to public review.

188.   Even if the future pillar aspect of the bulkhead/pillar mitigation plan was valid

under NEPA (which it is not), the only document cited in the JFEIS discussion of

the long-term efficacy of the mitigation alternatives categorically states that

bulkheads are not proven to be effective in the long-term.  "The long-term

effectiveness of constructed low permeability bulkheads is not documented as there

74

are no available data on service life for time horizons commensurate with the Post-Closure modeling scenario."  JFEIS at 614.

189.   The JFEIS relies on a memorandum prepared by a USFS engineer in 2014. Memorandum from Peter Werner, Engineer, USFS, *Long-Term Effectiveness of Constructed Low Permeability Bulkheads Final EIS, Montanore Mine, Kootenai NF*. (January 6, 2014)("Werner 2014"). Yet relying on Werner fails to support and undercuts the FEIS' conclusions.  The proposed mitigation measures are undemonstrated and it is therefore uncertain whether they will be able to effectively reduce the effects of groundwater drawdown and its subsequent impacts.  The agency's decision to consider bulkhead modeling to be a reasonable equivalent simulation of the agencies' new mitigation proposal is unsupported. (See JFEIS at 613-14).  Whether alone or combined with barrier pillars, the use of bulkheads is flawed because their use is undemonstrated and unproven and their long-term efficacy is unknown.  Rather than demonstrate the efficacy of bulkheads in the rock wall, the FEIS actually undercuts the FEIS' conclusion that bulkheads are a demonstrated technology to control water.

190.   The timeframes for re-establishing groundwater recharge of the mine void and steady state conditions are estimated by the groundwater modeling at over 1,000 years.  JFEIS section 3.10.4.3.3, Post Closure Phase, JFEIS at 603-609). Werner states that:

The timeframes for re-establishing groundwater recharge of the mine void and steady state conditions are estimated by the groundwater modeling at over 1,000 years (See FEIS section 3.10.4.3.3, PostClosure Phase). Because the bulkheads would be installed within the mine and because access adits would be plugged well before any significant hydraulic head developed, there likely would be no practical means of monitoring or assessing whether the bulkheads would function as designed, or any options for taking corrective action if they proved to be ineffective post-closure.  The inability to monitor the success of a bulkhead, or to remediate a potentially ineffective bulkhead would render its near-and long-term functionality unknown as an effective and reliable groundwater control system.

Memo from Werner at 2.

191.   Despite dewatering impacts for over 1,000 years, Werner acknowledges that

the proposed bulkhead and grouting mitigation measures will likely not last even

100 years.

In addition to the importance of a bulkhead's initial construction success, is the integrity and longevity of the bulkhead and grout materials. The service life of concrete and grout is variable depending on the materials used in the concrete and grout mixes, construction specifications, and environmental conditions. As a result, there is no documented consensus on design life due to the multitude of variables affecting bulkhead longevity. A reasonable estimate is about 100 years. This timeframe coincides with the development of reinforced and special-mix concrete as a reliable building material. If 100 years is used for the bulkhead design life, then even before the bulkheads are subjected to the anticipated final hydraulic head, the concrete materials and grout would potentially begin to deteriorate and seepage through and around the bulkhead system could increase.

Memo from Werner at 2.

192.   Werner concludes that the mitigation reviewed in the ROD would fail:

Considering the timeframes over which a constructed bulkhead across the mine void would be required to maintain design performance, it is likely that

76

they would eventually fail to meet the design hydraulic conductivity of 1 x $10^{-9}$ cm/sec. This would increase hydraulic communication between either sides of the bulkhead. For this analysis a conservative approach to groundwater analysis would assume that the any bulkhead constructed across the entire mine void would fail over time.

Memo from Werner at 2.

193.   Thus, the JFEIS fails to provide any supporting data to show that the proposed barrier pillars and constructed bulkheads will last longer or be any more effective than the bulkheads or grouting proposed in the Draft DEIS.  The JFEIS asserts that by leaving a wall of rock in place and using smaller bulkheads, it decreases the probability of failure. To the contrary, Werner makes it clear that a safe assumption is to expect failure within 100 years.  *Id*.

