DAVID K.W. WILSON, JR.
MORRISON, SHERWOOD, WILSON & DEOLA PLLP
401 North Last Chance Gulch
P.O. Box 557
Helena, MT  59624-0557
406-442-3261 Phone
406-443-7294 Fax
kwilson@mswdlaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SAVE OUR CABINETS, EARTHWORKS, and CLARK FORK COALITION<br><br>Plaintiffs,<br>vs.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, U.S. FOREST SERVICE, and CHRISTOPHER S. SAVAGE,<br><br>Defendants.<br>_____<br>LIBBY PLACER MINING COMPANY,<br><br>Plaintiff,<br>vs.<br><br>UNITED STATES FOREST SERVICE; U.S. DEPARTMENT OF AGRICULTURE, and CHRISTOPHER SAVAGE, in his official capacity as Forest Supervisor of the Kootenai National Forest.<br><br>Defendants. | Cause No. CV 16-53-M-DWM<br><br><br><br><br>**BRIEF IN SUPPORT OF PLAINTIFF LIBBY PLACER MINING COMPANYS' MOTION FOR SUMMARY JUDGMENT** |

TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................ii, iii

I. INTRODUCTION ............................................................................ 1

II. FACTS ............................................................................................ 2

III. STANDARD OF REVIEW ............................................................ 3

    A. Standard of Administrative Procedures Act Review ................................. 3

    B. Summary Judgment Standard of Review ................................................. 3

IV. ARGUMENT ................................................................................. 4

    A. The Forest Service Violated the National Environmental Policy Act ..... 4

        1. *NEPA Statutory Framework*.................................................................. 4

        2. *The Forest Service Arbitrarily and Capriciously*
           *Mis-Applied Evaluation Criteria in Choosing the*
           *Poorman Impoundment Alternative*.............................................................6

        3. *The Forest Service Failed to Address Mitigation Measures*
           *Related to Impacts From the Poorman Impoundment Site,*
           *in Particular in the Absence of Mitigation to the*
           *De-watering of Poorman Creek*.............................................................14

        4. *The Forest Service Unlawfully Postponed Critical Studies*
           *and Evaluation of the Poorman Site*.......................................................18

    B. The Forest Service Violated its Organic Act...........................................*25*

V. CONCLUSION............................................................................... 28

CERTIFICATE OF COMPLIANCE................................................................ 29

# TABLE OF AUTHORITIES

## CASES

*Blue Mountains Biodiversity Project v. Blackwood*,

    161 F.3d 1208, (9th Cir. 1998) ............................................................ 3, 4, 12

*Celotex Corp. v. Catrett*,

    477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ..................................... 4

*Friends of the Clearwater v. McAllister*,

    214 F.Supp.2d 1083, (D. Mont. 2002) ............................................................. 25

*Idaho Sporting Congress v. Thomas*, 137 F.3d 1146 (9th Cir. 1998) ...................... 4

*Lands Council v. McNair*, 537 F.3d 981, (9th Cir. 2008) ...................................... 12

*Lands Council v. Powell,* 395 F.3d 1019,  (9th Cir. 2005) ..................................... 11

*League of Wilderness Defenders-Blue Mts. Diversity Project v. Allen*,

    615 F.3d 1122, ............................................................................... 12, 13

*Northern Plains v. Surf. Transp. Brd.,* 668 F.3d 1067, (9th Cir. 2011) ................... 5

*Occidental Engineering Co. v. INS,* 753 F.2d 766, 770 (9th Cir. 1985) ................. 4

*Oregon Natural Desert Ass'n v. Jewell,*

    823 F3d 1258 (9th Cir. 2016) ........................................................................ 12, 13

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, (1989) ..................... 4

*Rock Creek Alliance v. United States Forest Service,* 703 F.Supp. 2d

    1152, (D. Mont. 2010) ........................................................... 4, 24, 25, 26

*South Fork Band Council v. Dept. of Interior*,

    588 F.3d 718, (9th Cir. 2009) ......................................................................... 17

*Vermont Yankee Power Corp. v. NRDC*, 435 U.S. 519, (1978) ................................. 4

*Western Watersheds Project v. Kraayenbrink,*

    632 F 3d 472, (9th Cir. 2011) ......................................................................... 13

## STATUTES

5 U.S.C. § 706(2) ..................................................................................... 11

16 U.S.C. §§ 478, 551 ................................................................. 2

33 U.S.C. § 1344 ....................................................................... 7

33 U.S.C. § 1344(b)(1) ............................................................... 7

42 U.S.C. §§ 4321, et seq ........................................................... 2

**RULES**

A.R.M. 17.30.715(1)(a) ............................................................ 16

Fed. R. Civ. P. 56(c) ............................................................... 4

**REGULATIONS**

33 C.F.R. §§ 320.4(b)(4) ........................................................... 7

33 C.F.R. §§325.2(a)(6) ............................................................ 7

36 C.F.R. § 228.8 ............................................................... 26, 27

40 C.F.R. § 230.1(c) ................................................................ 7

40 C.F.R § 1502.1 ................................................................... 5

40 C.F.R. §1502.14(f) ............................................................... 5

40 C.F.R. §1502.15 .................................................................. 5

40 C.F.R. §1502.16(h) ............................................................... 5

40 C.F.R. § 1502.22(a) ............................................................. 24

40 C.F.R § 1502.24 .................................................................. 5

## I.    INTRODUCTION

Plaintiff Libby Placer Mining Company (LPMC) files this Brief in support of its Motion for Summary Judgment.   The motion is also accompanied by a Statement of Undisputed Facts (SUF), and a standing affidavit of LPMC President John Cleveland.

