Kristine M. Akland
AKLAND LAW FIRM PLLC
P.O. BOX 7274, 317 E. Spruce St.
Missoula, MT 59807
Phone and Fax (406) 544-9863
aklandlawfirm@gmail.com

Roger Flynn (Colo. Bar # 21078), *Pro Hac Vice*
Jeffrey C. Parsons (Colo. Bar. # 30210), *Pro Hac Vice*
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738, Fax (303) 823-5732
wmap@igc.org

*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| **SAVE OUR CABINETS, EARTHWORKS, and CLARK FORK COALITION,**<br><br>          **Plaintiffs,**<br>     **vs.**<br><br>**UNITED STATES DEPARTMENT OF AGRICULTURE, U.S. FOREST SERVICE, and CHRISTOPHER S. SAVAGE,**<br>               **Defendants,**<br>      **and**<br><br>**MONTANORE MINERALS CORP.,**<br><br>          **Defendant-Intervenor.** | **CV 16-53-M-DWM**<br>**CV 16-56-M-DWM**<br><br>**PLAINTIFFS' (SAVE OUR CABINETS, ET AL.) MEMORANDUM  IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

**LIBBY PLACER MINING COMPANY,**

   **Plaintiff,**

 **vs.**

**UNITED STATES FOREST SERVICE, U.S. DEPARTMENT OF AGRICULTURE, and CHRISTOPHER S. SAVAGE,**

   **Defendants,**
  **and**

**MONTANORE MINERALS CORP.,**

   **Defendant-Intervenor.**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ v

INTRODUCTION ................................................................................ 1

STANDARD OF REVIEW ........................................................................ 4

ARGUMENT ..................................................................................... 5

I.    **VIOLATION OF THE CLEAN WATER ACT AND ORGANIC ACT** ......................................................................... 5

    A.    Clean Water Act Background ................................................... 5

    B.    Organic Act Background .......................................................... 6

    C.    Montana Water Quality Protection Requirements ................... 7

    D.    Failure to Ensure Compliance with State Water Quality Requirements ................................................... 10

        1.    *Violation of Nondegradation Standards* ........................ 10

        a.    Illegal degradation of Wilderness waters ....................... 10

        b.    Illegal degradation of other High-Quality waters ........... 12

        2.    *Violation of Fish Protection Standards Due to Discharges of Sediment and High Temperature Effluent* ............................................... 14

        a.    Failure to prevent adverse impacts from sediment ......... 14

        b.    Violation of temperature standards ................................ 15

    E.    Failure to Comply with CWA Section 401 .............................. 18

    F.    Failure to Comply with EPA's Zero-Discharge Effluent Rule .......................................................................... 19

**II.    VIOLATION OF THE NFMA** ......................................................... 19

**III.   VIOLATION OF NEPA** .................................................................. 23

    A.    <u>NEPA Background</u> ................................................................ 23

    B.    <u>Illegal Plan to Preclude Public Review of Information
Obtained from the Evaluation Phase</u> ........................................ 24

    C.    <u>Failure to Prepare Adequate Mitigation Plan and Analysis</u> ...... 26

        1.    *Lack of Adequate Plan to Prevent Loss of Flows and
Degradation of Wilderness Streams* ............................... 26

        2.    *Lack of Adequate Plan to Mitigate Degradation of
Poorman Creek Caused by the Tailings
Pumpback System* ............................................................ 28

    D.    <u>Failure to Obtain Baseline Data and Deferral of Critical
Environmental Analysis</u> ........................................................ 28

        1.    *Lack of Baseline Analysis and Deferral of Review
of Tailings Facility* ......................................................... 28

        2.    *Additional Lack of Baseline Analysis and
Deferral of Review* ......................................................... 28

<u>CONCLUSION</u> ............................................................................... 30

CERTIFICATE OF COMPLIANCE ................................................. 30

# TABLE OF AUTHORITIES

*Federal Caselaw*

Center for Biological Diversity v. U.S. Dept. of the Interior,
623 F.3d 633 (9th Cir. 2010) ................................................................. 27

Clouser v. Espy,
42 F.3d 1522 (9th Cir. 1994) ..................................................................7

Great Basin Mine Watch v. Hankins,
456 F.3d 955 (9th Cir. 2006)............................................................ 8, 9

Hells Canyon Presv. Council v. Haines,
2006 WL 2252554 (D. Or. 2006) ................................................. 5, 6, 15, 18, 20

Idaho Sporting Congress v. Thomas,
137 F.3d 1146 (9th Cir. 1998) ................................................................5

Lands Council v. Powell,
395 F.3d 1019 (9th Cir. 2005) ........................................................... 25

Northern Plains v. Surf. Transp. Brd.,
668 F.3d 1067 (9th Cir. 2011) ........................................................... 24

PUD No. 1 v. Washington Dept. of Ecology,
511 U.S. 700 (1994) ................................................................................6

Sierra Club v. Union Oil Co.,
813 F.2d 1480 (9th Cir. 1987) ......................................................... 15

South Fork Band Council v. Dept. of Interior,
588 F.3d 718 (9th Cir. 2009) ............................................................ 24

Rock Creek Alliance v. U.S. Forest Service,
703 F.Supp.2d 1152 (D. Mont. 2010) ................................................. 4, 7, 15, 20

## *Federal Statutes*

Administrative Procedures Act ("APA"),
5 U.S.C. § 706 ....................................................................................4

Federal Water Pollution Control Act ("Clean Water Act," or "CWA"),
33 U.S.C. §§ 1251 *et seq.* ............................................... 1, 5, 6, 7, 18

Forest Service Organic Administration Act ("Organic Act"),
16 U.S.C. §§ 478, 551 ................................................................ ..1, 6

National Environmental Policy Act ("NEPA"),
42 U.S.C. §§ 4321 *et seq.* ...................................................... *passim*

National Forest Management Act ("NFMA"),
16 U.S.C. §§ 1600-1614 ............................................................ 1, 20

