VICTORIA L. FRANCIS
MARK STEGER SMITH
Assistant U.S. Attorneys
U.S. Attorney's Office
2601 2ⁿᵈ Ave. N., Suite 3200
Billings, MT 59101
Phone: (406) 247- 4633
FAX: (406) 657- 6058
Email:  victoria.francis@usdoj.gov
          mark.smith3@usdoj.gov

ALLEN GREENBERG
U.S. Department of Justice
Environmental Defense Section
999 18th Street, Suite 370
Denver, CO  80202
Phone: (303) 844-1366
Email:  alan.greenberg@usdoj.gov

ATTORNEYS FOR FEDERAL DEFENDANTS/USA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SAVE OUR CABINETS, EARTHWORKS, and CLARK FORK COALITION, <br><br>         Plaintiffs, <br> vs. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, U.S. FOREST SERVICE, and CHRISTOPHER S. SAVAGE, <br><br>         Defendants. <br>    and | CV 16-53-M-DWM <br> CV 16-56-M-DWM <br><br> FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT |

**MONTANORE MINERALS CORP.,**

       **Defendant-Intervenor.**

**LIBBY PLACER MINING COMPANY,**

       **Plaintiff,**

   **vs.**

**UNITED STATES DEPARTMENT OF
AGRICULTURE, U.S. FOREST
SERVICE, and CHRISTOPHER S.
SAVAGE, in his official capacity as
Forest Supervisor of the Kootenai
National Forest,**

       **Defendants.**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

STATUTORY BACKGROUND......................................................................5

  I.  The Clean Water Act. ...................................................................5

  II.  The Forest Service Organic Act.. ..................................................7

  III. The National Forest Management Act. ..........................................8

  IV. The National Environmental Policy Act. .......................................9

  V.  The Administrative Procedure Act.................................................11

ARGUMENT .........................................................................................12

  I.  The Forest Service complied with all requirements of the Clean Water Act and the Organic Act. ...................................................................12

     A.  The Forest Service's decisions comply with Montana's water quality standards. .....................................................................13

        1.  Nondegradation Standard. ................................................15

        2.  Sediment Standard.........................................................18

        3.  Temperature Standard......................................................20

     B.  SOC cannot prevail on its claim based on Section 401  because the Forest Service has not issued a permit or license for the discharge of pollutants..........................................................................21

     C.  The Forest Service's decisions do not violate EPA's effluent standards forming operations. ..............................................23

  II.  The Forest Service's decisions complied with the NFMA. ...........................24

  III. The Montanore JFEIS complies with NEPA. ...............................................29

     A.  The Forest Service's plan for evaluating monitoring information fully complies with NEPA....................................................29

     B.  The mitigation plans fully comply with NEPA........................................33

        1.  No substantive requirement that mitigation be effective. ....................33

        2.  Poorman impoundment mitigation......................................35

C.   Baseline data were acquired as required by NEPA. .................................39

1.   Final Poorman / Libby Plant facility design not prerequisite to a valid NEPA analysis. ............................................................................39

2.   NEPA does not require analysis of unknown, unanticipated, yet-to-occur effects. ...................................................................................43

3.   The agencies are not relying on a bedrock ridge. ...............................49

4.   Rock Creek is inapposite as to adequacy of information. ....................51

5.   Groundwater Dependent Ecosystems were analyzed as required by NEPA. ……………………………………………………………….53

CONCLUSION ......................................................................................................56

# TABLE OF AUTHORITIES

## Cases

*Alaska v. Andrus*,
   580 F.2d 465 (D.C. Cir. 1978) ......................................................... 40

*Am. Rivers v. Fed Energy Regulatory Comm'n*,
   201 F.3d 1186 (9th Cir. 2000) ......................................................... 40

*Ark. v. Okla.*,
   503 U.S. 91 (1992) ........................................................................... 6

*Baker v. USDA*,
   928 F. Supp. 1513 (D. Idaho 1996) ................................................. 10

*Cal. Coastal Com v. Granite Rock Co.*,
   480 U.S. 572 (1987) ........................................................................ 10

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ........................................................................ 11

*Ctr. for Biological Diversity v. BLM*,
   422 F. Supp. 2d 1115 (N.D. Cal. 2006) .......................................... 40

*Forest Guardians v. U.S. Forest Serv.*,
   329 F.3d 1089 (9th Cir. 2003) ........................................................... 9

*Friends of the Clearwater v. Dombeck*,
   222 F.3d 552 (9th Cir. 2000) ............................................... 31-32, 32

*Friends of the Earth v. Hintz*,
   800 F.2d 822 (9th Cir. 1986) ..................................................... 11-12

*Havasupai Tribe v. United States*,
   752 F. Supp. 1471 (D. Ariz. 1990) ........................................... 11, 40

*Hells Canyon All. v. U.S. Forest Serv.*,
   227 F.3d 1170 (9th Cir. 2000) ......................................................... 10

*Hells Canyon Pres. Council v. Haines*,
   No. ?DOCKET?, 2006 WL 2252554 (D. Or. Aug. 4, 2006) ........... 23

*Idaho Sporting Cong. v. Thomas*,
   137 F.3d 1146 (9th Cir. 1998) ......................................................... 16

*Laguna Greenbelt v. U.S. Dep't of Transp.*,
   42 F.3d 517 (9th Cir. 1994) ............................................... 34

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ............................................. 16

*League of Wilderness Defenders v. U.S. Forest Serv.*,
   549 F.3d 1211 (9th Cir. 2008) ........................................... 42

*Montana v. U.S. EPA*,
   137 F.3d 1135 (9th Cir. 1998) ............................................. 5

*N. Plains Res. Council v. Fid. Expl. & Dev. Co.*,
   325 F.3d 1155 (9th Cir. 2003) ............................................. 6

*Nat'l Wildlife Fed'n v. Burford*,
   871 F.2d 849 (9th Cir. 1989) ............................................. 11

*Neighbors of Cuddy Mt. v. Alexander*,
   303 F.3d 1059 (9th Cir. 2002) ........................................... 11

*Ohio Forestry Ass'n v. Sierra Club*,
   523 U.S. 726 (1998) ..................................................... 8-9

*Okanogan Highlands All. v. Williams*,
   236 F.3d 468 (9th Cir. 2000) ............................................. 44

*Or. Nat. Desert Ass'n v. Dombeck*,
   172 F.3d 1092 (9th Cir. 1998) ........................................... 22

*Price Rd. Neighborhood Ass'n v. U.S. DOT*,
   113 F.3d 1505 (9th Cir. 1997) ........................................... 32

*River Runners for Wilderness v. Martin*,
   593 F.3d 1064 (9th Cir. 2010) ........................................... 11

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ................................................... 9, 33

*Rock Creek All. v. U.S. Forest Serv.*,
   703 F. Supp. 2d 1151 (D. Mont. 2010) ............... 11, 13, 20, 51, 52, 53

*Theodore Roosevelt Conserv. P'ship v. Salazar*,
   616 F.3d 497 (D.C. Cir. 2010) ....................................... 43, 44

*Transmission Access Policy Study Group v. Ferc*,
    225 F.3d 667 (D.C. Cir. 2000) ........................................................ 38

*United States v. Weiss*,
    642 F.2d 296 (9th Cir. 1981) ................................................ 8, 10, 42

**Statutes**

5 U.S.C. § 701 ...................................................................................... 11

5 U.S.C. § 706(2)(A) ............................................................................. 11

16 U.S.C. § 478 ................................................................................. 8, 10

16 U.S.C. § 551 ...................................................................................... 7

16 U.S.C. § 1133 .................................................................................. 25

16 U.S.C. § 1604 .................................................................................... 8

16 U.S.C. § 1604(i) ................................................................................. 9

30 U.S.C. § 21a ................................................................................... 10

30 U.S.C. §§ 22-54 ............................................................................. 10

33 U.S.C. § 401 (Clean Water Act) ......................... 2, 12, 17, 21, 22, 23

33 U.S.C. § 402 ...................................................................................... 5

33 U.S.C. § 1311(a) ............................................................................... 5

33 U.S.C. § 1311(b)(1)(C) ..................................................................... 6

33 U.S.C. § 1313(a), (b), (c)(1) .............................................................. 6

33 U.S.C. § 1313(c)(2)(A) ...................................................................... 6

33 U.S.C. § 1323(a) ........................................................................... 7, 13

33 U.S.C. § 1341 .................................................................................. 21

33 U.S.C. § 1341(a) ............................................................................... 7

33 U.S.C. § 1342 .................................................................................... 5

33 U.S.C. § 1342(a)-(d) .......................................................................... 6

33 U.S.C. § 1362(14) ............................................................................. 5

42 U.S.C. § 4332(2)(C) .......................................................................... 9

**Regulations**

36 C.F.R. pt. 228 ................................................................... 10

36 C.F.R. pt. 228, subpt. A ................................................ 50

36 C.F.R. § 219.15 .............................................................. 25

36 C.F.R. § 228.1 ................................................................ 10

36 C.F.R. § 228.4(a) ........................................................... 10

36 C.F.R. § 228.8(b) ........................................................ 8, 13

36 C.F.R. § 228.8(h) ............................................... 8, 13, 18, 19

40 C.F.R. § 124.53(e) ........................................................... 7

40 C.F.R. § 131.12 ............................................................... 6

40 C.F.R. § 440.104(b) ....................................................... 23

40 C.F.R. § 440.104(b)(2) ................................................... 23

40 C.F.R. § 440.131(a) ....................................................... 24

40 C.F.R. § 1502.9(c)(1)(ii) ..................................... 31, 32, 48

40 C.F.R. § 1502.14(f) ........................................................ 33

40 C.F.R. § 1502.22(a) ........................................... 46, 47, 49, 55

40 C.F.R. § 1502.24 ............................................................. 9

40 C.F.R. § 1503.4 ............................................................. 35

40 C.F.R. § 1508.20 ........................................................... 33

**Other**

Mont. Admin. R. 17.30.506 ............................................... 48

## INTRODUCTION

On February 12, 2016, the Kootenai National Forest (KNF) issued its Record of Decision (ROD) stating its intent to approve an amended Plan of Operations to be submitted by Montanore Minerals Corporation (MMC) for the Montanore Project, consistent with the requirements in the ROD. See U.S. Statement of Undisputed Facts, filed herewith, ¶ 2. The Montanore Project does not allow for surface access or surface facilities within the Cabinet Mountain Wilderness boundary. *Id*. at ¶ 5.

