Mark L. Stermitz
CROWLEY FLECK PLLP
P.O. Box 7099
Missoula, MT  59807-7099
Telephone: (406) 523-3600
Facsimile: (406) 523-3636
mstermitz@crowleyfleck.com

Robert Tuchman
Paul Lopach
BRYAN CAVE LLP
1700 Lincoln Street, Suite 4100
Denver, CO 80203
Telephone: (303) 861-7000
Facsimile: (303) 866-0200
paul.lopach@bryancave.com

*Counsel for Defendant-Intervenor
Montanore Minerals Corp.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| SAVE OUR CABINETS, EARTHWORKS, and CLARK FORK COALITION,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, U.S. FOREST SERVICE, and CHRISTOPHER S. SAVAGE,<br><br>Defendants, | CV 16-53-M-DWM<br>CV 16-56-M-DWM<br><br><br>**DEFENDANT-INTERVENOR MONTANORE MINERALS CORP.'S COMBINED BRIEF IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT** |

and

MONTANORE MINERALS CORP.,

     Defendant-Intervenor.

---

LIBBY PLACER MINING COMPANY,

        Plaintiff,

   vs.

UNITED STATES FOREST SERVICE,
U.S. DEPARTMENT OF AGRICULTURE,
and CHRISTOPHER SAVAGE, in his
official capacity as Forest Supervisor of the
Kootenai National Forest,

        Defendants,

   and

MONTANORE MINERALS CORP.,

     Defendant-Intervenor.

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................1

FACTUAL BACKGROUND ..................................................4

STANDARDS OF REVIEW ................................................7

ARGUMENT ....................................................................8

I.    The Forest Service Complied with the Clean Water Act and Organic Act ........................................................8

      A.    The Forest Service Ensured Compliance with Montana's Water Quality Standards. ......................................10

          1.    The Forest Service ensured compliance with Montana's nondegradation standards, for waters both within and outside of the Wilderness. ..................11

          2.    The Forest Service ensured compliance with Montana fish protection standards.................................19

          3.    The Forest Service adequately addressed the Environmental Protection Agency's concerns. .............26

      B.    The Forest Service Complied With Section 401 of the Clean Water Act.......................................................27

      C.    The Forest Service Ensured Compliance with the Environmental Protection Agency's Zero-Discharge Effluent Rule for the Poorman Tailings Impoundment. ..........30

      D.    The Forest Service met Organic Act requirements respecting state water quality standards and other Clean Water Act requirements. ...........................................31

II.    The Forest Service Complied With NFMA ........................32

      A.    The Forest Service ROD Is Consistent with the Forest Plan "Desired Conditions."....................................33

      B.    The Forest Service ROD Is Consistent With Inland Native Fish Strategy Stream Temperature Objectives.............33

      C.    The Forest Service ROD is Consistent With Inland Native Fish Strategy Fish Habitat Objectives..........................37

## TABLE OF CONTENTS
(continued)

**Page**

III.    The Forest Service Complied With NEPA ........................................38

    A.    The Forest Service Complied with NEPA's Public
         Review Requirements. .............................................................39

    B.    The Forest Service Adequately Evaluated and Identified
         Potential Mitigation Measures Regarding
         Nondegradation and Flow Reduction. ....................................41

    C.    The Forest Service Did Not Misapply Evaluation Criteria
         in Choosing the Poorman Impoundment Alternative. .............44

    D.    The JFEIS Provided Sufficient Baseline Data to
         Carefully Assess Potential Environmental Impacts.................47

CONCLUSION ......................................................................................50

CERTIFICATE OF COMPLIANCE ......................................................50

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Eskimo Whaling Comm'n v. Envtl. Prot. Agency*,
  791 F.3d 1088 (9th Cir. 2015) ...............................................................7

*Cal. ex rel. Imperial Cy. Air Pollution Control Dist. v. U.S. Dept. of
  the Interior*,
  767 F.3d 781 (9th Cir. 2014) ......................................................16, 17

*Chesapeake Bay Found. v. Gwaltney*,
  844 F.2d 170 (4th Cir. 1988) ..............................................................21

*Conservation Congress v. U.S. Forest Service*,
  ___ F. Supp. 3d ___, 2016 WL 727272 (E.D. Cal. Feb. 23, 2016)...................39

*Ctr. for Biological Diversity v. BLM*,
  833 F.3d 1136 (9th Cir. 2016) ............................................................26

*Florida Power & Light Co. v Lorion*,
  470 U.S. 729 (1985)...............................................................................7

*Friends of Clearwater v. Dombeck*,
  222 F.3d 552 (9th Cir. 2000) ..............................................................39

*Great Basin Mine Watch v. Hankins*,
  456 F.3d 955 (9th Cir. 2006) ......................................................10, 19

*Gwaltney v. Chesapeake Bay Found., Inc.*,
  484 U.S. 49 (1987)................................................................................21

*Hells Canyon Presv. Council v. Haines*,
  2006 WL 2252554 (D. Or. 2006) ...............................................22, 28

*Idaho Wool Growers Ass'n. v. Vilsack*,
  816 F.3d 1095 (9th Cir. 2016) ............................................................39

*Indep. Acceptance Co. v. California*,
  204 F.3d 1247 (9th Cir. 2000) ..............................................................7

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) .........................................................7, 32

*Marsh v. Oregon Nat. Res. Council, Inc.*,
  490 U.S. 360 (1989).......................................................................38, 39

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
402 F.3d 846 (9th Cir. 2005) ................................................................7

*Okanogan Highlands All. v. Williams*,
236 F.3d 468 (9th Cir. 2000) ..............................................................43

*Oregon Natural Desert Ass'n v. Jewell*,
823 F.3d 1258 (9th Cir. 2016) ............................................................46

*Plains Resource Council v. Surf. Transp. Brd.*,
668 F.3d 1067 (9th Cir. 2011) ............................................................48

*Protect Our Communities Found. v. Jewell*,
825 F.3d 571 (9th Cir. 2016) ..............................................................43

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am.*
*v. U.S. Dept. of Agric.*,
499 F.3d 1108 (9th Cir. 2007) ..............................................................7

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989).............................................................38, 41, 43

*Rock Creek All., et al. v. U.S. Forest Service, et al.*,
703 F. Supp. 2d 1152 (D. Mont. 2010)...................................*passim*

*Sierra Club v. Union Oil Co.*
813 F.2d 1480 (9th Cir. 1987) ............................................................20

*Sierra Club v. Union Oil Co.*,
853 F.2d 667 (9th Cir. 1988) ..............................................................21

## STATUTES

5 U.S.C. § 706(2)(A)............................................................................7

16 U.S.C. § 478...................................................................................9

16 U.S.C. § 551...................................................................................9

16 U.S.C. § 1604(i) ............................................................................32

33 U.S.C § 1341 .................................................................................27

33 U.S.C. § 1342(b)(1)(A) .................................................................27

Administrative Procedure Act.........................................................4, 7

Clean Water Act.........................................................................*passim*

Mont. Code Ann. § 75-5-303(1) .........................................................8

Montana Environmental Policy Act ..................................................40

Montana Water Quality Act ............................................................................3, 8, 13

National Environmental Policy Act ..................................................................*passim*

National Forest Management Act .....................................................................*passim*

Organic Administration Act ............................................................................*passim*

## REGULATIONS

36 C.F.R. Part 218 Subpart A .................................................................................37

36 C.F.R. § 219.15 ................................................................................................32

36 C.F.R. § 219.15(c)(3) .......................................................................................37

36 C.F.R. § 219.15(c)(4) .......................................................................................37

36 C.F.R. § 219.16(b) ...........................................................................................37

36 C.F.R. Part 228 Subpart A ..................................................................................5

36 C.F.R § 228.8 .........................................................................................9, 10, 30

36 C.F.R. § 228.8(h) .....................................................................................10, 19

40 C.F.R. § 440.104(b)(1) .....................................................................................29

40 C.F.R.§ 440.104(b)(2) ......................................................................................30

40 C.F.R. § 440.131(a) ..........................................................................................30

40 C.F.R. § 440.131(e) ..........................................................................................30

40 C.F.R. § 1502.9(c)(1)(ii) ...................................................................................38

Mont. Admin. R. 17.30.623(2)(f) ..........................................................................19

Mont. Admin. R. 17.30.715(1)(a) ..........................................................................13

## OTHER AUTHORITIES

Forest Service Handbook 1909.15 Chap. 10 Sec. 18.1 ...........................................39

Defendant-Intervenor Montanore Minerals Corp. ("MMC") submits the following brief in opposition to the summary judgment motions of Plaintiffs Save Our Cabinets, Earthworks, Clark Fork Coalition, and Libby Placer Mining Company (collectively "Plaintiffs" unless context or specificity dictates otherwise) and in support of MMC's cross-motion for summary judgment:

## INTRODUCTION

The federal action under review is the U.S. Forest Service ("Forest Service" or "Forest") Record of Decision ("ROD") approving a Plan of Operations for the Montanore copper and silver mine ("Project") in the Libby Creek area of Lincoln County, Montana. The Project is enormously important not only to MMC, but also to the many local citizens who will work in the mine and communities who will receive its tax revenue, employment, and other socioeconomic benefits. AR0008764-65 (JFEIS at 887-88).[1]

In its review of the proposed Project, the Forest Service invested more than a decade of detailed study, technical assessments, and widespread stakeholder collaboration under the National Environmental Policy Act ("NEPA") and other laws and regulations. The NEPA effort was jointly conducted with the Montana Department of Environmental Quality ("DEQ"), culminating in the completion of a

---

[1] "AR" refers to the bates-stamped page(s) of the administrative record file by the Federal Defendants with this Court. "SOUF" refers to MMC's Statement of Undisputed Facts filed contemporaneously with this brief.

federal-state Joint Final Environmental Impact Statement ("JFEIS"), with participation by MMC as the Project applicant and numerous other agencies and the public, including Plaintiffs. To say the Forest Service took a hard look at the Project is the height of understatement. The Administrative Record consists of 156 volumes containing more than 250,000 pages of information. The JFEIS with appendices is more than 5 volumes and 2,759 pages. The Forest ROD with mitigation plans and other attachments is 480 pages long.