194.   Regarding the efficacy of the rock wall pillars, the USFS's presumption of sufficiency is not demonstrated, particularly given the mining activities' potential to cause fracturing.  The JFEIS fails to provide any supporting data to show that the proposed barrier pillars and constructed bulkheads will last longer or be any more effective than the bulkheads or grouting proposed in the Draft EIS.  The JFEIS asserts that by leaving a wall of rock in place and using smaller bulkheads, it decreases the probability of failure.  In fact, Werner makes it clear that a safe assumption is to expect failure within 100 years.  Memo from Werner at 2.

195.   Similarly, there is no way to know if the pillars would be effective.  This makes the lack of any public review of the new pillar mitigation plan especially

problematic under NEPA.  As a result, the JFEIS fails to demonstrate that the

bulkhead/chamber design will actually work or prove durable; if a failure is detected

it is largely impossible to correct the problem.

196.   Additionally, as detailed above, there is no mitigation proposed at all to

negate the significant degradation to Poorman Creek from the tailings pumpback

system.  BA at 58 and 120 (showing 12% reduction in baseflow in Poorman Creek

from tailings pumpback system).  "The length of time seepage interception and

water treatment would be necessary is unknown and may be decades or more after

operations." JFEIS at M-343.

197.   Thus, the JFEIS fails to demonstrate that there are any mitigation measures

available to reduce the impacts of groundwater drawdown on the rivers, streams and

lakes in the affected area throughout mine operations, closure, post-closure, and

beyond.  The agency's decision to consider the modeling of the bulkheads to be an

equivalent simulation of the agencies' new mitigation proposal is unfounded.  The

lack of any public review opportunity of the new pillar aspect of the bulkhead/pillar

mitigation plan, let alone its effectiveness, is also a basic NEPA violation.  As a

result, the FEIS cannot rely on the proposed mitigation measure when determining

the effects of dewatering on the Wilderness, adjacent downstream high quality

waters, groundwater dependent ecosystems, overlying Outstanding Resource

Waters, and the effects to bull trout and other aquatic life that these waters support.

198.   Regarding these purported mitigation measures, as well as the other

mitigation measures relied upon by the USFS, the JFEIS fails to provide the detailed

analysis of the mitigation measures, including a detailed analysis of their

effectiveness, as required by NEPA. *See South Fork Band Council v. Dept. of*

*Interior*, 588 F.3d 718, 727 (9th Cir. 2009)(rejecting EIS for open pit mine for

failure to conduct adequate review of mitigation and mitigation effectiveness).

**Failure to Obtain Baseline Data and Deferral of Critical Environmental Analysis**

199.   Despite the ROD authorizing the construction of the tailings facility in

Poorman Gulch, the tailings facility design is only "conceptual."  The environmental

effects of the tailings facility have not been fully determined.  The structural stability

of the facility is unknown and basic baseline data to determine the feasibility of the

tailings facility has not yet been collected. This is critical information with broad

implications for the mine plan and for evaluating environmental impacts of the mine

alternatives.  As such, the JFEIS and ROD violate NEPA and the USFS's

substantive environmental protection mandates noted herein.

200.   Although MMC submitted a detailed engineering design and 585-page site

investigation analysis for the Little Cherry Creek tailings impoundment (Alternative

2), which was evaluated in the FEIS analysis, similar information and analysis was

never conducted for the Poorman tailings facility (the chosen site in the ROD).

According to the March 2015 FEIS, "the design developed for project facilities in Alternatives 3 and 4, such as the Poorman tailings impoundment site, is conceptual and is based on *limited* geotechnical investigations." FEIS at 132 (emphasis added).

201.   After Plaintiffs highlighted this flaw in the FEIS (in their administrative Objections), the agency changed this wording in the JFEIS, and now describes the lack of information as "based on *available* geotechnical investigations." JFEIS at 134 (emphasis added).  Despite the implication in the change, no additional analysis or geotechnical investigation was performed by the agency in preparing the JFEIS. Thus, no detailed site analysis was completed to confirm whether the Poorman Tailings Impoundment site is geotechnically suitable and supported by sound engineering design.

202.   The JFEIS states that, "the Poorman Tailings Impoundment Site would not provide sufficient capacity for 120 million tons of tailings without a substantial increase in the starter dam crest elevation if tailings were deposited at a density proposed in Alternative 2."  JFEIS at 153.