In this action, LPMC challenges the Kootenai National Forest's approval of the Montanore Mine Project through its Record of Decision (ROD), AR 0010517. The decision, issued February 12, 2016, was supported by a Joint Final Environmental Impact Statement (JFEIS) issued the same day.   (AR 0007757-0010515).

The proposed Montanore Mine, a large copper and silver underground mine and associated facilities, will significantly impact a remote valley on the East side of the Cabinet Mountains, bringing large-scale industrial activity and impacts to Plaintiff's property.   LPMC's property lies less than 300-feet east of the Poorman Tailings Impoundment site, the site the Forest Service chose in the ROD for the disposal of mine tailings.   As the Statement of Undisputed Facts and this Brief show, adverse impacts to LPMC's property from the mine will include permanent changes to the landscape immediately west of the property; impacts to groundwater as it flows below LPMC's property; dewatering of Poorman Creek and Libby Creek as they run through LPMC's property; noise and dust.

1

LPMC alleges that the Forest Service violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq,* and the Forest Service "Organic Act", 16 U.S.C. §§ 478, 551.

In this Brief, LPMC will argue that the Forest Service violated NEPA by failing to take the requisite "hard look" at the environmental impacts of the mine, including failing to adequately analyze the direct, indirect and cumulative impacts, particularly from the Poorman tailings impoundment; failing to mitigate mine impacts to Forest resources and to LPMC property, in particular from the de-watering of Poorman Creek; and deferring critical analysis of impacts until the future.  LPMC will also argue that the project's failure to comply with Montana State water quality standards and to minimize environmental impacts constitutes a violation of the Organic Act.

Per the Court's July 19, 2016 request that the Plaintiffs "confer and coordinate", LPMC will, where appropriate, incorporate by reference argument made by the Save Our Cabinets Plaintiffs.

## II.    FACTS

Plaintiff has filed a Statement of Undisputed Facts and will reference those facts, and facts from Plaintiff Save Our Cabinets' Statement of Undisputed Facts, as needed in the Argument below.

## III.   STANDARD OF REVIEW

A.   <u>Standard of Administrative Procedures Act Review</u>

The Administrative Procedures Act requires a reviewing court to "hold unlawful and set aside agency action, findings or conclusions found to be  (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; …(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2).  As the Court said concerning a NEPA claim in *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998),

> (W)e must determine whether the Forest Service's decision was 'based on a consideration of the relevant factors' or whether its actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'. . . 5 U.S.C. 706 (2) (a) In short, we must ensure that the agency has taken a 'hard look' at the environmental consequences of its actions' *Citing Oregon Natural Resource Council v. Lowe,* 109 F.3[rd] 521, 526 (9th Cir. 1997).

Thus, in order for the Forest Service's actions to pass muster here, it must have taken a "hard look" at the environmental consequences of its decision to fully permit the Montanore Mine.  As the discussion below illustrates, the Forest Service has not done so.

B.   <u>Summary Judgment Standard of Review</u>

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.

R. Civ. P. 56(c); *see also, Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Summary judgment is particularly applicable to cases involving judicial review of final agency action. *Occidental Engineering Co. v. INS,* 753 F.2d 766, 770 (9th Cir. 1985) (citation omitted). *See also Rock Creek Alliance v. United States Forest Service,* 703 F.Supp. 2d 1152, 1163 (D. Mont. 2010)

## IV.    ARGUMENT

A. <u>The Forest Service Violated the National Environmental Policy Act</u>

*1.    NEPA Statutory Framework*

NEPA requires the federal agency to "consider every significant aspect of the environmental impact of a proposed action," *Vermont Yankee Power Corp. v. NRDC*, 435 U.S. 519, 553 (1978). NEPA's analysis and disclosure goals are two-fold: (1) to insure that the agency has carefully and fully contemplated the environmental effects of its action, and (2) "to insure that the public has sufficient information to challenge the agency."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). *See also Blue Mountain,* 161 F.3d at 1212. ("It [NEPA] guarantees that the relevant information will be made available to the larger public.") This review must be supported by detailed data and analysis; unsupported conclusions violate NEPA. *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998).

Pursuant to the Council of Environmental Quality (CEQ) NEPA regulations, agencies must insure the professional integrity, including scientific integrity of the discussions and analysis in environmental impact statements.  40 CFR 1502.24 (Methodology and Scientific Accuracy). 40 CFR § 1502.1 mandates that NEPA documents be supported by evidence that the agency has made the necessary environmental analysis.  Consequently, the Forest Service has a duty to disclose the underlying scientific data and rationale supporting the conclusions and assumptions in the JFEIS.

NEPA requires USFS to "describe the environment of the areas to be affected or created by the alternatives under consideration."  40 C.F.R. §1502.15. "[**W**]**ithout [baseline] data**, an agency cannot carefully consider information about significant environment impacts.  Thus, the agency fail[s] to consider an important aspect of the problem, resulting in an arbitrary and capricious decision." *Northern Plains v. Surf. Transp. Brd.*, 668 F.3d 1067, 1085 (9th Cir. 2011)(Emphasis added).