## *Federal Regulations*

36 C.F.R. § 219.15(d) ............................................................... 20

36 C.F.R. § 228.4 .......................................................................7

36 C.F.R. § 228.8 ................................................................. 7, 12

40 C.F.R. § 131.2 .......................................................................6

40 C.F.R. § 440.104(b)(1)........................................................ 19

40 C.F.R. § 1500.1(b) ............................................................... 24

40 C.F.R. § 1502.14 ................................................................. 24

40 C.F.R. § 1502.15 ................................................................. 24

40 C.F.R. § 1502.16 ................................................................. 24

40 C.F.R. § 1508.8 ................................................................... 24

40 C.F.R. § 1508.25 ................................................................. 24

*Montana Statutes and Regulations*

Mont. Code Ann. § 75-5-103(13) ........................................................................8

Mont. Code Ann. § 75-5-303 ..............................................................................7

Mont. Code Ann. § 75-5-303 (7) ........................................................................8

Admin. R. Mont. 17.30.623(1) ...........................................................................9

Admin. R. Mont. 17.30.623(2)(e) .......................................................................9

Admin. R. Mont. 17.30.623(2)(f) ........................................................................9

Admin. R. Mont. 17.30.705(2)(c) ........................................................................8

Admin. R. Mont. 17.30.715(1)(a) ........................................................................8

## INTRODUCTION

Plaintiffs Save Our Cabinets, et al., ("SOC") submit this memorandum in support of their Motion for Summary Judgment.  SOC challenges the U.S. Forest Service's ("USFS") Record of Decision ("ROD") AR0010517 – 0010996,[1] and Joint Final Environmental Impact Statement (issued along with the Montana Department of Environmental Quality "DEQ") ("JFEIS"), AR0007757 – 0010515, for the Montanore Project ("Project" or "Mine").

USFS failed to comply with mandatory procedural and substantive requirements governing the agency's approval of the Project under the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*. ("NEPA"); National Forest Management Act, 16 U.S.C. §§ 1600-1614 ("NFMA"); Forest Service Organic Administration Act of 1897 ("Organic Act"), 16 U.S.C. §§ 478, 551; the Federal Water Pollution Control Act ("Clean Water Act," or "CWA"), 33 U.S.C. §§ 1251 *et seq*.; and their implementing regulations.

"The KNF [Kootenai National Forest] ROD approves an amended Plan of Operations for the development of the mine consistent with the agencies Mitigated Alternative of FEIA [sic, FEIS]."  USFS Answer to Amended Complaint (ECF 20), at 22, ¶ 92.  The ROD authorizes Montanore Minerals Corporation ("MMC"),

---

[1] "AR" refers to the bates-stamped page(s) of the Administrative Record filed by the Federal Defendants with this Court. "SOUF" refers to the Plaintiffs' Statement of Undisputed Facts filed today.

to mine and process up to 20,000 tons of ore every day for 20 years during an "operations phase."  Additional activities will occur in an initial "evaluation phase" (lasting 2 years) and a "construction phase" (lasting 3 years).  The ROD also authorizes "closure" and "post-closure" operations for an additional 10 years (with some operations potentially lasting for an unknown duration).  ROD, AR0010517 – 0010996.

The Project would extend an existing tunnel ("adit") 3,300 feet, dig two new adits (13,700 and 17,000 feet each), and blast and excavate ore from a copper/silver deposit underneath the Cabinet Mountains Wilderness Area (other facilities would be outside the Wilderness). "The operating permit area would be 2,157 acres and the disturbance area would be 1,565 acres." JFEIS S-13, AR0007807.

In addition to the mine adits/tunnels, MMC would construct 14 miles of electric transmission line, waste rock storage facilities, a wastewater treatment plant, wastewater holding and seepage collection ponds, pipelines for transporting water and mine tailings, a 120 ton tailings waste storage facility, pave/widen 13 miles of roads, and clear-cut trees and vegetation.  *See* JFEIS S-1 to S-70, AR0007795-0007860.

Adverse impacts to the local and regional environment resulting from the Project's dewatering of the aquifer (to keep the mine workings dry) will last for

decades and groundwater levels will not reach equilibrium for over 1,300 years. JFEIS 605, AR0008482.  "The dewatering rate at full mine build out during the 22-year life of mine (Evaluation through Operations Phases) is predicted by the 3D model to be about 370 gpm [gallons/minute], with possible short-term inflow peaks of nearly 800 gpm during the mine Construction Phase." JFEIS 591, AR0008468.

This does not include the additional groundwater pumping under and around the Poorman Creek tailings facility (at a rate of 247 gpm) to capture contaminated seepage from the tailings. JFEIS 596, AR0008473.  "The length of time seepage interception and water treatment would be necessary is unknown and may be decades or more after operations." JFEIS M-343, AR0010381.

The DEQ determined that the Project as authorized in the USFS ROD and reviewed in the JFEIS would violate state laws and regulations designed to protect water quality, fisheries, and fisheries habitat from degradation.  DEQ Record of Decision ("DEQ ROD"), AR0010998-0011270.

The Project will violate Montana nondegradation requirements for water quality and flow, Montana water quality standards for temperature, sediment, and fish protection, as well as the CWA's "zero discharge" requirement for copper processing mills.  The Project's severe impacts to water quality and fisheries will also not be consistent with the Kootenai National Forest Plan ("Forest Plan" or

"Plan").

In addition to these substantive violations, the ROD and JFEIS violate NEPA by: (1) failing to include an adequate mitigation plan, including an analysis of the effectiveness of mitigation measures; (2) deferring critical analysis and gathering of baseline information; (3) precluding public review of future information and Project revisions; and (4) overall failing to take the required "hard look" at the Project.