The proposed Montanore Project is an underground copper and silver mine near the Cabinet Mountains of northwestern Montana. MMC holds mineral patents which straddle the Cabinet Mountain Wilderness boundary: On 22 acres inside the Wilderness MMC has rights to the mineral estate, with the federal government retaining surface rights; On 14.5 acres outside the Wilderness, MMC has fee title, with surface and mineral rights. *Id*. at ¶¶6-7. In addition, MMC holds unpatented lode mining claims, mill site claims, and tunnel claims on National Forest System lands that cover the proposed mine development east of the Wilderness in the Libby Creek drainage. *Id*. at ¶ 8.

Holders of validly existing mining claims within the National Forest and Wilderness have rights under U.S. mining laws, and also must comply with Forest Service mining regulations. Mining operations can occur within Wilderness,

subject to enhanced regulatory requirements. *Id*. at ¶9. Those requirements, however, cannot prevent the operator from exercising its rights under U.S. mining laws. *Id*.

The Montanore Project, as approved in the ROD, contemplates proceeding in phases: Evaluation, Construction, Operations, Closure, and Post-closure. Signed approval by KNF is required prior to proceeding with each phase. *Id*. at ¶38. Before any phase may begin, MMC must obtain a Montana Pollutant Discharge Elimination System permit from the Montana Department of Environmental Quality (Montana DEQ), any necessary water quality certifications under Clean Water Act Section 401, and a Section 404 permit from the Army Corps of Engineers. *Id*. at ¶75a.

Before commencing the Evaluation Phase, MMC must also fund or implement extensive requirements to convert many different roads and trails to non-motorized access. *Id*. at ¶75e. They must utilize best management practices, including replacing culverts, removing bridges, and stabilizing eroding slopes. *Id*. at ¶¶64-65. They must obtain and transfer over 6,000 acres of land to the Forest Service or a private conservation group. *Id*. at ¶65. They must implement

hundreds of additional mitigation requirements set forth in ROD Attachment 2. AR10698. [1]

The KNF ROD was only issued after many years and many layers of NEPA review, commencing with the issuance of a Draft EIS on February 27, 2009. In response to public comment on that draft, new alternatives were developed and issued in an October 7, 2011 Supplemental Draft EIS. After additional review and comment, the KNF issued a Final EIS and a Draft ROD on April 1, 2015. Finally, a Joint Final EEIS (JFEIS) incorporating significant changes was issued by KNF and Montana DEQ for the Montanore Project in December 2015. U.S. Statement of Facts, ¶¶24, 25. The NEPA review encompassed information gathering, analysis, and scientific review on a host of issues, including geologic, stream, wetland, wildlife, fish, air, and industrial. This information encompasses thousands of pages of scientific literature, monitoring information, and modeling, all as set forth in the Administrative Record.

And the information gathering goes on. Continued detailed monitoring is mandated by the ROD throughout the life of the Montanore Project, commencing before the Evaluation Phase and continuing through the Post-Closure Phase. The

---

[1] "AR" cites herein refer to the sequential Bates stamped number located center-top of each page in the Administrative Record. Where feasible and not unduly redundant, this brief will also cite the document title and internal page number, for ease of reference.

Monitoring requirements are extensive, and apply to all affected resources: air quality, cultural, wetlands and other waters, wildlife, geotechnical, groundwater, rock mechanics, reclamation, geochemistry, aquatic biology, wilderness.  See ROD Attachment 3, AR10739.

Public notice and participation regarding the Montanore Project also does not stop with the issuance of the ROD.  Montana DEQ will conduct additional MEPA analysis upon receipt of the data obtained in the Evaluation Phase.  The KNF will make all of the data obtained during the Evaluation Phase available to the public.  All monitoring information will be made available to the public. Annual meetings will continue throughout all phases, and will include governmental agencies, citizens, and non-governmental organizations. Participation by these entities is required to review management objectives, the impacts of mitigation measures, information obtained through the Evaluation Phase, and continued monitoring.  U.S. Statement of Facts, ¶26.  If information obtained during the Evaluation Phase is beyond the scope of the JFEIS, KNF will conduct additional NEPA analysis.  *Id*.

Finally, MMC's plans are required to be adaptive.  If monitoring indicates environmental objectives are not being met, MMC will be required to modify its plans and activities.  In fact, there is no other way for this process to work, but to continue to gather information and respond to that information, while meeting

-4-

requirements of the Clean Water Act, the Organic Act, the U.S. Mining laws, the

National Environmental Policy Act, and the National Forest Management Act.

The detailed checks and balances and public involvement contemplated in

the ROD comply with the law.  Summary judgment should be granted to the

Federal Defendants, and denied for all Plaintiffs in this consolidated proceeding.

## STATUTORY BACKGROUND

### I.     The Clean Water Act.

The Clean Water Act prohibits the discharge of pollutants from point

sources[2] into waters of the United States, except in compliance with specific

provisions of the statute.  33 U.S.C. § 1311(a); *see Montana v. EPA,* 137 F.3d

1135, 1138 (9th Cir. 1998).  For most dischargers, compliance may be achieved by

obtaining and adhering to the terms of a National Pollutant Discharge Elimination

System ("NPDES") permit issued under Section 402 of the Act, 33 U.S.C. § 1342.

*See Montana v. EPA*, 137 F.3d at 1138.  In the State of Montana, the Montana

DEQ is responsible for administering the NPDES permit program for most

discharges within Montana's borders, and for issuing permits that contain

conditions that implement the Act's various requirements, subject to EPA review.

---

[2]  The term "point source" is defined in the CWA to mean, "any discernible,
confined and discrete conveyance . . . from which pollutants are or may be
discharged."  33 U.S.C. § 1362(14).

*See* 33 U.S.C. § 1342(a)-(d); *Northern Plains Res. Council v. Fidelity Exploration and Dev. Co.*, 325 F.3d 1155 (9th Cir. 2003).

The Clean Water Act directs the states, with federal approval and oversight, to establish water quality-based standards to assure protection of the quality of waters within the state.  33 U.S.C. § 1313(a), (b), and (c)(1).  These state standards designate uses for waters (*e.g.,* public water supply, propagation of fish and wildlife) and establish water quality criteria, which specify the amounts of various pollutants that may be present in those waters without impairing the designated uses.  33 U.S.C. § 1313(c)(2)(A).  States must include in their water quality standards an antidegradation policy,[3] which is intended to maintain existing uses of waters and limit or prevent the further degradation of high quality waters.  *See* 40 C.F.R. § 131.12.  If necessary to meet applicable water quality standards, NPDES permits must contain water quality-based effluent limitations more stringent than limitations that would be required to comply with the applicable technology-based standards.  33 U.S.C. § 1311(b)(1)(C); *see Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992).

The Clean Water Act requires that federal agencies "having jurisdiction over any property or facility," or "engaged in any activity resulting, or which may

---

[3]  EPA's use of the term "antidegradation" is functionally equivalent to Montana's use of the term "nondegradation."

result, in the discharge or runoff of pollutants," to "comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity . . . ."  33 U.S.C. § 1323(a).

Under the Clean Water Act, any applicant for a federal license or permit to conduct an activity that may result in any discharge to navigable waters must provide the federal licensing or permitting agency with a certification from the State in which a discharge originates that, if the permittee discharges in accordance with the limitations and conditions contained in the permit and the certification, applicable water quality standards will be met.  *See* 33 U.S.C. § 1341(a); 40 C.F.R. § 124.53(e).  The state's certification may specify additional effluent limitations or other permit conditions required to ensure compliance with the state's water quality standards or other appropriate requirements of state law.  *Id.*

## II.   The Forest Service Organic Act..

The Forest Service Organic Administration Act authorizes the Forest Service to regulate the "occupancy and use" of the national forest and to "preserve the forests thereon from destruction."  16 U.S.C. § 551.  The Organic Act limits that authority by requiring that no such regulation "prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of

prospecting, locating, ***and developing*** the mineral resources thereof." 16 U.S.C. §

478 (emphasis added). Thus, the Forest Service may regulate use of National

Forest lands by holders of mining claims, but only to the extent that the regulations

are reasonable and do not impermissibly encroach on legitimate uses incident to

mining and mill site claims. *United States v. Weiss*, 642 F.2d 296, 299 (9th Cir.

1981).

Federal regulations require that mining activity "shall be conducted so as,

***where feasible,*** to minimize adverse environmental impacts on National Forest

surface resources." 36 C.F.R. § 228.8 (emphasis added). The mining operator

must submit a plan of operations that describes how the operator intends to meet

various requirements for environmental protection, including water quality

standards and any additional practicable measures to maintain and protect fisheries

and wildlife habitat that may be affected by the operations. *Id.* § 228.8(b), (e).

Certification or other approval issued by a state or federal agency of compliance

with laws and regulations relating to mining operations will be accepted as

compliance with similar or parallel requirements of the Forest Service's

regulations. *Id.* § 288.8(h).

## III.    The National Forest Management Act.

NFMA provides for forest planning and management at two levels: the

forest level and the project level. 16 U.S.C. § 1604; *Ohio Forestry Ass'n v. Sierra*

*Club*, 523 U.S. 726, 729-30 (1998). At the forest level, the agency develops a Land and Resource Management Plan ("forest plan"). Once approved, the Forest Service implements the forest plan by approving or denying site-specific actions. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1092 (9th Cir. 2003). While NFMA requires that site-specific actions be consistent with the governing forest plan (16 U.S.C. § 1604(i)), USFS's interpretation and implementation of its own forest plan is entitled to substantial deference. *Forest Guardians*, 329 F.3d at 1097, 1099.

## IV.    The National Environmental Policy Act.

NEPA requires federal agencies to take a "hard look" at the environmental consequences of their proposed actions before a final decision to proceed. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989). NEPA establishes procedures for agencies to consider the environmental impacts of their actions, but does not dictate substantive results. *Id.* at 350. Agencies must prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An agency must ensure the "professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements" and "identify any methodologies used." 40 C.F.R. § 1502.24. It satisfies these requirements if its "analysis is sufficient for reasoned decision-

making" and if its methodology complies with the "rule of reason." *Hells Canyon All. v. U.S. Forest Serv.*, 227 F.3d 1170, 1177 & 1182 (9th Cir. 2000).