The Forest Service did not select MMC's proposed action as the preferred alternative; rather it selected "Alternative 3 Agency Mitigated Poorman Impoundment and Transmission Line Alternative D-R" that "incorporates modifications and mitigating measures proposed by the agencies to reduce or eliminate adverse environmental impacts." AR0010535 (Forest ROD at 14). While authorizing the full project, the Forest ROD requires a defined sequence of activities (phased Plan of Operations) with additional written Forest approval required prior to MMC commencing each Project phase. AR0010529 (Forest ROD at 8). The first phase, Evaluation, is limited primarily to validating and supplementing the current delineation of the Project with further underground data collection. This phase consists of extending the existing Libby Adit (tunnel) and other project assessments that involve the least practicable use of national forest surface lands and with minimal environmental impacts. AR0010530-31 (Forest ROD at 9-10). Under the

Forest ROD, the Project cannot proceed to the Construction or other subsequent phases until MMC completes all Evaluation phase work and receives subsequent written approval from the Forest.  Work includes updating and refining hydrological effects modeling using additional data collected from underground and the refinement of Project designs. The Forest will conduct additional NEPA if significant new information or circumstances relevant to environmental concerns are identified. AR0010531-32 (Forest ROD at 10-11).   The DEQ ROD, issued concurrently with the Forest ROD, requires MMC to obtain a renewed Clean Water Act Section 402 and Montana Water Quality Act "MPDES" permit ("Discharge Permit") prior to proceeding with any Project operations that would discharge to state waters, and does not approve any Project operations beyond the Evaluation phase.  AR0011014 (DEQ ROD at 15).  Further, the project cannot move past the Evaluation phase without obtaining additional DEQ permits for construction, operation and closure, which will require additional review and comment in compliance with Montana Environmental Policy Act.  The Forest Service, DEQ, and other agencies obtained and developed sufficient information to evaluate, disclose, and compare the effects among Project alternatives in the Project EIS. *See*, *e.g*., AR0008441 (JFEIS at 564).

Thus, rather than triggering the avalanche of adverse consequences described by Plaintiffs, the Forest ROD provides a sound framework for the Forest Service to

3

review and approve each phase in the Plan of Operations for Project activities on national forest lands stepwise.  This is to ensure at each step that all federal and state permits and other required approvals and authorizations are met and that effects on national forest surface resources are reasonably minimized before proceeding. Against this background, Plaintiffs reprise arguments previously and correctly rejected by the Court in *Rock Creek All. v. U.S. Forest Serv*., 703 F. Supp. 2d 1152 (D. Mont. 2010).  The voluminous record documenting the very conservative and careful approach to implementing the Project in a phased fashion more than adequately supports the Forest Service's decision under NEPA's "hard look" requirements, the provisions of other applicable federal laws, and the Administrative Procedure Act ("APA") standard of review.

## FACTUAL BACKGROUND

MMC (via its parent company) holds fee title by patent to mining claims (denoted HR 133 and HR 134) and associated extralateral rights that encompass a large ore body—an estimated 135 million tons—containing copper and silver. AR0007863-64 (JFEIS at 3-4).  HR 133 and HR 134 cover 22 acres inside the Cabinet Mountains Wilderness Area ("Wilderness"), and 14.5 acres outside the Wilderness, and contain the surface exposure of the ore body.  AR0007863 (JFEIS at 3).  While the ore body eventually to be mined is located underground beneath the

4

Wilderness, all Project access and surface facilities will be located outside the Wilderness boundary. AR0011003 (DEQ ROD at 4).

MMC has property rights recognized under the Organic Administration Act for national forests ("Organic Act") and other laws to access, explore, develop and extract the minerals in this ore deposit, subject to reasonable regulation. *See*, *e.g.*, AR0010571, 10577, 10583 (Forest ROD at 50, 56, 62). MMC has now invested more than ten years to pursue the necessary regulatory approvals to evaluate, construct, operate and reclaim the Project "in an environmentally sound manner, subject to reasonable mitigation measures designed to avoid or minimize environmental impacts to the extent practicable." AR0007800 (JFEIS at 5-6).

This requires, as described in the Forest ROD, a Plan of Operations approved by the Forest Service under its 36 C.F.R. § 228 Subpart A regulations regarding surface use of national forest lands for locatable mineral activities, as well as further approvals by DEQ and other agencies, such as issuance of a Clean Water Act § 404 permit from the U.S. Army Corps of Engineers ("Corps") for fill of any wetlands or other federal jurisdictional "Waters of the U.S." AR0010572-75 (Forest ROD at 50-53); SOUF at ¶¶ 14-20, 29-30. MMC holds a Discharge Permit (MT0 030279) that will require DEQ renewal and amendment to authorize any Project discharge to state waters. AR0011014 (DEQ ROD at 15). Finalization of the draft renewed Discharge Permit has been awaiting further review of public comment and action by DEQ.

AR0011022 (DEQ ROD at 23).   As described in the DEQ ROD, the DEQ has

withheld any decision on mine construction, operation, and closure, and approved

amendments to MMC's existing DEQ Operating Permit 00150 to conditionally

allow only the initial Evaluation phase.  AR0010522 (Forest ROD at 1); AR0011014

(DEQ ROD at 15).    The Forest ROD itself requires MMC to obtain

renewal/amendment of the Discharge Permit as well as any other required DEQ and

other agency approvals applicable to activities included in the Evaluation or other

phases of the Project, prior to commencing operations in that phase.  AR0010573-

74, 0010530-32 (Forest ROD at 52-53, 9-11).  The respective RODs incorporate

many other mitigation measures and monitoring requirements, and other terms and

conditions to maintain consistency in implementing the phased approach for

reviewing and approving Project operations, to ensure compliance with applicable

environmental and other standards, and to reasonably minimize environmental

effects.  *See*, *e.g.*, AR0010522, 0010531, 0010780-81 (Forest ROD at 1, 10, 39-40);

AR0011014-18 (DEQ ROD at 15-19).  *See generally*, AR0010696-738 (Forest

ROD, Att. 2).

MMC disputes the accuracy of many of the factual representations made by

the Plaintiffs.  However, the administrative record is more than sufficient for the

Court to enter summary judgment in favor of the Forest Service and MMC.  MMC

incorporates by reference its Statement of Undisputed Facts filed together with this memorandum.

## STANDARDS OF REVIEW

This is an APA case in which Plaintiffs allege, *inter alia*, violations of the Clean Water Act, Organic Act, National Forest Management Act ("NFMA"), and NEPA. The Court must reject each of these challenges unless it is persuaded that the Forest Service's analysis was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (APA); *see Rock Creek All.*, 703 F. Supp. 2d at 1162 (reviewing Clean Water Act, NFMA, Organic Act, NEPA claims under APA standard); *see also Alaska Eskimo Whaling Comm'n v. Envtl. Prot. Agency*, 791 F.3d 1088, 1092 (9th Cir. 2015) (reviewing Clean Water Act challenge under APA standard); *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*) (reviewing NFMA challenge under APA standard); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2005) (reviewing NEPA challenge under APA standard). "This standard of review is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.'" *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dept. of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (quoting *Indep. Acceptance Co. v. California,* 204 F.3d 1247, 1251 (9th Cir. 2000). With limited exceptions, review under the APA is limited to the

7

agency administrative record filed with the court. *Florida Power & Light Co. v Lorion*, 470 U.S. 729, 743-44 (1985).

## ARGUMENT

## I.   THE FOREST SERVICE COMPLIED WITH THE CLEAN WATER ACT AND ORGANIC ACT

Montana DEQ administers Section 402 of the Clean Water Act under authority delegated from the U.S. Environmental Protection Agency. Therefore, an applicant for a project that will require a Clean Water Act Discharge Permit must obtain that permit from the State of Montana, not the federal government. The Montana Water Quality Act generally requires that current water quality must be maintained and protected. Mont. Code Ann. § 75-5-303(1).

Prior to the NEPA and other regulatory processes at issue here, MMC possessed, among other authorizations, a Discharge Permit from DEQ (MPDES Permit MT0030279) allowing discharges of water from the existing Libby Adit. AR0011004 (DEQ ROD at 5). Permit MT0030279 allows three points of discharge: Outfall 001 – percolation pond, Outfall 002 – infiltration system of buried pipes, and Outfall 003 – pipeline outlet to Libby Creek. *Id*.[2]   MMC also possessed an order from the Montana Board of Health and Environmental Sciences (now known as the

---

[2] A direct discharge to Libby Creek via Outfall 003 has not occurred since the permit was issued. AR0008634 (JFEIS at 757). As is discussed further below, Outfall 003 has a very limited role in the overall water quality picture for the operation of the mine.

Board of Environmental Review) authorizing degradation with numeric limits for both surface and groundwater that remain in effect for the life of the mine and beyond as necessary.  AR001004; *See* AR0009627-37 (App. A, JFEIS).  MMC also previously obtained a hard rock mine operating permit from Montana, DEQ Operating Permit #00150, with minor revisions in 2006 regarding approved Libby Adit evaluation drilling that were referenced and incorporated in an amended Operating Permit under the 2016 DEQ ROD.  AR0011004 (DEQ ROD at 5).  The actions under review by the DEQ for the Project also included a renewal of the Discharge Permit.  The DEQ ROD conditioned amendment of the Operating Permit for the Evaluation phase upon MMC receiving DEQ renewal of the Discharge Permit. AR0011014 (DEQ ROD at 15).