203.   The JFEIS acknowledges that there is insufficient geotechnical data to demonstrate that the Poorman alternative will be stable over the short and long-term, and that additional site information is needed to complete the final design for the chosen Poorman Tailings Impoundment Site.  The agency admits that it does not

even have a *preliminary* design for the tailings facility (and for the site of the large

processing mill near Libby Creek, the Libby Plant Site):

> Additional site information is needed to complete a final design. The design
> process would include a preliminary design phase and a final design phase.
> Site information would be collected during geotechnical field studies during
> final design. MMC would submit a tailings impoundment site geotechnical
> field study plan to the agencies for their approval before commencing
> activities. Once approved, the Site Exploration Plan would become a
> component of the amended Plan of Operations. A preliminary site program
> would be completed to confirm the geotechnical suitability of the Poorman
> Tailings Impoundment Site. A similar process would be used for the
> Libby Plant Site. The field studies would include a site reconnaissance and a
> drilling and sampling program to evaluate:
> • Site geology and foundation conditions
> • Groundwater conditions and water quality
> • Borrow material availability
> • Geotechnical characteristics of foundation and borrow materials

JFEIS at 134.

204.   The agency further acknowledges that critical Project information, especially

regarding the tailings facility, will only be obtained after the ROD is approved and

public review under NEPA completed:  "The design process will include a

preliminary design phase and a final design phase. Site information will be collected

during field exploration programs during the design phase.  MMC will submit a

tailings impoundment site exploration plan to the agencies for their approval before

commencing activities."  ROD Attachment 1, at 9.

205.   The USFS provided no credible rationale or explanation as to why the

"geotechnical investigations," "additional testing of simulated tailings materials,"

"field exploration programs," "tailings site exploration plan," and other baseline data gathering associated with the Poorman tailings waste site could not have occurred prior to issuance of the FEIS and JFEIS during the public NEPA process.

206.   Additional information on baseline conditions and Project impacts related to the Poorman tailings site is also needed, yet will only be obtained after the Project has begun:

> Site data to be collected would include an assessment of artesian pressures and their potential influence on impoundment stability, an assessment of a subsurface bedrock ridge between Little Cherry Creek and the effect it may have on pumpback well performance, aquifer pumping tests to refine the impoundment groundwater model and update the pumpback well design, and site geology to identify conditions such as preferential pathways that may influence the seepage collection system, the pumpback well system, or impoundment stability.  Based on these data, a preliminary design of the facility would be completed to confirm the site layout and design/operation feasibility.  Field studies would be completed to collect data and material samples necessary for the final design.

JFEIS at 134-35.

207.    The ROD also notes that even the "conceptual design" of the tailings facility is based on whether DEQ approves a "mixing zone" underneath the facility to allow the seepage from the tailings to violate state groundwater standards.  "Should DEQ not grant a mixing zone, MMC will develop a revised approach to tailings disposal that does not require a mixing zone." ROD at 38.  DEQ has not granted that mixing zone.

208.   This is legally deficient under NEPA.  It is impossible to evaluate the potential impacts of the Poorman tailings impoundment facility (the preferred alternative), and compare to other alternatives, when the plans considered by the FEIS are merely "conceptual."  A ROD for a mine alternative cannot be approved without sufficient information to determine whether that alternative is feasible, stable, and what the potential effects will be to surface water, groundwater, and other resources.

209.   "NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. §1500.1(b).  *See also* 40 C.F.R. §1502.22 (requiring collection of necessary data that is "essential to a reasoned choice among alternatives" unless "the overall costs of obtaining it are … exorbitant").  The USFS cannot credibly argue that the costs of obtaining the missing information are "exorbitant" because MMC has pledged to obtain it later, albeit long after the JFEIS and ROD were issued.

210.   NEPA requires the Forest Service to "describe the environment of the areas to be affected or created by the alternatives under consideration."  40 C.F.R. § 1502.15. "[W]ithout [baseline] data, an agency cannot carefully consider information about significant environment impacts.  Thus, the agency fail[s] to consider an important aspect of the problem, resulting in an arbitrary and capricious decision."  *Northern Plains v. Surf. Transp. Brd.*, 668 F.3d 1067, 1085 (9th Cir. 2011).

211.   There is no credible reason why this information, acknowledged by the agency to be needed for review and approval of the Project, could not have been obtained during the NEPA process and prior to approval of the ROD.  Indeed, it is accepted practice of the USFS to conduct detailed geotechnical and related analysis of potential tailings sites prior to the completion of a Final EIS for large mining projects such as Montanore.