Further, NEPA requires that an EIS: (1) "include appropriate mitigation measures not already included in the proposed action or alternatives," 40 C.F.R. §1502.14(f); and (2) "include discussions of: … Means to mitigate adverse environmental impacts (if not already covered under 1502.14(f))." 40 C.F.R. §1502.16(h).

The Forest Service has failed to meet these requirements by inconsistently applying evaluation criteria in analyzing the chosen Poorman Tailings Impoundment alternative, inadequately addressing mitigation measures, and deferring determination of the suitability of, and review of many projected impacts from, the Poorman Tailings Impoundment alternative until after the JFEIS and ROD were completed.

2.      *The Forest Service Arbitrarily and Capriciously Mis-Applied Evaluation Criteria in Choosing the Poorman Impoundment Alternative*

The Forest Service evaluated a number of alternative sites for the tailings impoundment, but in the record of decision (ROD), the Forest Service chose Alternative 3, the Poorman Tailings Impoundment. (AR 0010528) LPMC is naturally concerned about this choice:  the Poorman site lies less than 300-feet to the west of LPMC's property (AR 0009509), and will have significant impacts to LPMC's property as proposed. (*See generally* LPMC's Statement of Undisputed Facts [SUF] 26 and 27. ***The LPMC property is the shaded "private land" straddling Libby Creek depicted on Figure S-2, AR 0007806.***) Additionally, as the SUF and this Brief will demonstrate, the Forest Service wholly failed to evaluate the Poorman Alternative in light of NEPA's strict requirements. Specifically, in Count One, Plaintiff LPMC asserts that the Forest Service failed to disclose underlying scientific data and mis-applied scientific criteria in choosing the Poorman Alternative.

The Agencies (the Forest Service and the MT DEQ) originally identified the Poorman tailings site as an impoundment option in 2006 and 2007 (AR 0158937; JFEIS, AR 0008118[1]).   The Agencies retained the Poorman site along with one other site (the Little Cherry Creek site) for detailed analysis in the draft EIS (*Id.*).

After a preliminary review of the Poorman and the Little Cherry Creek impoundment options, the U. S. Army Corps of Engineers apparently[2] requested that the Agencies re-evaluate the impoundment sites evaluated in prior alternatives analyses in accordance with Clean Water Act 404(b)(1) guidelines. (*Id.*) The Army Corps of Engineers oversees the Section 404 permit process and may issue either general permits or individual permits for a specific disposal site. 33 U.S.C. § 1344. "Section 404" permits must be issued in accordance with guidelines ("404(b)(1) Guidelines") promulgated by the Environmental Protection Agency ("EPA"), 33 U.S.C. § 1344(b)(1), which the Corps has incorporated into its own regulations. *See, e.g.,* 33 C.F.R. §§ 320.4(b)(4), 325.2(a)(6). The underlying intent behind the 404(b)(1) Guidelines is that dredged or fill material should not be discharged if it will result in an unacceptable adverse impact on the aquatic ecosystem. 40 C.F.R. § 230.1(c).

---

[1]  The 2011 analysis, prepared by ERO Resources Corp. on behalf of the agencies, was carried over into the JFEIS.

[2]  LPMC was unable to find a discrete, written, request in the AR, although the JFEIS seems to refer to one.

To address the Corps' comment on the previous analyses, the Agencies completed an alternatives analysis of **all** impoundment sites previously evaluated. The Little Cherry Creek site and the Poorman site developed by the Agencies were included in the analysis. (AR 0008118) The Agencies decided to use three successive levels of screening to evaluate tailings impoundment options. To "standardize disturbance areas" for the impoundment sites during the screening, a 2,000-foot buffer was applied to **each** impoundment footprint. (AR 0008119) The disturbance area is the impoundment footprint and the 2,000-foot buffer zone is intended to **surround** the disturbance area with an undisturbed area. (*See e.g.* the diagram at AR 0068019, showing clearly the 2,000-foot buffer around the Hoodoo and Crazyman sites.)

The Agencies' Poorman tailings impoundment option was included for the alternatives screening analysis. (AR 0008118) However, the Agencies did not apply the 2,000-foot buffer to the Poorman site. (JFEIS, AR 0008119, and AR 0010261, response to comment 342-9) The reason the Agencies gave for not applying the 2,000-foot buffer to the Poorman site is that the Agencies "had already established a disturbance area" around it. (AR 0008119) However, disturbance areas for *other* potential impoundment sites (e.g., Crazyman, Upper Hoodoo and Lower Hoodoo) had *also* already been established; yet the 2,000-foot

8

buffer *around the disturbance area* was applied to them. (*see* diagram AR 0068019; AR 0158947).

In summary, the facts as detailed in the 2011 ERO Final Tailings Disposal Alternatives Analysis and the JFEIS show that the screening criteria developed by the Agencies was not applied in a uniform manner. The 2,000-foot buffer that was used in evaluating all of the other potential tailings sites was not applied in the case of the Poorman or Little Cherry Creek sites. (AR, 0008119 and 0010261, and AR 0158937). The Forest Service failed to follow the standardized criteria that it established for tailing site evaluation in compliance with Section 404(b)(1) of the Clean Water Act.