## STANDARD OF REVIEW

The APA requires a reviewing court to "hold unlawful and set aside agency action, findings or conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).  "The court must ask whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. The court also must determine whether the agency articulated a rational connection between the facts found and the choice made. The review must not rubber-stamp administrative decisions that the court deems inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." Rock Creek Alliance v. U.S. Forest Service, 703 F.Supp.2d 1152, 1162-63 (D. Mont. 2010).

4

## ARGUMENT

## I.    VIOLATION OF THE CLEAN WATER ACT[2] AND ORGANIC ACT

A.    <u>Clean Water Act Background</u>

The CWA is designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The CWA establishes water quality standards which protect the desired conditions of each waterway.  33 U.S.C. § 1313(c)(2)(A).  Standards include one or more designated "uses" such as protection and propagation of fish and wildlife, numeric and narrative "criteria" specifying the water quality conditions such as fish habitat protection that are necessary to protect the designated uses, and an antidegradation policy that ensures uses are protected and that high quality waters will be maintained and protected.  33 U.S.C. §§ 1313(c)(2), 1313(d)(4)(B).

Under CWA Section 313, the USFS cannot authorize mining operations that fail to ensure compliance with all state and federal water quality standards and requirements at all times. "Under the Clean Water Act, all federal agencies must comply with state water quality standards, including a state's antidegradation policy. 33 U.S.C. § 1323(a)." <u>Idaho Sporting Congress v. Thomas</u>, 137 F.3d 1146, 1153 (9th Cir. 1998). *See also* <u>Hells Canyon Presv. Council v. Haines</u>, 2006 WL

---

[2] Plaintiffs submitted the required CWA 60-day notice letter to the Federal Defendants on February 26, 2016.

2252554, *4-5 (D. Or. 2006)(USFS mine approvals must ensure compliance with state CWA standards).

"A water quality standard defines the water quality goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting criteria necessary to protect the uses." 40 C.F.R. § 131.2 (EPA water quality regulations). "[A] project that does not comply with a designated use of the water does not comply with the applicable water quality standards." PUD No. 1 v. Washington Dept. of Ecology, 511 U.S. 700, 714-15 (1994).

The CWA also prohibits the USFS from authorizing a project that does not comply with CWA Section 401, which requires that DEQ certify that any activity receiving a "Federal license or permit," will comply with state water quality standards. 33 U.S.C. § 1341(a)(1). "Proposed mining activities on National Forest System lands are subject to compliance with Clean Water Act Section[] 401." JFEIS 622, AR0008499. *See also* Hells Canyon, 2006 WL 2252554, *4 (USFS authorization of mining operations without obtaining Section 401 Certification violated CWA).

B.   Organic Act Background

On National Forests, the Organic Act requires the USFS "to regulate their occupancy and use and to preserve the forests thereon from destruction." 16 U.S.C. § 551. "[P]ersons entering the national forests for the purpose of exploiting

mineral resources must comply with the rules and regulations covering such national forests." <u>Clouser v. Espy</u>, 42 F.3d 1522, 1529 (9th Cir. 1994). USFS mining regulations require that "all [mining] operations shall be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest resources." 36 CFR § 228.8.

The operator must fully describe "measures to be taken to meet the requirements for environmental protection in § 228.8." 36 CFR 228.4(c)(3). The "[o]perator shall comply with all applicable Federal and State water quality standards, including regulations issued pursuant to the Federal Water Pollution Control Act, as amended (33 U.S.C. 1151, et seq.)[the CWA]." 36 CFR § 228.8(b). "The operator also has a separate regulatory obligation to 'take all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations.' 36 C.F.R. § 228.8(e)." <u>Rock Creek Alliance</u>, 703 F.Supp.2d at 1164.

C.     <u>Montana Water Quality Protection Requirements</u>

Montana law requires that "[e]xisting uses of state waters and the level of water quality necessary to protect those uses must be maintained and protected." Mont. Code Ann. § 75-5-303 (the "nondegradation" standard). "All of the waters in the analysis area are high quality waters, except surface waters that have zero flow or surface expression for more than 270 days during most years. High quality

waters are defined in the Montana Water Quality Act (Mont. Code Ann § 75-5-103(13)). The Montana Water Quality Act prohibits degradation of high quality waters unless the DEQ issues an authorization to degrade."  JFEIS 623, AR0008500.  DEQ has not issued an "authorization to degrade" to the Project for its effects on water flow, which is a critical water quality parameter that will be significantly degraded by the Project's dewatering.

"Under the Montana Water Quality Act, no authorization to degrade may be obtained for outstanding resource waters, such as surface waters within a wilderness."  JFEIS at 624, AR0008501.  *See* Mont. Code Ann. § 75-5-303(7); Admin. R. Mont. 17.30.705(2)(c) ("For outstanding resource waters, no degradation is allowed …").

Montana law provides that actions resulting in stream-flow depletions exceeding 10% of stream base flow constitute degradation.  *See* Admin. R. Mont. § 17.30.715(1)(a) (stating that flow depletions are "insignificant" and do not result in degradation only if they involve a reduction of less than 10% of stream base flow measured as the seven-day ten-year low flow). JFEIS 623-24, AR0008500-0008501.

In Great Basin Resource Watch v. Hankins, the Ninth Circuit held that a federal agency can avoid the mandate of Section 313 to ensure that a mine's dewatering did not violate water quality standards only if the "[state] does not

regulate dewatering under its Clean Water Act authority." 456 F.3d 955, 964 (9th Cir. 2006).  The court focused on whether "[state] law subjects withdrawal of water to the standards of the Clean Water Act, as it is permitted to do." Id. at 964. Montana's nondegradation standard for streamflows, included as part of the Montana Water Quality Act, meets this test.

Regarding other applicable Montana water quality standards, state law requires that waters be "maintained suitable for … growth and propagation of salmonid fishes and associated aquatic life" and that "[n]o increases are allowed above naturally occurring concentrations of sediment or suspended sediment … which will or are likely to … render the waters harmful, detrimental, or injurious to … fish …."  ARM § 17.30.623(1), (2)(f).  This applies to the increased sediment loading from the Project.