Mining operations are subject to NEPA. *Baker v. U.S. Dep't of Agric.*, 928 F. Supp. 1513, 1519 (D. Idaho 1996). While mining has been accorded a special place in our laws relating to public lands, there is no doubt that mining activities are subject to regulation to protect the environment. *California Coastal Comm'n v. Granite Rock*, 480 U.S. 572 (1987). The Mining Act of 1872, 30 U.S.C. §§ 22-54, is still the basic law governing mining activities, as modified by ensuing statutes and as applied through Forest Service rules and regulations. 16 U.S.C. §478; 30 U.S.C. § 21a; 36 C.F.R. § 228, et seq. The Act provides owners of a mine or mill site claim with a statutory right to enter National Forest lands to search for minerals, while the regulations "minimize adverse environmental impacts on National Forest System surface resources." 36 C.F.R. § 228.1.

The regulations require the holder of a mining claim to file a proposed Plan of Operations before conducting any "significant disturbance of surface resources." 36 C.F.R. § 228.4(a). The Forest Service cannot categorically deny an otherwise reasonable plan of operations. *United States v. Weiss*, 642 F.2d 296 (9th Cir.1981). The Forest Service can deny an unreasonable plan of operations or a plan otherwise prohibited by law, in which case the agency would return the plan to the claimant with the reasons for disapproval and request submission of a new plan to

meet the environmental concerns. *Havasupai Tribe v. United States*, 752 F. Supp. 1471, 1492 (D. Ariz. 1990), aff'd sub nom. *Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991). "The NEPA does not expand the authority of the Forest Service to include rejection of an otherwise reasonable plan of operations." *Havasupai Tribe*, 752 F.Supp. at 1492.

## V.    The Administrative Procedure Act.

All claims in this case are reviewed under the APA, 5 U.S.C. § 701 et seq. *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1065 (9th Cir. 2002); *Rock Creek Alliance v Forest Service*, 703 F. Supp. 2d 1151, 1162 (D. Mont. 2010). Under the APA, judicial review of federal agency actions is "deferential." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). A court may set aside an agency action only if it determines the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[T]he court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971) (abrogated on other grounds, *Califano v. Sanders*, 97 S. Ct. 980 (1977)). "The [agency's] action . . . need be only a reasonable, not the best or most reasonable, decision." *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989); *Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986) ("The court

may not set aside agency action as arbitrary or capricious unless there is no rational

basis for the action.") (citation omitted).

## ARGUMENT

I.    **The Forest Service complied with all requirements of the Clean Water Act and the Organic Act.**

The Forest Service is entitled to summary judgment on the claims SOC[4]

asserts based on the Clean Water Act and the Organic Act.  SOC makes three sets

of claims, none of which have merit.   First, SOC incorrectly argues that the ROD

does not comply with several state water quality standards.  Doc. 34-5 at 10-18.

Second, it asserts a meritless claim that the Forest Service issued a permit or

license without a proper state certification under Clean Water Act Section 401.

Doc. 34-5 at 18.  Third, SOC erroneously argues that the Forest Service's decision

does not comply with EPA's zero discharge effluent rule for process water from

mills that use froth flotation processes.  Doc. 34-5 at 19.

---

[4] Following Plaintiffs' lead, Save Our Cabinets, Earthworks, and Clark Fork Coalition will be collectively referred to as "SOC" in this memorandum.  Libby Placer Mining Company will be referred to as "Libby-Placer."

**A.      The Forest Service's decisions comply with Montana's water quality standards.**

When a party seeks to undertake mining activities on Forest Service land, the Forest Service is responsible for ensuring that the mine operator obtains the proper permits and certifications to demonstrate that the operator complies with all applicable federal and state water quality standards.  *See* 33 U.S.C. § 1323(a); 36 C.F.R. § 228.8(b); ROD at 58, AR10579; JFEIS at 622, AR 8499.[5]  Because the State of Montana has been delegated authority to issue discharge permits and has adopted water quality standards approved by EPA, the State is the primary decision maker regarding compliance with Clean Water Act requirements, including compliance with its state water quality standards.  *See* JFEIS at 702, 704; AR8579, 8581.  For this reason, the Forest Service reasonably determined that Montana DEQ's water quality decisions, including its MPDES permit renewal for the mine, any required 401 certifications, and any other applicable water quality permits, constitute compliance with Clean Water Act requirements.  36 C.F.R. § 228.8(h); ROD at 58, AR10579; *Rock Creek Alliance*, 703 F. Supp. 2d at 1169 ("The permit is the means by which the Montana DEQ enforces state water quality standards,

---

[5]  This Court has held that judicial review of this requirement is available under the APA in the case of nonpoint discharges or under a Clean Water Act citizen suit for point source discharges.  *See Rock Creek Alliance v. U.S. Forest Service*, 703 F. Supp. 2d 1152, 1165 (D. Mont. 2010).

and the Forest Service is allowed to rely on the Montana DEQ to issue and enforce a valid permit.").

The fact that Montana DEQ has not yet issued a renewed MPDES permit or issued a 401 certification for discharges associated with the Montanore Project does not mean issuance of the ROD violates any water quality standards.  The Forest Service's decisions under review do not authorize the commencement of any actions that will result in discharges to waters of the United States.  The ROD indicates that the Forest Service "intends to approve" a plan of operation for the Montanore Project.  ROD AR10522. The ROD sets out numerous steps that MMC must take before MMC commences operations, including the submission of amended plans of operations to the Forest Service and the Forest Service's approval of the plans.  ROD at 7, AR10528; *see* ROD at 8, AR10529 (all plans must be approved by the Forest Service before the Forest Service will approve MMC to proceed with taking actions that will affect Forest Service land).  Specific to SOC's claims arising under the Clean Water Act, the ROD states that "any activity that may result in any discharge into waters of the U.S. cannot proceed until MMC provides [the Forest Service] a 401 certification from the DEQ, unless the DEQ waives its issuance."  ROD at 52-53, AR10573-74.   Because no discharges to waters will occur without an MPDES permit or 401 certification issued by Montana that establishes compliance with water quality standards, the

-14-

Forest Service has ensured compliance with state water quality requirements.

Further, as explained below, none of the specific water quality standards identified

by SOC establishes a violation.

### 1.    Nondegradation Standard.

SOC first incorrectly claims that Alternative 3 selected by the ROD will

result in violations of the State's nondegradation requirements.  Doc. 34-5 at 10-

14.  They base this argument on modeled degradation associated with reductions in

base flows of several streams to be affected by the project, and a

mischaracterization of Montana DEQ's decision regarding dewatering impacts.  *Id.*

Montana DEQ determined that the Evaluation Phase of the project will not result in

violation of nondegradation requirements attributable to lower stream flows.  DEQ

ROD at 15; AR11014.  Although the hydrologic modeling *predicts* noncompliance

with Montana's nondegradation standards during subsequent phases of mine

development, Montana DEQ observed that there is significant uncertainty in the

model due to the lack of site specific hydrogeologic data.  DEQ ROD at 18,

AR11017.  The Evaluation Phase will include the collection of additional

hydrogeologic data, and Montana DEQ expects that a determination of compliance

with the nondegradation standard for operation of the mine may be made after this

additional information is collected during the Evaluation Phase.  DEQ ROD at 18,

AR11017.  Due to this uncertainty, DEQ is "holding in abeyance" its decision to

amend its permit to allow construction until that additional data is gathered during the evaluation phase.    *Id.*

Montana DEQ's decision to hold in abeyance its determination regarding compliance with nondegradation of streamflow requirements during subsequent phases until additional data are obtained does not make the Forest Service's decisions a violation of the Clean Water Act.  The Forest Service has not approved a plan of operations for any phases, and will not until Montana DEQ certifies compliance with water quality standards.  In addition, this approach is supported by the Ninth Circuit's decision in *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146 (9th Cir. 1998), *overruled on other grounds*, *The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008), a case that also challenged a Forest Service action based on an alleged violation of an antidegradation standard.  The court of appeals declined to find a violation because "until further studies are completed on the two streams, we lack sufficient facts to determine whether Idaho's antidegradation statute has been violated."  *Id.* at 1153.  Here, too, no violation exists because the Montana DEQ deferred a decision regarding compliance with its nondegradation standard based on the need to obtain additional data.  Significantly, the Montana DEQ's ROD expressly states that MMC is not authorized to proceed past the Evaluation Phase of the mining project while a decision on subsequent phases is held in abeyance.  AR11018.  If Montana DEQ does not amend the mine permit

and issue an MPDES permit to allow mining to proceed in compliance with water quality standards, the Forest Service will similarly not approve operations.[6]  *See* ROD at 71, AR10592 (issuance of amended mining permit and MPDES permit is a precondition to plan approval).  Thus, the ROD does not authorize any operations that would violate the nondegradation provision of Montana's water quality standards.[7]

Further, streamflow issues do not result in any violation of the Organic Act because all practicable measures are being taken to protect fisheries that may be impacted.  The selected alternative requires numerous mitigation measures to minimize impacts to the base flow of streams, including maintenance of buffers that separate mining locations from both lakes and faults in the rock formation, grouting, and retention of barrier pillars, which will minimize impacts to surface waters.  *See* JFEIS at 612-15, 676-77; AR8489-92, AR8553-54.  The Forest

---

[6]  Contrary to SOC's argument, Doc. 34-5 at 12, the Forest Service does not maintain that all phases of the Project currently comply with all Montana water quality laws.  Rather, the ROD ensures that all phases will comply because the Forest Service will require permits and Section 401 certifications before operations commence.  ROD at 9, 58, AR10530, AR10579.

[7]  SOC also objects to modeled stream flows that may exceed nonsignificance criteria at High Quality Waters (those outside the wilderness boundaries).  Doc. 34-5 at 12-14.  Again, MMC will be collecting additional hydrogeological data and DEQ will subsequently determine whether operations will meet water quality standards before it issues an amended operating permit, *see* JFEIS at 623, AR8500, and before the Forest Service approves subsequent plans of operation.