With respect to the national forests, the Organic Act provides for the Forest Service "to regulate their occupancy and use and to preserve the forests thereon from destruction."  Dkt. 34-5 ("Pls.' Brief"), p. 6 (citing 16 U.S.C. § 551).  The statute is more authorization than mandate, stating that the Secretary of Agriculture "may make such rules and regulations" as will avoid destruction of the national forests. 16 U.S.C. § 551.  While mining operators must comply with such rules and regulations, nothing in 16 U.S.C. § 551 or other sections of the Organic Act shall prohibit "prospecting, locating, and developing the mineral resources" within national forests.  16 U.S.C. § 478.  Under Forest Service regulation 36 C.F.R § 228.8 relied

upon by Plaintiffs, the mine <u>operations</u> are required to, "where feasible", reasonably "minimize adverse environmental impacts on National Forest surface resources", including the requirement that the "<u>Operator</u>" comply with applicable federal and state water quality standards. *Id*. (emphasis supplied). This regulation on its face does not impose an actionable legal standard on the Forest Service. Under this regulation, the Forest Service may rely on other federal and state agency approvals regarding operator compliance with federal and state water quality standards, respectively. AR0011014 (DEQ ROD at 15); 36 C.F.R. § 228.8(h); *Rock Creek All.*, 703 F. Supp. 2d at 1169 (citing *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965-66 (9th Cir. 2006)).

A.     **The Forest Service Ensured Compliance with Montana's Water Quality Standards.**

Plaintiffs argue that both Montana's water quality nondegradation policy and fish protection standards will be violated by mining operations conducted pursuant to the approved Plan of Operations. Contrary to Plaintiffs' claims, the Forest Service has properly ensured compliance with both standards. As indicated above, the conditions in the Forest ROD for approval of the MMC amended Plan of Operations require that MMC obtain all necessary Clean Water Act and other permits prior to implementing each phase of the Project. *See*, *e.g.*, AR0010697 (Forest ROD, Att. 2 at 1). As provided by 36 C.F.R. § 228.8(h), the Forest ROD references the DEQ ROD and explains that the DEQ Discharge Permit renewal and conditions and other

10

applicable water quality approvals, along with the Corps Clean Water Act § 404 permit and conditions, will constitute compliance with the Clean Water Act. AR0010579 (Forest ROD at 58).  As stated previously, the Forest would conduct additional NEPA if new information or circumstances so warranted. AR0010531-32 (Forest ROD at 10-11).

> **1.    The Forest Service ensured compliance with Montana's nondegradation standards, for waters both within and outside of the Wilderness.**

Plaintiffs argue that Montana's water quality standards will be violated because the Forest ROD allegedly permits MMC to "substantially reduce or eliminate entirely" baseflow in waters both outside and within the Wilderness in violation of Montana's nondegradation standard.  Most of Plaintiffs' claims derive from this contention, but to the contrary, the administrative record confirms that no such degradation will occur during the Project Evaluation phase or be allowed during any phase that the Forest Service and DEQ may approve to proceed.   DEQ determined "that completion of the Libby Adit during the Evaluation Phase will comply with all water quality standards, including nondegradation provisions . . . ." AR0011017 (DEQ ROD at 18).  No renewal/amendment of MMC's Discharge Permit or Operating Permit will be approved unless it is shown "that any changes in stream flow . . . will be in compliance with the nondegradation requirements." *Id*. Further hydrological data will be collected and the modeling updated prior to the

Construction and later Project phases to demonstrate compliance with nondegradation requirements. MMC must demonstrate compliance with Montana water quality standards before additional project phases are authorized.

A key stipulation requires MMC to update the 3D groundwater model for the mine area to incorporate hydrologic and geologic information collected during the initial Evaluation phase. AR0011016 (DEQ ROD at 17). The necessity and rationale for incorporating additional data into the 3D model is well-documented:

> While the 3D model results included in the Joint Final EIS are the best currently available estimate of impacts that can be obtained using currently available data, there is uncertainty in the model. The principal cause of uncertainty is the lack of site-specific hydrogeologic data collected near the mineral deposit, particularly from the Rock Lake Fault, a structure which may be the dominant influence controlling groundwater flow in the area. These data would normally be obtained via drilling from the surface and the installation and testing of monitoring wells. Because the Montanore deposit is located beneath a wilderness, data collection via drilling from the surface is not practicable.

AR0011017 (DEQ ROD at 18). The DEQ is holding in abeyance a decision whether to amend the Operating Permit to authorize operations beyond the Evaluation phase pending this collection of data and updating of the model. AR0011018 (DEQ ROD at 19). The DEQ anticipates greater model certainty to be able to evaluate stream flow impact for the Project construction, operation, and closure phases. AR0011024 (DEQ ROD at 25). Attachments 2 and 3 of the Forest ROD, among other requirements, outline a proactive, comprehensive monitoring program and

management techniques for water quality as well as other aquatic habitat and hydrogeologic parameters for key resources, for each Project phase.  AR0010697-10738, 0010740-835 (Forest ROD, Atts. 2, 3).

Turning more specifically to Montana's nondegradation policy, its regulations set the threshold for degradation at depletions greater than 10% of stream baseflow; depletions of 10% or less are insignificant.  Admin. R. Mont. 17.30.715(1)(a). Initially, as reflected in the Project draft EIS, the agencies used a two dimensional numerical model to analyze changes to baseflows.  AR0008503 (JFEIS at 626). Subsequently, a more complex 3D model was developed and applied.  *Id*.  That model simulated the changes in baseflow for each mine phase.  AR0008398 (JFEIS at 521).  The effects were measured using the lowest streamflow averaged over 7 consecutive days that occurs, on average, once every 10 years.  AR0008396 (JFEIS at 519).  This "7Q10" flow has a 10% probability of occurring in any given year, and is used for measuring stream baseflow for purposes of nondegradation under the Montana Water Quality Act. *Id*.; Mont. Admin. R. 17.30.715(1)(a).  The agencies also applied a "7Q2" estimate for flows, which is the lowest streamflow averaged over 7 consecutive days that occurs, on average, once every 2 years.  The 7Q2 flow has a fifty percent probability of being exceeded in any one year.  *Id*.

In this context, Plaintiffs are mistaken in claiming "groundwater drawdown caused by the mine will substantially reduce or eliminate entirely the baseflow of

East Fork Rock Creek (EFRC), East Fork Bull River (EFBR), and Libby Creek." Pls.' Brief p. 10.  In support of these claims, Plaintiffs cite percentages in JFEIS tables as reflecting percentage reductions in surface water baseflow.  *Id.*  In actuality, the percentages do not reflect an absolute change in surface water flows; rather, they are percentage changes of groundwater contribution to surface water.  *See*, *e.g.*, AR0049518 (AMEC Geomatrix report) ("The model predicts a net reduction in flux from groundwater for Rock Lake . . . and *no reduction* in baseflow to the stream flowing into Rock Lake") (emphasis added).  The model does predict "that *following full mine build-out*, some streamflow depletion will occur."  AR0049519 (emphasis added).  Furthermore, the record reflects a candid understanding that there is much uncertainty about the predictions, particularly, in upper reaches of drainages such as the Project site, "because of the low and variable baseflow conditions, and lack of data regarding groundwater/surface water interaction in these areas for which the model can be calibrated."  *Id.*  *See* SOUF at ¶¶ 40-52 (explaining the considerable uncertainty in model predictions in upper reaches of headwater streams).[3]

---

[3] [language appears to be missing from the first sentence.]For example, the limitations on obtaining flow measurements in the upper reaches of stream channels, "it is not possible to conclude with certainty which reaches are perennial versus ephemeral or intermittent."  AR0050269 (Vol. 4, doc. 130).  Thus, it is "difficult to separate any mine-induced stream flow reductions in these upper reaches from natural variability, especially when some sections of no flow have been documented." *Id.*

As to that uncertainty, while the modeling presently has limitations in its ability to predict impacts, it "is conservative with respect to predicted impacts to streamflows". AR0056449 (AMEC memo on model reruns); SOUF at 49. That is because certain features of hydraulic interaction and conductivity that would reduce predicted impacts to streamflows were not simulated in the model. Such features would facilitate shallow groundwater and precipitation recharge to likely maintain surface flows, due to decreased seepage to the underlying bedrock aquifer. *See*, *e.g.*, *id*. Furthermore, standard model runs "did not consider the use of mitigation measures in the results." AR0012693 (response to Supplemental Draft EIS comments); SOUF at ¶¶ 58-60. Plaintiffs misstate that very point when they allege, "these severe stream depletions are predicted to occur even with the agency's mitigation measures in place." Pls.' Brief p. 10 (citing AR0008579 (AR008479 (JFEIS at 602)), Table 101 (footnote)). First, the cited table lists "maximum baseflow change", and, *inter alia*, the loss of water in storage at Rock Lake <u>without</u> modeled mitigation. *Id*. at fn. The note goes on to say that the table of model predictions shows maximum baseflow reductions seen at mining year 38 for the Rock Creek drainage, year 52 for the East Fork Bull River drainage, and between years 22 and 25 for Libby Creek. *Id*.