212.   For example, for the Resolution Copper Project in Arizona, the agency recently issued an Environmental Assessment to determine the baseline characteristics of the tailings and related facilities.  *See* Tonto National Forest, *Preliminary Environmental Assessment, Resolution Copper Mining Baseline Hydrological and Geotechnical Data Gathering Activities Plan of Operations, March 2015.*[4]  *See also* Tonto NF, *Preliminary EA Scoping Comment and Response Report, March 2015*, where the USFS stresses that such baseline analysis is required before the agency can consider the main mine.

213.   The GMUG National Forest in Colorado is undertaking the same baseline analysis to determine the geotechnical and related aspects of tailings and mine facilities prior to reviewing the main mine:

---

[4] The Final Environmental Assessment was issued in January 2016, accessed at http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/98906_FSPLT3_2640925.pdf

U.S. Energy Corp (U.S. Energy) has prepared this updated Baseline Data
Collection and Groundwater Investigations Plan (Plan) dated 8-8-14 for the
United States Forest Service (USFS), for review in conformance with 36 CFR
Part 228 Subpart A (Locatable Minerals) and in support of a Plan of
Operations (POO) for surface-disturbing activities associated with
investigation-well construction and geotechnical borings. This Plan has been
developed to facilitate National Environmental Policy Act (NEPA) review of
the proposed Mt. Emmons Project, and is designed for use during 10 years of
data gathering.

U.S. Energy Corp., *Baseline Data Collection and Groundwater Investigations Plan*

*of Operations* at 2. *See also* Letter from Gunnison Ranger District to U.S. Energy

Corp. regarding need for USFS environmental review of proposed baseline analysis

for tailings and related areas for a large molybdenum mine, dated Sept. 11, 2014;

Emails to/from USFS, Mortenson and Wehrl, *Mt. Emmons project* (July 31,

2014)(noting that "Baseline data is … needed to do any NEPA analysis on the Mine

Plan of Operations").

214.   As noted by the Tonto National Forest, analysis of the geotechnical and other

aspects of the tailings facility is part of the "logical sequence" of mine review by the

USFS.  The gathering of such information is the "logical sequence of activities."

Tonto NF, *Preliminary EA Scoping Comment and Response Report, March 2015* at

Table 2-6.  The Forest relied upon the Forest Service Handbook 2809.15, Minerals

and Geology, Chapter 10.  "Resolution's Baseline Plan would provide baseline

information on hydrologic, geochemical, and geotechnical data.  … This

information would be used to inform later, separate actions and proposals related to Resolution's proposed General Plan of Operations." Tonto NF, *Preliminary EA Scoping Comment and Response Report, March 2015* at Table 2-6.

215.   All of these documents were submitted to the USFS as part of Plaintiffs' administrative Objection to the FEIS and Draft ROD in May of 2015, yet were never mentioned by the Regional Office in its response.  *See* July 22, 2015 Response to Objections.

216.   This is the same type of "baseline information on hydrologic, geochemical, and geotechnical data" that the Montanore JFEIS admits is lacking, and is only proposed to be obtained in the future as noted herein.

217.   Under its Part 228 mining regulations, the Forest Service must reject an unreasonable Plan of Operations (PoO), especially one without the required baseline and other aspects of the tailings and other facilities noted herein.  The "reasonableness" of the mining plan and the duty of the agency to protect resources are expressly linked together.  According to the agency's mining regulations, upon receipt of a plan of operations: "[t]he authorized officer shall … analyze the proposal, considering the economics of the operation along with the other factors in determining the reasonableness of the requirements for surface resource protection." 36 C.F.R. § 228.5.  It is impossible for the agency to adequately process the PoO,

and to adequately involve the public in that review, when critical plans and information are missing.

218.   The current mining plan (and JFEIS and ROD) are not "reasonable" because they are clearly incomplete.  MMC has not submitted a detailed mining plan of operation as required by 36 C.F.R. § 228.4(c)(3) & (d), § 228.8, and § 228.12 and as defined by §228.3(a).  "Operations" is defined to include "[a]ll functions, work, and activities in connection with prospecting, exploration, development, mining or processing of mineral resources." §228.3 (a).  A mining plan of "operations" is thus incomplete and unreasonable when it does not contain all necessary plans for "operations" as defined by the agency itself.  The fact that the USFS has no idea how the long the Project will last also violates these requirements.  *See* 36 C.F.R. 228.4(c)(1)("The Plan of operations shall include: … the period during which the proposed activity will take place.").  Yet, here "The length of time seepage interception and water treatment would be necessary is unknown and may be decades or more after operations." JFEIS at M-343.