The consequences of not uniformly applying the 2,000-foot buffer to the preferred alternative are clear, and the impacts, both to LPMC land and to forest resources that would have been avoided had the 2,000-foot buffer been uniformly applied to eliminate the Poorman alternative, are significant. (*See generally SUF* ¶¶ 21-28) As early as 2007, MMC, in a letter to the Forest Service, questioned "the viability of constructing a tailings impoundment near private lands." (June 18, 2007 letter from MMC to the Forest Service, AR 004271.

In 2008, the mining company's consultants projected that the Poorman site would negatively affect LPMC property in numerous ways, to the point of suggesting that the private landowner (LPMC) be compensated. (*See generally*

April 30, 2008 KMS report, AR 0041376-0041386).  The consultants also noted the design limitations, in terms of being able to deal with contingencies or mitigation, given the proximity to LPMC's private land, and to Libby Creek. (AR 0041382)

In a January 22, 2009 letter to the Corps of Engineers (AR 0011434-0011437), the Forest Service echoed MMC's consultant's concerns about the impact to LPMC's land, and the project limitations that arise because of it.  The proximity of the LPMC land "leaves little room for any surface disturbance that may result from future contingencies to manage changes in tailings characteristics, water quality issues, reclamation, or monitoring." (AR 0011436) *See also* March, 2009 Risk Assessment prepared by MMC's consultants, Klohn Crippen Berger, AR 0173698-AR 0173701). In particular, the report noted:

> (T)he risk assessment (for the Poorman site) is similar to Little Cherry Creek, however, additional risks are added due to the **very limited constraints with a private land owner located at the toe of the dam**. If changes are required to the dam layout, they will be constrained by the landowner and, in the worst case, an alternative new facility would be required. **The close proximity of the landowner also adds additional risks associated with noise, dust and groundwater influences, which could, in the worst case, delay construction, halt operations, or require an alternative new site.**

(AR 0173700, emphasis added)

In a December 21, 2011 letter, the Army Corps of Engineers was concerned that the tailings impoundment site and shortcomings lead to "short-term and long-

term adverse impacts on water quality" and "persistent and permanent" effects.

(AR 0016170-0016171) The Corps went on to note "(p)ollution can invade the

surface and groundwater through TSF (tailings storage facility) leaks and pipeline

breaks, **and drainage water _would_ eventually seep into the surface and**

**groundwater system** and impact the aquatic resources. . . . **Pollution _would_ occur**

**over time.**" (AR 0016171, emphasis added)

Finally, less than a month before the issuance of the JFEIS and ROD, the

EPA commented that it did not think the JFEIS contained sufficient information

for the Corps to give approval under the 404(b) guidelines.  (EPA January 19, 2016

letter to Forest Service and DEQ, Vol. 10, Doc. 237, AR 0013493s)

Yet, despite these many red flags, the Forest Service approved the Poorman

Tailings Impoundment alternative (JFEIS, AR 0007994), even though its design

was "conceptual only." (_Id._, AR 0008686)

In doing so, it violated NEPA. "An agency's action is arbitrary and

capricious if the agency fails to consider an important aspect of the problem, **if the**

**agency offers an explanation that is contrary to the evidence,** … or if the

agency's decision is contrary to the governing law. 5 U.S.C. § 706(2)." _Lands_

_Council v. Powell,_ 395 F.3d 1019, 1026 (9th Cir. 2005)(Emphasis added).

"[G]eneral statements about possible effects and some risk do not constitute a hard

look absent a justification regarding why more definitive information could not be

provided." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998) (internal quotation marks omitted).

> We will reverse a decision as arbitrary and capricious only if the agency relief on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, **or offered an explanation that runs counter to the evidence before the agency** or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*League of Wilderness Defenders-Blue Mts. Diversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010)(*citing Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)(en banc)(Emphasis added).

The recent 9th Circuit case of *Oregon Natural Desert Ass'n v. Jewell,* 823 F3d 1258 (9th Cir. 2016)(*ONDA)*, is analogous to the inconsistent application of evaluation criteria here. In *ONDA,* Plaintiffs challenged the Bureau of Land Management's (BLM's) assessment of winter sage grouse numbers in a proposed project area.  While the EIS acknowledge the potential conflict between wind development and winter sage grouse foraging habitats, the BLM did not conduct any surveys to determine if sage grouse were actually present and would be impacted. *Id.* 823 F3d at 1262.  Further, the record disclosed that some sage grouse were found in the area, but this was not disclosed in the EIS.  The Court found that the EIS's inaccurate data rendered its assumptions arbitrary and capricious.  *Id.,* 823 F3d at 1265.

More directly analogous to the Forest's actions here, the Court in *ONDA* concluded as follows:

> The errors in the BLM's analysis were not harmless. *See Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 880 (9th Cir. 2009). The inaccurate information and unsupported assumption **materially impeded informed decisionmaking and public participation**. *See id.*; *cf. Montana Snowmobile*, 790 F.3d at 926. Without appropriate data regarding sage grouse use of the Echanis site during the winter, whether direct or via a supportable extrapolation, it was not possible to begin to assess whether sage grouse would be impacted with regard to access to viable sagebrush habitat in the winter months.

> In addition**, had the BLM assumed the Echanis site provides winter sage grouse habitat, rather than that it does not, the site would be deemed "Category-1 Habitat"** pursuant to the *Sage Grouse Strategy* and *Mitigation Framework*. **Under that designation and the mitigation measures adopted in the FEIS and ROD, the Project would not go forward there**. FEIS 3.5-53; ROD 14-15; *see Sage Grouse Strategy* at 83, 86; *Mitigation Framework* at 1-2. In that respect, the BLM's analysis **materially affected the outcome of environmental review**. *See Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016).