Regarding the Project's discharge of higher temperature effluent, in addition to "maintaining" waters suitable for aquatic life, Montana law states that only "a 1ºF maximum increase above naturally occurring water temperature is allowed within the range of 32ºF to 66ºF." ARM 17.30.623(2)(e).  These standards apply to the discharge to Libby Creek from the water treatment plant (which handles water from the adits/tunnels and other facilities).

D.    Failure to Ensure Compliance with State Water Quality Requirements

1.    *Violation of Nondegradation Standards*

    a.    Illegal degradation of Wilderness waters

The JFEIS shows that groundwater drawdown caused by the mine will

substantially reduce or eliminate entirely the base flow of East Fork Rock Creek

(EFRC), East Fork Bull River (EFBR), and Libby Creek within the Cabinet

Mountains Wilderness –each exceeding the 10% nondegradation standard.  *See*

JFEIS Tables 100 and 101 (documenting that Project will reduce base flows in

EFRC by 59-100%, in EFBR by 97%, and in Libby Creek by 11-19%, depending

on Project phase), JFEIS 601-02, AR0008478-0008479.

Notably, these severe stream depletions are predicted to occur even with the

agency's mitigation measures in place.

> With and Without MMC's modeled mitigation - maximum model predicted
> baseflow reductions occur at Year 38 for the Rock Creek drainage and Year
> 52 for the East Fork Bull River drainage. East of the divide, the maximum
> model predicted baseflow reductions in the Libby Creek watershed would
> occur between Year 22 (as reported in Table 99) and Year 25 (as reported in
> Table 100).  Baseflow changes for east slope watersheds in this table are for
> Year 38.

Table 101 (footnote), JFEIS 602, AR0008579.

This dewatering of Outstanding Resource Waters within the Wilderness will

irreversibly and adversely affect water quality, fisheries, and fisheries habitat. *See*

JFEIS 1062, AR0008939 ("All alternatives would irreversibly reduce streamflow

in the eligible East Fork Bull River and Bull River Wild and Scenic River segments."); JFEIS M-59, AR0010089 (Interior Department noting the dewatering "would adversely impact the value of the upper East Fork Bull River for spawning and rearing habitat, including the possibility of serious population reductions or even extirpation of bull trout from the East Fork Bull River."). The JFEIS and the Aquatic Biological Opinion ("Aquatic BiOp") issued by the federal Fish and Wildlife Service further detail the severe impacts caused by the dewatering. SOUF at ¶¶ 39-44.

Based on the JFEIS's conclusion that these significant baseflow reductions will occur, even with the mitigation plan approved in the USFS ROD, the Montana DEQ concluded that the Project cannot be fully approved because implementing the Project's Construction, Operations, Closure, and Post-Closure phases will violate the Montana Water Quality Act:

> [T]the 3D model results included in the Joint Final EIS do not demonstrate compliance with the nondegradation provisions for the other phases of the Montanore Project. In regard to the Construction Phase, which as modeled includes two years of mining, the 3D model results do not affirmatively demonstrate compliance with the nondegradation provisions. In regard to the Operation, Closure, and Post-Closure Phases, the 3D model results predict decreases in the baseflow of surface water in the CMW greater than what is considered nonsignificant under ARM 17.30.715. **Therefore, the 3D model predicts violations of Montana's nondegradation provisions.** Surface waters located within the boundaries of the CMW are outstanding resource waters. Authorizations to degrade may not be issued for state waters that are classified as outstanding resource waters.

DEQ ROD 18, AR0011017 (emphasis added).

11

Defendant Forest Supervisor Savage specifically noted that DEQ's rejection of the Project as authorized in the USFS ROD "would be a huge setback for the project since our ROD is predicated on decisions through the entire project." Email from Savage to Marten and Schmid (USFS), dated October 30, 2015, AR0232606.

Despite this conclusion by DEQ, the USFS maintains that **all** phases of the Project fully comply with all Montana water quality laws and regulations: "As documented in the FEIS and ROD, the Kootenai National Forest has ensured that all phases of the project will comply with all applicable laws and regulations." Answer (ECF 20), at 4, ¶ 8. *See also* Answer at 14, ¶ 63 ("As documented in the FEIS and ROD, the KNF has ensured that all phases of the Project will comply with all applicable laws, including 36 CFR 228.8."). "This decision approves the entire Plan of Operations for the development of the Montanore copper silver deposit." USFS ROD 8, AR0010529.

b.      Illegal degradation of other High-Quality Waters

In addition to the illegal degradation of Outstanding Resources Waters in the Wilderness, the Project will also illegally degrade protected High-Quality Waters downstream from the Wilderness. The JFEIS documents that the Mine will reduce base flows by more than 10% in reaches of East Fork Rock Creek and Libby Creek that are designated High-Quality waters. *See* JFEIS Tables 99, 100, 101,

AR008472, 008478-79 (predicting base flow reductions of 17-59% in East Fork

Rock Creek and 16-20% in Libby Creek, depending on Project phase).  MMC does

not possess an authorization to degrade these waters by reducing those streams'

base flows.  *See* DEQ ROD, AR0010998-0011270 (no mention of authorization to

degrade these waters).

The Project will also pump groundwater at and near the tailings waste

impoundment facility near Poorman Creek "to capture all seepage from the

impoundment that was not collected by the underdrain system.  The pumpback well

system would consist of a series of groundwater extraction wells designed to

provide 100 percent capture of all groundwater moving from beneath the footprint

of the impoundment." JFEIS 596, AR0008473.  This pumping is needed because

the seepage is predicted to violate Montana water quality standards.  *See* Table 131,

JFEIS 755, AR0008632.  "The length of time seepage interception and water

treatment would be necessary is unknown and may be decades or more after

operations." JFEIS M-343, AR0010381.