Service developed a Bull Trout Mitigation Plan containing approximately 27 mitigation measures, which the Fish & Wildlife Service supplemented with additional requirements as part of the incidental take statement accompanying its biological opinion.  ROD, Attachment 5, AR10879-898; Biological Opinion, Appendix E; AR221744-761.  These measures included mitigation to address adverse effects associated with predicted water depletions, *see* AR221744, thereby fulfilling the Forest Service's obligations under the Organic Act.[8]

## 2.    Sediment Standard.

SOC's second challenge based on water quality standards relates to fish protection standards potentially impaired by the discharge of sediment.  SOC Brief, Doc. 34-5 at 14-15.  As with nondegradation requirements, the ROD permissibly relies on Montana DEQ's permits and water quality certifications and associated conditions to ensure compliance with water quality standards; the ROD does not allow operations to commence prior to the receipt of those permits and certifications.  *See* 36 C.F.R. § 228.8(h); ROD at 52-53, AR10573-74.  In the case of sediment, the ROD ensures compliance with state water quality standards by requiring compliance with the terms of DEQ's MPDES permit, a storm water

---

[8]  Following additional data collection and modeling, the predicted impacts on surface water resources in the analysis area, including simulation of mitigation measures, may change.  The Forest Service will use adaptive mitigation to modify the mitigation plans described in the ROD if necessary to incorporate the revised model results.  ROD at 14, AR10622.

pollution prevention plan, best management practices, and other terms and

conditions to meet water quality standards applicable to sediment.  *See* ROD at 52,

AR10573; DEQ ROD at 16, AR11015.  In addition, the EPA and Montana DEQ

established a Total Maximum Daily Load for Libby Creek.  JFEIS at 758,

AR8635.  A Total Maximum Daily Load is the maximum amount of a pollutant a

water body can receive and still meet water quality standards.  *Id.*  The Montanore

facility was assigned a waste load allocation of 24 tons of sediment per year, which

Montana DEQ and the EPA determined assures compliance with water quality

standards for sediment for Libby Creek.  JFEIS at 758-59, AR8635-36.

These permit terms and best management practices also meet the

requirements of the Organic Act because the operator is taking all practicable

measures to maintain and protect fisheries.  The Forest Service requires

implementation of best management practices to minimize sediment and runoff

from roads and other disturbed areas in accordance with Forest Service practices

and the MPDES permit.  ROD at 54, AR10575; JFEIS at 758, AR8635.  The

MDPES permit will require submission of MMC's stormwater pollution

prevention plan no later than three months after the effective date of the MPDES

permit, thus ensuring that best management practices and other control measures

are implemented to comply with the terms of its MPDES permit.  JFEIS at 758,

AR8635. The Total Maximum Daily Load allocation, which is currently effective,

-19-

will contribute to the water restoration goals set by EPA and Montana DEQ to restore all beneficial uses, including fisheries, currently affected by sediment in Libby Creek.  JFEIS at 766, AR8643.  In addition, MMC will be implementing the additional mitigation measures that the Fish and Wildlife Service determined were necessary or appropriate to minimize the impact of incidental take on bull trout attributable to sediment.  ROD, Attachment 5, AR10879-898; Biological Assessment, Appendix E; AR221744- 761.  Thus, unlike the situation in *Rock Creek*, 703 F. Supp. 2d at 1170, there is no gap in taking all practicable sediment control measures.

### 3. Temperature Standard.

SOC's third challenge relates to temperature standards.  Montana has water quality standards for temperature in order to protect aquatic life.  JFEIS at 756, AR8633.  SOC raises a concern regarding discharges from the water treatment plant directly to Libby Creek, known as Outfall 003.  Doc. 34-5 at 15-17.  The renewed MPDES permit that MMC must obtain to continue to discharge water from any outfall will contain any terms and conditions necessary to meet water quality standards, such as temperature.  *See* JFEIS at 700, AR8577.  Thus, the ROD does not violate any water quality standards.

Further, any discharges from Outfall 003 are not anticipated to require additional practicable measures to protect fisheries because any discharges will be

infrequent and, if they occur, the temperature of discharge is expected to be within

an acceptable range of between 51 and 60 degrees Fahrenheit based on measured

temperatures of water representative of discharges from the Water Treatment Plant

from February 2014 to May 2015.  JFEIS at 756, AR8633.  The conditions where a

direct discharge to Libby Creek at Outfall 003 is necessary are expected to be

limited in duration and frequency during the term of the MPDES permit.  JFEIS at

S-43, AR7833, JFEIS at 750, AR 8627.  The adit water treated by the facility is at

or near typical groundwater temperatures; the facility does not add heat in any of

their industrial processes or wastewater treatment processes.   JFEIS at 757,

AR8634.  Thus, direct discharges are not expected to have a thermal effect on

Libby Creek, and practicable measures in addition to those in the Bull Trout

Mitigation Plan, as supplemented by the Fish & Wildlife Service, are not required

at this time.

>    **B.    SOC cannot prevail on its claim based on Section 401  because the
>          Forest Service has not issued a permit or license for the discharge
>          of pollutants.**

Clean Water Act Section 401 requires that an applicant for a federal license

or permit that may result in any discharge into the navigable waters provide a

certification from the State in which the discharge originates that the discharge will

comply with state water quality standards.  33 U.S.C. § 1341.  A federal agency's

issuance of a permit or license without such a water quality certification can be a

violation of the Clean Water Act enforceable by a citizen suit.  *See Oregon Nat.*

*Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1095 (9th Cir. 1988).   However, the

Forest Service has not yet issued a license or permit that authorizes the discharge

of pollutants into waters of the United States within the meaning of Section 401,

and will not do so until its receives a water quality certification from Montana.  No

violation of Section 401 exists.

    The fact that Montana DEQ has not yet issued a Section 401 water quality

certification for the mine does not result in a violation of the Clean Water Act.  The

Plaintiffs do not have a viable claim under the Clean Water Act's citizen suit

provision because the Forest Service has not yet issued a license or permit for an

activity that may result in a discharges to waters of the United States and therefore

has not triggered the obligation to obtain a Section 401 certification.  The ROD

sets out numerous steps that MMC must take, including additional Forest Service

approvals, before MMC commences operations that will result in a discharge to

waters of the United States.  *See* ROD at 8-9, AR10529-30.  Of significance to

obligations under Section 401, the ROD expressly states that "any activity that may

result into any discharge to waters of the U.S. cannot proceed until MMC provides

[the Forest Service] a 401 certification from the DEQ, unless the DEQ waives its

issuance."  ROD at 52-53, AR10573-74.   Thus, the Forest Service has not, and

will not, issue a permit or license that may result in the discharge into navigable

waters without first receiving a Section 401 certification, and it is not in violation

of section 401 of the Clean Water Act.[9]

### C.   The Forest Service's decisions do not violate EPA's effluent standards formining operations.

The effluent standard for new copper milling operations using froth flotation

milling provides that there "shall be no discharge of process wastewater to

navigable waters" except under two circumstances described in the standard.  40

C.F.R. § 440.104(b).  One of those circumstances allows new copper mines and

mills to discharge certain waters attributable to precipitation exceeding evaporation

if the water meets effluent limitations applicable to those discharges.  *See* 40

C.F.R. § 440.104(b)(2).  Because the plan of operations that the Forest Service

intends to approve does not involve the discharge of process wastewater other than

the possible discharge of precipitation, the Forest Service's decision does not

violate the effluent limitation guidelines of the Clean Water Act.

---

[9]  The unpublished district court decision in *Hells Canyon Preservation Council v. Haines*, 2006 WL 2252554 (D. Ore. Aug. 4, 2006), cited by SOC, Doc. 34-5 at 18, does not support its claim here.  In *Hells Canyon*, the Forest Service approved plans of operation that authorized the commencement of mining operations, and associated discharges into navigable waters, without requiring a 401 certification. *Id.* at * 4.  In contrast, the Forest Service here has not yet approved a plan of operation that allows commencement of mining operations, and will not do so until MMC submits any necessary Section 401 certification, or Montana DEQ waives its issuance.

As explained in the JFEIS, any water from the tailings impoundment to be treated and discharged would be mine drainage and precipitation commingled with process water.  AR8032.  The effluent limitations guidelines expressly allow such discharges from comingled waters, provided the volume discharged does not exceed the volume that could have been discharged had each waste stream been treated separately and the pollutants in the volumes permissibly discharged do not exceed applicable effluent limitations.  40 C.F.R § 440.131(a).   The JFEIS confirms that no process water will be discharged unless one of the two exemptions in the effluent limitation guidelines are met (*e.g.*, precipitation exceeding evaporation).  AR8032.  Thus, contrary to SOC's argument, Doc. 34-5 at 19, no process water from the mill other than precipitation will be discharged to Libby Creek, and thus there is no violation of the Clean Water Act.

## II.     The Forest Service's decisions complied with the NFMA.

The development of privately owned minerals is not directly regulated by NFMA and does not alter Forest Service Organic Act authority to regulate mineral development described above (*supra*, pp. 7-9). Accordingly, forest plans developed under NFMA likewise cannot expand Forest Service authority to regulate mining operations.  Under the Wilderness Act the Forest Service may regulate ingress and egress to valid claims "consistent with the use of the land for mineral location and development and exploration, drilling, and production, and use of land for

-24-

transmission lines, water lines, telephone lines, or facilities necessary in exploring, drilling, producing, mining, and processing operations." 16 U.S.C. 1133.

Plaintiffs claim that the JFEIS and ROD violate the forest plan for failure to meet desired future conditions. Doc. 34-5 at 19. This claim fails, because there is no requirement in the forest plan or NFMA regulations that development of a private mineral estate be consistent with all desired future conditions of the forest plan. The relevant regulation, 36 C.F.R. § 219.15, identifies the consistency criteria as "the maintenance or attainment of one or more goals, desired conditions, or objectives." Thus, there is no requirement that any project be consistent with all desired future conditions. The ROD specifically identifies how the Montanore project will contribute to the maintenance or attainment of several desired future conditions outlined in the forest plan, i.e.,

> "contributing to the economic strength and demands of the nation by supplying mineral and energy resources while assuring that the sustainability and resiliency of other resources are not compromised or degraded …" (FW-DC-MIN-01), as well as generating outputs contributing to sustaining social and economic systems (FW-DC-SES-01), contributing to the local economy through the generation of jobs and income (FW-DC-SES-02), and contributing to community stability or growth, and the quality of lifestyles in the Plan area (FW-DC-SES-03).

ROD p. 62; AR10583. Thus, the NFMA regulations requiring consistency with "one or more" desired future conditions are fully satisfied.