Thus, these figures are merely the near worst-case scenario predicted from current modeling; they reflect currently estimated numbers that are not contemplated

for approval by DEQ before MMC receives an authorization to proceed with mine construction and operation.  SOUF at ¶¶ 38, 48.  "After the additional information is gathered during the Evaluation Phase, MMC may submit analysis . . . demonstrating that any changes in stream flow from construction, operation, closure and post-closure of the mine will be in compliance with the nondegradation requirements."  AR0011017-18 (DEQ ROD at 18-19).  Plaintiffs' arguments based on these numbers do not take into account a primary reason the agencies authorized Evaluation as the first phase—to enable the work needed to collect and analyze additional data in order to refine and update the baseflow model and increase the certainty and precision of predicted effects, before any commitment to Project Construction or Operation phases.[4]

The JFEIS candidly discusses the limitations and uncertainty with the model's predictive value, as noted above.  That does not undermine the quality of the analysis; to the contrary, a discussion of such uncertainty is indicative of an agency

---

[4] Plaintiffs complain that the effects of groundwater depletions that current modeling estimates won't manifest until long after the mine is closed, making any mitigation at that point impractical.  But this ignores that the modeling and other analysis will be refined with additional data in advance of any Forest Service or DEQ authorization for MMC to proceed with mine development or operation to which such potential effects are attributed, at which point such potential effects may evaporate and mitigation for any updated predicted effects can be incorporated into the Project.  Plaintiffs also ignore that monitoring under the Forest ROD will continue throughout the life of the mine, allowing for further adjustments and mitigation as needed to be implemented during construction, operation and/or closure to further mitigate any long-term effects.

taking the requisite "hard look" at potential impacts. *Cal. ex rel. Imperial Cy. Air Pollution Control Dist. v. U.S. Dept. of the Interior*, 767 F.3d 781, 798 (9th Cir. 2014). The modeling predictions in the JFEIS were considered the best conservative estimates of potential impacts using currently available data. AR0008487 (JFEIS at 610); AR0011023 (DEQ ROD at 24). The Forest Service considered this data and methodology adequate to evaluate and disclose reasonably foreseeable adverse effects and to make a reasoned choice among alternatives. AR0008441 (JFEIS at 564). However, given the location of the ore body beneath the Wilderness, further underground drilling and other work was considered needed to collect more specific data, not currently available, to further confirm potential effects in advance of approving mine development or operations. *Id.*; SOUF at ¶ 53-57. Thus, the extension of the Libby Adit and other work included in the Evaluation phase is required to obtain this information. *Id*.; AR0008487, AR0011023.

Plaintiffs also contend that the Forest Service approved a plan that violates Montana water quality standards through groundwater pumping at the Poorman Creek tailings facility. Pls.' Brief p. 13. Plaintiffs allege the record shows baseflow reductions in Poorman Creek of between 12 and 23%. *Id*. Plaintiffs further allege that this purported reduction in flow will cause significant negative impacts to the fishery, including bull trout, and that no mitigation is proposed to offset the effects of the pumping. Pls.' Brief p. 14. In the Evaluation phase, "[l]ow

flow in Ramsey, Poorman, and Little Cherry creeks would not be affected" and effects to these creeks during the Construction phase "would be small (-1 to +3 percent)." AR0008534 (JFEIS at 657).  Even in the Operations phase, the current modeled effects at Poorman Creek PM-1200 7Q10 flow are conservatively predicted without mitigation to be near the 10% nondegradation significance threshold (12%) AR0008539 (JFEIS at 662, Table 111).

Plaintiffs also mistakenly argue that "[n]o mitigation is proposed to prevent degradation." Pls.' Brief p. 14 (citing AR0008473-75 (JFEIS 596-598)).  The record on "Stream Channel Characteristics of Impoundment Sites", which includes the table showing estimated flow impacts cited earlier by Plaintiffs, provides for mitigation measures to be "evaluated after additional data were collected during the Evaluation Phase." AR0008539 (JFEIS at 662, Fn.).  Further investigation of the groundwater system in the Poorman tailings facility area during the Evaluation phase will refine groundwater predictions for the pumpback system.  AR0008444 (JFEIS at 567); AR0010717 (Forest ROD, Att. 2 at 21).  "MMC would update the pumpback well design and analysis using the additional data," which would include evaluating effectiveness of mitigation measures and modification of mitigation plans to incorporate results.  AR0008444 (JFEIS at 567).  The JFEIS further discusses and provides for a technical advisory group to review the final tailings facility design and advise the agencies on effective mitigation measures.  AR0008688 (JFEIS at

811).  The Forest ROD otherwise provides for monitoring, review, and the addition of measures or other Project adjustment where required to comply with nondegradation requirements for all streams.  AR0010729-31, 0010813-14 (Forest ROD, Att. 2 at 33-35, Att. 3 at 76-77).

Plaintiffs' arguments disregard the many Forest Service terms and conditions designed to synthesize its ROD with DEQ's permitting decisions.  The Forest Service did determine that "all phases" of the project will comply with all applicable laws, since it approved a Plan of Operations with terms and conditions to ensure such compliance.  Nothing in the ROD or JFEIS can be fairly read as somehow overriding the DEQ ROD that is limited to an initial Evaluation phase.  As Plaintiffs themselves say, "MMC does not possess an authorization to degrade these waters by reducing those streams' base flows."  Pls.' Brief p. 13.

> **2.    The Forest Service ensured compliance with Montana fish protection standards.**

Plaintiffs argue that sediment discharges as well as temperature increase will disrupt fishery protection, violating Montana's fish protection standards.  Plaintiffs rely in part on *Great Basin Resource Watch v. Hankins*, 456 F.3d 955 (9th Cir. 2006), in which the court concluded that Clean Water Act nondegradation and other standards did not apply because the subject state (Nevada) had chosen not to regulate water withdrawals under its Clean Water Act authority. *Id.* at 964.  Pls.' Brief pp. 8-9.  In Montana, DEQ is regulating flow reductions under its Clean Water Act and

other authority, but that is of no consequence here, since the Forest Service has the right to rely on that process and DEQ issuance of permits and approvals regarding flow reductions for compliance with state fish protection and other water quality standards.  36 C.F.R. § 228.8(h); *Rock Creek All.*, 703 F. Supp. 2d at 1169.

> **a.    The Forest ROD requires sufficient mitigation measures to ensure sediment will not render the waters injurious to fish.**

Plaintiffs assert that even with implementation of Best Management Practices mitigation identified in the ROD, increased sediment will occur during the Project Evaluation phase, in violation of Mont. Admin. R. 17.30.623(2)(f), which prohibits increases in sedimentation that  "will or are likely to . . . render the waters . . . injurious to . . . fish."  Pls.' Brief p. 14.  While small, short-term sediment increases with minor potential adverse impacts may occur during the first years of the Evaluation and Construction phases, particularly as off-site mitigation is implemented for roadways, bridges, and culverts, those efforts will ultimately improve sediment loading over the baseline that currently exists.  AR0221654-655 (BiOp).  That is, the adverse effects about which Plaintiffs complain are actually minor and substantially attributable to temporary impacts from implementing Best Management Practices and measures such as road closures and culvert removals that will have long-term benefits in sediment reduction for bull trout and other aquatic species.  *See* AR 0221550 (BiOp); AR0221545-46.  *See also*, *e.g.*, AR0221646

("The road activities associated with the proposed mining operations are predicted to cause short-term increases of sediment input followed by long-term decreases that are expected to improve baseline conditions.")   That improvement to baseline conditions is especially valuable because the quality of the current habitat is functioning at an unacceptable risk for bull trout.  *Id.*  With the implementation of these mitigation measures and Best Management Practices, the streams will be functioning appropriately prior to Construction activities and continuing after closure of the mine.  AR0212666, 0212671-72 (BA); AR0013345.

Plaintiffs rely on *Sierra Club v. Union Oil Co*., 813 F.2d 1480 (9th Cir. 1987), to argue that the temporary increase in sediment due to implementation of Best Management Practices is illegal.  Pl.'s Brief p. 15.  There are serious flaws in that analysis.  Notably, that case was vacated by the U.S. Supreme Court and remanded in light of *Gwaltney v. Chesapeake Bay Found., Inc.*, 484 U.S. 49 (1987).   In *Gwaltney*, the U.S. Supreme Court emphasized that to establish federal jurisdiction for a citizen suit based on the allegation of ongoing violations of the Clean Water Act, "a citizen plaintiff must allege 'a state of either continuous or intermittent violation-that is, a reasonable likelihood that a past polluter will continue to pollute in the future.'"  *Sierra Club v. Union Oil Co.*, 853 F.2d 667, 669 (9th Cir. 1988) (on remand) (quoting *Gwaltney*, 484 U.S. at 56).  The opinion on remand also endorsed a Fourth Circuit opinion that a citizen suit based on alleged ongoing violations may

21

be moot "where remedial actions were taken to cure violations" and there is an "*ex ante* probability that such remedial measures would be effective, and any other evidence presented during the proceedings that bears on *whether the risk of defendant's continued violation had been completely eradicated* when citizen-plaintiffs filed suit." *Id.* at 671 (quoting *Chesapeake Bay Found. v. Gwaltney*, 844 F.2d 170, 171-172 (4th Cir. 1988)). Thus, if Plaintiffs were to bring a citizen suit alleging ongoing violations of the Clean Water Act caused by temporary impacts from the construction of mitigation measures, *Gwaltney* would urge dismissal for mootness because the alleged continuing violation was already eradicated by the mitigation plan that results in improved water quality.

Plaintiffs also cite *Hells Canyon Presv. Council v. Haines*, 2006 WL 2252554 (D. Or. 2006), in support of their argument regarding sediment mitigation measures. In *Hells Canyon*, the dispute simply concerned whether the administrative record supported the Forest Service's contention that road-related sediment reduction activities would compensate for the sediment contribution from mining activity. *See id.* at *5. The Court found that the roadwork was uncertain to occur and that the Forest Service did not contend that it was complying with Oregon water quality law as a result of those activities. *Id.* Those facts are nowhere like the case at bar, where road mitigation is clearly required and slated to occur in large part on the front end

of the Project.  *Hells Canyon* certainly does not say that beneficial mitigation measures are illegal if they temporarily exceed water quality standards.