219.   The agency has the authority, and indeed the obligation, to delay or deny consideration of the mining plan until it has received all relevant information about necessary aspects of the mine plan.

> The [agency] may require information beyond that submitted with an
> initial MPO [Mining Plan of Operations].  "[I]nsofar as [the agency] has
> determined that it lacks adequate information on *any* relevant aspect of a

87

plan of operations, [the agency] not only has the authority to require the filing of supplemental information, *it has the obligation to do so.*"  *Great Basin Mine Watch*, 146 I.B.L.A. 248, 256 (1998).

*Center for Biological Diversity v. U.S. Dept. of Interior*, 623 F.3d 633, 644 (9th Cir. 2010) (emphasis added).

220.   Pledges from the USFS and MMC that this information will come in the future are clearly inadequate under NEPA, the Organic Act, and Part 228 regulations.  "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. 40 C.F.R. §1500.1(b).  "General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided."  *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011).

221.   The federal court reviewing the USFS's approval of the nearby Rock Creek Mine specifically held that the agency cannot rely on future submittals of important information to cure the lack of information in the FEIS.  In *Rock Creek Alliance v. U.S. Forest Service*, 703 F.Supp.2d 1152, 1180 (D. Mont. 2010), the court held that the FEIS violated NEPA in part, "because additional surveys are needed to better understand bull trout populations and the amount and condition of spawning habitat."  The court also held that: "The Forest Service may not address a deficiency in an environmental impact statement through the issuance of a supplemental information report."  *Id*.

222.   The U.S. Environmental Protection Agency ("EPA") was strongly critical of

the lack of important information regarding the Poorman site and proposed tailings

facility. JFEIS at M-84 to 85.  In response, the JFEIS acknowledged the lack of

information but insisted "that the final design process for the Poorman

Impoundment Site would include geotechnical field studies during final design to

characterize the Poorman site with respect to possible preferential pathways and the

specific nature of the bedrock between the Poorman and Little Cherry Creek

watersheds."  JFEIS at M-85.

223.   The EPA specifically criticized the Forest Service's decision to defer the

gathering and analyzing of this critical information until after the NEPA EIS process

was completed.  In a May 29, 2015 letter to the USFS commenting upon the March

2015 FEIS and Draft ROD, EPA urged that: "this site evaluation work be completed

**prior to the completion of the Final EIS** because it will inform the design of the

TSF [Tailings Storage Facility] and the associated environmental impacts of the

facility." May 29, 2015 letter from EPA Region 8 to Forest Supervisor Savage,

Detailed Comments at 2 (emphasis added).

224.   In response, the USFS repeated its position that its post-EIS and post-ROD

"technical review" of the tailings facility will consider these issues.  The USFS

acknowledges that this investigation and analysis is needed to determine whether the

Poorman site is even feasible.  "If design modifications to the current proposed

design cannot satisfactorily mitigate geotechnical, wetland or groundwater impacts thereby rendering the Poorman site unsuitable as a tailings disposal site, an alternative site will need to be identified and additional NEPA conducted as necessary."  September 8, 2015 letter from Supervisor Savage to EPA Region 8, Detailed Comments response at 3.

225.   Thus, the USFS admits that it will not know if the Poorman site is "suitable as a tailings disposal site" until after all of the "field exploration programs" and "tailings site exploration" are completed.

226.   Regarding the adverse impact from constructing and operating the tailings facility in the Poorman site to the Little Cherry Creek wetlands and area hydrology caused by the pumpback wells in the area, EPA also raised serious concerns.  JFEIS at M-87.  In response, again, the USFS relied on future baseline analysis as the means to ascertain critical conditions at the site:

> A **possible** subsurface bedrock ridge and hydrologic divide **may occur** south of Little Cherry Creek. This bedrock ridge **may create** a hydrologic divide between the impoundment sites and wetlands on the other side of the bedrock ridge.  **If** a subsurface bedrock ridge and hydrologic divide at this location were confirmed, the pumpback wells would not affect the wetlands between the bedrock ridge and Little Cherry Creek. **Additional subsurface data would be collected during the final design process of the Poorman Impoundment to assess the bedrock ridge and the 3D model would be rerun to evaluate the site conditions with the new data.  Any areas within the modeled drawdown area not surveyed for wetlands would be surveyed.**

90

JFEIS at M-87 (emphasis added).  The JFEIS relies on this "possible subsurface bedrock ridge" as the rationale for concluding that the pumpback wells would not affect the protected wetlands near Little Cherry Creek.  JFEIS at M-78.