*Id.*, 823 F3d at 1266, emphasis added. (*See also Western Watersheds Project v. Kraayenbrink,* 632 F 3d 472, 492 (9th Cir. 2011): "Here, the BLM failed to address concerns raised by its own experts, FWS, the EPA and state agencies.")

Here, as in *ONDA,* the "evidence before the agency" (*League of Wilderness Defenders, supra)* was that the application of the 2,000-foot buffer to the Poorman Tailings Impoundment *would have eliminated it as an option* because it would not have been able to meet the minimum 120-million ton tailing capacity, and the impoundment would not have been sited at the Poorman site, given the proximity

to Libby Creek and to LPMC's private land. The 2,000-foot buffer was intended to ensure that a situation like this – where the tailings impoundment cannot handle contingencies because of limited space – does not occur.

In sum, the Forest Service's failure to consistently apply the evaluation criteria to all tailings impoundments evaluated – one of the most critical components of the Montanore Mine (AR 0008686) – was arbitrary and capricious, in violation of NEPA.  The decision should be set aside with instructions on remand that the Forest consistently apply the same criteria to all alternatives, including Poorman.

> 3.     *The Forest Service Failed to Address Mitigation Measures Related to Impacts From the Poorman Impoundment Site, in Particular in the Absence of Mitigation to the De-watering of Poorman Creek*

Here, the ROD makes clear that mitigation measures to mitigate the impact of the Poorman Impoundment on Plaintiff's property, particularly in reference to dust, groundwater contamination and impoundment stability, have yet to be developed. (*See, e.g.* ROD, AR 10557-10560) Mitigation of the noise is not even addressed.  In addition, the groundwater drawdown under LPMC property due to the construction and operation of the Poorman Impoundment will be significant, between 15-95 feet in the northwest corner of the LPMC property. (*See* Figure 25, AR 9509, showing LPMC property in relation to Poorman Impoundment facilities; and Figure 73, AR 9581, showing areas of groundwater drawdown in the vicinity of the Poorman Impoundment.)

14

Significantly, the Forest Service also failed to identify or require mitigation measures addressing the de-watering of Poorman and Libby Creeks. There is no mitigation proposed *at all* to negate the significant degradation to Poorman Creek from the tailings pumpback system.  The Project will pump groundwater at and near the tailings waste facility along Poorman Creek:

> A pumpback well system would be installed downgradient of the impoundment and designed to capture all seepage from the impoundment that was not collected by the underdrain system.  The pumpback well system would consist of a series of groundwater extraction wells designed to provide 100 percent capture of all groundwater moving from beneath the footprint of the impoundment.

JFEIS 596, AR0008473

This seepage is predicted to violate Montana water quality standards.  *See* Table 131, JFEIS 755, AR 0008632 (showing violations of state standards for Antimony and Manganese).

"The length of time seepage interception and water treatment would be necessary is unknown and may be decades or more after operations." JFEIS M-343, AR 0010381.

Notably, the agencies project excessive reductions in flow in Poorman Creek as it enters LPMC's property. "As a result of lower groundwater levels, the model predicted that operation of the pumpback well system would reduce baseflow in Poorman Creek by 0.18 cfs (81 gpm)."  (JFEIS Vol. 2, AR 0008473. Groundwater drawdown due to this pumpback system exceeds 125 feet at the

tailings location, and would be roughly 15 feet adjacent to Poorman Creek.  JFEIS Figure 73; AR0009581.

Summer flows in Poorman Creek adjacent to the tailings facility location are below 1 cfs, ranging from .91 cfs at monitoring point PM-4 to .77 cfs at point PM-1000.  Table 106, JFEIS, AR 0008522.  *See also* JFEIS Figure 76; AR 0009585 (showing location of PM monitoring locations).  Thus, a loss of .18 cfs of flow amounts to a loss of flow of 19.7 % (at PM-4) and 23.3% at PM-1000.

The USFS Aquatic Species Biological Assessment (BA) for the Project depicts slightly different numbers, showing a flow reduction in Poorman Creek at monitoring point PM-1200 (downstream from PM-4 and PM-1000, at the boundary of LPMC's property) of 12%: "The pumpback wells and any other diversions, such as make-up wells, would reduce streamflow.  For example, at PM-1200 in Poorman Creek, the estimated 7Q10 flow is predicted to be reduced by up to 12 percent."  (BA, AR 0212614.) Table 5.4.2.1-1 shows this flow reduction at PM-1200 to be 11.6%.  (BA, AR 0212663.  *See also* Forest Service Answer, admitting SOC's Amended Complaint, ¶ 38). Regardless of which figure is used, these projected reductions in flow are considered significant changes to water quality. A.R.M. 17.30.715(1)(a) (stating that flow depletions are insignificant, and do *not* result in degradation, if they involve a reduction in flow of less than 10% of stream base flow.