The pumpback system would reduce baseflows in Poorman Creek by

between 12 and 23%.  SOUF ¶¶ 72-75 (detailing predicted flow reductions).  This

loss of flow will result in significant adverse impacts to bull trout and fisheries.

SOUF ¶¶ 75-77.

13

No mitigation is proposed to prevent this degradation. *See* JFEIS 596-598, AR0008473-75 (analysis of dewatering flow reductions in Poorman Creek due to pumpack, with no mention of mitigation).

2.    *Violation of Fish Protection Standards Due To Discharges of Sediment and High Temperature Effluent*

a.    Failure to prevent adverse impacts from sediment

The record establishes that the Project will result in increased sediment discharges that will injure fish and fish habitat. *See* Aquatic BiOp 96, AR0221619. The JFEIS acknowledges that "any sedimentation" from "mine activity sources … can affect salmonid reproductive success by degrading and decreasing spawning and rearing habitat, and by increasing egg and juvenile mortality." JFEIS 441-42, AR0008301-02.

Even with implementation of BMP (Best Management Practices) mitigation relied upon in the ROD, Project sediment discharges will cause harm to bull trout, as bull trout populations in Libby, Poorman, and Ramsey Creeks all will be adversely affected by sediment discharges during the first 2-4 years of the Project. Aquatic BiOP 96-97, AR0221619-20; Aquatic BiOp 105-06, AR0221628-29. "With required BMPs, there would be an overall net increase [in sediment loadings into streams] … during the evaluation phase (Table 5.4.1-1)." USFS Biological Assessment ("BA") 42, AR0212603. The BA noted the "significant impact that

was identified for Big Cherry Creek, Bear Creek, Cable Creek, Midas Creek, Fisher River, and West Fisher Creek is [from] temporarily increased input of sediment due to disturbances during road construction, road closures or road use." BA 57, AR0212618.  *See* SOUF ¶¶ 79-88 (detailing further sediment impacts).

USFS must comply with Montana's fish protection standards at all times, and may not rely on mitigation that may alleviate the problem in the future. *See* Sierra Club v. Union Oil Co., 813 F.2d 1480, 1489 (9th Cir. 1987) (water quality standards must "be met at all times").  *See also* Hells Canyon, 2006 WL 2252554, at *5 (rejecting USFS argument that future mitigation would comply with CWA). The USFS violates the CWA, Organic Act and Part 228 regulations when it fails to ensure that water quality standards and fisheries will be protected at all times. Id. at *6.  *See also* Rock Creek Alliance, 703 F.Supp.2d at 1167-70 (failure to prevent increased sediment loading in initial phase of mining operation violated water quality and fisheries protection requirements in Organic Act).

      b.    Violation of temperature standards

In addition to violations of Montana fish protection standards for sediment, the Project will violate state water quality standards aimed at protecting sensitive fish populations from harmful increases in temperature.

Libby Creek already is "functioning at risk/at unacceptable risk" for bull trout due to elevated stream temperatures.  Aquatic BiOp 50, AR0221573.  "Bull

trout require water temperatures ranging from 36ºF to 59ºF."  JFEIS 397,

AR0008257.  "Temperature data indicate that the lower and middle segments of

Libby Creek and the lower segment of West Fisher Creek are warmer than 59ºF, a

maximum limit for salmonids, for numerous days during the summer months and

may create thermal barriers for bull trout and other species."  JFEIS 396,

AR0008256.

For the discharges from the Treatment Plant into Libby Creek and related

Project impacts that will result in higher water temperatures, both the Aquatic BiOp

and March 2015 FEIS determined that: "The temperature of the discharge of mine

and adit water during the evaluation, construction and operations phases is

expected to be between 56º and 65ºF (KNF BA 2013) which exceeds the

temperature thresholds of bull trout spawning, egg incubation, and rearing, and for

generally preferred water temperatures of bull trout (see [Aquatic BiOp] section

III.B., Habitat Characteristics)."  Aquatic BiOp 95, AR0221618; FEIS 677,

AR0005429.  *See* SOUF ¶¶ 89-92.

In the December 2015 JFEIS, however, USFS now argues that: "The

temperature of the discharge of mine and adit water is expected to be between 51º

and 60ºF based on measured temperatures of the Water Treatment Plant effluent

from February 2014 to May 2015 (DEQ 2015b)."  JFEIS 756, AR0008633.  Yet

the USFS Answer admits that: "The Forest Service did not assert that there will not

be any discharge from the Water Treatment Plant into Libby Creek that exceeds 60 degrees F, or more than 1 degree F higher than the receiving stream." Answer (ECF 20) at 12, ¶ 52.  "DEQ 2015b" is the Montana DEQ's "Fact Sheet" for DEQ's proposed renewal and issuance of the CWA discharge permit for the Project. AR0153839–0153938.

This new Fact Sheet was not part of, nor referenced or relied upon, by the USFS FEIS and Draft ROD issued in March of 2015.  Thus, neither the Plaintiffs nor the public were made aware of this new information regarding these warm-water discharges during the NEPA public review process, in violation of NEPA's public review requirements.

Regardless, the data presented in the DEQ Fact Sheet actually shows that discharges from the Treatment Plant have exceeded 60ºF since discharges began in 2007.  *See* SOUF ¶¶ 98-106.  This is because the JFEIS/Fact Sheet did not analyze the temperature of the direct discharge from the Plant into Libby Creek from Outfall 003, a "direct discharge" from the Plant into the Creek.  Instead, the agency relies on measurements of the water temperature in Libby Creek 2,536 feet downstream from the Plant.  *See* SOUF ¶¶ 98-106.  As the Fact Sheet shows, the temperature of the "effluent discharged by the wastewater treatment plant" at Outfall 003 has reached 17.6ºC (which equals 63.68 ºF).  Fact Sheet 99, Appendix 6, AR0153937.