Plaintiffs SOC take issue with the conclusion in the JFEIS that Alternative Three would have neutral water quality effects in terms of maintaining forest plan desired condition FW-DC-WTR-01.  Doc. 34-5 at 21.  But the mining operation must fully comply with the Clean Water Act, as well as extensive mitigation measures, to ensure that water quality effects on watersheds and associated aquatic ecosystems are minimized to the extent practicable.  AR10528.  The conclusion that the mitigated project would be neutral with respect to water quality is not arbitrary and capricious.  Plaintiff's argument regarding Poorman Creek is without merit.  Poorman Creek contains no critical habitat for bull trout.  AR34348.  As discussed *supra* and *infra* with respect to Plaintiffs' Clean Water and NEPA claims (§I(A)(1)-(2), §III(B)(2)), the JFEIS and ROD discuss and implement numerous measures to mitigate for potential impacts to bull trout habitat in Poorman Creek.

Plaintiff's claims regarding the applicability of Inland Native Fish Strategy (INFS) Resource Management Objectives (RMO's) are inaccurate and misleading.  Doc. 34-5 at 22-23.  INFS Resource Management Objectives are not standards with which the project is required to comply.  Rather, "interim RMO's provide the target toward which managers aim as they conduct resource management activities across the landscape.  It is not expected that the objectives would be met instantaneously, but rather would be achieved over time."  AR37205.  The Inland Native Fish Strategy does contain standards applicable to mineral activities which

implicitly recognize the Forest Service has limited regulatory authority under the Organic Act.  Consistent with this authority, standard MM-1 requires the Forest Service to "minimize adverse effects to inland native fish species from mineral operations … For operations in a Riparian Habitat Conservation Area ensure operators take all practicable measures to maintain, protect, and rehabilitate fish and wildlife habitat which may be affected by the operations." AR37188.  The extensive mitigation measures required by the ROD fully comply with the Inland Native Fish Strategy.

Alternative 3 will not prevent or retard attainment of any resource management objectives.  Maximum seven-day average temperatures on Libby Creek ranged from 50°F to 68°F.  AR8257.  The temperature of the discharge of mine and adit water is expected to be between 51°F and 60°F based on measured temperatures of the water treatment plant effluent from February 2014 to May 2015.  AR8311.  Increases in stream temperature between sites upstream and downstream of the water treatment plant discharges were less than 1°F in most months in 2014 and 2015, data and stream temperatures at both sites were less than 51°F. *Id*.  Moreover, water discharged from the water treatment plant will flow through a percolation pond or drain field and will cool as it flows to Libby Creek. *Id*.  The JFEIS thus reasonably concluded that water treatment plant effluent is not expected to adversely affect stream habitat in Libby Creek.  *Id*.  In addition,

-27-

temperatures in Libby Creek upstream and downstream of the discharges would be monitored. *Id*.

SOC's argument that potential impacts to $7Q_{10}$ low flows[10] will result in Poorman becoming "degraded" is a gross misreading of the Biological Assessment (BA). While the BA identifies the potential for increase in Poorman Creek stream temperatures at $7Q_{10}$ low flow, it does not state that such changes would be significant. In fact, it states the opposite:

> …in Poorman Creek the estimated $7Q_{10}$ flow is predicted to be reduced by up to 12%. It is possible that this might increase the stream temperature during low flows but forest shading and flow in the gravel streambed substrate, as well as groundwater supply to the stream, may prevent or minimize such a temperature change … Overall, the influence of reduced base flows on stream temperature is uncertain but appears to represent a minimal risk to bull trout.

AR212614-15. Thus, while the BA recognizes the *potential* for reduced base flows to increase temperature in Poorman Creek, it does not state that Poorman Creek will become "degraded" but rather concludes that any effect on temperature is uncertain but expected to be minimal. *Id*.[11]

---

[10] $7Q_{10}$ is the seven-day average low flow expected to occur once in 10 years. AR8396.

[11] Libby-Placer advances the same argument in support of its Poorman impoundment mitigation claims under NEPA. Doc. 36 at 16-17. For the same reasons set forth here, that argument fails.

III.   **The Montanore JFEIS complies with NEPA.**

The JFEIS prepared by the Forest Service and Montana DEQ presents comprehensive analyses of the potentially significant impacts of the Montanore project.  The 2,670-page document fully satisfies the twin objectives of NEPA: The JFEIS provided the decision-maker with relevant environmental information in making a decision regarding the mine and it fostered effective public involvement into the decision-making process.  NEPA requires no more.

Plaintiffs raise three claims under NEPA.  First, they claim there is an "illegal plan to preclude public review of information obtained from the evaluation phase" of the project.  Doc. 34-5 at 24.  Second, Plaintiffs claim the agencies "failed to prepare adequate mitigation plans" with respect to potential impacts of the mine on groundwater and from the tailings facility.  *Id*. at 26-28.  Finally, Plaintiffs claim that JFEIS failed "to obtain baseline data" and instead deferred "critical environmental analysis" to the future.  *Id*. at 28.  None of Plaintiffs' claims have merit.

A.   **The Forest Service's plan for evaluating monitoring information fully complies with NEPA.**

Underground mine development occurs in rock formations that are hundreds to thousands of feet below the surface, hidden from view, and inaccessible other than through mine development or drill holes.  AR8441.  This inaccessibility limits the amount of data initially available which means a degree of uncertainty is

inherent in evaluating the specific environmental impacts related to groundwater prior to actual mine development. *Id*. While models and estimates of groundwater conditions can be developed based on the best available information, actual knowledge of underground conditions may not be fully known, or knowable, until underground operations are underway and additional data can be collected. *Id*.

The JFEIS addresses the uncertainty associated with the impacts on groundwater in two ways. First, the JFEIS utilized numerical groundwater models widely accepted in the scientific community to evaluate potential hydrology impacts. AR8445. MMC prepared a complex and comprehensive three-dimensional (3D) model of the analysis area.[12] AR8445. These model results should be considered conservative with respect to predicting impacts to the upper reaches of modeled streams, because of the way the model assumes interconnection between groundwater and surface water. AR49400.

Because of uncertainty in model inputs (and hence outputs) particularly with respect to the upper reaches of headwater streams, "its best utility in predicting inflows and impacts will be when empirical data are obtained during further underground drilling and testing in and near the ore zone to obtain more reliable input data about rock and groundwater flow conditions." *Id*. This empirical data

---

[12] A complete description of the 3D model is provided in Geomatrix (2011a). AR49396.

can only be gathered during the Evaluation Phase of the project.  Recognizing this,

the agencies implemented a detailed and robust monitoring program to evaluate

model predictions.  ROD appendix C 10.4, AR10792.  After review and evaluation

of the data collected during the Evaluation Phase, the Forest Service will conduct

additional NEPA analysis if significant new circumstances or information relevant

to environmental concerns and bearing on the proposed action or its impacts, as

described by 40 C.F.R. § 1502.9(c)(1)(ii), are identified during final design.

AR10529.

Although all documents generated during monitoring and required by the

ROD will be available to the public, Plaintiffs are simply wrong that NEPA

requires public review and comment before the agency can decide the significance

of that monitoring information.[13]

An agency that has prepared an EIS for which major federal action has yet to

occur must be alert to new information that may alter the results of its original

environmental analysis and continue to take a "hard look at the environmental

effects of its planned action."  *Friends of the Clearwater v. Dombeck*, 222 F.3d

552,557 (9th Cir. 2000) citing *Marsh v. Oregon Natural Res. Council*, 490 U.S.

---

[13] "Public participation does not end with the permitting of the Montanore Project. The public has the right to review permit files and monitoring reports at any time. If a person or organization believes there is an unreported violation or potential for environmental harm, that person has the right to file a complaint with the agencies and expect it to be investigated."  AR10594.

360, 374 (1989).  A supplemental EIS must be prepared if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii).  An agency must therefore conduct an evaluation of new information to determine its significance.  See *Price Rd. Neighborhood Ass'n v. United States Dep't of Transp*., 113 F.3d 1505, 1510 (9th Cir.1997) (holding that when faced with a project change, the Federal Highway Administration may conduct an environmental "reevaluation" in order "to determine the significance of the new design's environmental impacts and the continuing validity of its initial EA.").

But, while NEPA requires agencies to allow the public to participate in the preparation of an SEIS "there is no such requirement for the decision *whether* to prepare an SEIS". *Friends of the Clearwater*, 222 F.3d at 560 (Emphasis in original). As the Ninth Circuit explained:

> …the public comment process … is not essential every time new information comes to light after an EIS is prepared.  Were we to hold otherwise the threshold decision not to supplement an EIS would become as burdensome as preparing the supplemental EIS itself, and the continuing duty to gather and evaluate new information … could prolong NEPA review beyond reasonable limits.

*Id*.

The monitoring program here requires the gathering and assessment of data collected during the Evaluation Phase in order to reassess the impacts of the projected mine.  ROD pp.10-11; AR10531-32.  This ongoing reevaluation is

-32-

consistent with NEPA, as set forth above.  Plaintiffs' claim that the monitoring

program "eviscerates" the public's rights under NEPA is without merit, and must

fail.

      **B.**      **The mitigation plans fully comply with NEPA.**

          **1.**      **No substantive requirement that mitigation be effective.**

Plaintiffs claim that the JFEIS violates NEPA because mitigation measures

may not completely prevent some impacts of the project.  Doc. 34-5 at 26.  This

claim fails as a matter of law.  Under the CEQ regulations implementing NEPA, an

EIS must discuss "appropriate mitigation measures."  40 C.F.R. §1502.14(f).  The

definition of "mitigation" includes avoiding or minimizing environmental impacts,

rectifying the impact by repairing, restoring, or rehabilitating the affected

environment, reducing or eliminating the impact over time through preservation or

maintenance, and compensating for the impact by providing substitute resources.

40 C.F.R. §1508.20.  While mitigation measures must be discussed in sufficient

detail to ensure there has been a fair evaluation of environmental consequences,

there is no requirement that a complete mitigation plan be formulated and adopted

or that mitigation be effective.  *Robertson v. Methow Valley Citizens Council*, 490

U.S. 332, 352 (1989).