In the *Rock Creek All.* case, this Court was concerned with the argument that the Forest Service violated the Organic Act by allowing excessive sediment loading in the first five to seven years of the project.  703 F. Supp. 2d at 1170.  The situation in that case is also not similar to this one on that point.  There, it was determined that there would be sediment impacts in the first five years due to construction associated with development of the mine, and that although sediment levels would eventually stabilize and return to pre-project conditions, it was not clear that the Forest Service was requiring practicable sediment mitigation measures to be applied to that initial phase of the mine project.  *Id.* at 1171.  That contrasts with the case at bar, where temporary sediment loading includes the implementation of mitigation measures required during the initial phase that will result in a net improvement to existing stream conditions, with benefits to fish as soon as the mitigation measures are in place.

> **b.    The Forest ROD properly ensures that any increase in ambient water temperature will be within Montana standards and will not threaten bull trout.**

Plaintiffs argue that the Project will violate Montana's water quality temperature standards, which they allege will threaten bull trout.  In support of their argument, they note that bull trout require water temperatures ranging from 36° to

59° F and they allege that direct discharge into Libby Creek will exceed 60° F.  This argument is addressed here and also later in this brief, in the NFMA section addressing Plaintiffs' argument that temperature issues violate the Kootenai Forest Plan.

Plaintiffs fail to take the entire record into account, yet the record demonstrates that the impact on temperatures in Libby Creek due to direct discharges is unlikely to affect stream temperature during future phases that are not currently authorized to proceed.  "Discharges to groundwater (Outfalls 001 and 002) are expected to attenuate any thermal effects."  AR0007833 (JFEIS at S-43).  Data gathered recently generally show less than one degree change in the receiving water. *Id*.  If water is discharged from the treatment plant to the adjacent percolation pond, water "would cool as it flowed . . . via the subsurface to the creek." *Id*.  With respect to Outfall 3 that Plaintiffs have focused upon, direct discharges that would have temperature effects are very unlikely.  The percolation pond will be sized to avoid direct discharges to Libby Creek caused by the pond reaching full capacity. *Id*.  That event (overflow of the pond) is the only event that would involve a direct discharge to Libby Creek through Outfall 003. AR0008627 (JFEIS at 750).  Such "[c]onditions where a direct discharge to Libby Creek would be necessary are expected to be limited in duration and frequency."  AR0007833, 0010000 (JFEIS at App. S-43, L-34). *See also* AR0153873 (DEQ Fact Sheet) ("A direct discharge is not expected to

have a thermal effect on Libby Creek.").  In addition, there are many factors that affect stream temperature, and with minimal likelihood of an impact, it may "not be possible" to identify any indirect impacts of the operations within from the naturally occurring variations caused by, *e.g.* "forest shading and flow in gravel streambed substrate."  AR0007834, 0010001.

In support of their argument, Plaintiffs cite the Forest Service's answer to their amended complaint as an admission that discharges from the treatment plant will exceed 60°F.  Pl.'s Brief pp. 16-17.  Plaintiffs cite only a portion of the Forest Service's answer to that allegation, omitting the remainder of the answer, that "the temperature of the discharge of mine and adit water is expected to be between 51 degrees and 60 degrees F based on measured temperatures of the Water Treatment Plan effluent from February 2014 to May 2015 (DEQ 2015b).  Continuous electronic temperature monitoring of LB-200 and LB-300 is required as described in JFEIS, App. C, pp. C-59 and C-72.  In addition the MPDES permit also requires additional monitoring."  Dkt. 20, at ¶ 52.  (Answer to Amended Complaint).

Plaintiffs portray the DEQ Fact Sheet referenced in the Answer text above as changing the Forest Service findings between the issuances of the Draft ROD and the final ROD or otherwise not being subject to public review, but that is not the case.  The Fact Sheet contains information that was among that already in the record and that was subject to public review and comment.  *See*, *e.g.*, AR0034752-91,

25

0035284-329 (2013 and 2014 Annual Aquatic Reports); AR0153893-938.  The Fact

Sheet summarizing this information was also made available with DEQ's public

notice for comment on the draft Discharge Permit, for which it was prepared.

AR0153909 (DEQ Fact Sheet at 71).

### 3.   The Forest Service adequately addressed the Environmental Protection Agency's concerns.

With respect to criticism and concerns expressed in the Environmental

Protection Agency comments, cited by Plaintiffs with respect to water quality effects

and other issues in their briefs, these are not a basis to find the Forest ROD arbitrary

and capricious or otherwise in violation of law.  While another agency might have

criticisms or prefer a different approach, this is insufficient to show that the action

agency acted unreasonably.  *Ctr. for Biological Diversity v. BLM*, 833 F.3d 1136,

1150 (9th Cir. 2016).  In this case, the Forest Service disclosed and responded

specifically to Environmental Protection Agency comments in the JFEIS.

AR001072-84, 00010109-130 (JFEIS App. M).  The Environmental Protection

Agency ultimately stated its appreciation for the Forest Service's collaborative

approach to addressing effects and concerns and the improved 3D hydrogeologic

modeling and other evaluation of effects in the JFEIS.  AR0013492-95 (1/19/16 EPA

letter).  The Forest Service resolved many of Environmental Protection Agency's

concerns through technical workgroups and other efforts in the EIS process.

AR0013492.  In its comments on the JFEIS and draft ROD, the Environmental

Protection Agency expressed remaining outstanding concerns about the potential magnitude of environmental effects and uncertainty of the current estimates, but expressed its support for and intent to participate in the phased approach to Project implementation incorporated in the Forest ROD, and its expectation that the Evaluation phase would yield additional information and analysis that would further address these concerns and lead to more refined, further mitigation as needed to reduce impacts.  AR0013492-93.

##### B.   The Forest Service Complied With Section 401 of the Clean Water Act.

Section 401 of the Clean Water Act provides, in pertinent part, that an "applicant for a Federal license or permit" that "may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State . . . that any such discharge will comply with the applicable provisions of [the Clean Water Act]."  33 U.S.C § 1341.  Plaintiffs argue that the Forest ROD is a "Federal license or permit" that requires a state § 401 certification, but ignore the portion of § 401 that limits its scope to federal licenses or permits resulting in a discharge to federal jurisdictional waters.  Nor is their argument accompanied by relevant legal authority.

As Plaintiffs concede, the DEQ is the permitting authority for the discharges encompassed by the Project, which will be addressed by the Discharge Permit under § 402 of the Clean Water Act, and DEQ is already required under that section, before

27

issuing the Permit, to conclude that the discharge complies with the Clean Water Act.  Pls.' Brief p. 18; 33 U.S.C. § 1342(b)(1)(A).  Given that the Forest ROD requires MMC to obtain the Discharge Permit and any other required DEQ approvals before allowing any operations involving such discharges to proceed, the Forest ROD is authorizing nothing by way of a discharge that is not covered by a DEQ permit.

To read the statute as the Plaintiffs assert would just add another layer of unnecessary bureaucracy without any additional substantive protections.  Practically speaking, if MMC were to request that Montana certify that the Forest ROD decision regarding a discharge to federal jurisdictional waters was consistent with Montana water quality standards, the state would have nothing to review, beyond its own DEQ Discharge Permits.  Additionally, at this point there is only the existing Discharge Permit, which as noted requires further DEQ review for renewal and amendment before any Project discharges will be allowed.  So quite literally, on this record there has been no action, state or federal, that authorizes a Project discharge.

The single case that the Plaintiffs cite in support of their argument, *Hells Canyon Pres. Council v. Haines, supra.*, is an unpublished decision with different key facts from the instant case.  In *Hells Canyon*, the Forest Service permitted the discharge of pollutants into Oregon state waters from placer mining operations on several occasions without any prior state approval—the state did not authorize or

28

certify the discharge under either § 401 or § 402 of the Clean Water Act.  2006 WL 2252554 at *3.  In requiring that any future discharge in that case receive state approval, the court explained that § 401 "intends state certification to precede approval of a discharge-causing activity by a federal agency."  *Id*. at *4.  Here, the approval of the "discharge-causing activity" rests with the state DEQ, not a federal agency, and the Forest ROD requires that DEQ must approve the discharge before it can occur.  *Hells Canyon* is inapplicable.

Even assuming, arguendo, that an additional § 401 certification is required, that is not a basis to invalidate the ROD.  Again, the Forest ROD requires MMC to obtain all necessary state permits and approvals before being allowed to proceed under the Plan of Operations, including any  required under § 401.  AR0010528-30, 0010573-74 (Forest ROD at 7-9, 52-53).  It is undisputed that MMC must obtain § 401 certification of any Army Corps § 404 permit required for fill of jurisdictional waters.  AR0010547, 0010573 (Forest ROD at 26, 52).  If the Court determined that a § 401 certification is also required for other discharges covered by the DEQ Discharge Permit or the Plan of Operations, then the ROD itself requires that MMC obtain the certification before the activity causing the discharge can proceed.

C.    **The Forest Service Ensured Compliance with the Environmental Protection Agency's Zero-Discharge Effluent Rule for the Poorman Tailings Impoundment.**

Plaintiffs claim that the Forest Service has failed to require MMC to comply with Environmental Protection Agency's "'New Source Performance Standards' effluent limits for copper milling operations using froth-flotation milling." Pls.' Brief p. 19 (citing and quoting 40 C.F.R. § 440.104(b)(1)).  Here again, it must be emphasized at the outset that the Forest ROD requires MMC to obtain all necessary permits and authorizations, including a DEQ Discharge Permit for any discharge to state waters, plus additional written approval from the Forest Service before the Project may proceed to the Operations phase during which milling would occur. Nothing in the record indicates that DEQ will issue a discharge permit or that the Forest Service will issue an Operations phase approval that will authorize violation of New Source Performance Standards.