227.   EPA further noted that:  "The SDEIS does not disclose the potential indirect impacts of this drawdown to 14.7 acres of CWA jurisdictional wetlands and 0.31 acres of non-jurisdictional wetlands in the Little Cherry Creek area, north of the Poorman Tailings Impoundment."  JFEIS at M-78.  EPA also raised significant concerns about the proposed on-site mitigation to the loss of wetlands via the USFS's proposed "'South Little Cherry Creek' site and the 2-acre 'Gravel Pit' site, [which] are located within the area of predicted groundwater drawdown." JFEIS at M-78.

228.   In response, the USFS acknowledged that the mitigation plan for the loss of wetlands depends on "an apparent subsurface bedrock ridge that separates groundwater flow between the watershed of Little Cherry Creek from those of drainages 5 and 10 of the Poorman Impoundment Site."  JFEIS at M-78.  Yet the actual existence of this "apparent" geologic feature has yet to be verified – and will only be done long after the FEIS and ROD are approved.  JFEIS at M-78 (noting that the analysis would be completed only "after MMC collects additional data in the Poorman Impoundment Site").  The USFS also admits that it does not have accurate knowledge of the critical bedrock conditions below the authorized Poorman

tailings site, and will only obtain such information in the future: "Depth to bedrock is not well defined with the Poorman site." JFEIS at 579.

229.   Thus, the failure to obtain the necessary baseline information also violates the USFS's duty to fully analyze the effectiveness of all mitigation measures, as the JFEIS admits that it has no information as to whether the "possible subsurface bedrock ridge" between Little Cherry Creek and Poorman Creek even exists – the existence of which is critical to the implementation and success of the mitigation for the loss of wetlands and waters resulting from the tailings seepage collection and pumpback system. JFEIS at M-87.

230.   Similar to the lack of adequate information on the Poorman tailings site itself, the JFEIS acknowledges the agency lacks critical information on the tailings themselves that will now be "thickened" before placement in the Poorman facility, admitting that it is "uncertain" whether the Poorman site can handle the anticipated 120 million tons of tailings.

> The Poorman Tailings Impoundment Site would not provide sufficient capacity for 120 million tons of tailings without a substantial increase in the starter dam crest elevation if tailings were deposited at a density proposed in Alternative 2. The tailings thickener requirements to achieve higher tailings slurry density (and hence higher average in-place tailings density) are uncertain without additional testing of simulated tailings materials. Such testing would be completed during the Evaluation Phase.

JFEIS at 153.  Similar to the "geotechnical investigations" for the Poorman site that will be conducted during the Evaluation Phase, the "additional testing of simulated tailings materials" will be conducted during the post-ROD/JFEIS Evaluation Phase.

231.   The USFS provides no credible rationale why the needed "additional testing of simulated tailings materials" could not have been done during the NEPA process for the FEIS, JFEIS, and ROD.

232.   In addition to the admitted lack of baseline data or analysis for the authorized Poorman tailings site, the FEIS and JFEIS acknowledge that they lack important baseline information on water conditions (such as flows, quality, etc.) and related Groundwater Dependent Ecosystems (GDEs) for waters that will be significantly affected by the Mine's dewatering.

233.   Despite the agency's approval of groundwater dewatering that is predicted to lower the groundwater table by 100-1000 feet throughout a large portion of the Cabinet Mountains Wilderness and cause severe reductions in streamflow in wilderness rivers and streams, the JFEIS does not provide adequate baseline data to characterize the groundwater dependent ecosystems (GDEs) that would be adversely affected, including streams, springs, riparian areas, fens, wetlands and lakes.

234.   According to the Forest Service, groundwater dependent ecosystems are critical to biodiversity and threatened species: "GDEs encompass many of the regionally-and nationally-significant ecosystems on NFS lands and are critical

to management of many threatened and endangered species. In many watersheds, they support a disproportionately large percentage of the total biological diversity relative to their size." Carlson, *Groundwater Dependent Ecosystems on National Forest System Lands*, USDA Forest Service, at 9 (attached to Plaintiffs' administrative Objection).

235.   Yet, adequate baseline data to characterize these important ecosystems and associated stream conditions has not been provided in the JFEIS, but deferred until after the ROD and before the Evaluation phase in what the USFS now refers to as the "pre-evaluation" phase.  *See* USFS ROD, Attachment 3 at 40.