The BA acknowledges that this flow loss will adversely affect bull trout in the short term: "Maximum 7Q10 flow reductions in Poorman Creek would be 12% and would occur after closure. This would increase low flow challenges to bull trout, including gaining access to the stream due to a seasonally dry lower reach." (BA; AR 0212619)

The BA further details the adverse effect of this dewatering on Poorman Creek. BA Table 5.5-17, entitled "Potential impacts of the Proposed Action on the environmental baseline" describes Poorman Creek moving from its current condition of "Functioning Appropriately, A" to "Degrade[d], D" due to the significant increase in temperature caused by the dewatering. (BA, AR 0212681)

No mitigation is proposed to prevent this degradation to Poorman Creek as it enters LPMC property. (*See* JFEIS, AR 0008473-75 [analysis of dewatering flow reductions in Poorman Creek due to pumpack, with no mention of mitigation]).

The JFEIS fails to provide the detailed analysis of the mitigation measures, including a detailed analysis of their effectiveness, as required by NEPA. *See South Fork Band Council v. Dept. of Interior*, 588 F.3d 718, 727 (9th Cir. 2009)(rejecting EIS for mine for failure to conduct adequate review of mitigation and mitigation effectiveness: "As the EIS concedes, these are significant environmental harms. Though NEPA, of course, does not require that these harms actually be mitigated,

17

it does require that an EIS discuss mitigation measures, with 'sufficient detail to ensure that environmental consequences have been fairly evaluated.'")

The Forest Service's failure to address mitigation of impacts from the Poorman Tailings Impoundment site, in particular to Poorman Creek, was arbitrary and capricious, in violation of NEPA. The decision should be set aside.

4. *The Forest Service Unlawfully Postponed Critical Studies and Evaluation of the Poorman Site*

The JFEIS and ROD acknowledge that critical project information and designs for the 120-million-ton Poorman tailings waste impoundment facility, have yet to be gathered, and will only be obtained during the Evaluation Phase. The agency admits that it does not even have a *preliminary* design for the Poorman tailings facility (and for the site of the large processing mill near Libby Creek, the Libby Plant Site). The FEIS states:

> The design developed for project facilities in Alternatives 3 and 4, such as the Poorman tailings impoundment site, **is conceptual** and is based on the available geotechnical investigations. **Additional site information is needed to complete a final design. The design process would include a preliminary design phase and a final design phase.** Site information would be collected during geotechnical field studies during final design. MMC would submit a tailings impoundment site geotechnical field study plan to the agencies for their approval before commencing activities. Once approved, the Site Exploration Plan would become a component of the amended Plan of Operations. A preliminary site program would be completed to confirm the geotechnical suitability of the Poorman Tailings Impoundment Site. A similar process would be used for the Libby Plant Site. The field studies would include a site reconnaissance and a drilling and sampling program to evaluate:

• Site geology and foundation conditions
• Groundwater conditions and water quality
• Borrow material availability
• Geotechnical characteristics of foundation and borrow materials

Site data to be collected would include an assessment of artesian pressures and their potential influence on impoundment stability, an assessment of a subsurface bedrock ridge between Little Cherry Creek and the effect it may have on pumpback well performance, aquifer pumping tests to refine the impoundment groundwater model and update the pumpback well design, and site geology to identify conditions such as preferential pathways that may influence the seepage collection system, the pumpback well system, or impoundment stability.  Based on these data, a preliminary design of the facility sites would be completed to confirm the site layout and design/operation feasibility.  Field studies would be completed to collect data and material samples necessary for the final design.

(JFEIS, AR 0007994-95, emphasis added.  *See also* ROD Attachment 1, AR 0010617 ("The design process will include a preliminary design phase and a final design phase. Site information will be collected during field exploration programs during the design phase.   MMC will submit a tailings impoundment site exploration plan to the agencies for their approval before commencing activities.").

Regarding the lack of substantial data for the tailings waste facility design, the March 2015 FEIS had originally stated, "The design developed for project facilities in Alternatives 3 and 4, such as the Poorman tailings impoundment site, is conceptual and is based on *limited* geotechnical investigations" (FEIS, AR 0004884, emphasis added), while in the final version, the agencies changed its description of the information used to "*available* geotechnical investigations."

(JFEIS, AR 0007994, emphasis added). However, elsewhere in the JFEIS, the agency conceded that this information was – still – "limited."   (JFEIS, AR 0008686)

In any event, the JFEIS acknowledges that it is "uncertain" whether the Poorman site can even handle the anticipated 120-million tons of tailings.

> The Poorman Tailings Impoundment Site would not provide sufficient capacity for 120 million tons of tailings without a substantial increase in the starter dam crest elevation if tailings were deposited at a density proposed in Alternative 2. The tailings thickener requirements to achieve higher tailings slurry density (and hence higher average in-place tailings density) are uncertain without additional testing of simulated tailings materials. Such testing would be completed during the Evaluation Phase.

(JFEIS, AR 0008013)

The ROD also notes that even the "conceptual design" of the tailings facility is based on whether DEQ approves a "mixing zone" underneath the facility to allow the seepage from the tailings to violate state groundwater standards: "Should DEQ not grant a mixing zone, MMC will develop a revised approach to tailings disposal that does not require a mixing zone." (ROD, AR 0010559)  DEQ has not granted that mixing zone.   (DEQ ROD, AR 0010998-0011270) (no mention of granting of mixing zone).