In ignoring the high temperature of Outfall 003, USFS also misleadingly relies on the fact that the two other discharges from the Plant will first be to ponds where the water cools somewhat as it passes through groundwater before entering Libby Creek. *See* SOUF ¶¶ 102-106.  Yet these discharges are irrelevant to the question of whether the direct discharge from Outfall 003 into Libby Creek will exceed the state standards.

E.    <u>Failure to Comply with CWA Section 401</u>

"Proposed mining activities on National Forest System lands are subject to compliance with Clean Water Act Section[] 401." JFEIS 622, AR0008499.  Here, "The DEQ did not issue a 401 certification because MMC has not applied for one. MMC will submit a 401 certification application to the DEQ prior to the time that the Corps [of Engineers] needs a certification permit." USFS Answer (ECF 20) at 15, ¶ 67.

Thus, USFS mistakenly believes that a Section 401 Certification is only required for the Corps of Engineers' permit for the discharge of fill material into water.  That ignores the fact that the USFS's approval of the Mine plan is considered a "Federal license or permit" that requires a 401 Certification. *See* <u>Hells Canyon</u>, 2006 WL 2252554, *4 (D. Or. 2006)(rejecting argument that USFS authorization of mining is not a "Federal License or permit" requiring 401 Certification).   Thus, the lack of the required Certification violates the CWA.

F.   <u>Failure to Comply with EPA's Zero-Discharge Effluent Rule</u>

USFS also failed to require that MMC meet the zero-discharge requirements of EPA's "New Source Performance Standards" for copper milling operations using froth-flotation milling:

> [T]there shall be no discharge of process wastewater to navigable waters from mills that use the froth-flotation process alone, or in conjunction with other processes, for the beneficiation of copper, lead, zinc, gold, silver, or molybdenum ores or any combination of these ores.

40 C.F.R. §440.104(b)(1).

The USFS admits that this requirement applies here, but relies on the plan to direct the discharge from the mill first through the tailings and then back through the Water Treatment Plant before discharging to Libby Creek. *See* JFEIS Figure 58, AR0009561 (showing water flows between facilities); SOUF ¶¶ 107-110 (additional depictions/statements of water flow in ROD/JFEIS).

Thus, because some effluent from the mill will be discharged into Libby Creek in violation of 40 C.F.R. §440.104(b)(1), USFS's approval violates the CWA, Organic Act, and Part 228 regulations.

## II.   **VIOLATION OF THE NFMA**

The USFS ROD and the Project activities it authorizes are not consistent with the Kootenai National Forest Plan ("KFP") and thus violate the NFMA. NFMA requires the Forest Service to develop and implement a Forest Plan. 16

U.S.C. § 1604(a).  "Each proposed site-specific project must (1) be consistent with

the forest plan and any amendments; [and] (2) be analyzed as required by NEPA."

Rock Creek Alliance, 703 F.Supp.2d at 1182 (Forest Plan requirements apply to

ROD for mining project).  *See* Hells Canyon, 2006 WL 2252554, *7-*10 (approval

of mining violated INFISH and other Forest Plan requirements).

The Forest Plan established a number of "Desired Conditions" ("DCs") to

manage and protect forest and public resources, including water quality, fisheries,

beneficial uses of waters (such as fisheries), and associated streamflows.  These

include:

> **FW-DC-WTR-01.** Watersheds and associated aquatic ecosystems retain
> their inherent resilience to respond and adjust to disturbance without long-
> term, adverse changes to their physical or biological integrity.

> **FW-DC-WTR-02.** Water quality meets applicable state water quality
> standards and fully supports beneficial uses. Flow conditions in watersheds,
> streams, lakes, springs, wetlands, and groundwater aquifers fully support
> beneficial uses, and meet the ecological needs of native and desirable non-
> native aquatic species and maintain the physical integrity of their habitats.

Quoted in JFEIS 703, AR0008580.  USFS's NMFA regulations require that the

agency meet a Forest Plan's Desired Conditions.  36 C.F.R. § 219.15(d).

The JFEIS asserts that "Compliance with the 2015 KFP is described in the

following sections."  JFEIS 791, AR0008668.  That page then repeats the FW-DC-

WTR-01 and FW-DC-WTR-02 water and fisheries protection provisions.

In describing its compliance with WTR-01, the USFS asserts that:

> Watersheds and associated aquatic ecosystems would retain their inherent resilience to respond and adjust to disturbance without long-term, adverse changes to their physical or biological integrity in the agencies' mine and transmission line alternatives. The agencies' alternatives include appropriate mitigation for all reasonably foreseeable adverse water quality effects on watersheds and associated aquatic ecosystems. The agencies' alternatives would be neutral with regard to progress toward this desired condition.

JFEIS 791, AR0008668.

Yet, as detailed above, the Project's dewatering will certainly not "be neutral" regarding the significant loss of flows and impacts to aquatic ecosystems, and is predicted to have "long-term, adverse changes" to "watersheds and associated aquatic ecosystems." Further, USFS's "mitigation" for these impacts is predicted to **not** appreciably reduce these long term dewatering impacts because the significant flow reductions within and downstream from the Wilderness are predicted to occur even **after** the mitigation approved in the ROD was factored-in. JFEIS 602, AR0008479. For flow reductions resulting in degradation to essential bull trout habitat in Poorman Creek due to the tailings facility water pumpback system, as detailed above, no mitigation is proposed at all.

In describing its compliance with WTR-02, USFS asserts that the full Project will comply with all Montana water quality requirements. JFEIS 791, AR0008668. Yet, as noted above, DEQ specifically found that the Project will **not** be in compliance with Montana's nondegradation requirements for water quality. DEQ ROD 18, AR0011017.