As the Ninth Circuit held in *Laguna Greenbelt v. United States Department*

*of Transportation*, "NEPA does not require a fully developed plan that will

mitigate all environmental harm before an agency can act; NEPA requires only that

mitigation be discussed in sufficient detail to ensure that environmental

consequences have been fully evaluated." 42 F.3d 517, 528(9th Cir. 1994).

Mitigation of effects on the baseflow of streams within the Cabinet Mountain

Wilderness and to Rock Lake, the effectiveness of the mitigation and uncertainty

associated with each mitigation are discussed in detail in JFEIS sections 3.10.4.3.5

(AR8487) and 3.10.4.3.6 (AR8488-8492).  This discussion fully complies with

NEPA.  Plaintiff's argument that NEPA requires mitigation to be substantively

effective or to completely eliminate impacts from the proposed action is contrary

to CEQ regulations and well-established case law.

Plaintiffs next argue that the public must be allowed to comment on the

alternative barrier pillar design.  Doc. 34-5 at 27.  This claim also lacks merit.  The

use of low permeability barriers within the mine void is described in the 2011

Supplemental Draft EIS at pages 245 and 253.  AR3961, 3969.   In response to

concerns regarding uncertainty in the design life of constructed barriers, the

agencies identified a potential alternative: leave natural barriers in place.  AR8490.

Although a constructed bulkhead would be made of concrete and grout, and a

barrier pillar would be made of in-place unmined rock, they both would function in

a similar manner to reduce the hydraulic conductivity between sections of the mine

void.  *Id*. Consequently, the agencies considered the modeling of the bulkheads to

-34-

be an equivalent simulation of the agencies' mitigation of leaving one or more

barriers, if necessary, during the Operations Phase.  *Id.*  This modification of the

potential mitigation measure is well within the scope of appropriate responses to

comments. 40 C.F.R. § 1503.4 (identifying modification of alternatives between

the EIS and FEIS as appropriate).  Plaintiffs' argument that this potential

mitigation measure requires an additional round of public comment is without

merit.

### 2.    Poorman impoundment mitigation.

The SOC Plaintiffs adopt Libby-Placer's argument that the JFEIS violates

NEPA in its discussion of mitigation measures related to the effects of the

Poorman impoundment site.  Doc. 34-5 at 28.  These mitigation measures were

analyzed as part of Alternative Three, and selected in the ROD.  AR10528.

Contrary to Plaintiffs' argument, the JFEIS analyzed, and the ROD implements, a

comprehensive suite of mitigation measures to address potential impacts of the

Poorman tailings impoundment such that the potentially significant impacts of the

project have been "fairly evaluated".

The Forest Service selected the Poorman tailings impoundment because it

had significantly less impact than other impoundment sites analyzed.  The

Poorman site has the least impact on aquatic and riparian resources of all the sites

considered in the JFEIS.  Compared to the Little Cherry Creek site in alternative

-35-

two and the modified Little Cherry Creek site in alternative four, the Poorman site

has fewer impacts on wetlands, fewer impacts on Riparian Habitat Conservation

Areas, and avoids the permanent diversion of a perennial stream.  AR10552.  Thus,

the selection and utilization of the Poorman site itself minimizes impacts.

The KNF ROD further specifically considered and adopted mitigation

measures to reduce impacts on Libby Placer's property.  AR10557-10560.  To

eliminate the potential of seepage from the tailings impoundment migrating onto

private property, the ROD requires the installation of pumpback wells down

gradient of the tailings impoundment to collect any seepage not captured by the

under drain system for the impoundment.  AR10541.  Water withdrawn by the

pumpback system will be used for ore processing thus reducing the need for wells

elsewhere to provide this water.  AR8028.  Libby Placer Mining does not have a

beneficial water right to use groundwater beneath its property and no beneficial

water right will be adversely affected by the pumpback wells.  AR8458.

The JFEIS and ROD discuss and implement mitigation measures for dust

control as well:

> Spigots distributing wet tailings material and water will cover about one half
> of the total tailings at any time. The spigots will be moved regularly and will
> cause wetting of all non-submerged portions of the tailings impoundment.
> This wetting will be supplemented by sprinklers as necessary when weather
> conditions could exist to cause fugitive dust.

AR1058.  Using sprinklers to reduce the potential of fugitive dust is a mitigation

measure that will reduce the impacts to adjacent private property.  Air quality

monitoring at the impoundment site will assess the effectiveness of this mitigation.

AR10742-10745.  Mitigation measures to reduce noise are also described in the

ROD.  AR10613.

Libby-Placer argues that the JFEIS failed to address mitigation for the

"dewatering" of Libby and Poorman creeks, but the contention lacks merit.  Doc.

36 at 14.  First, flow in Libby Creek where it runs through Libby-Placer's property

is expected to increase during all phases of the project.  AR8535-8539.  For

Poorman Creek, flow is expected to increase during the construction phase of the

project and decrease slightly (0.18 CFS) during the operations and closure phases.

What Libby-Placer fails to acknowledge, however, is that Poorman creek is already

dewatered under baseflow conditions where it runs through Libby-Placer's

property.  "Maximum baseflow reductions in Poorman Creek would be 12% at the

point that typically is dewatered at baseflow conditions near its confluence with

Libby Creek and this effect would occur after mine closure."  USFWS BO p. 102;

AR221625.

The impact of such reductions in flow on the aquatic environment is

insignificant.  "All of the reaches that could potentially be impacted by changes to

$7Q_{10}$ flows are currently unlikely to be passable by adult migratory bull trout

during $7Q_{10}$ flows.  Predicted changes to $7Q_{10}$ flows that could result from the

Proposed Action do not change this assessment for any of the reaches."

AR212609.  Accordingly, the agency's decision to not specifically mitigate for the

impact of the pumpback well mitigation on streamflows is not arbitrary and

capricious.  *Transmission Access Policy Study Group v. F.E.R.C.*, 225 F.3d 667,

736 (D.C. Cir. 2000) (upholding decision not to require mitigation measures where

impact of the action was insignificant).

Nevertheless, the Forest Service identified and implemented mitigation for

potential impacts to aquatic resources in Poorman Creek, including replacement of

a culvert on Forest Service Road 278 that currently restricts fish passage (JFEIS p.

120) and removal of a bridge on Forest Service Road 6212 at closure.  BO p.58;

AR2211582.  These mitigations will improve habitat for aquatic resources over

baseline and help reduce the impact from any reduction in base flow caused by the

pumpback system.  AR34631 ("Bull trout mitigation was driven by potential

impacts that would occur if estimated streamflow reductions during low flow

conditions were to occur.").

Further, additional subsurface data, such as aquifer pumping tests, from this

area would be collected during the final design process of the Poorman

Impoundment. The KNF will use adaptive mitigation to modify the mitigation

plans described in ROD Attachment 1, Section 1.1.6, if necessary to incorporate

-38-

the revised model results.  AR10622.  The mitigation plan is designed to reduce or

compensate for any adverse impacts on aquatic resources by a reduction in base

flows.  AR34400 ("More definite mitigating factors are the long-term sediment

reductions that would occur before any flow impacts would occur, and replacement

of the FSR278 culvert.  This would improve connectivity by allowing unrestricted

access to habitat upstream of the culvert where bull trout are currently absent but

assumed to have occurred historically.").  Plaintiffs' arguments that the Forest

Service failed to consider mitigation measures related to impacts from the Poorman

Creek tailings site are without merit.

### C.    Baseline data were acquired as required by NEPA.

SOC argues that USFS deferred "critical environmental review of the

baseline resource conditions," and that such deferral precludes accurate analysis of

the Project's impacts and violates NEPA.  Doc. 34-5 at 28.  In making this claim,

SOC incorporates by reference pages 18-25 of Libby-Placer's brief (doc. 36,

§IV(A)(4)).  As set forth below, both Plaintiffs' claims lack merit.

### 1.    Final Poorman / Libby Plant facility design not prerequisite to a valid NEPA analysis.

Plaintiffs argue the project's analysis was flawed because of the "failure to

obtain baseline data."  Doc. 34-5 at 28.  They argue the Poorman tailings waste

impoundment facility and Libby Plant Site have only been conceptually designed,

rather than finally designed, which precludes adequate NEPA analysis.  Doc. 36 at

18-19.  Plaintiffs quote the JFEIS and ROD, which acknowledge that final facility

design will depend on additional site information to be obtained during future

geotechnical investigations.  *Id.*, quoting AR7994-95.  But Plaintiffs miss an

important distinction between final facility design and baseline site data necessary

for a valid NEPA analysis.  In NEPA analyses, the "baseline" is the condition of

the environment before or in lieu of a proposed action.  *Havasupai Tribe*, 752 F.

Supp. at 1492.  It is represented by the "no action" alternative, i.e., what the

environment would look like if the mine were rejected.  *Id.*

The environmental baseline is an integral part of an EIS because

environmental impacts are measured and evaluated against that standard.  *Am.

Rivers v. Fed Energy Regulatory Comm'n*, 201 F.3d 1186, 1195 & n 15 (9th Cir

2000); *Ctr. for Biol. Diversity*, 422 F Supp.2d at 1163.  Thus, baseline information

must be accurate and complete.  *Id*.  But NEPA does not specify the "quantum of

information" an agency must possess about any resource before the agency may

proceed with a given project, and the information available to an agency can

always be augmented.  *Alaska v. Andrus*, 580 F.2d 465, 473 (D.C. Cir. 1978),

vacated in part on other grounds, *Western Oil & Gas Ass'n v. Alaska*, 439 U.S. 922

(1978).

Plaintiffs concern seems to be that the NEPA analysis did not demonstrate that the proposed facility sites could handle the future facilities. But this contention is wrong on two fronts: First, for each resource area, the Forest Service determined they had adequate data to describe the environmental effects of the mine and all associated facilities. The Poorman site, for example, was analyzed using best available site-specific information and information from the nearby Little Cherry Creek site. See JFEIS at Section 3.14.3.2.3, AR8685. The Poorman and the Little Cherry Creek sites have similar subsurface geology, based on a comparison of drill log data from 1988 geotechnical investigations consisting of 1) geologic mapping, 2) seismic refraction surveys, 3) drilling, 4) test pit excavation and 5) laboratory testing. See Table 5.1 of Morrison-Knudsen Engineers, AR1893334. These data demonstrate the Poorman site is feasible for a stable tailings impoundment facility. AR41880-41974, 8679-85. A final design of the tailings impoundment facility itself is not necessary to disclose environmental impacts.