In any case, the administrative record shows the Project design complies with the Environmental Protection Agency effluent limitations in 40 C.F.R. § 440.104(b)(2) and § 440.131(a), (e), which allow discharges equivalent to net precipitation, including groundwater seepage/surface runoff, and commingling of process water with groundwater infiltration at the Project mill tailings impoundment, as opposed to an absolute "zero" discharge limit. *See*, *e.g*., AR0056455 (3/5/12 letter; Forest Service/DEQ review).  As shown in Table 6, Attachment 1 to the Forest

ROD (AR0010655), "[a]ny water from the tailings impoundment to be treated and discharged will be mine drainage and precipitation commingled with process water. No process water will be discharged unless one of the two exemptions in the [Effluent Limitations Guidelines] is met (40 C.F.R. § 440.104(b)(2))."  AR0010659 (Forest ROD, Att. 1 at 51).  The only water that will report to the mill/tailings impoundment water treatment plant will be precipitation, groundwater seepage runoff and mitigation water to maintain flow for senior water rights.  During the Operations phase, an estimated high of 1,414 gallons per minute will be recycled to the mill to maintain compliance with "zero discharge" net precipitation limits. AR0010656 (Forest ROD, Att. 1 at 48).  This configuration is consistent with the New Source Performance Standards.

### D.   The Forest Service met Organic Act requirements respecting state water quality standards and other Clean Water Act requirements.

As set out above, the administrative record solidly reflects that the Forest Service has adhered to the Organic Act and 36 C.F.R. § 228.8 through the terms and conditions in its ROD regarding compliance with state water quality standards and other Clean Water Act requirements, as well as for other environmental effects on national forest surface resources.  *See Rock Creek All.*, 703 F. Supp. 2d at 1164.  As indicated above, the ROD explicitly requires and relies upon DEQ's issuance of permits and approvals to demonstrate compliance with water quality standards prior to approving each Project phase to commence.  Before MMC is even authorized to

begin the initial Evaluation Phase, and in addition to obtaining a renewed Discharge Permit and other requirements, it must complete a lengthy list of prerequisite plan amendment, bonding, monitoring, and mitigation steps.  AR0010530-31 (Forest ROD at 9-10)

The Forest ROD in turn established "key requirements" that must occur before approving any Construction or subsequent phase activities to proceed.  *Id.* Attachment 2 of the ROD shows more than 270 further stipulations and mitigation measures.  AR0010698-0010738.  These are all in addition to more general terms and conditions elsewhere in the ROD.  *See*, *e.g.*, AR0010572-74 (Forest ROD at 51-53).  Thus, the Forest Service, contrary to Plaintiffs' contentions, did not render the entire project a *fait accompli* with a blanket approval of all future activities.

## II.    THE FOREST SERVICE COMPLIED WITH NFMA

Under the NFMA, Forest Service authorized projects must generally be consistent with applicable forest plan requirements, subject to valid existing rights. AR0010583 (Forest ROD at 62); 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15; *Lands Council v. McNair*, 537 F.3d at 988-89.  Plaintiffs argue that the activities authorized by the ROD are inconsistent with the Kootenai Forest Plan and thus violate NFMA. Pls.' Brief pp. 19-23.  Plaintiffs' arguments are relatively conclusory and largely overlap or duplicate arguments addressed above.  Plaintiffs allege that the Forest ROD is inconsistent with the Forest Plan in three ways: (1) "Desired Conditions" for

water quality and fisheries; (2) the Inland Native Fish Strategy pertaining to stream temperatures of Libby Creek and Poorman Creek; and (3) Inland Native Fish Strategy as regards fish habitat.  Each of Plaintiffs' claims fail.

### A.    The Forest ROD Is Consistent with the Forest Plan "Desired Conditions."

Plaintiffs first contend that "the Project's dewatering" will violate "Montana's nondegradation requirements for water quality" in violation of Forest Plan "Desired Conditions" FW-DC-WTR-01 and FW-DC-WTR-02.   This argument duplicates Plaintiffs' erroneous Clean Water Act and Organic Act arguments addressed previously.   As explained above, the ROD requires that stream flow reductions comply with Montana's nondegradation requirements, and includes measures to ensure that result.  Thus, the ROD has ensured that any water depletion will comply with the Forest Plan.

### B.    The Forest ROD Is Consistent With Inland Native Fish Strategy Stream Temperature Objectives.

Plaintiffs next erroneously argue that the ROD will permit violations of Inland Native Fish Strategy riparian management objectives for water temperatures in Libby Creek and Poorman Creek.  However, the ROD has also ensured that stream temperatures in both Libby Creek and Poorman Creek will be consistent with the Forest Plan objectives.

Plaintiffs (Pls.' Brief p. 22) assert that for "the discharges into Libby Creek, there is no analysis in the JFEIS regarding whether the discharges will meet the 7 day moving average of daily maximum temperature standard" for bull trout. (Which require "water temperature ranging from 36°F to 59°F." AR0008311 (JFEIS at 451)). However, the record confirms that the Forest Service analyzed stream temperatures for sites along Libby Creek. AR008256-57 (JFEIS at 396-97); AR0153935-36 (DEQ Fact Sheet at 97-98). Temperatures were collected from a site directly upstream ("LB200") and directly downstream ("LB300") from the currently permitted Libby Adit water treatment plant outfalls. AR008256-57 (JFEIS at 396-97); AR0153937 (DEQ Fact Sheet at 99).[5] Pre- and post-discharge temperatures were collected from both sites and compared. *Id.* Increases in stream temperature between these sites were less than 1° F; stream temperatures at both sites were less than 51°F. AR0008311 (JFEIS at 451). The data thus revealed that the change in temperature due to discharge was non-measurable from background conditions, temperatures were not influenced by the discharge, and were within the acceptable range for bull trout. The Forest Service analysis of this data thus found that discharge is "not expected to adversely affect stream habitat in Libby Creek."

---

[5] Plaintiffs complain about the distance of these monitoring sites from the outfall locations, but these are previously established locations for monitoring discharge effects under the existing Discharge Permit, and allow for some distance for discharges via groundwater to mix with the stream flows with respect to ambient water temperature effects. AR0229049

*Id.*   The Forest Service noted however, that stream "temperatures would be monitored upstream and downstream of the outfalls in Libby Creek" and "if necessary to accommodate higher discharge rates during operation" MMC would be required to enact mitigation measures such as enlarging the percolation pond. AR0008289 (JFEIS at 429).  These requirements were incorporated in the ROD. AR0010660 (Forest ROD, Att. 1 at 52).

Plaintiffs further contend, without citation, that stream flow temperatures will increase in Poorman Creek after the Evaluation phase due to dewatering.  As explained above, although the Forest Service determined that the available data and analysis were adequate to evaluate effects in tailings impoundment and in the mine area for comparison of alternatives in the Project EIS (AR0008441 (JFEIS at 564)), the extent of base flow reduction cannot be predicted with exactness until further data is obtained in the Evaluation phase.  The ROD requires that, during the Evaluation phase, MMC complete aquifer testing at the Poorman Impoundment Site to refine the impoundment groundwater model and finalize the pumpback well design to ensure that any dewatering of Poorman Creek will comply with Montana's nondegradation requirements.  AR0009713 (JFEIS at C-67); AR0010717 (Forest ROD, Att. 2 at 21).  Again, before the Construction phase begins, MMC will update the 3D models, incorporating the hydrologic and geologic information collected during the Evaluation phase.  AR0009713 (JFEIS at C-67).  Effects on stream flows

will be re-evaluated based on the revised modeling. *Id.* Both the Forest Service and the DEQ will review this information before authorizing MMC to commence the Construction phase and if necessary supplement mitigation measures. AR0010529 (Forest ROD at 8). Thus, any alleged temperature increases based on stream depletion are largely speculative and hypothetical until the Evaluation phase is completed and stream flow effects can be further verified.

The JFEIS does contemplate the "possib[ility] that [dewatering] might increase the stream temperature during low flows" in Poorman Creek. AR0008634 (JFEIS at 757). But, as the JFEIS explains, such temperature increases may be mitigated by "forest shading and flow in the gravel streambed substrate, as well as groundwater supply to the stream." *Id.* Given the "numerous factors affecting stream temperatures and the constantly changing stream temperature regime that occurs, it is difficult to predict how effects other than water treatment plant discharges in Alternative 3 may indirectly affect stream temperature, or to what extent." AR0008634-35 (JFEIS at 757-58). Indeed, because of the numerous factors that influence stream temperatures, it "may not be possible to separate indirect effects [of the Project] on stream temperature from other natural effects." AR0008592 (JFEIS at 715). The Forest Service's monitoring includes temperature of Poorman Creek to ensure that any temperature increases will comply with the Forest Plan. AR0008634 (JFEIS at 757). Thus, the Forest Service has ensured that

if temperatures do increase, which is not certain, they will be monitored, mitigated, and consistent with the Forest Plan.

### C.     The Forest ROD is Consistent With Inland Native Fish Strategy Fish Habitat Objectives.

Lastly, Plaintiffs argue that the Forest Service violated Inland Native Fish Strategy objectives for fish habit for Poorman Creek and Libby Creek temperatures and for "wetted width/depth" stream flows for Rock Creek, East Flow Rock Creek, and the East Fork Bull River, relying on selected excerpts from the agency Biological Assessment.  However, subsequent to the Biological Assessment, the Forest Service updated its temperature analysis.  AR0013263-471 (1/12/16 letter, Savage to Bush with attachments).  The Fish and Wildlife Service concluded that the updated information shows anticipated temperature effects in the upper section of Libby Creek would be negligible.  AR0010845 (Forest ROD, Att. 4).  As explained earlier, ROD requirements to update modeling and monitor streamflow as part of the Evaluation phase and beyond will review whether stream baseflow depletions are significantly different than pre-Project, and if so trigger additional review and mitigation steps to avoid degradation and help ensure consistency with Inland Native Fish Strategy and other Forest Plan direction as well as other requirements.  *See*, *e.g*., AR0010779-81, 0010817 (Forest ROD, Att. 3 at 38-40, 80); AR0010696-738 (Forest ROD, Att. 2); AR0008489 (JFEIS at 612).