236.   The JFEIS and ROD state that the purpose of data collection and monitoring during this pre-evaluation phase are to "*identify and characterize* groundwater dependent ecosystems (GDEs) in the upper Libby Creek, upper East Fork Rock Creek, and East Fork Bull River drainages; *Characterize* streamflow and water quality in upper East Fork Rock Creek and East Fork Bull River, and *Characterize* water levels, water supply, and water quality of Rock Lake." ROD Attachment 3 at 40 (emphasis added).

237.   According to the ROD, streams, springs and wetland and riparian vegetation would be assessed for their connection to a regional groundwater system based on flow measurements, water chemistry, and the associated hydrogeology. ROD Attachment 3 at 51.

238.   Equally problematic is the agency's decision to only require the collection of

one year of data during the pre-evaluation phase.

> MMC would submit to the agencies for approval a GDE Monitoring Plan for
> important GDEs found during the inventory. The plan would be incorporated
> into an overall Water Resources Monitoring Plan. The plan's objective is to
> effectively detect stress to flora and fauna from effects on surface water or
> groundwater due to mine dewatering so that mitigation could be implemented
> to minimize such stress. **The plan would be submitted to the agencies for
> approval after the GDE inventory was completed and early enough for at
> least 1 year of data to be collected before additional dewatering and
> extension of the Libby Adit started.** The plan would include piezometers in
> critical locations. The plan would include a monitoring schedule, potential
> mitigation measures, and identification of possible mitigation implementation
> triggers if stress to flora and fauna is detected and determined to be a result of
> mine dewatering. The results of the initial inventory, subsequent inventories,
> and monitoring would be reported in annual reports to the agencies.

ROD Attachment 3 at 51 (emphasis added).

239.   Yet the USFS admits to the necessity for **multi-year** baseline data collection

to provide sufficient characterization of the existing environment in order to detect

changes in that environment that occur as a result of dewatering.

> The agencies would require that MMC collect flow data from stream reaches
> predicted to be affected by mine dewatering.  The monitoring would be
> initiated before any additional dewatering of the Libby adit for the areas east
> of the Cabinet Mountains divide and before implementation of the Evaluation
> Phase for areas west of the divide.  This monitoring requirement would be
> effective in obtaining year to year flow data, but because of natural variability
> it would be less effective in identifying impacts on stream baseflow in any
> one year.  *Effectiveness would increase as data from multiple years were
> evaluated to establish long-term trends in baseflow*.

JFEIS at 612 (emphasis added).

240.   The EPA further emphasizes the insufficiency of data to characterize these

systems, and the inability of the conceptual monitoring plan to adequately detect

impacts:

> *Conceptual Monitoring Plan ([ROD] Attachment 3).* The future
> monitoring planned for the Pre-evaluation and Evaluation Phases and
> throughout the project does not appear able to successfully detect, or
> respond to, effects. Numerous springs, streams, and lakes will be
> monitored over a one year period to establish background conditions,
> seasonal variability and connection to the regional groundwater system
> (Attachment 3). **While determining the seasonality of surface and
> groundwater systems is important, collection of seasonal data over
> a one year period will not provide an adequate baseline dataset.
> Determining interannual variability of the surface and
> groundwater conditions will be critical to understanding the
> hydrologic conceptual model and determining baseline conditions.**
> In general, MMC should collect a minimum of three to four years of
> data that encompass years that are above, near and below average
> precipitation and snowpack. It is worth noting that the non-intrusive,
> low disturbance nature of surface water monitoring is feasible even
> given wilderness constraints and could thus be initiated this season.

May 29, 2015 EPA letter to USFS on FEIS and Draft ROD at 4 (bold

emphasis added).

241.   EPA continued:

> The Conceptual Monitoring Plan ([ROD] Attachment 3) broadly discusses
> action levels. It does not present a clear threshold or decision point for the
> decision-maker or provide any information on the type of action that would be
> taken if a threshold is reached. In some instances where action levels are
> generally described, such as for surface water quantity and quality, they
> appear to rely upon possibly unrealistic thresholds (e.g. a statistically
> significant simple linear relationship). For example, the absence of data to

96

characterize the nature of the relationship or the comparability of the affected sites and their benchmark sites, lowers expectations that the monitoring data will demonstrate the specified relationship, limiting its usefulness as a meaningful action threshold. It is also important, where feasible, to document what action will be taken to reduce or mitigate effects in order to demonstrate that the project will not cause or contribute to significant degradation, 40 CFR § 230.10(c), or exceedances of water quality standards, 40 CFR § 230.1 O(b), and will meet the ESA mitigation objectives. This type of decision would ·benefit from public and agency input. For example, neither the ROD nor the Conceptual Monitoring Plan identify mitigation options or actions for impacts determined as a result of the groundwater dependent ecosystem inventory and/or revised groundwater modeling.