As Plaintiffs Save Our Cabinets noted in their Objections to the FEIS and draft ROD, it is accepted practice of the Forest Service to conduct detailed geotechnical and related analysis of potential tailings sites **prior** to the completion

of a Final EIS for large mining projects such as Montanore.  (*See* SOC Objections, AR 0226833-0226994, at 0226836-37.) For example, as SOC noted in its comments, for the Resolution Copper Project in Arizona, the agency recently issued an Environmental Assessment to *determine the baseline characteristics* of the tailings and related facilities. (*Id.,* AR 0226836-837) The Grand Mesa Uncompahgre and Gunnison National Forest in Colorado also undertook the same type of baseline analysis to determine the geotechnical and related aspects of tailings and mine facilities *prior to* reviewing the main mine proposal. (*Id.*)

The EPA was strongly critical of the lack of important information regarding the Poorman site and proposed tailings facility. (JFEIS M-84 to 85, AR 0010122-0010123)  In response, the JFEIS acknowledged the lack of information but insisted "that the final design process for the Poorman Impoundment Site would include geotechnical field studies during final design to characterize the Poorman site with respect to possible preferential pathways and the specific nature of the bedrock between the Poorman and Little Cherry Creek watersheds." (JFEIS, AR 0010123)

The EPA specifically criticized the Forest Service's decision to defer the gathering and analyzing of this critical information until after the NEPA EIS process was completed.  In a letter to the Forest Service commenting upon the March 2015 FEIS and Draft ROD, EPA urged that: "this site evaluation work be

completed **prior to the completion of the Final EIS** because it will inform the design of the TSF [Tailings Storage Facility] and the associated environmental impacts of the facility." (May 29, 2015 letter from EPA to Forest Supervisor Savage, AR 0013163, emphasis added).

In response, the Forest Service repeated its position that its post-EIS and post-ROD "technical review" of the tailings facility will consider these issues and that this investigation and analysis is needed to determine whether the Poorman site is even feasible:  "If design modifications to the current proposed design cannot satisfactorily mitigate geotechnical, wetland or groundwater impacts thereby rendering the Poorman site unsuitable as a tailings disposal site, an alternative site will need to be identified and additional NEPA conducted as necessary." (September 8, 2015 letter from Supervisor Savage to EPA, AR 0013206)

Regarding the adverse impact from constructing and operating the tailings facility and pumpback wells at the Poorman site to the Little Cherry Creek wetlands and area hydrology, EPA also raised serious concerns.  (JFEIS M-87, AR 0010125)  In response, again, the USFS relied on future baseline analysis as the means to ascertain critical conditions at the site:

> A **possible** subsurface bedrock ridge and hydrologic divide **may occur** south of Little Cherry Creek. This bedrock ridge **may create** a hydrologic divide between the impoundment sites and wetlands on the other side of the bedrock ridge.  **If** a subsurface bedrock ridge and

hydrologic divide at this location were confirmed, the pumpback wells would not affect the wetlands between the bedrock ridge and Little Cherry Creek. **Additional subsurface data would be collected during the final design process of the Poorman Impoundment to assess the bedrock ridge and the 3D model would be rerun to evaluate the site conditions with the new data. Any areas within the modeled drawdown area not surveyed for wetlands would be surveyed.**

(JFEIS, AR 0010125) (emphasis added)

The USFS acknowledged that the mitigation plan for the loss of wetlands depends on "an apparent subsurface bedrock ridge that separates groundwater flow between the watershed of Little Cherry Creek from those of drainages 5 and 10 of the Poorman Impoundment Site."  (JFEIS, AR 0010116)  Yet the actual existence of this "apparent" geologic feature has yet to be verified – and will only be done long after the FEIS and ROD are approved.  (JFEIS, AR 0010116 [Noting that the analysis would be completed only "after MMC collects additional data in the Poorman Impoundment Site"]; JFEIS, AR 0010125).  The USFS also admits that it does not have accurate knowledge of the critical bedrock conditions below the authorized Poorman tailings site, and will only obtain such information in the future:  "Depth to bedrock is not well defined with the Poorman site." (JFEIS, AR 0008456)

The agency cannot defer such critical analysis until the future, when it could have been obtained during the public review NEPA process.  As noted by this Court in the Rock Creek Mine case regarding a similar situation, in which the

USFS admitted that important information would only be obtained after the FEIS

was completed:

> The statements by the Forest Service and the Fish and Wildlife
> Service in 2003 show the agencies **knew at the time that
> information on bull trout habitat and population was inadequate**.
> The information should have been included in the Final
> Environmental Impact Statement. The agency cannot 'update its
> NEPA study' with a non-NEPA Supplemental Information Report
> issued four years after the Record of Decision. The Congress enacted
> a statute that requires such information be discussed in a NEPA
> planning document and that the public have an opportunity to
> comment on it. The decision to issue a Record of Decision despite
> relying on bull trout information that the agency deemed 'inadequate'
> is arbitrary and
> capricious and violates 40 C.F.R. § 1502.22(a).

*Rock Creek Alliance v. United States Forest Service,* 703 F.Supp.2d 1152, 1181

(D. Mont. 2010)(Emphasis added).

As this Court stated there in finding a violation of 40 C.F.R. §

1502.22(a):

> That regulation addresses incomplete or unavailable information in an
> environmental impact statement and provides, 'If the incomplete
> information relevant to reasonably foreseeable significant adverse
> impacts is essential to a reasoned choice among alternatives and the
> overall costs of obtaining it are not exorbitant, the agency shall
> include the information in the environmental impact statement.'

*Rock Creek Alliance*, 703 F.Supp.2d at 1180.