The Forest Plan also implements USFS's Inland Native Fish Strategy ("INFISH" or "INFS") that require attainment of the following Riparian Management Objective ("RMO") for Water Temperature:

> No measurable increase in maximum water temperature (7 day moving average of daily maximum temperature measured as the average of the maximum daily temperature of the warmest consecutive 7-day period). Maximum water temperatures below 59°F within adult holding habitat and below 48°F within spawning and rearing habitats

Plan 136, AR0214017. For the discharges into Libby Creek, there is no analysis in the JFEIS regarding whether the discharges will meet the "7 day moving average of daily maximum temperature" standard. The same is true for Poorman Creek, as there is no analysis showing that the temperature increases due to the dewatering of the tailings area will comply with this standard. *See* JFEIS 596-598, AR0008473-AR0008475 (analysis of dewatering flow reductions in Poorman Creek, with no analysis of Forest Plan standard or mention of mitigation).

The JFEIS details additional INFISH/INFS, Forest Plan, and NFMA requirements:

> INFS identifies riparian management objectives (RMOs) that guide management of key habitat variables for good fish habitat on National Forest System lands. The RMOs for stream channel conditions provide the criteria against which attainment or progress toward attainment of riparian goals is measured. RMOs, as established by INFS standards and guidelines for forested streams, include pool frequency, large woody debris (LWD) frequency, and width/depth ratio (Table 64). **Actions that retard attainment of these RMOs, whether existing conditions are better or worse than objective values, are considered to be inconsistent with INFS and therefore *not in compliance with the 2015 KFP.***

JFEIS 326, AR0008186 (emphasis added).  "For the purposes of analysis, to 'retard' would mean to slow the rate of recovery below the near natural rate of recovery if no additional human caused disturbance was placed on the system." Plan 136, AR0214017.

For Poorman Creek, it will move from its current condition of "Functioning Appropriately, A" to "Degrade[d], D" due to the increase in temperature caused by the dewatering.  BA 120, AR0212681.  Libby Creek will suffer the same impacts, moving to the "Degrade[d], D" condition for the temperature RMO.  Table 5.5-17, BA 120, AR0212681.  For the RMO of "wetted width/depth" of a stream, the BA determined that Rock Creek, East Fork Rock Creek, and the East Fork Bull River will each become "Degrade[d], D" from its current condition.  Table 5.5-17, BA 120, AR0212681.

Thus, the ROD does not ensure consistency with the Forest Plan and violates the NFMA.

## III.    VIOLATION OF NEPA

A.    <u>NEPA Background</u>

"NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken … Accurate scientific analysis, expert agency comments, and public scrutiny

are essential to implementing NEPA."  40 C.F.R. § 1500.1(b).  The EIS must

analyze all "direct," "indirect," and "cumulative" environmental impacts of the

proposed action. 40 C.F.R. § 1502.16; 40 C.F.R. § 1508.8; 40 C.F.R. § 1508.25(c).

NEPA requires USFS to "describe the environment of the areas to be

affected or created by the alternatives under consideration."  40 C.F.R. §1502.15.

"[W]ithout [baseline] data, an agency cannot carefully consider information about

significant environment impacts.  Thus, the agency fail[s] to consider an important

aspect of the problem, resulting in an arbitrary and capricious decision." Northern

Plains v. Surf. Transp. Brd., 668 F.3d 1067, 1085 (9th Cir. 2011).

NEPA also requires that an EIS: (1) "include appropriate mitigation measures

not already included in the proposed action or alternatives," 40 C.F.R. §1502.14(f);

and (2) "include discussions of: . . . Means to mitigate adverse environmental impacts

(if not already covered under 1502.14(f))." 40 C.F.R. §1502.16(h).  *See* South Fork

Band Council v. Dept. of Interior, 588 F.3d 718, 727 (9th Cir. 2009)(rejecting EIS

for mine for failure to conduct adequate review of mitigation and mitigation

effectiveness).

B.  Illegal Plan to Preclude Public Review of Information Obtained from the
    Evaluation Phase

The ROD authorized all phases of the Project based on the position that the

USFS's review of the data obtained in the Evaluation Phase would allow it to

modify the Project as needed and purportedly allow for additional public review

based on the results. ROD 8, AR0010529.  Yet, further public review will **not**

occur if "the environmental impacts associated with final design remain within the

scope of those impacts identified in the Final EIS." Id.  In other words, if the

revised Project, and all the new information obtained during the Evaluation Phase,

would not result in greater impacts, then no additional public review under NEPA

would occur. *See also* SOUF ¶¶ 62-68.

Yet as stated by USFS and DEQ, only if the information on dewatering and

other water quality and flow issues obtained during the Evaluation Phase showed

much **fewer** impacts under the State's nondegradation requirements, could the

State ever consider authorizing the later phases of the Project.  DEQ ROD 18,

AR0011017.  "DEQ could only approve the mine if it determines streamflow

changes are nonsignificant." JFEIS 565, AR0008442.  Such a scheme eviscerates

the public's right under NEPA to fully participate in USFS's review of the Project.

NEPA requires "informed public comment on proposed action and any choices or

alternatives that might be pursued with less environmental harm." Lands Council v.

Powell, 395 F.3d 1019, 1027 (9th Cir. 2005).

C.    Failure to Prepare Adequate Mitigation Plan and Analysis

1.    *Lack of Adequate Plan to Prevent Loss of Flows and Degradation of Wilderness Streams*

USFS has no credible plan to prevent the severe loss of flows in, and degradation to, the Outstanding Resource Waters in the Wilderness.  The mitigation to reduce the loss of baseflows from mine dewatering consists of a combination of concrete bulkheads, grouting, and buffers between the overhead waters and actual mining. JFEIS 162, AR0008022.

Yet even these mitigations, incorporated into the USFS/DEQ 3D Model, are acknowledged to be inadequate.  "The agencies' evaluation of the constructed bulkheads … concluded that man-made concrete bulkheads would unlikely provide the necessary mitigation over the long-term."  JFEIS 162, AR008022.  With respect to grouting: "the effectiveness of grouting over the long term (i.e., 100 years or more) is uncertain. Fracture grouting of storage facilities typically use a design life of 50 years, and the effectiveness of grouting may decrease beyond 50 years." JFEIS M-336, AR0010374. *See* SOUF ¶¶ 45-55 (detailing additional admissions on inadequate mitigation).