Second, the final facility designs for the Poorman and Libby plants depend on site-specific geotechnical information that will only be obtained after the agencies approve a plan for field study. AR7994 ("MMC would submit a tailings impoundment site geotechnical field study plan to the agencies for their approval before commencing activities."). If and when the Site Exploration Plan is

approved, it would become a part of the amended Plan of Operations, which is then subject to Forest Service approval, conditions, and mitigation measures. *Weiss*, 642 F.2d at 298-99.

The design of the facilities themselves will also be subject to agency control and approval: The JFEIS describes at § 2.5.2.6.3 the "Final Tailings Impoundment Design Process," which includes a preliminary design phase and a final design phase. An approved tailings impoundment final design will need to include requirements for:

• Updating the seismic stability analysis;
• Avoiding or minimizing to the extent practicable, the filling of wetlands;
• Funding an independent technical review of the final tailings impoundment design; and
• Submitting final design to the lead agencies for approval.

JFEIS at 134-136, AR7994-96. In order to meet the agencies' requirements for final design, the facilities must be designed, constructed, operated, and reclaimed in accordance with applicable regulations. JFEIS at 566, AR8443. This ensures safe tailings facilities that minimize environmental impacts.

But even if a potential environmental impact arose through unforeseen circumstances,[14] Plaintiffs and the public would have a remedy: The JFEIS

---

[14] NEPA only requires agencies to analyze the environmental effects of "reasonably foreseeable future actions." *League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1220 (9th Cir. 2008).

specifically requires additional NEPA analysis should the final design generate significant impacts that are outside of the scope of those analyzed in the JFEIS. AR8443-8445, 8671.  Similarly, Montana DEQ states in its ROD that new information acquired during the Evaluation Phase may be submitted as part of a new MEPA review to demonstrate that, e.g., changes in stream flow will comply with the nondegradation standard.  AR11017-11018, 10522.

>  **2.    NEPA does not require analysis of unknown, unanticipated, yet-to-occur effects.**

The kind of ongoing monitoring and review called for by the Plan of Operations and JFEIS, also known as "adaptive management and mitigation," is entirely appropriate and acceptable under NEPA where future environmental impacts are variable depending on certain approvals and site-specific information. *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 516 (D.C. Cir. 2010).  Such adaptive management and mitigation "amply fulfills NEPA's mandate to discuss mitigation measures," and comports with NEPA's requirement "to take a hard look at environmental impacts before actions are taken."  *Id*., citing 40 C.F.R. § 1500.1(b).

> The procedural requirements of NEPA do not force agencies to make detailed, unchangeable mitigation plans for long-term development projects. Through the adaptive management plan, the Bureau plans to monitor the real effects of the development it authorizes, and adapt its mitigation measures to specific drilling proposals in response to trends observed. Allowing adaptable mitigation measures is a responsible decision in light of the

-43-

inherent uncertainty of environmental impacts, not a violation of NEPA. It is certainly not arbitrary or capricious.

*Id*. So too, here, the proposed mine is a long-term development project, and the decision approving the Plan of Operations embraces and depends upon ongoing monitoring and approvals. Contrary to Plaintiffs' claims, this is not a NEPA violation. *Id*.; see also *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 477 (9th Cir.2000) (approving mitigation "described in general terms" and based on "general processes" where "the actual adverse effects are uncertain, and the EIS considered extensively the potential effects and mitigation processes.").

Plaintiffs argue "it is accepted practice of the Forest Service to conduct detailed geotechnical and related analysis of potential tailings sites prior to the completion of a Final EIS for large mining projects such as Montanore." Doc. 36 at 20-21, alluding to two mines in Arizona and Colorado where the Forest Service undertook NEPA analyses to ascertain "baseline characteristics" before approving the main mine proposals. Even if the comparison of those projects with Montanore is apt (which is unlikely given the complexity of each mine proposal and the duration and history of its approval process), Plaintiffs are still only talking about an "accepted practice."[15] They do not describe an analytical or regulatory requirement that all detailed geotechnical investigations must be completed before

---

[15] In fact, they are only discussing two examples, which could be outliers.

any FEIS can be approved for a large mining project.  As set forth above, there is

no such requirement under NEPA, and there are excellent policy reasons to avoid

such a restrictive interpretation (i.e., adaptable management and mitigation are

more responsive to "real effects" over time).

Plaintiffs argue EPA's comments were "strongly critical" of the decision to

proceed with the JFEIS prior to acquiring detailed geotechnical field studies.  *Id*. at

21.  Yet examination of the referenced comments reveals two agencies working

cooperatively to establish comprehensive and rigorous analytical protocols.  See,

e.g., AR 10129 (showing the agencies developed a geochemical sampling and

analysis plan "In cooperation with the EPA", EPA's acknowledgment that "data

are limited", and that EPA supports additional data collection efforts).

Moreover, EPA's concerns about completing geotechnical review prior to

the final EIS were predicated on an unlikely contingency, i.e., "if the Poorman TSF

site is determined to be geotechnically unsuitable…."  AR13163.  As noted in the

Forest Service's response, that contingency assumes geotechnical issues that

cannot be addressed by MMC's impoundment design, or by additional mitigation

prescribed through adaptive management.  AR13206.  Such a result is unlikely

because, as noted above, the site data indicate the Poorman location can support

the TSF facility.  AR8679-85, 41880-41974, 1893334; *see also* MMC statement of

disputed facts at ¶22.  Plaintiffs point to no record evidence impeaching this

determination.  In fact, if the Poorman site is wholly unsuitable, the JFEIS

recognizes that relocation of the TSF facility will be required, along with new

NEPA.  AR13206.

Under 40 C.F.R. § 1502.22(a), if "incomplete information relevant to

*reasonably foreseeable* significant adverse impacts is essential to a reasoned

choice among alternatives and the overall costs of obtaining it are not exorbitant,

the agency shall include the information in the environmental impact statement."

(Emphasis added).  Here, the "wholly unsuitable" outcome at the Poorman site is

not "reasonably foreseeable" because none of the data indicate such a result.

Moreover, that information is not "essential to a reasoned choice among

alternatives" because the existing decision countenances new alternatives, i.e., a

new NEPA process and decision, when and if this unlikely scenario occurs.

Finally, MMC would likely characterize the costs of obtaining the

information now as "exorbitant" because the field surveys, preliminary and final

facility designs, independent technical advisors, reports, and plans are all part of a

costly and iterative multi-phase process requiring approval by numerous State and

federal agencies.  AR10717-10719, stipulations 113-116, 122, 124, 125.  Thus, for

example, DEQ is holding in abeyance any decision on a permit for the tailings

facility until after completion of the monitoring required in the Evaluation Phase: It

makes no sense to conduct a detailed site investigation for final design unless and

until DEQ determines that it can permit the development.  MMC wants approval of the Plan before investing the money, whereas Plaintiffs want MMC to spend all the money before knowing whether the Plan is approved (on the remote chance the Poorman site is wholly unsuitable).

Libby-Placer's claims regarding the mixing zone fail for the same reason. Doc. 36 at 20.  Plaintiffs complain that "the 'conceptual design' of the tailings facility is based on whether DEQ approves a 'mixing zone' underneath the facility to allow the seepage from the tailings to violate state groundwater standards." *Id*. Plaintiffs note that DEQ has not yet granted a mixing zone, and the implication seems to be that the NEPA analysis was deficient because it did not discuss the "revised approach" MMC would develop for dealing with seepage in lieu of a mixing zone. *Id.* citing AR10559.

As noted *supra*, all seepage will be intercepted by the pumpback wells located immediately downgradient of the Poorman Impoundment.  AR10541. Also, antimony is the only parameter predicted to exceed Montana groundwater quality standards within a mixing zone. JFEIS at 755, AR8632.  Based on geochemical conditions in the area, and experience at the analogous Troy Mine, the Forest Service anticipates natural attenuation and removal of metals in the tailings water that infiltrates at the tailings impoundment. *Id*. at 739-740, AR8616-8617.  Thus, groundwater metal concentrations beneath the impoundment will

-47-

likely be less than predicted by the mass balance calculations, and a mixing zone or other treatment may not be required.  *Id.*

Also, while DEQ has not yet granted a mixing zone, that does not suggest they will not grant one.  Indeed, the foregoing factors make it likely DEQ *will* grant a mixing zone.  Mont. Admin. R. 17.30.506 (i.e., because it will not threaten or impair existing beneficial uses, will not discharge a toxic parameter, etc.).  DEQ has not yet acted on MMC's request for a mixing zone only because it is holding in abeyance a decision on the Construction and Operation phases.  The Evaluation Phase will facilitate DEQ's assessment, and the JFEIS specifically envisages that DEQ will make a mixing zone determination "During the permitting process." AR8628.

Once again, the need of a mixing zone, and the inability to utilize one (i.e., DEQ's refusal to grant), are based on speculation.  Plaintiffs offer no record evidence that natural attenuation will not occur, or that DEQ will refuse to grant a mixing zone.  Also, if DEQ does not grant a mixing zone, MMC's revised approach to tailings disposal would be subject to a significance determination under 40 C.F.R. § 1502.9(c)(1)(ii) and new NEPA analysis.  ROD at 38, AR10559, 13206.  Thus, the mode of tailings treatment if a mixing zone is required, and denied by DEQ, is not "relevant to reasonably foreseeable significant adverse

impacts [that are] essential to a reasoned choice among alternatives….” 40 C.F.R. § 1502.22(a).

Site-specific geotechnical and hydrological information is contained in the record, and informed the Forest Service’s decision.  See *supra*; see also “Technical Memorandum: Hydrogeology in Poorman Tailings Storage Facility and Little Cherry Creek Areas; Montanore Mine Project” (AR35257-35283); see also “Technical Memorandum: Additional Analysis of Potential Indirect Dewatering Impacts to Wetlands Resulting from Pump-back Wells at the Poorman Tailings Storage Facility, Montanore Mine Project” (AR34085-34114).  The absence of further, as yet unknown geotechnical and mixing zone information, is not a NEPA defect.

### 3.   The agencies are not relying on a bedrock ridge.

Plaintiffs next argue that the Forest Service relies on an underground bedrock ridge as a means of preventing contaminated groundwater from migrating from under the Poorman impoundment to the Little Cherry Creek wetlands, without actually knowing that such a feature exists.  Doc. 36 at 22-24.  Plaintiffs are wrong.