None of Plaintiffs' NFMA claims shows inconsistency with the Forest Plan for Evaluation phase activities.   If the Evaluation phase reveals Forest Plan inconsistencies in the Construction or later phases, that triggers Forest ROD provisions for review and evaluation to add mitigation or otherwise adjust the Project to achieve consistency.   In addition, the Forest Service will also have the option of completing a Forest Plan amendment specific to the Project to reconcile the inconsistency, as it has already done in the ROD for certain Plan provisions, including two related to riparian areas.   AR0010528-29, 0010583 (Forest ROD at 7-8, 62); 36 C.F.R. § 219.15(c)(3), (4).   Under the ROD, such an adjustment of the Plan will remain subject to public review and comment under NFMA as well as NEPA regulations.   36 C.F.R. § 219.16(b), 36 C.F.R. Part 218 Subpart A.   These provisions for adjustment as the Project proceeds confirm that the ROD is consistent with the Forest Plan.

## III.   THE FOREST SERVICE COMPLIED WITH NEPA

NEPA imposes procedural obligations on federal agencies to focus their attention and the public on the environmental effects of proposed federal actions, but does not mandate any particular substantive environmental or other decisions or results.   *Rock Creek All.*, 703 F. Supp. 2d at 1172-73 (citing *Marsh v. Oregon Nat. Res. Council, Inc.*, 490 U.S. 360, 371 (1989); *Robertson v. Methow Valley Citizens*

*Council*, 490 U.S. 332, 359 (1989)).  Plaintiffs have not shown any procedural NEPA violation here.

###   A.   The Forest Service Complied with NEPA's Public Review Requirements.

Plaintiffs argue that the JFEIS could violate NEPA's public review requirements.  The crux of Plaintiffs' claim is the ROD statement that further public review will not occur if "the environmental impacts associated with final design remain within the scope of those impacts identified in the Final EIS." AR0010532 (Forest ROD at 11).  Yet that ROD statement accurately reflects the applicable regulation regarding the circumstances that give rise to an obligation to re-open a NEPA evaluation, as well as Forest Service Handbook NEPA guidance.  NEPA requires an agency to supplement an existing EIS if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii); AR0010532 (ROD at 11, referencing and reciting this regulation text as the applicable criteria).  A supplemental EIS is required only "if the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered . . . ." *Idaho Wool Growers Ass'n. v. Vilsack*, 816 F.3d 1095, 1106 (9th Cir. 2016) (citing *Marsh*, 490 U.S. at 374).  Thus, if additional information comes in that does not change "the scope of impacts identified" in the JFEIS, there is no reason, legally or otherwise, to re-open

the NEPA process.  Forest Service Handbook 1909.15 Chap. 10 Sec. 18.1.  "To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."  *Marsh*, 490 U.S. at 373.  The Ninth Circuit Court has also clarified that "public comment 'is not essential every time new information comes to light after an EIS is prepared' for if it were 'to hold otherwise, the threshold decision not to supplement an EIS would become as burdensome as preparing the supplemental EIS itself.'"  *Conservation Congress v. U.S. Forest Service*, ___ F. Supp. 3d ___, 2016 WL 727272 (E.D. Cal. Feb. 23, 2016), Slip Op. at 4-5 (quoting *Friends of Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000)).

Under these applicable NEPA criteria, it remains untrue that there will be no further public participation post-Evaluation phase.  The Forest ROD does not mandate redundant or needless further public review and comment, but the ROD clearly provides for supplemental NEPA if warranted.  AR0010529.  Additionally, Montana DEQ will be conducting additional review under the Montana Environmental Policy Act, prior to taking new agency action in issuing its approvals for the construction and operation phases.  AR0011018 (DEQ ROD at 19).

Ironically, Plaintiffs make this argument because the agencies have applied a cautious, comprehensive approach to the Montanore Project.  If the Forest Service and DEQ had not decided on a phased approach, there would be no future Project

40

milestones identified in the ROD needing an evaluation whether further NEPA process is warranted before proceeding further.  That phased approach is familiar to the Court, as it was employed by the Forest Service in *Rock Creek All*.  In that case, the Court rejected similar NEPA arguments to the erroneous assertions presented by Plaintiffs here.  *See Rock Creek All.*, 703 F.Supp.2d at 1175.  This approach is even more responsive to NEPA concerns than the approach that Plaintiffs have characterized as the Forest Service "accepted practice" of authorizing further exploration, baseline data collection, and evaluation phases of other mining projects through an environmental assessment process, before proceeding with a mine development/operation phase EIS.  Dkt. 26 ("Libby Brief"), pp. 20-21.  Here, likewise the Forest Service has authorized an initial Evaluation phase for collection and analysis of additional data prior to committing to approval of construction of mine development/operation facilities.  However, the agency's EIS has already comprehensively and in much more detail addressed the cumulative potential effects of the full life of the mine, up front.

**B.    The Forest Service Adequately Evaluated and Identified Potential Mitigation Measures Regarding Nondegradation and Flow Reduction.**

As stated in *Robertson v. Methow Valley Citizens Council*,  "[w]e conclude that NEPA does not require a fully developed plan detailing what steps *will* be taken to mitigate adverse environmental impacts and does not require a 'worst case

analysis.'"   490 U.S. at 359.  It is sufficient that there is a "reasonably complete discussion of possible mitigation measures."  *Id.* at 352.  Plaintiffs have not shown that the Forest Service fell short of this requirement here.

Plaintiffs denigrate the agencies' evaluation of mitigation measures for flow reduction such as bulkheads, grouting and buffers.  They cite so-called "admissions" that the mitigation is inadequate.  Pls.' Brief p. 26.  This argument does not take the full record into account.  While Plaintiffs cite the tables discussed *infra*, there was additional information supplied to the Forest Service, and considered by it, with regard both to rates of reduced flow, and the associated mitigation.  For example, the values presented in Table 101 (AR0008479 (JFEIS at 602)) do not include other mitigation measures that were simulated in some model runs and presented in a technical memorandum dated February 27, 2012.  *See* AR0050405-414.  That additional information was discussed in a May 8, 2012 meeting among MMC, the consultant AMEC, DEQ, and the Forest Service.  AR0056597.  The mitigation measures that were evaluated in these model runs were considered and discussed by the Forest Service.  *See* AR0056498-500.  The record includes discussion that the bulkheads, in combination with pillars and other mitigation, would likely provide the necessary mitigation, even if they eventually failed during the long-term groundwater recovery period.  AR0008490 (JFEIS at 613).

The DEQ ROD, as well as the JFEIS, document consideration of these additional factors.  *See* AR0011026 (DEQ ROD at 27-28); AR0008479 (JFEIS at 602, *see* footnote to Table 101:  "Effects shown do not include mitigation measures not provided in MMC's 3D model report such as increasing buffer zones or using multiple plugs in the adits during closure. Such mitigation would be evaluated after additional data were collected during the Evaluation Phase.").  The JFEIS includes analysis and discussion of several mitigation measures including buffers, grouting, barrier pillars with bulkheads at access openings, and multiple adit plugs. AR0008489-92 (JFEIS at 612-15).  All of these mitigation measures would reduce the maximum drawdown and streamflow depletions predicted by the model results depicted in the JFEIS.  As summarized earlier in the Clean Water Act section of this brief, the JFEIS and the Forest ROD also discuss and provide for mitigation regarding the Poorman tailings facility.  *See*, *e.g.*, AR 0008688 (JFEIS at 811); AR0010729-31, 0010813-14 (Forest ROD, Att. 2 at 33-35, Att. 3 at 76-77).

Plaintiffs allege that these mitigation measures, especially those related to pillars and bulkheads, were not part of sufficient NEPA review, and that the Forest Service "cannot rely on a critical mitigation measure that will not be subject to public and EPA review until 5 years after the JFEIS was issued, if ever."  Pls.' Brief p. 27. As  discussed elsewhere in this brief, there was ample detailed discussion of adopted and potential further mitigation measures in the JFEIS and draft ROD circulated for

agency and public review to meet applicable NEPA requirements.  *See*, *e.g.*, AR0010696-738 (Forest ROD, Att. 2); AR0008489-92 (JFEIS at 612-15); AR0056498-500 (Discussions of buffer zones, plugs, bulkheads, grouting).

Plaintiffs' claims here are reminiscent of those rejected in *Robertson,* 490 U.S. at 352.  This case is of course comparable on this point also to *Rock Creek Alliance*, where this Court affirmed a ROD adopting a phased approach to mining project implementation, and rejected similar arguments that the Forest Service had improperly deferred mitigation analysis.  703 F. Supp. 2d at 1175-80.  *See also Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016); *Okanogan Highlands All. v. Williams*, 236 F.3d 468, 473-77 (9th Cir. 2000) (rejecting similar arguments regarding mitigation for mining projects).  In this case, the potential impacts from the alternatives were evaluated and mitigation measures were discussed in detail in the JFEIS, but the further extent and methods of mitigating will best be identified and refined with additional data, through the ROD Evaluation phase and DEQ permitting process that provide for further appropriate agency and public participation.