May 29, 2015 EPA letter to USFS on FEIS and Draft ROD at 4.

242.   Overall, the EPA highlighted the problems in deferring such baseline analysis. "Based upon projected flow changes and groundwater drawdown, seasonal dry-up of bull trout spawning habitat is likely and groundwater dependent ecosystems will be lost, including some within the CMW. The Final EIS does not fully assess and quantify these impacts to aquatic life nor demonstrate that those impacts can be offset through mitigation." May 29, 2015, EPA letter to USFS on FEIS and Draft ROD at 2.

243.   Although the ROD refers to the information that will be gathered during the pre-Evaluation and Evaluation Phases as "monitoring" data, as EPA notes, it is actually baseline data that is required to be gathered prior to completion of the FEIS and JFEIS in order to adequately analyze the Project, its impacts, mitigation, and alternatives under NEPA.

## CLAIMS FOR RELIEF

### Claim 1: Violation of the Forest Service Organic Act and Its Implementing Regulations

244.   Plaintiffs hereby re-allege and incorporate all preceding paragraphs of this Complaint herein by reference.

245.   The Forest Service's actions and decisions issuing the Montanore Project ROD, including its reliance upon the inadequate FEIS and JFEIS, are arbitrary, capricious, an abuse of discretion, otherwise contrary to the Organic Act and its implementing regulations (including USFS Mining Regulations at 36 C.F.R. Part 228), not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA.  5 U.S.C. §§ 701-706.

### Claim 2: Violation of the National Forest Management Act and Its Implementing Regulations

246.   Plaintiffs hereby re-allege and incorporate all preceding paragraphs of this Complaint herein by reference.

247.   The Forest Service's actions and decisions issuing the Montanore Project ROD, including its reliance upon the inadequate FEIS and JFEIS, are arbitrary, capricious, an abuse of discretion, otherwise contrary to the NFMA and its implementing regulations, not in accordance with the law, and without observance

of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA.  5 U.S.C. §§ 701-706.

## Claim 3: Violation of the National Environmental Policy Act and Its Implementing Regulations

248.   Plaintiffs hereby re-allege and incorporate all preceding paragraphs of this Complaint herein by reference.

249.   The Forest Service's actions and decisions in the preparation, issuance, and reliance upon the inadequate FEIS, JFEIS, and ROD, including the failure to comply with the public and agency review requirements under NEPA, are arbitrary, capricious, an abuse of discretion, otherwise contrary to the NEPA and its implementing regulations, not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA.  5 U.S.C. §§ 701-706.

## REQUEST FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully request that this court:

 A. Declare that the Forest Service has violated the Organic Act, NFMA, NEPA, the APA, and the implementing regulations and policies of these laws;

 B. Set aside and vacate the ROD, FEIS, and JFEIS;

 C. Enjoin the Forest Service from allowing, authorizing or approving mining or mining related operations in reliance on the ROD and JFEIS until

the Forest Service has complied with the Organic Act, NFMA, NEPA, the

APA, and their implementing regulations;

D.       Award Plaintiffs their reasonable fees, costs, expenses, and

disbursements, including attorneys' fees under the Equal Access to Justice

Act, 28 U.S.C. § 2412, and any other applicable federal law; and

E.       Grant such additional relief as this court deems equitable, just, and

proper.

Respectfully submitted this 1st day of April, 2016.


*/s/ Kristine Akland*
Kristine Akland, Montana Bar # 13787
317 E. Spruce St.
Missoula, MT 59802
(406) 544-9863
kristine@matriumlawgroup.com

Roger Flynn, (Colo. Bar # 21078) *Pro Hac Vice Application To Be Filed*
Jeffrey C. Parsons (Colo. Bar. # 30210), *Pro Hac Vice Application To Be Filed*
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
Fax (303) 823-5732
wmap@igc.org

*Counsel for Plaintiffs*