This Court further noted that "information that [the agency] 'knew or should

have known' at the time it prepared the original NEPA document" was required to

be in the EIS, not some document in the future. *Id. quoting Friends of the*

*Clearwater v. McAllister*, 214 F.Supp.2d 1083, 1087-88 (D. Mont. 2002). The fact

that the agency relied upon a post-FEIS Supplemental Information Report in *Rock*

*Creek* in an attempt to fill holes in the FEIS, whereas here the agency simply

defers critical baseline information gathering and analysis to the future, is not

determinative, as the NEPA requirement is the same – information that the agency

"should have known at the time it prepared the original NEPA document" was

required to be in the EIS, not some document in the future.

Here, the USFS has not provided any credible reason why the analysis of

baseline conditions and impacts from the Poorman tailings facility could not have

been known or obtained before it issued the JFEIS in this case.  That information is

not dependent upon completion of the exploration adit.  As such, this Court should

adopt its reasoning in *Rock Creek Alliance*, which ordered that that the agency

decision be set aside and remanded for further action to comply with NEPA. 703

F.Supp.2d at 1181.

The Forest Service's failure to gather adequate baseline data, in particular

concerning the Poorman Tailings Impoundment site, was arbitrary and capricious,

in violation of NEPA. The Forest Service's decision should be set aside.

B.      The Forest Service Violated its Organic Act

In Count Three of its Complaint, LPMC alleged that the Forest Service

violated the Forest Service Organic Act, primarily based on the decision's failure to

comply with Montana State water quality standards for non degradation, as well as due to the de-watering of Poorman and Libby Creek, discussed previously. On the National Forests, the Organic Act requires the USFS to, among other things, minimize adverse environmental impacts and to comply with state water quality standards. (36 C.F.R. § 228.8)

In the interests of avoiding duplication, LPMC incorporates by reference Save Our Cabinets' argument (SOC Opening Summary Judgment Brief, pp. 5-19) concerning violations of the Organic Act[3]. LPMC believes a critical factor in evaluating the arbitrary nature of the Forest Service's decision is the fact that it, and its co-permitting agency, Montana DEQ, do not agree on one main element.

In order to purportedly show compliance with its own regulatory requirements (including the Organic Act, the Forest Service depends on future Montana DEQ permitting decisions. (ROD, AR 0010573, 0010579) Yet, simultaneous with the release of the USFS ROD, DEQ concluded that it cannot fully approve the Montanore project at this point because of projections that it would violate Montana's nondegradation standards. "(T)he 3D model results included in the Joint Final EIS do not demonstrate compliance with the

---

[3]     Plaintiff LPMC did not bring a stand-alone Clean Water Act (CWA) claim as Save Our Cabinets did, which are also discussed in the Save Our Cabinets brief. In *Rock Creek Alliance v. U.S. Forest Service,* 703 F. Supp. 2d 1152, 1169 (D. Mont. 2010), this Court allowed a stand-alone Organic Act claim tied to water quality degradation to move forward.

nondegradation provisions for the other phases of the Montanore Project. . . .the 3D model predicts violations of Montana's nondegradation provision." (DEQ ROD, AR 0011017) Indeed, Forest Supervisor Savage said in an October 30, 2015 email, only a few months before the final ROD was issued "(T)his [DEQ not issuing a water quality decision past the exploration phase] would be a huge setback for the project **since our ROD is predicated on decisions through the entire project.**" (AR 0232606)

Thus, the two agencies equally responsible for permitting the Montanore Mine to go forward parted ways on a fundamental, lynchpin determination, whether the project will comply with State water quality standards. This illustrates the same sloppy, results oriented "analysis", particularly notable in reference to the analysis of the Poorman Tailings Impoundment site and its impacts to LPMC property, that LPMC challenges with this action.

Additionally, as noted above in the discussion of the Poorman Creek drawdown, the lack of mitigation means that the Forest Service is not taking adequate measures to minimize adverse environmental impacts as required by 36 CFR § 228.8. Finally, as noted, the agency will be unable to mitigate, i.e. make adjustments to the Poorman facility, due to its proximity to Libby Creek and LPMC property because the Forest Service did not consistently apply the 2,000-foot buffer.

## V.     CONCLUSION

LPMC, and its 1,070 acres of land immediately downhill and downstream of this massive mine, has a great deal riding on whether the Forest Service decision is upheld, and MMC allowed to go forward.  LPMC's concerns that the project has been inadequately reviewed are fully supported by the administrative record in this case.  LPMC asks the Court to grant it summary judgment, set aside the February 12, 2016, and direct that if the project is re-analyzed, the Forest Service consistently apply evaluation criteria to all tailings impoundment sites.

DATED this 30th day of September, 2016.

By: /s/ David K.W. Wilson, Jr.
David K.W. Wilson, Jr.
MORRISON SHERWOOD WILSON DEOLA PLLP

*Attorneys for Plaintiff, Libby Placer Mining Company*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(d)(2)(E) of the Montana Federal Local Rules of Procedure, I certify that Plaintiff's Brief is printed with a proportionately spaced Times New Roman text typeface of 14 points; is double spaced; and the word count calculated by Microsoft Word 2008 for Mac is 6, 463 excluding caption and certificate of compliance.

DATED this 30th day of September, 2016.

By: /s/ David K.W. Wilson, Jr.
David K.W. Wilson, Jr.
MORRISON SHERWOOD WILSON DEOLA PLLP

*Attorneys for Plaintiff, Libby Placer Mining Company*

29