In the March 2015 FEIS, the agency mentioned a potential future mitigation measure to try to offset the dewatering effects, proposing to possibly consider using barrier pillars with constructed bulkheads in the underground tunnels, concluding that "leaving a 'pillar' of unmined ore with characteristics similar to the

constructed bulkheads simulated in the modeling would likely provide the

necessary mitigation over the long-term, again assuming the hydrologic modeling

was representative of underground conditions."  JFEIS 162, AR0008022. *See also*

JFEIS 613, AR0008490 ("Leaving barrier pillars overcomes some of the

limitations associated with constructed bulkheads, such as long-term

effectiveness.").

Yet, the "pillar" part of the bulkhead/pillar mitigation plan has not even been

submitted or planned yet.  "By the fifth year of operations, MMC would assess the

need for barrier pillars to minimize post-mining changes in East Fork Rock Creek

and East Fork Bull River streamflow and water quality."  JFEIS 614, AR0008491.

Thus, there is no data to support the USFS's conclusion that the barrier pillar with

constructed bulkhead will last longer or be more effective than the constructed

bulkheads.

Further, USFS's reliance on the future new "pillar" plan to accompany the

original "bulkhead" plan was not subject to proper public review under NEPA. The

USFS cannot rely on a critical mitigation measure that will not be subject to public

and EPA review until 5 years after the JFEIS was issued, if ever.  NEPA

"guarantees that the relevant information will be made available to the larger

audience" before completion of the FEIS.  Center for Biological Diversity v. Dept.

of Interior, 623 F.3d 633, 642 (9th Cir. 2010).

2.  *Lack of Plan to Mitigate Degradation of Poorman Creek Caused by the Tailings Pumpback System*

To avoid redundancy, Plaintiffs adopt and incorporate the argument submitted by Libby Placer Mining Co. ("LPMC") regarding USFS's failure to have any plan to mitigate the loss of flows in, and degradation of, Poorman Creek caused by the tailings groundwater pumpback system.  *See* LPMC opening brief at pp. 14-18.

D.  <u>Failure to Obtain Baseline Data and Deferral of Critical Environmental Analysis</u>

USFS defers critical environmental review of the baseline resource conditions at the site and accordingly fails to accurately analyze the Project's impacts on these resources.

1.  *Lack of Baseline Analysis and Deferral of Review of Tailings Facility*

To avoid redundancy, Plaintiffs adopt and incorporate the argument submitted by Libby Placer Mining Co. ("LPMC").  *See* LPMC opening brief at pp. 18-25.

2.  *Additional Lack of Baseline Analysis and Deferral of Review*

In addition to the admitted lack of baseline data or analysis for the Poorman tailings site, USFS acknowledges that its lacks important baseline information on water conditions (such as flows, quality, etc.) and related Groundwater Dependent

Ecosystems (GDEs) for waters that will be significantly affected by the Project's

dewatering, and will only gather such information in what USFS now refers to as

the post-JFEIS "pre-evaluation" phase.  USFS ROD, Attachment 3 at 40,

AR0010781.

This deferred analysis will "Identify and characterize groundwater dependent

ecosystems (GDEs) in the upper Libby Creek, upper East Fork Rock Creek, and

East Fork Bull River drainages; Characterize streamflow and water quality in upper

East Fork Rock Creek and East Fork Bull River, and Characterize water levels,

water supply, and water quality of Rock Lake." Id.  Streams, springs and wetland

and riparian vegetation would be assessed for their connection to a regional

groundwater system based on flow measurements, water chemistry, and the

associated hydrogeology. Id. at 51, AR0010789.

In addition to deferring this analysis to a "pre-evaluation," post-JFEIS period

(with no public comment), the agency only required "1 year of data to be collected

before additional dewatering and extension of the Libby Adit started." Id.  This is

despite acknowledging that multi-year baseline data collection provides the needed

characterization of the existing environment in order to detect changes in that

environment resulting from the Project. JFEIS 612, AR0008489.  *See* SOUF ¶¶

151-52.

29

The EPA was strongly critical of the lack of baseline data to characterize these systems.  May 29, 2015 EPA letter to USFS at 4, AR0013159.  EPA highlighted the problems in deferring such baseline analysis: "Based upon projected flow changes and groundwater drawdown, seasonal dry-up of bull trout spawning habitat is likely and groundwater dependent ecosystems will be lost, including some within the CMW. The Final EIS does not fully assess and quantify these impacts to aquatic life nor demonstrate that those impacts can be offset through mitigation." Id. at 2, AR0013157.

EPA's comments on the JFEIS reiterated concerns about the lack of baseline information and impact analysis: "The EPA considers the GDE impact assessment, based on the currently available data, insufficient to reliably describe the reasonable foreseeable significant adverse effects." EPA 2016 letter to USFS at 3. AR0013494.

As such, USFS's failures to adequately document and analyze the baseline conditions of the affected environment, and thus the Project's true impacts, violate NEPA.

## CONCLUSION

Accordingly, this Court should grant Plaintiffs' Motion for Summary Judgment and vacate, remand and set aside the ROD and JFEIS.

Respectfully submitted this 30th day of September, 2016.


*/s/ Roger Flynn*
Roger Flynn, (Colo. Bar # 21078) *Pro Hac Vice*
Jeffrey C. Parsons (Colo. Bar. # 30210) *Pro Hac Vice*
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
Fax (303) 823-5732
wmap@igc.org


*/s/ Kristine Akland*
Kristine Akland, Montana Bar # 13787
P.O. Box 7274
Missoula, MT 59807
(406) 544-9863
aklandlawfirm@gmail.com

*Counsel for Plaintiffs*


<u>Certification of Word Limit Compliance</u>

I certify that the foregoing complies with the 6,500 word limit established by this
Court's Order (ECF 27).

*/s/ Roger Flynn*
Roger Flynn

31