The JFEIS discusses the hydrogeology of the tailings impoundment and land application disposal (LAD) areas, as part of the Affected Environment section. JFEIS at 579, AR 8445.  The information is based on field data collected for

numerous reports, as summarized by NewFields 2014.  AR191516-191542.  These

data adequately evaluate and disclose site conditions, including subsurface

geotechnical features, enabling the decision makers to make a reasoned choice

among alternatives.  JFEIS at 794, AR8671.

Contrary to Plaintiffs' claim, the Forest Service did not state that mitigation

"depends on an apparent bedrock ridge…."  Doc. 36 at 23, citing AR10116.  The

Corps' regulations require that harm to jurisdictional wetlands be minimized in

accordance with Executive Order 11990.  36 C.F.R. 228 Subpart A.  Further, the

Kootenai National Forest would require MMC to develop compensatory mitigation

that would create 7.5 acres of wetlands and 4.5 acres of upland buffers.  JFEIS at

1028, AR8905.  MMC would submit a final isolated wetland mitigation plan to the

Kootenai NF for its approval and for incorporation into MMC's amended Plan of

Operations.  *Id.*

Far from assuming this bedrock ridge would block migrating groundwater,

the JFEIS assumed the opposite: Because geologic and hydrologic data between

the Little Cherry Creek and Poorman drainages are limited, the Forest Service

accepted the possibility that the pumpback well system could adversely affect

groundwater-supported wetlands.  JFEIS §2.5.2.6, AR7991, 9645-9744.

Accordingly, subsurface data from this area will be collected during the final

design process of the Poorman Impoundment.  *Id*.  These data will confirm the

geophysical results, and the hydrogeologic data amassed by MMC to date.  *Id*.

One year before mill operations begin, MMC will measure water levels in

piezometers in wetlands LCC-35 and LCC-39 four times over the annual

hydrograph.  JFEIS Appendix C, AR9685.  Vegetation will also be monitored,

following the methods used for the Groundwater Dependent Ecosystem

monitoring.  AR8902.  Monitoring will continue through the Closure Phase as long

as the pumpback well system is operated or until agreed upon by the agencies that

it was no longer necessary.  *Id*.  Should the monitoring or 3D model indicate

adverse unforeseen effects, MMC will need to deploy appropriate mitigation.

JFEIS at 1025, AR8902.  In other words, the Forest Service is not relying on an

underground bedrock ridge for mitigation of potential ground water effects.

### 4.    *Rock Creek* is inapposite as to adequacy of information.

Plaintiffs try to analogize this case to this Court's decision in *Rock Creek*.

Doc. 36 at 24-25, quoting 703 F. Supp. 2d at 1180-81.  But in *Rock Creek*, the

Forest and the Fish & Wildlife Service admitted bull trout population data were

inadequate at the time of the decision and Biological Opinion (2003), and at the

time of the pre-construction baseline (1985-88).  *Id.* at 1181.  As noted above, the

agencies make no such concessions here.

Also, the information to come which Plaintiffs complain about in this case (detailed geotechnical investigations, mixing zones) is not information the Forest Service "knew or should have known" at the time it issued the ROD. *Id.* at 1180. In *Rock Creek*, the fish were in the streams, and nothing was stopping the Forest from monitoring their populations. Here, there is no decision on the mixing zone, and there is no authorization or approval for MMC to begin site assessment, let alone facility design. Here, there is a dizzying array of sequential assessments and authorizations which MMC must secure from a variety of sovereigns and agencies before it – or anybody else – can know the answer to either question.

The JFEIS analyzes impacts based on the appropriate data in hand, i.e., the Poorman site will be suitable for the impoundment facility, and a DEQ-sanctioned mixing zone will accommodate ground water remediation, if required. If either of these analytical premises is wrong, the agency acknowledges it opens the door to significance and new NEPA. But, thanks to the phased approach, those revelations would precede the Operational Phase, and any threat of new significant environmental harm.

Even where the agency "should have known" omitted information at the time of the original NEPA document, *Rock Creek* is not incompatible with this approach. In *Rock Creek*, the Forest tried to update a 2003 ROD, deficient on bull trout habitat data, with a 2007 Supplemental Information Report. "The agency

cannot 'update its NEPA study' with a non-NEPA Supplemental Information Report issued four years after the Record of Decision." *Id.* at 1181. This Court did not state, however, that supplemental NEPA was impermissible. To the contrary, the Court remanded for the agency to conduct precisely that analysis. *Id.* ("…remanded to the Forest Service for further action to comply with NEPA, … through the issuance of supplemental environmental impact statement addressing the updated bull trout population and habitat information…"). Thus, if the Poorman site turns out to be wholly incompatible, or if a mixing zone is not granted, the Forest Service can deal with those changed circumstances by supplemental NEPA.

## 5.   Groundwater Dependent Ecosystems were analyzed as required by NEPA.

SOC argues that the JFEIS was deficient because it deferred the acquisition and analysis of "important baseline information" on groundwater dependent ecosystems. Doc. 34-5 at 28-30. Contrary to Plaintiffs' claims, however, the Forest Service did not identify any incomplete or unavailable geotechnical information. The JFEIS states:

> The KNF and the DEQ determined that the baseline data and methods used are adequate to evaluate and disclose reasonably foreseeable significant adverse effects on resources in the analysis area potentially affected by geotechnical issues, and to enable the decision makers to make a reasoned choice among alternatives. Section 3.10.2.4, Additional Data Collection and Appendix C describe the geotechnical data that would be collected during all phases of the project, including the Evaluation Phase and for final design.

> The agencies did not identify any incomplete or unavailable geotechnical
> information, as described in section 3.1.3, Incomplete and Unavailable
> Information.

JFEIS at 794, AR8671.  Thus, while additional information will be collected, the

agencies already possess sufficient information to make an informed decision

under NEPA.

In 2009, MMC completed a Groundwater Dependent Ecosystem inventory,

focusing on areas at or below 5,600 feet on the north side of the Libby Creek

watershed.  JFEIS, Appendix C, C-43-46, AR9689-92.  Additional inventory in the

Libby Creek drainage was completed in 2010.  *Id.*  The additional inventory

catalogued Groundwater Dependent Ecosystems identified in 2009 and in

connection with the threatened, endangered, and Region 1 sensitive species lists.

*Id.*  MMC conducted inventory work in other mine areas, like the Ramsey Creek

drainage (2012), the East Fork Rock Creek drainage (2013), and the East Fork Bull

River drainage (2014).  *Id.*  Water samples for isotope analyses have been collected

by MMC and DEQ since 2010, and were collected by Gurrieri in 1999 (as reflected

in the Gurrieri (2001) study).  Gurrieri (2015) summarized isotope data collected

by MMC.  MMC completed surveys for wetlands, springs, and perennial and

ephemeral streams in the Impoundment Sites in 2005 and 2007, and surveys for

sensitive plants, amphibians, and reptiles were also completed at both sites.  *Id.*

Thus, Plaintiffs are wrong to suggest there is any paucity of information

concerning Groundwater Dependent Ecosystems.

Some data regarding the hydrologic characteristics of the streams, seeps and

springs and Groundwater Dependent Ecosystems above the mine area are

incomplete or unavailable.  These include the precise location where subsurface

bedrock groundwater discharges to surface water, the specific relationship between

the rate of bedrock groundwater discharged to surface water and the rate of total

surface flow, and the precise nature and timing when bedrock groundwater

overlying the mine area discharging to surface water is the dominant component of

streamflow.  But KNF determined this information was not essential to an

informed decision under NEPA.  AR8441.  Because these features occur above the

mine, and relate to dynamics and processes peripheral to the mine itself, Plaintiffs

cannot demonstrate this determination was arbitrary and capricious.  Moreover,

some of the additional information can only be obtained with decades of data

collection, and at exorbitant overall costs.  *Id.*  As noted above, this means the data

need not be included in the agency's EIS.  40 C.F.R. § 1502.22(a).

Plaintiffs contend that EPA was "strongly critical" of the purported lack of

baseline data for Groundwater Dependent Ecosystems, noting in particular a

concern that groundwater drawdown would likely cause a "seasonal dry-up of bull

trout spawning habitat."  Doc. 34-5 at 29-30, citing AR13157, 13159.  But the

premise of EPA's comment is wrong: The record does not indicate that flow

changes and groundwater drawdown will cause seasonal dry-up of bull trout

spawning habitat.  As stated in the Biological Assessment (AR212605-212608)

and Biological Opinion (AR221611-221615), the model did not predict seasonal

dry-up of any stream reach that supported fisheries.  The JFEIS states:

> Effects on aquatic populations from these minimal decreases would likely
> not be measurable within this reach or farther downstream in the Rock Creek
> mainstem.  The intermittent flows that occur in the mainstem of Rock Creek
> under existing conditions could be exacerbated by the slight decreases in low
> flows, and, if so, would further restrict movement of migratory and resident
> fish.

JFEIS at 447, AR8307.  The U.S. Fish & Wildlife Service considered these

potential effects in its Biological Opinion and in developing the reasonable and

prudent measures.  Thus, contrary to Plaintiffs' argument, baseline data were not

deferred, and the NEPA analysis took the required hard look at Groundwater

Dependent Ecosystems.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this

matter be summarily adjudicated in favor of the federal defendants, and that the

Court hold the JFEIS and ROD were not arbitrary and capricious under the APA,

or otherwise contrary to law.

**DATED** this 21st day of November, 2016.

MICHAEL W. COTTER
United States Attorney


/s/ Victoria L. Francis
Assistant U.S. Attorney

Mark Steger Smith
Assistant U.S. Attorney

Allen Greenberg
U.S. Department of Justice
Environmental Defense Section

Attorneys for Federal Defendants/USA

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), the attached brief is proportionately spaced, has a typeface of 14 points and contains 12,742 words, excluding the caption and certificates of service and compliance.

**DATED** this 21st day of November, 2016.

MICHAEL W. COTTER
United States Attorney


/s/ Victoria L. Francis
Assistant U.S. Attorney

Mark Steger Smith
Assistant U.S. Attorney

Allen Greenberg
U.S. Department of Justice
Environmental Defense Section

Attorneys for Federal Defendants/USA