### C.   The Forest Service Did Not Misapply Evaluation Criteria in Choosing the Poorman Impoundment Alternative.

The Plaintiffs (Libby Placer) argue that the Forest Service was arbitrary and capricious in allegedly applying a 2000-foot "buffer" around potential alternative impoundment sites except the Poorman and Little Cherry Creek sites as screening

44

criteria for consideration in the Project EIS.  Libby Placer contends that if the 2000 foot "buffer" had been applied around the Poorman site, it would have been eliminated from consideration as an alternative because its proximity to Libby Placer private property would not allow a 2000 foot "buffer" around it.  Libby Brief, pp. 6-13.  This argument simply misapprehends the use of the 2000 linear foot adjustment to candidate impoundment site disturbance areas in the EIS process.  Plaintiffs have not shown that the Forest Service failed to consider the adverse as well as beneficial aspects of the Poorman site in comparison with other alternatives, or other violation of NEPA.

As explained in the JFEIS, the disturbance area around impoundment site candidates other than Poorman and Little Cherry Creek was enlarged by 2000 linear feet outward to standardize the disturbance areas for purposes of screening in relation to the disturbance areas of between 1,500 and 2000 acres already determined for the facilities proposed for the Poorman and Cherry Creek sites.  *See*, *e.g.*, AR0068018 (map showing application of 2000 foot adjustment for disturbance areas for sites in proximity to Little Cherry Creek and Poorman sites).  Other sites considered had been previously evaluated for much smaller tailings capacities or otherwise lacked detailed information about their expected disturbance areas for the current Project.  The 2000 foot increase in estimated disturbance footprint around these sites was used to make evaluation of their potential environmental effects more

comparable to the Poorman and Cherry Creek sites for the current tailings capacity anticipated to be needed for of the Project, not to provide a buffer of nondisturbance around facilities at any site.  AR0008119 (JFEIS at 259); AR0158939.

This 2000-foot disturbance area adjustment and other tailings capacity considerations were included among other initial "Level 1" screening criteria that eliminated only five of the 22 candidate impoundment sites other than Poorman and Little Cherry Creek.  Further, the inclusion of the Poorman site for consideration beyond the Level 1 screen along with numerous other potential alternatives did not preclude evaluation of its proximity to private property or other negative effects that Plaintiffs assert.  Plaintiffs' own citations regarding such adverse effects in the JFEIS record confirm disclosure and active consideration of the same by the Forest Service and other agencies, along with other relevant effects and factors.

Notably, under the Clean Water Act § 404(b)(1) regulations, the tailings impoundment site must be determined by the Corps to be the "least environmentally damaging practicable alternative" with respect to fill of wetlands and other effects on aquatic resources, and the Corps identified the Poorman site as the likely least environmentally damaging practicable alternative under these criteria.  AR0016170; AR0010134 (JFEIS at App. M-96); *see* AR0010547 (Forest ROD at 26).  Considering this and other data and analysis, the site was reasonably identified as the selected alternative for the Forest ROD, with the acknowledgement of its

proximity to the Libby property and potential adverse effects, and provision for further data collection and analysis regarding the site during the Evaluation phase. The Forest Service provided a rational, reasonable explanation for its decision regarding the Poorman site.  *See* AR0010528-30 (Forest ROD at 7-9).

Thus, Plaintiffs have not shown that the Forest Service evaluation was arbitrary and capricious or a violation of NEPA's purely procedural requirements. The evaluation of the Poorman site in comparison with other alternative sites in the Project EIS did not make an erroneous assumption about or ignore a fact or concern such as the presence of sage grouse habitat in the case relied upon by Plaintiffs, *Oregon Natural Desert Ass'n v. Jewell*, 823 F.3d 1258 (9th Cir. 2016).  Plaintiffs' attempt to draw analogies from that case and others compared to the present record falls apart, due to their basic mischaracterization of the alternatives screening and other evaluation in the Project EIS.

### D.    The JFEIS Provided Sufficient Baseline Data to Carefully Assess Potential Environmental Impacts.

The Plaintiffs argue that the Forest Service failed to obtain baseline data and illegally deferred analysis of the Poorman tailings facility. Pls.' Brief p. 28; Libby Brief pp. 18-23.  They contend that the agencies have deferred analyses on groundwater dependent ecosystems, i.e., the assessment of streams, springs and wetlands to determine potential connection to groundwater that may be impacted by mining activity.  Pls.' Brief p. 29.  Plaintiffs characterize the Forest ROD as only

requiring one year of data. *Id.* This is incorrect. Baseline water resources and groundwater dependent ecosystems monitoring have been conducted for several years in the Project Area and Wilderness, including the Poorman site. *See*, *e.g.*, AR0008503, AR0008881 (JFEIS at 626, 1004); AR0161076-265 (November 2006 Water Resources Report for Baseline Conditions); AR0161266-363 (October 2006 Hydrogeology Report). Baseline water resource monitoring in the Project area started in 1986 and has continued intermittently since then, resulting in a long period of record for seasonal baseline surface water and groundwater conditions, including streams, lakes, springs, wells, and Libby Adit mine inflows. Groundwater dependent ecosystems inventory and monitoring began in 2009 and continues through the present time, with results typically presented in annual reports. *See also* AR0227067-69 (Forest Service responses to objections on these issues). These data support the conceptual model, i.e., the response of the hydrogeological system to changes that may occur from mining. The conceptual model, in turn, is the basis for the numerical model "that can integrate *known hydrologic data* to determine potential impacts on groundwater levels and groundwater contributions to surface water flow." AR0008453 (JFEIS at 576). Because mine construction and operation is not yet authorized, by the time that is on the table, the "known hydrologic data" (baseline) will include not only all the data gathered from 1988 to the present, but also the more focused data gathered under the Evaluation phase.

Again, although the agencies acknowledge that various environmental effects cannot be more precisely identified and further assessed without the additional information gathered in the Evaluation phase, this is not a situation where there is a lack of data necessary to form a reasonable choice about alternatives, or where the agency did not make an effort to obtain baseline data for its EIS, such as *Plains Resource Council v. Surf. Transp. Brd.*, upon which Plaintiffs rely. *Plains*, 668 F.3d 1067, 1085 (9th Cir. 2011). The Forest Service has confirmed in the JFEIS and its ROD that the existing baseline and other information for the Poorman site and other components of the Project were sufficient for it to assess and compare environmental effects among alternatives at this stage. *See*, *e.g.*, AR0010764-66 (Forest ROD, Att. 3 at 23-25); AR0008188-93, 0008441; 00010380 (JFEIS at 328-33, 564, App. M-342).[6] The Forest Service is not relying on a supplemental information report or other analysis beyond the JFEIS and ROD to fill informational gaps, as was the case for bull trout data in the *Rock Creek All.* case. *Rock Creek All.*, 703 F. Supp. 2d at 1180-81. MMC as well as the Forest Service can be expected to be alert to that concern in determining whether supplemental NEPA process with opportunity for

---

[6] Plaintiffs profess uncertainty about the existence of an underground bedrock ridge dividing the Poorman site from Little Cherry wetlands. While further validating data will be collected for bedrock and other Poorman site parameters during the Evaluation phase, existing geophysical survey and other data clearly shows this bedrock ridge, with water table contours supporting a flow direction change along the ridge. AR0007824, 0008456 (JFEIS at S-32, 579); AR0034093-95.

public comment is warranted to address any new information obtained and analyzed in the Evaluation phase.

Regarding concerns expressed in the comments of the Environmental Protection Agency and other agencies, cited by Plaintiffs in support of their baseline data and other NEPA arguments, as indicated previously this is not a basis for finding the selection of the Poorman site or other components of the ROD arbitrary and capricious. The Environmental Protection Agency as well as DEQ ultimately supported and will be participants along with others in the phased approach adopted by the ROD that will yield further information and analysis far in advance of any approval for construction of the tailings impoundment or other production facilities. AR0013492-93; AR0010134 (JFEIS at M-96). The Environmental Protection Agency's recommendations for the Evaluation phase, such as further consideration of a tailings impoundment liner and other measures to reduce impacts and uncertainty (plus further review of the suitability of the Poorman site for the tailings impoundment), were not notably critical of the screening or other criteria employed by the Forest Service for evaluating tailings facility site alternatives in the ROD or JFEIS. AR0013155-73 (5/29/15 EPA letter); AR0013492-95 (1/19/16 EPA letter).

## CONCLUSION

For the reasons set forth above, the Court should grant MMC's motion for summary judgment and deny the motions for summary judgment filed by Plaintiffs.

DATED this 21st day of November, 2016.

CROWLEY FLECK PLLP


/s/ *Mark L. Stermitz*
Mark L. Stermitz
CROWLEY FLECK PLLP
P.O. Box 7099
Missoula, MT  59807-7099
Telephone: (406) 523-3600
Facsimile: (406) 523-3636
mstermitz@crowleyfleck.com

Robert Tuchman
Paul Lopach
BRYAN CAVE LLP
1700 Lincoln Street, Suite 4100
Denver, CO 80203
Telephone: (303) 861-7000
Facsimile: (303) 866-0200
paul.lopach@bryancave.com

*Counsel for Defendant-Intervenor*
*Montanore Minerals Corp.*

51

## CERTIFICATE OF COMPLIANCE

Defendant-Intervenor Montanore Minerals Corp. hereby certifies, pursuant to Local Rule 7.1(d)(2)(e) of the Montana United States District Court, that its *COMBINED BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT* contains 12,897 words (as counted by Microsoft Word 2007), excluding caption, certificate of service and compliance, is double spaced and printed in at least 14 point font.

By    /s/ Mark L. Stermitz
         MARK L. STERMITZ

         *Counsel for Defendant-Intervenor*
         *Montanore Minerals Corp*

52