# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

**FILED**

MAY 3 0 2017

Clerk, U.S Courts
District Of Montana
Missoula Division

SAVE OUR CABINETS, EARTHWORKS, and CLARK FORK COALITION,

        Plaintiffs,

    vs.

UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*,

        Defendants,

---

LIBBY PLACER MINING COMPANY,

        Plaintiff,

    vs.

UNITED STATES FOREST SERVICE, *et al.*,

        Defendants,

---

    and

MONTANORE MINERALS CORPORATION,

        Defendant-Intervenor.

CV 16–53–M–DWM

(Consolidated with Case No. CV 16–56–M–DWM)

OPINION
and
ORDER

The plaintiffs in this consolidated action seek review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, of federal agency actions and the associated planning documents relating to the approval of a proposed mining operation in the Cabinet Mountains Wilderness area in the Kootenai National Forest in northwestern Montana. The plaintiffs in CV 16–53–M–DWM are a coalition of environmental advocacy groups led by Save Our Cabinets. The plaintiff in CV 16–56–M–DWM is a private Montana mining company that owns 1,000 acres of land adjacent to the proposed mine facilities. The cases are brought against the United States Department of Agriculture and the United States Forest Service ("Forest Service" or "Federal Defendants"). Montanore Minerals Corp. ("Montanore"), the owner and operator of the proposed mine, intervened as a matter of right. *See* Fed. R. Civ. P. 24(a)(2).

The plaintiffs (collectively referred to as "Plaintiffs" unless context or specificity dictates otherwise) invoke the National Environmental Policy Act ("NEPA"), the Forest Service Organic Act of 1897 ("Organic Act"), the Federal Water Pollution Control Act ("Clean Water Act"), and the National Forest Management Act ("NFMA"). The challenged planning documents are the February 12, 2016 Record of Decision ("ROD"), the March 2015 Final Environmental Impact Statement ("FEIS"), the December 2015 Joint Final

Environmental Impact Statement ("JFEIS"), and the July 22, 2015 Combined Response to Objections. Plaintiffs ask the Court to declare that the agencies violated the relevant statutes and enjoin them from authorizing any activity relating to the Montanore Mine Project (the "Project" or "Mine") until they have complied with all applicable statutes and regulations. Argument was heard on this matter along with a related Endangered Species Act case on March 30, 2017. *See Save Our Cabinets v. U.S. Fish & Wildlife Serv.*, CV 15–69–M–DWM.

For the reasons set forth below, Plaintiffs' claims are granted in part and denied in part. Approval of the Project would violate the Clean Water Act and the Organic Act as the approval violates Montana's nondegradation standards. The approval also fails to pass NFMA and NEPA muster.

## FACTUAL BACKGROUND

### I.    The Montanore Mine Project

The February 12, 2016 ROD states the Forest Service intends to approve a Plan of Operations for the Montanore Project, a copper and silver underground mine and associated facilities, including a new transmission line, located near Libby, Montana. ROD at 1, AR10522.[1] The Project will affect private, state, and

---

[1] "AR" cites refer to the sequential Bates number stamped at the center-top of each page. Cites also include the document title and the internal page number where feasible.

National Forest System lands. *Id.* Montanore holds fee title by patent to mining claims (denoted HR 133 and HR 134), which lie partially within the Cabinet Mountains Wilderness Area ("Wilderness"). *Id.* While the ore body is located beneath the Wilderness, all Project mining access and surface facilities would be located outside the Wilderness boundary. JFEIS at 2, AR7862.

The Project is to proceed in four phases: Evaluation, Construction, Operations, and Closure. ROD at 8, AR10529. The first phase, Evaluation, consists of extending the existing Libby Adit (mining tunnel) and collecting and analyzing additional geotechnical, hydrological, and other information to assess the mining prospects and environmental impacts of the Project. ROD at 9-10, AR10530-31. The Evaluation Phase is expected to last two years, Construction three years, Operations 16 to 20 years, and Closure and Post-Closure up to 20 years. JFEIS at 273, AR8133. The Project would consist initially of 12,500 tons per day underground mining and would ultimately expand to 20,000 tons of ore every day of operation. JFEIS at 7, AR7867. The ore deposit is estimated at 135 million tons, of which Montanore anticipates mining 120 million tons. The permit area is 2,157 acres and expected disturbance area is 1,565 acres. JFEIS at S-13, AR7807. Employment is estimated at 450 people at full production, JFEIS at 7, AR7867, assuming the Project meets all legal requirements imposed by law.

4

## II.    Agency Action

In order to operate, the Project requires a Plan of Operations approved by the Forest Service and permits as well as approvals from the Montana Department of Environmental Quality ("Montana DEQ"), the Bonneville Power Administration, the U.S. Army Corps of Engineers ("Corps"), and other state and local agencies. In conjunction with the Forest Service, the Montana DEQ is a lead agency on the Project with authority over permits for Montana water quality regulations and the Clean Water Act. The Forest Service and the Montana DEQ determined that the Project may significantly affect the quality of the human environment. ROD at 2, AR10523. Consequently they, along with the Corps and the Bonneville Power Administration, prepared an Environment Impact Statement ("EIS"). On February 27, 2009, a Draft EIS was issued for public comment. *Id.* In response to public comment, the agencies revised the mine alterative and transmission line alignments and issued a Supplemental Draft EIS on October 7, 2011. *Id.* As of April 1, 2015, the Forest Service issued a Final EIS ("FEIS") and Draft ROD. *Id.* A Joint Final EIS ("JFEIS") was issued in December 2015. *Id.*

The Forest Service did not select Montanore's proposed action as the preferred alternative; rather it selected "Alternative 3 Agency Mitigated Poorman Impoundment and Transmission Line Alternative D-R" that "incorporates

5

modifications and mitigating measures proposed by the agencies to reduce or eliminate adverse environmental impacts." ROD at 14, AR10535. Under this alternative, the Libby Plant site would be on the ridge between Poorman and Ramsey creeks, with mine production and the ventilation adits in the Upper Libby Creek Drainage, about one mile from the Wilderness boundary. *Id.* A tailings impoundment site would be located north of Poorman Creek. *Id.*

While authorizing the full project, the ROD requires additional Forest Service approval prior to each Project phase. ROD at 8, AR10529. It also requires that Montanore obtain all necessary Clean Water Act permits prior to approval of the amended Plan of Operations and before implementing each phase. Montanore does not yet have the required permits. Montana DEQ decisions are documented in a separate Record of Decision ("DEQ ROD"). After reviewing the Project, the Montana DEQ held in abeyance its decision on whether to amend the provisions of the current operating permit regarding the Construction, Operation, Closure, and Post-Closure Phases of the Project to make it consistent with the Forest Service's selected mine alternative. DEQ ROD at 15, AR11014. The DEQ approved amendments to Montanore's existing DEQ Operating Permit 00150 to conditionally allow only the Evaluation Phase. *Id.*; ROD at 1, AR10522.

6

### III. Plaintiffs' Claims

The environmental plaintiffs assert violations of the Organic Act (Count I), the Clean Water Act (Count II), NFMA (Count III), and NEPA (Count IV). Their claims are based primarily on the Project's effects on water quality and stream flows, as well as the Forest Service's consideration of mitigation measures and public access during the NEPA process. Plaintiff Libby Placer Mining Company ("Libby Placer Mining"), also challenges the Project under NEPA (Counts I, II) and the Organic Act (Count III). Its arguments focus primarily on the decision to use the Poorman Creek tailings impoundment site.

### IV. Amicus

The Attorney General for the State of Montana filed an amicus brief, arguing that Montanore should be allowed to complete the Evaluation Phase. (Doc. 46.) According to the amicus, the ROD granted only limited exploratory permit rights contingent on a determination by Montana DEQ that actions beyond the Evaluation Phase will comply with Montana's water quality laws. *See* ROD at 58, AR10579. The Attorney General argues that such "phased review" has previously been upheld and should be upheld here. That position is addressed in the context of the parties' substantive arguments.

## SUMMARY CONCLUSION

Federal Defendants insist that the existing baseline data enabled the Forest Service to evaluate the reasonably foreseeable significant effects of the Mine and to make a reasoned choice among alternatives as to all phases of the Project. The defendants and amicus emphasize, however, that while the ROD authorizes the full Project, further analysis and authorization is required after the Evaluation Phase and before the Project can proceed. They refer to this process as either "phased" or "adaptive management." Plaintiffs do not dispute the necessity of collecting additional data on hydrogeologic conditions during the Evaluation Phase, (Doc. 63 at 18), but argue the legal error is that the ROD covers all phases of the Project. Plaintiffs emphasize that the ROD, as final agency action, must be assessed and the Forest Service cannot simply defer its substantive environmental analysis pending the DEQ permitting process.

Although the "phased" approach used by the Forest Service is not inherently flawed, its application in this case is problematic. The Forest Service's approval of the Project despite noncompliance with Montana's nondegradation standards is arbitrary and capricious in violation of the Clean Water Act, the Organic Act, and NFMA. Additionally, the agencies violated NEPA by failing to discuss mitigation with regard to the Poorman site.

## I. Legal Standards Applicable to All Claims

### A. APA

Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). The scope of review is narrow, and a court must "not [] substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A decision is arbitrary or capricious:

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1224 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)). An agency's actions are valid if it "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Id.* (internal quotation marks omitted); *Motor Vehicles Mfrs.*, 463 U.S. at 50.

**B.    Summary Judgment**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment is particularly applicable to cases involving judicial review of final agency action. *Occidental Eng'r Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985). Summary judgment is appropriate in this case because the issues presented address the legality of the agencies' actions based on the administrative record and do not require resolution of factual disputes.

**II.    Clean Water Act and Organic Act**

Plaintiffs insist there are three sets of claims under the Clean Water Act and the Organic Act: (1) noncompliance with state water quality standards, (2) lack of proper certification under Clean Water Act Section 401, and (3) noncompliance with the EPA's zero discharge effluent rule. Although the Forest Service can legally rely on future approvals by Montana DEQ, *Rock Creek II*, 703 F. Supp. 2d at 1169, baseflow model results show the Project will violate Montana's water quality requirements in the future; the Forest Service's decision to approve the Project despite that violation is arbitrary and capricious.

**A.    Clean Water Act**

The Clean Water Act is designed "to restore and maintain the chemical,

10

physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). It

establishes water quality standards to protect the desired condition of each

waterway. 33 U.S.C. § 1313. "A water quality standard defines the water quality

goals of a water body, or portion thereof, by designating the use or uses to be

made of the water and by setting criteria that protect the designated uses." 40

C.F.R. § 131.2. "[A] project that does not comply with a designated use of the

water does not comply with the applicable water quality standards." *PUD No. 1 v.*

*Wash. Dep't of Ecology*, 511 U.S. 700, 715 (1994). Under the Clean Water Act

Section 313, the Forest Service cannot authorize mining operations that do not

comply with state and federal water quality regulations, "including a state's

antidegradation policy. 33 U.S.C. § 1323(a)." *Idaho Sporting Congr. v. Thomas*,

137 F.3d 1146, 1153 (9th Cir. 1998). The Act also prohibits the Forest Service

from authorizing a project that does not comply with Clean Water Act Section

401, which requires certification that any activity receiving a "Federal license or

permit" that may result in any discharge into navigable waters will comply with

state water quality standards. 33 U.S.C. § 1341(a)(1). "Proposed mining activities

on National Forest System lands are subject to compliance with [Section 401]."

JFEIS at 622, AR8499.

Montana DEQ administers the Clean Water Act under authority delegated

from the United States Environmental Protection Agency ("EPA"). Here, Montanore possessed a discharge permit from Montana DEQ (MPDES Permit MT0030279) allowing discharges of water from the existing Libby Adit. DEQ ROD at 5, AR11004. Permit MT0030279 allows three points of discharge: "Outfall 001 – percolation pond, Outfall 002 – infiltration system of buried pipes, and Outfall 003 – pipeline outlet to Libby Creek." *Id.* Montanore also previously obtained a hard rock mine operating permit from Montana, DEQ Operating Permit #00150, with minor revisions in 2006 regarding approved Libby Adit evaluation drilling that were referenced and incorporated in an amended Operating Permit. *Id.* The actions under review by the DEQ for the Project also included a renewal of that Discharge Permit, upon which the DEQ ROD conditioned amendment of the Operating Permit for the Evaluation Phase. DEQ ROD at 15, AR11014.

## B. Organic Act

The Organic Act authorizes the Forest Service to regulate use and occupancy, such as mineral operations, on National Forest System lands and to develop mineral regulations. *See* 16 U.S.C. §§ 475, 478, 551. Those regulations require that "all [mining] operations shall be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources." 36 C.F.R. § 228.8. They further require that mining operators comply with

applicable state and federal water quality standards including the Clean Water Act; take all practicable measures to maintain and protect fisheries and wildlife habitat; and construct and maintain all roads so as to assure adequate drainage and to minimize or, where practicable, eliminate damage to soil, water, and other resource values. *See Rock Creek II*, 703 F. Supp. 2d at 1164.

The Organic Act limits the Forest Service's regulatory authority, however, by requiring that no such regulation "prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof." 16 U.S.C. § 478. The Forest Service does not have authority to prohibit or deny mine proposals that can be approved in a manner that will comply with applicable environmental laws that are reasonably necessary to mining of a private mineral estate or the use of unpatented claims on National Forest System lands subject to the General Mining Act. *See* 30 U.S.C. §§ 22-42 (giving United States citizens the right to explore, locate, patent, and develop claims on National Forest System lands). Holders of validly existing mining claims within the Wilderness are accorded the rights provided by the United States mining laws and must comply with the Forest

Service mineral regulations.[2]  36 C.F.R. § 228.15.  Operations in the Wilderness

> shall be conducted so as to protect National Forest surface resources in accordance with the general purposes of maintaining the [Wilderness] unimpaired for future use and enjoyment as wilderness and to preserve its wilderness character, consistent with the use of the land for mineral location, exploration, development, drilling, and production and for transmission lines, water lines, telephone lines, and processing operations, including, where essential, the use of mechanized transport, aircraft or motorized equipment.

36 C.F.R. § 228.15(b).

## C.    Analysis

Plaintiffs argue that the selected alternative will violate Montana's water quality requirements and that the Forest Service failed to comply with the Clean Water Act Section 401 and the EPA's zero-discharge effluent rule.  Those arguments are addressed in turn.

### 1.    Montana Water Quality Requirements

Montana law requires that "[e]xisting uses of state water and the level of water quality necessary to protect those uses must be maintained and protected." Mont. Code Ann. § 75-5-303 (the "nondegradation" standard).  Montana law further requires that waters be "maintained suitable for . . . growth and propagation

---

[2]  The Wilderness Act withdrew the lands in the Wilderness from mineral entry on January 1, 1984, subject to valid existing rights.  Only claims that had documented valid existing rights as of December 31, 1983, such as Montanore's, are allowed reasonable and prudent access and development of facilities within the Wilderness boundary.  JFEIS at 3, AR7863.

of salmonid fishes and associated aquatic life" and that "[n]o increases are allowed

above naturally occurring concentrations of sediment or suspended sediment . . .

which will or are likely to . . . render the waters harmful, detrimental, or injurious

to . . . fish." Admin. R. Mont. 17.30.623(1), (2)(f). In addition to "maintaining"

waters suitable for aquatic life, Montana law states that only "a 1° maximum

increase above naturally occurring water temperature is allowed within the range

of 32°F to 66°F." Admin. R. Mont. 17.30.623(2)(e). Plaintiffs challenge the

Project's compliance with all three standards: (1) nondegradation, (2) sediment,

and (3) temperature.

According to the defendants, because the State of Montana has been

delegated authority to issue discharge permits and has adopted water quality

standards approved by the EPA, the State is the primary decision-maker regarding

compliance with the Clean Water Act, including compliance with state water

quality standards. For that reason, they argue that the Forest Service properly

determined that reliance on Montana DEQ's decisions constitutes compliance with

Clean Water Act requirements. ROD at 58, AR10579; *see Rock Creek Alliance v.

United States Forest Service (Rock Creek II)*, 703 F. Supp. 2d 1152, 1169 (D.

Mont. 2010) ("The permit is the means by which the Montana DEQ enforces state

water quality standards, and the Forest Service is allowed to rely on the Montana

DEQ to issue and enforce a valid permit."). Although the Montana DEQ determined that "the Libby Adit during the Evaluation Phase will comply with all water quality standards," it chose to hold in abeyance its compliance determination for the remaining phases of the Project. DEQ ROD at 18, AR11017. Federal Defendants insist the status of the permit is irrelevant because the Forest Service's proposals are expressly contingent upon Montana DEQ approval of operations. *See* ROD at 8, AR10529; *see Rock Creek II*, 703 F. Supp. 2d at 1169 n.13 (noting that the status of a similar State DEQ permit was "irrelevant to the consideration of" compliance with the Organic Act). The Montana Attorney General echoes that such reliance on the Montana DEQ is consistent with the law. (*See* Doc. 46.)

Plaintiffs argue that by deferring to the State's future permit process, despite the current record which predicts that State water quality standards will be violated, the Forest Service ignores Section 313's creation of a separate and independent duty on federal agencies to comply with all federal and state water quality standards, and that judicial review of current compliance is appropriate under the APA, *Idaho Sporting Cong'r*, 137 F.3d at 1153, and the Clean Water Act's citizen suit provision, *Rock Creek II*, 703 F. Supp. 2d at 1163-65.[3]

---

[3] As explained in *Rock Creek II*, whether a plaintiff proceeds under the APA or is subject to the notice requirements of the citizen suit provision under 33 U.S.C. § 1365 depends on whether the challenged project is a "point source." As it relates to Plaintiffs' Section 401

### a.    Nondegradation[4]

Plaintiffs first argue that the Alternative 3 selected by the ROD will result in violation of Montana's nondegradation requirements. Montana law requires that "[e]xisting uses of state waters and the level of water quality necessary to protect those uses must be maintained and protected." § 75-5-303(1). Degradation of "high quality" waters is prohibited unless the DEQ issues an authorization to degrade. §§ 75-5-103(13), 75-5-303. No degradation of "outstanding resource waters" is allowed, such as surface waters within a wilderness. Admin. R. Mont. 17.30.705(2)(c); DEQ ROD at 18, AR11017 ("Surface waters located within the boundaries of the [Wilderness] are outstanding resource waters. Authorizations to degrade may not be issued for state waters that are classified as outstanding resource waters.").

The Montana Water Quality Act defines "degradation" as a change in water quality that lowers the quality of high-quality waters in terms of physical, biological or chemical properties of the water, unless the change is nonsignificant. § 75-5-103(7), (27). Alteration of stream flows by less than 10 percent (based on

---

challenge, Federal Defendants argue the citizen suit provision has not been triggered because no discharge has occurred. Regardless, the environmental plaintiffs complied with the Clean Water Act's notice provision. (*See* Amend. Compl., Doc. 11 at ¶ 14.)

[4] The EPA's use of the term "antidegradation" is functionally equivalent to Montana's use of the term "nondegradation."

a seven-day, ten-year low flow) is generally not considered "significant," unless the Montana DEQ determines otherwise. Admin. R. Mont. 17.30.715(1)(a), (2). Additionally, the Montana DEQ can make a nonsignificant finding based on information submitted by the applicant. Admin. R. Mont. 17.30.715(3).

Here, "[a]ll of the waters in the analysis area are high quality waters, except surface waters that have zero flow or surface expression for more than 270 days during most years." JFEIS at 623, AR8500. According to the DEQ ROD, while the "completion of the Libby Adit during the Evaluation Phase will comply with all water quality standards, including nondegradation provisions set forth in administrative rules, the 3D model results included in the Joint Final EIS do not demonstrate compliance with the nondegradation provisions for the other phases of the Montanore Project." DEQ ROD at 18, AR11017. The DEQ ROD goes on to state that "another nondegradation compliance determination for operation of the mine may be made after" additional information is collected during the Evaluation Phase. *Id.* As a result, the DEQ decided to "hold[] in abeyance" its decision on whether to approve the remaining phases of the Project. *Id.*

Federal Defendants rely on *Idaho Sporting Congress* to support their decision to defer future water quality compliance issues to the DEQ and reassessment following the Evaluation Phase. *See* 137 F.3d at 1153. In that case

18

the court found that it "lack[ed] sufficient facts" on the record to determine

whether the nondegradation standards would be violated. *Id.* Unlike the situation

in *Idaho Sporting Congress*, however, this record contains degradation data in the

form of baseflow modeling. A complex three-dimensional ("3D") model was used

to simulate changes in baseflows for each mine phase. JFEIS at 521, AR8398.

The effects were measured using the lowest streamflow averaged over 7

consecutive days that occurs, on average, once every 10 years. JFEIS at 519,

AR8396. This "7Q10" has a 10 percent probability of occurring in any given year,

and is used for measuring stream baseflow for purposes of nondegradation under

the Montana Water Quality Act.[5] *Id.*; Admin. R. Mont. 17.30.715(1)(a). The

defendants argue that the modeled baseflow data cannot and should not be relied

upon to reach a degradation conclusion because the model is conservative, more

data will be collected during the Evaluation Phase, and the model will be updated

before the Project proceeds. They ignore the fact the Forest Service determined

the current data was "sufficient" "to make a reasoned choice among alternatives

and to evaluate the reasonably foreseeable significant adverse effects on

groundwater and groundwater dependent ecosystems." JFEIS at 564, AR8441.

---

[5] The agencies also applied a "7Q2" estimate for flows, which is the lowest streamflow averaged over 7 consecutive days that occurs, on average, once every 2 years. The 7Q2 flow has a 50 percent probability of being exceeded in any one year. JFEIS at 519, AR8396.

The modeled data is therefore sufficient for judicial review of the Forest Service's decision.

## I.     Outstanding Resource (Wilderness) Waters

Plaintiffs first argue that the Project will substantially reduce or eliminate entirely the baseflow of outstanding resource waters in East Fork Rock Creek, East Fork Bull River, and Libby Creek, "each exceeding the 10% nondegradation standard." (Pls.' Br., Doc. 40 at 17.) In support of these claims, Plaintiffs rely on JFEIS tables reflecting percentage reductions in baseflows expected to occur during the Closure and Post-Closure Phases. *See* JFEIS Tables 100, 101 (documenting projected reductions in baseflows in East Fork Rock Creek by 59-100 percent, East Fork Bull River by up to 97 percent, and Libby Creek by 11-14 percent); JFEIS 601-02, AR8478-79.[6] Plaintiffs further argue that these significant baseflow losses to the outstanding resource waters in the Wilderness

_____

[6] Montanore's allegation that Plaintiffs incorrectly state that severe depletions are expected even with mitigation measures is itself misleading. As noted in Table 101, the predictions are outlined both with and without Montanore's modeled mitigation. *See* JFEIS at 602, AR8479. While the attendant footnote clarifies that the table "does not include mitigation measures not provided in [Montanore]'s 3D model report such as increasing buffer zones or using multiple plugs in the adits during closure," *id.*, it by definition includes some mitigation measures. *Compare* Table 101, AR8479 (providing percentages both *with* and *without* mitigation) *with* Table 111, AR8539 (providing only one set of numbers with notation "without mitigation"). And, the record shows that even with mitigation, baseflow reductions during the Operations Phase are expected to be 17 percent in East Fork Rock Creek and 22 percent in Libby Creek. JFEIS at 661, AR8538.

are categorically excluded under Montana law.

Contrary to Plaintiffs' position, the fact modeled results exceed the percentage threshold for determining nonsignificance does not categorically equate to a violation of the Montana's nondegradation standard. Montana DEQ can determine baseflow reductions in excess of ten percent are nonsignificant for other reasons. *See* Admin. R. Mont. 17.30.715(3). But, the stance of the Montana DEQ appears to be that the predicted losses here would be significant: "the 3D model results predict decreases in the baseflow of surface water in the [Wilderness] greater than what is considered nonsignificant under [Montana's regulatory regime]." DEQ ROD at 18, AR11017. The defendants' argument that Montana DEQ could except reduction in excess of ten percent is not persuasive. Other than citing to unknown data that will be gathered during the Evaluation Phase, the defendants have no evidence that the modeled predictions will be found nonsignificant. And, if significant, Montana DEQ cannot authorize degradation within the Wilderness area. *See* Admin. R. Mont. 17.30.705(2)(c).

The amicus argues that such a conclusion results in an "illogical paradox" which recognizes that exploratory drilling is necessary to determine full-scale mining effects but that exploratory drilling cannot occur until the full-scale effects are known. (Doc. 46 at 6.) But that again ignores the fact that the Forest Service

21

determined it had enough information to proceed with the ROD. While the conditionality of the DEQ's approval would ostensibly prevent the Project from proceeding in its noncompliant form, the DEQ determined that, based on available data, the Project would not comply with Montana law. To say that noncompliance does not matter in the face of "adaptive management" is contrary to the evidence before the agency. *Cf. Greater Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015, 1029 (9th Cir. 2011) ("[I]t is not enough to invoke 'adaptive management' as an answer to scientific uncertainty."). In *Rock Creek II*, the status of the permitting was considered irrelevant when the Montana Supreme Court remanded back to the DEQ. 703 F. Supp. 2d at 1169 n.13; *Clark Fork Coalition v. Mont. DEQ*, 197 P.3d 482 (Mont. 2008). Here, the issue is not that the permits have not yet been issued or questions remain as to the procedural process that must be followed. Rather, the DEQ has explicitly refused to approve permitting for future stages of the Project based on the environmental record presently before the agencies. This case falls outside of the purview of *Rock Creek II*.

## ii. High-Quality Waters (Outside Wilderness)

Plaintiffs also cite flow reductions in excess of 10 percent in East Fork Rock Creek and Libby Creek outside the Wilderness, which are designated high-quality waters. Tables 99, 100, 101, AR8472, 8778-79 (17-59 percent in East Fork Rock

22

Creek; 16-20 percent in Libby Creek, depending on phase). Additionally, the pumpback system under Poorman Creek is expected to reduce flows by up to 12 percent, BA at 58, AR212619, and no mitigation is proposed to address these baseflow reductions, JFEIS at 596-98, AR8473-75; JFEIS at 1025, AR8902 ("The agencies did not require [Montanore] to identify mitigation for three potential indirect effects of the project [including] . . . reducing the flow in Poorman and Little Cherry creeks by the pumpback well system."). Montanore does not currently have an authorization to degrade any of these streams. It argues, however, that the 12 percent reduction reflected in the JFEIS for Poorman Creek is a conservative prediction, is near the 10 percent nondegradation significance threshold, and does not consider mitigation measures. (Doc. 53 at 25.) Montanore argues that mitigation measures are to be evaluated after data is collected during the Evaluation Phase, JFEIS at 662, n., AR8539, and it would update the pumpback system at that time, JFEIS at 567, AR8444. That position puts the proverbial cart before the horse.

Although these flow reduction percentages are not as extreme as those expected within the Wilderness, the defendants do not point to anything in the record indicating that the Montana DEQ would find the reductions nonsignificant

23

given the DEQ's current position.[7]  Once again, the data before the Court shows

noncompliance for future stages of the Project.  Approval of the Project despite the

violation of Montana's water quality standards is arbitrary and capricious.

###   b.   Fish Protection Standards

Plaintiffs further argue that sediment discharges and water temperature

increases violate Montana's fish protection standards.

####   i.   Sediment

Montana law requires that waters be "maintained suitable for . . . growth

and propagation of salmonid fishes and associated aquatic life" and that "[n]o

increases are allowed above naturally occurring concentrations of sediment or

suspended sediment . . . which will or are likely to . . . render the waters harmful,

detrimental, or injurious to . . . fish."  Admin. R. Mont. 17.30.623(1), (2)(f).  The

Project is anticipated to increase sediment discharges that will harm fish.  Aquatic

BiOp at 96, AR221619; JFEIS at 441-42, AR8301-02.

Plaintiffs assert that even with the implementation of the mitigation

measures identified in the ROD, including Best Management Practices ("BMPs"),

increased sediment will occur, in part during the Evaluation Phase, in violation of

_____

[7]  Tempering this conclusion, however, is the fact that even if they are significant, the
DEQ could authorize degradation, unlike inside the Wilderness.

24

Montana law. *See* Aquatic BiOp at 96-97, AR221619-20; *id.* at 42, AR212603 (recognizing that even with BMPs, increase in sediment loading expected in Evaluation Phase). Montanore argues that despite short term sediment increases, long-term mitigation efforts will ultimately improve sediment loading over baseline conditions. (Doc. 53 at 27); *see* Aquatic BiOp at 123, AR221646 ("The road activities associated with the proposed mining operations are predicted to cause short-term increases of sediment input followed by long-term decreases that are expected to improve baseline conditions.").

Plaintiffs are correct that an agency cannot simply rely on long-term mitigation in the face of short-term impacts. *See Rock Creek II*, 703 F. Supp. 2d at 1170-71 (concluding the agency acted arbitrarily by providing no explanation for why mine phase with most sediment impacts was to proceed with no mitigation efforts). However, the situation here is distinguishable from that in *Rock Creek II* because the Project requires not only the implementation of BMPs over the life of the Project, *see* JFEIS at 762-63, AR8639-40, but additional bull trout mitigation measures in the short term, AR 10879-898 (Bull Trout Mitigation Plan). A similar problem was discussed in *Hells Canyon Preservation Council v. Haines*, 2006 WL 2252554 (D. Or. Aug. 4, 2006). There, the Forest Service argued the project's "contemplation of road closures and decomissionings will reduce road-related

sediment and improve water quality." *Hells Canyon*, at *5. The court disagreed

that such action compensated for sediment in the short term, noting that "[t]he

timing of those [mitigation measures] is, at best, uncertain." *Id.* Here, unlike *Rock

Creek II* and *Hells Canyon*, there is no "gap" between the impacts and imposition

of mitigation measures. *See* AR8639-40 (listing BMPs), 8060 (Table 28), 10960

(discussing BMPs during Evaluation Phase and requiring monthly sediment

reports); JFEIS at 758, AR8635 (establishing total maximum daily load); *see also

Okanogan Highlands All. v. Williams*, 236 F.3d 468, 478 (9th Cir. 2000) (noting

that 36 C.F.R. § 228.1 "sets no substantive standards that [the agency] could

violate").[8] Approval of the Project did not violate Montana's sediment standards.

## ii. Water Temperature

Under Montana law, only "a 1° maximum increase above naturally

occurring water temperature is allowed within the range of 32° to 66°F." Admin.

R. Mont. 17.30.623(2)(e). Plaintiffs note that bull trout require water temperatures

ranging from 36° to 59°F, JFEIS at 397, AR8257, and allege that direct discharge

at Outfall 003 into Libby Creek will exceed 60°F. Outfall 003 is an overflow pipe

that would result in direct discharge when the percolation pond for Outfalls 001

---

[8] Federal Defendants argue that Montana law allows the DEQ to authorize short-term
violations of water quality standards for sediment during the type of construction occurring in the
Evaluation Phase. *See* Mont. Code Ann. § 75-5-318. Such authorization has not occurred here.

26

and 002 reaches capacity. JFEIS at 750, AR8627. As a result, "[c]onditions where a direct discharge to Libby Creek would be necessary are expected to be limited in duration and frequency." JFEIS at S-43, AR7833.

Plaintiffs cite to both the 2014 Aquatic Biological Opinion and the March 2015 EIS which determined "the temperature of the discharge of mine and adit water during the evaluation, construction and operation phases is expected to be between 56° and 65°F (KNF BA 2013) which exceeds the temperature thresholds of bull trout spawning, egg incubation, and rearing, and for generally preferred water temperatures for bull trout []." Aquatic BiOp at 95, AR221618; FEIS at 677, AR5429. The December 2015 JFEIS, however, describes the discharge as being between 51° and 60°F "based on temperatures of the Water Treatment Plant effluent from February 2014 to May 2015 (DEQ 2015b)." JFEIS at 756, AR8633. Although Plaintiffs challenge the Forest Service's reliance on this new data from the "DEQ Fact Sheet" on the grounds that it was not part of the NEPA review process, the agency is required to use "best available scientific and commercial data available." 50 C.F.R. § 402.14(g)(8); *see San Luis*, 747 F.3d at 602 (agency cannot ignore available scientific information); *Conservation Cong'r v. U.S. Forest Serv.*, 2016 WL 727272, at *6 (E.D. Cal. Feb. 24, 2016) (upholding an agency's internal consideration of a new study between draft EIS and ROD).

27

Moreover, some of that temperature data was present in the annual aquatic reports submitted by Montanore. *See* AR35301 (Table 3 (including 2014 data)).

Plaintiffs insist that even if the DEQ Fact Sheet may be used, it shows discharges in excess of 60°F since discharges began in 2007. *See* AR153937. They also criticize the Forest Service's reliance on temperatures measured 2,536 feet below the Outfall 003 discharge point, as opposed to at the point of discharge. However, the DEQ Fact Sheet shows that the temperature taken at the distribution box does not show the change in stream temperature relevant to Montana's water quality standard. Rather, the relevant temperatures are taken above the Outfall sites and below the discharge area to assess the overall impact on stream temperature. *See* AR153937. Plaintiffs' attempt to look to the temperature changes noted in the data for 2014/2015 as evidence that Outfall 003 has a greater than 1°F impact on the stream temperature is unpersuasive as no discharges occurred in that year from Outfall 003. (*See* Doc. 66 at 13). Moreover, temperature data shows a natural variation of over 2°F. *See* AR153938.

Plaintiffs are correct that the defendant's reliance on the "infrequent" and "limited duration" of the discharge from Outfall 003 would not excuse compliance with the water temperature standards, especially when the record shows the threat high temperatures may have to bull trout. However, those limited and infrequent

28

additions to the stream, when combined with the many factors that influence stream temperature—including groundwater/surface interaction, stream depth, and canopy coverage, AR8592—do not lead to the conclusion that the Forest Service acted arbitrarily or capriciously in determining the Project complied with Montana's stream temperature restrictions. Approval of the Project did not violate Montana's temperature regulations.

## 2. Clean Water Act Section 401

Plaintiffs further argue that the agencies failed to comply with Clean Water Action Section 401. Section 401 provides, in pertinent part, that an "applicant for a Federal license or permit" that "may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State . . . that any such discharge will comply with the applicable provisions of [the Clean Water Act]." 33 U.S.C. § 1341. As noted by Plaintiffs, a 401 certification has not been issued here because Montanore has not yet applied for one. (Doc. 40 at 25.) Plaintiffs insist, however, that approval of the Mine itself is a "federal license or permit" that requires 401 certification. The defendants insist that a 401 Permit is based on discharge and the Forest Service has not yet issued a license or permit that authorizes discharge and will not do so until it receives water quality certification from the Montana DEQ. ROD at 52-53, AR10573-74.

The parties cite to *Hells Canyon* as instructive, but the defendants persuasively argue *Hells Canyon* is inapposite. There, the Forest Service improperly allowed discharges into Oregon waters from placer mining operations on several occasions without any prior state approval. 2006 WL 2252554, at *3. Here, the Forest ROD requires DEQ approval prior to any discharge and there is no indication unapproved discharge has occurred.

In relation to the Evaluation Phase, Plaintiffs' argument is somewhat unclear. To the extent Plaintiffs insist a permit is necessary, potential discharge is covered in the amended Discharge Permit issued by DEQ and, even if it were not, an additional permit could be obtained and the DEQ could waive certification. *See* Mont. Admin. R. 17.30.105(2)(b); *see* DEQ ROD at 15, AR11014 (conditioning DEQ approval of Evaluation Phase on Montanore receiving renewal of its discharge permit). The Forest Service did not violate Section 401.

### 3.    EPA's Zero-Discharge Effluent Rule

Plaintiffs claim that the Forest Service failed to require Montanore to comply with the EPA's New Source Performance Standards effluent limits for copper milling operations using froth-flotation milling. The effluent standard provides that there "shall be no discharge of process wastewater to navigable waters from mills that use the froth-flotation process alone, or in conjunction with

30

other processes, for the beneficiation of copper, lead, zinc, gold, or molybednum ores or any combination of these ores." 40 C.F.R. § 440.104(b). Plaintiffs challenge the Project's plan to direct discharge from the mill first through the tailings and then back through the Water Treatment Plant before discharging into Libby Creek. *See* JFEIS Figure 58, AR9661 (showing water flows). Federal Defendants argue that the effluent standard includes exceptions, including allowing new copper mines and mills to discharge certain waters attributable to precipitation exceeding evaporation if the water meets effluent limitations applicable to those discharges. 40 C.F.R. § 440.104(b)(2). Plaintiffs challenge any reliance on that exemption, noting that the JFEIS specifically determined that "precipitation and surface runoff within the impoundment area would not consistently exceed evaporation." JFEIS M-381, AR10419.

Although Plaintiffs convincingly explain that discharge is inescapable, (*see* Doc. 63 at 29-31), such discharge is of the type permitted under the exceptions, AR8027-29, 9725, 10419. The JFEIS explains that any water from the tailing impoundment to be treated and discharged would be mine drainage and precipitation commingled with process water. JFEIS at 172, AR8032; AR56455 (Mar. 5, 2012 Letter discussing effluent limitations). The effluent limitations guidelines expressly allow such discharges from commingled waters, provided the

volume of discharge does not exceed the volume that could have been discharged had each waste stream been treated separately and the pollutants in the volumes permissibly discharged do not exceed applicable effluent limitations. *See* 40 C.F.R. § 440.131(a). The approval of the ROD did not violate the EPA rule.

Accordingly, approval of the Project violated the Clean Water Act and Organic Act insofar as it violated Montana's nondegradation standards. Plaintiffs' remaining challenges under these statutes lack merit.

## III. NFMA

The environmental plaintiffs argue that the ROD and the Project activities it authorizes are inconsistent with the Kootenai National Forest Plan (the "Forest Plan") in violation of NFMA. NFMA provides for forest planning and management at two levels: the forest level and the individual project level. 16 U.S.C. § 1604; *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30 (1998). At the forest level, the agency develops a Land and Resources Management Plan, i.e., "forest plan." Once the forest plan is approved, the Forest Service implements the plan by approving or denying site-specific actions. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1092 (9th Cir. 2003). The Forest Service's failure to comply with a forest plan violates NFMA. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005). The environmental plaintiffs

claim that the Project violates the Forest Plan by failing to meet Desired

Conditions and retarding attainment of the Inland Native Fish Strategy Objectives.

They are partially correct.

## A. Desired Conditions

The Forest Plan established a number of "desired conditions" to manage and

protect the forest and public resources, including:

**FW-DC-WTR-01.** Watersheds and associated aquatic ecosystems retain their inherent resilience to respond and adjust to disturbance without long-term, adverse changes to their physical or biological integrity.

**FW-DC-WTR-02.** Water quality meets applicable state water quality standards and fully supports beneficial uses. Flow conditions in watersheds, streams, lakes, springs, wetlands, and groundwater aquifers fully support beneficial uses, and meet the ecological needs of native and desirable non-native aquatic species and maintain the physical integrity of their habitats.

Plan at 22, AR213903; JFEIS at 703, AR8580. The environmental plaintiffs argue

that NFMA's implementing regulations require that the agency meet a Forest

Plan's desired conditions, relying on 36 C.F.R. § 219.15(d), which provides in

relevant part: "[e]very project and activity must be consistent with the applicable

plan components" by *inter alia* "contribut[ing] to the maintenance or attainment of

one or more goals, desired conditions, or objectives, or does not foreclose the

opportunity to maintain or achieve any goals, desired conditions, or objectives,

33

over the long term." 36 C.F.R. § 219.15(d)(1). Federal Defendants insist that

there is no requirement that any project be consistent with *all* desired conditions,

and that the ROD adequately explains how the Project will contribute to "one or

more" desired conditions other than those raised by the environmental plaintiffs.

*See* ROD at 62, AR10583 (referencing desired conditions related to economic

growth). The environmental plaintiffs note that the Federal Defendants' litigation

position is contradicted by the JFEIS, which states that Project complies with the

two water-based desired conditions. *See* JFEIS at 791, AR8668.

> As stated in the Forest Plan:
>
> Because of the many types of projects and activities that can occur over
> the life of the Plan, it is not likely that a project or activity can maintain
> or contribute to the attainment of all goals and desired conditions . . . .
> Most projects and activities are developed specifically to maintain or
> move conditions toward one or more of the desired conditions of the
> Plan. It should not be expected that each project or activity will
> contribute to all desired conditions in a plan, but usually to one or a
> subset.

Plan at 3, AR213884. The Plan further states that consistency with desired

conditions is based on four factors, including if a project is "neutral with regard to

progress toward Plan desired conditions." *Id.* The Plan merely requires that the

project documentation "identify which of the[ ] criteria are being met and how

they are being met." *Id.* Here, the Forest Service asserts that the Project would be

34

"neutral" as to both desired conditions based on mitigation measures and required compliance with State water quality standards. JFEIS at 791, AR8668. Although Plaintiffs challenge that finding, the agency's explanation, when considered in the context of the extensive discussions on baseflow reductions and impacts on bull trout throughout the record, is sufficient under the Forest Plan as to FW-DC-WTR-01. However, FW-DC-WTR-02 requires compliance with Montana's water quality standards. Because the Project is expected to violate Montana's nondegradation standards in future phases, the "neutral" finding reached by the agency is not supported by the record, making it arbitrary and capricious and in violation of NFMA.

## B. Inland Native Fish Strategy Objectives

The Forest Plan also implements the Forest Service's Inland Native Fish Strategy that requires the attainment of the following Riparian Management Objective for Water Temperature:

No measurable increase in maximum water temperature (7 day moving average of daily maximum temperature measures as the average of the maximum daily temperature of the warmest consecutive 7-day period). Maximum water temperatures below 59°F within adult holding habitat and below 48°F within spawning and rearing habitats.

Plan at 136, AR214017. The environmental plaintiffs argue that record lacks analysis as to whether the discharges into Libby or Poorman Creek comply with

35

this standard.

The Plan states that these Objectives "would be achieved over time." *See* Plan at 135, AR214016 ("It is not expected that the objectives would be met instantaneously, but rather would be achieved over time."); AR37205 (describing objectives as "criteria against which attainment or progress toward attainment of the riparian goals is measured"). The Project's failure to immediately comply with them does not violate the Plan. Nevertheless, the Plan further states that "[a]ctions that would reduce habitat quality (whether existing conditions are better or worse than objective values) would be inconsistent with the purpose of" the Objectives. Plan at 135, AR214016. That limitation is reflected in the JFEIS: "Actions that retard attainment of these [Objectives], whether existing conditions are better or worse than objective values, are considered to be inconsistent with [the Inland Native Fish Strategy] and therefore not in compliance with the [Forest Plan]." JFEIS at 326, AR8186; *see also* BiOp at 23, AR212584. "For the purpose of analysis, to 'retard' would mean to slow the rate of recovery below the near natural rate of recovery if no additional human caused disturbance was placed on the system." Plan at 136, AR214017. Compliance with the Plan thus depends whether the Project "retards" attainment of the identified Objectives. It does.

As argued by the environmental plaintiffs, the 2013 Biological Assessment

36

indicates the temperature parameters for the Objectives currently identified as "Functioning Appropriately" in Poorman and Libby Creeks are going to be "Degraded" by the Project. *See* Aquatic BA at 120, AR212681. The Biological Assessment also indicates that the "wetted/depth" conditions in Rock Creek, East Fork Rock Creek, and East Fork Bull River—a separate Objective—will be "Degraded" as well. *See id.* Federal Defendants argue that the mitigation measures required by the ROD fully comply with the Inland Native Fish Strategy and the resulting temperatures of the discharges would be acceptable in light of existing conditions. *See* JFEIS at 396-97, AR8256-57 (outlining baseline conditions). Federal Defendants further argue that while the Biological Assessment recognizes the potential for reduced baseflows to increase temperatures, it concludes that any effect on temperature, while uncertain, represents a minimal risk to bull trout. *See* BA at 53-54, AR212614-15. Additionally, subsequent to the Biological Assessment, the Forest Service updated its temperature analysis. *See* AR13263-471 (January 12, 2016 Letter). The Fish and Wildlife Service concluded that the updated information shows anticipated temperature effects in the upper section of Libby Creek would be negligible. *See* ROD Att. 3, AR10845. That data does not address Poorman Creek or the wetted/depth requirements in other streams and does not indicate that temperature

conditions will not be "degraded." It is arbitrary and capricious for the Forest Service to conclude that a Project that degrades two Objectives across multiple streams does not retard attainment of those Objectives.[9]

Accordingly, the Forest Service's conclusion that the Project complies with NFMA is arbitrary and capricious given its unsupported "neutrality" finding with respect to FW-DC-WTR-02 and its conclusion that the Project complies with the Inland Native Fish Strategy despite retarding certain objectives.

## VI. NEPA

NEPA is a procedural statute that does not "mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *Neighbors of Cuddy Mtn. v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002) (internal quotation marks omitted). NEPA provides that all federal agencies shall prepare an EIS for every major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(C). The EIS must analyze all "direct," "indirect," and "cumulative" environmental impacts of the proposed action. 40 C.F.R.

---

[9] Montanore also notes that the Forest Service has the option to complete Project-specific Forest Plan amendments to reconcile any inconsistencies, *see* AR10528-29 (stating that other provisions of the Forest Plan were suspended for Project); 36 C.F.R. § 219.15(c)(3), (4), and that such an adjustment would be subject to NFMA and NEPA, 36 C.F.R. § 219.16(b). That has not happened for the provisions of the Forest Plan addressed here.

§§ 1502.16, 1508.8, 1508.25(c). An agency must ensure the "professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements" and "identify any methodologies used." 40 C.F.R. § 1502.24. NEPA's implementing regulations also require that an agency describe the environmental baseline of the areas to be affected, 40 C.F.R. § 1502.15, and address "appropriate mitigation measures not already included in the proposed action or alternative," 40 C.F.R. §§ 1502.14(f), 1502.16(h).

The environmental plaintiffs raise three claims under NEPA: (1) the preclusion of public review of information obtained during the Evaluation Phase, (2) the failure to obtain baseline data and deferral of critical environmental analysis, and (3) the failure to prepare adequate mitigation plans. Libby Placer Mining raises similar challenges, focusing primarily on the selection of the Poorman tailings impoundment site. The arguments are addressed in turn.

## A.    Public Review

Plaintiffs generally challenge the agency's reliance on the Evaluation Phase as a chance to reconsider the Project's environmental impacts and avoid further public review. The defendants argue that public review is not prevented by such reassessment because NEPA, pursuant to 40 C.F.R. § 1502.9(c)(ii), requires preparation of a supplemental EIS if there are "significant new circumstances or

39

information relevant to environmental concerns and bearing on the proposed action or its impacts." *See Conservation Cong'r*, 2016 WL 727272, at *6 (noting that "public comment is not essential every time new information comes to light after an EIS is prepared" (internal quotation marks omitted)). Federal Defendants further argue that although the inaccessibility of the underground mine limits the amount of data that is currently available, the agencies have addressed the resulting uncertainty through the use of groundwater modeling, *see* JFEIS at 568, AR 8445, and a monitoring plan to gather more data as it becomes available, *see* ROD at 10-11, AR10531-32. They assure that the public will not be left out.

Plaintiffs point out, however, it is not simply that the environmental impacts could be different following the Evaluation Phase, but rather that they *must* be different in order for the Project to proceed under Montana water quality regulations. The ROD authorized all phases based on an JFEIS that will have to be updated following the Evaluation Phase; yet "the public [will] never ha[ve] an opportunity to comment on the 'double check' analysis, frustrating NEPA's goal of allowing the public the opportunity to 'play a role in . . . the decisionmaking process.'" *Great Basin Resource Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). Plaintiffs insist NEPA requires informed public comment

"on proposed actions and any choices or alternatives that might be pursued with less environmental harm." (*Id.* (quoting *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005).)

Plaintiffs note that the EPA raised similar concerns, recommending the ROD allow the public a formal opportunity to review the information collected during the Evaluation Phase. *See* AR13474 (Oct. 2015 EPA conference call notes); AR13493 (Jan. 19, 2016 EPA letter informing Forest Service of ongoing concerns). The ROD rejected that recommendation, stating that public review would occur only if Project impacts were greater than currently predicted. ROD at 8, AR10529. As an independent grounds for finding a NEPA violation, Plaintiffs' reliance on inter-agency disagreement is unpersuasive because the "ultimate responsibility for ensuring compliance with applicable laws lies with the agency undertaking the proposed action," here, the Forest Service. *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1150 (9th Cir. 2016). The fact that "another agency might prefer a different approach is insufficient to demonstrate that [the action agency] acted unreasonably." *Id.*

The question is whether the current record is sufficient to analyze the environmental effects of the Project and provide for meaningful public—and judicial—review of agency action. It is. In *Great Basin*, the agency failed to

provide any support for its use of baseline values of zero for several air pollutants, arguing that it instead "double-checked" its analysis following the issuance of the FEIS. *Id.* The Ninth Circuit held the agency's analysis was inadequate "because the agency did not provide any support for its use of baseline values of zero." *Id.* Similarly, in *Oregon Natural Desert Association v. Jewell*, the Ninth Circuit held the agency violated NEPA when it failed to gather accurate baseline data on the sage grouse when it assumed they were not at the site in question but made no effort to verify that assumption. 840 F.3d 562, 569-70 (9th Cir. 2016). The Ninth Circuit concluded that the agency's "inaccurate data and unsupported assumption materially impeded informed decisionmaking and public participation." *Id.* at 570.

Here, the record includes baseflow modeling and data upon which compliance with the Clean Water Act, Organic Act, and Montana water quality standards has been assessed. There is a difference between a dearth of data, which was the case in *Great Basin* and *Oregon Natural Desert Association*, and conclusions drawn in contravention of presented data, which is the case here. Because the record currently under review was subjected to public comment, and NEPA itself provides safeguards for future review, 40 C.F.R. § 1502.9(c)(ii), Plaintiffs' public review challenge lacks merit.

## B. Postponed Critical Studies and Baseline Data

Plaintiffs further argue that the Forest Service failed to obtain baseline data and improperly deferred analysis of the Poorman tailings facility through its "approve now, study later" approach. NEPA regulations require an agency to include information "relevant to reasonably foreseeable significant adverse impacts" in an EIS if it is "essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant." 40 C.F.R. § 1502.22(a); *Rock Creek II*, 703 F. Supp. 2d at 1180. The Forest Service determined it had adequate baseline and other information regarding potential environmental effects to make a reasoned choice among alternatives and approve the Project operations adopted in the ROD. *See* JFEIS at 564, AR8441.

Plaintiffs focus their challenge to the agency's baseline data in two areas. First, Plaintiffs generally criticize reliance on data to be gathered during the Evaluation Phase. Second, Plaintiffs argue that the specific decision to proceed with the Poorman Tailings Site was based on inadequate information. The agency fulfilled its obligations under NEPA in both respects.

### 1. Phased Approach Generally

As to Plaintiffs' more general challenge to the "phased approach," the defendants repeatedly insist that certain data about site conditions will only be

obtained in the future, both in what the agency refer to as the "pre-evaluation phase," *see* AR10781, and after the Evaluation Phase. The defendants maintain, however, that an adequate baseline is present in the record, *see* JFEIS at 564-65, AR8440-41, and additional data will merely determine whether the environmental impacts remain within the scope identified in the JFEIS, ROD at 7-8, AR10528-29. And, because the phases of the Project are interdependent parts of the same proposal, they are required to be discussed in the same EIS. 40 C.F.R. § 1508.25(a)(1). The defendants cite to this Court's decision in *Rock Creek II* as instructive because it recognized the legitimacy of the "phased" approach.

The project in *Rock Creek II* was slated to be completed in two phases, an evaluation phase similar to the one at issue here, followed by a construction and operation phase. 703 F. Supp. 2d at 1174. The agency in that case successfully argued that a phased approach was acceptable, at least in part, because the second phase was conditioned on additional agency approval. *Id.* at 1175. Federal Defendants insist that such an "adaptive management" approach is necessary here where the anticipated effects of later phases are not yet known. While the proposition presents precarious risk of environmental harm, in this case using available data to outline baseline conditions and projected impacts of the Mine that acknowledge shortcomings, the Forest Service complied with NEPA. *See*

44

*Great Basin*, 844 F.3d at 1102. Although compliant with NEPA, those shortcomings present problems for the agency in the context of the Clean Water Act, the Organic Act, and NFMA as discussed above.

### 2. Poorman Site

Plaintiffs also specifically challenge the baseline data for the Poorman Tailings Impoundment Site. They point to the fact that the Poorman facility and the Libby Plant site have only been conceptually designed, and argue such an incomplete status precludes adequate NEPA analysis. JFEIS at 134-35, AR 7994-95; ROD at 9, AR 10617. Libby Placer Mining argues that this Court rejected a similar attempt to rely on "inadequate" information in *Rock Creek II*. 703 F. Supp. 2d 1152, 1180-81 (holding agency's decision to issue an ROD despite relying on bull trout information the agency itself deemed "inadequate" was arbitrary and capricious and violated 40 C.F.R. § 1502.22(a)).

Here, the JFEIS and ROD acknowledge that final facility design will depend on additional site information to be obtained during future geotechnical investigations. JFEIS at 134-35, AR 7994-95; ROD at 9, AR 10617. Federal Defendants argue that approach is acceptable as "[a] final design of the tailings impoundment facility itself is not necessary to disclose environmental impacts," because the agency already determined that the site is feasible for a stable tailings

45

impoundment. (Doc. 51 at 40-41, 49; Doc. 66 at 23); AR41974, 8685; JFEIS at 134, AR7994 ("[Montanore] would submit a tailings impoundment site geotechnical field study plan to agencies for their approval before commencing activities."). Design features, on the other hand, would shed no further light on the environmental concerns surrounding the site. (Doc. 66 at 23.) They also note the "competing interests involved" when dealing with mining on public lands. *United States v. Weiss*, 642 F.2d 296, 298-99 (9th Cir. 1981). Federal Defendants insist that Plaintiffs miss an important distinction between final facility design and baseline site data necessary for a valid NEPA analysis.

Plaintiffs, on the other hand, argue there is an important difference between gathering pre-Project baseline data and monitoring of Project activities, a difference overlooked by the defendants. *See N. Plains Resource Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1084-85 (9th Cir. 2011) (explaining that mitigation measures cannot be used as a "proxy" for baseline data); *see Or. Natural Desert Ass'n*, 840 F.3d at 570 (mitigation measures "are not a panacea for inadequate data collection and analysis"). Plaintiffs argue accepted practice within the Forest Service is to conduct detailed geotechnical data and related analysis of a proposed tailings site prior to completion of an EIS, citing to two mines in Arizona and Colorado where the Forest Service undertook NEPA

46

analyses to ascertain "baseline characteristics" before approving the main mine proposals. See AR226836-37. Federal Defendants argue that while this may have occurred, it by no means rises to the level of a regulatory obligation.

The JFEIS adequately explains that, despite the need for additional information, the current information in the record was sufficient to assess the environmental impacts based on the information gathered from the 3D model, predictions that the Poorman site location will have less of an impact than the originally proposed Little Cherry Creek site, and the 404 permitting requirements by the Corps. *See* JFEIS at 566-67, AR8443-44. The record upon which the agency considered the Poorman site is based primarily on information and data about the Little Cherry Creek site, or the site proposed under Montanore's chosen alternative (Alternative 2). *See* JFEIS at 808-09 AR8685; AR1893334 (summary of field exploration and laboratory tests of both sites, showing similar subsurface geology). Federal Defendants maintain that data shows that the Poorman site is feasible for a stable tailings impoundment facility. AR41880-41974 (ERO Consultant Report); JFEIS at 802, AR8679-85 (discussing the suitability of the Little Cherry Creek site). The JFEIS discusses why the information for the Little Cherry Creek site was used to analyze the Poorman site, noting that the dynamic loading conditions were the same, the sites "appear to have similar foundation

47

conditions," and the "site borrow soils and cyclone sand foundation materials were assumed to be similar." JFEIS at 808-09, AR5685-86. That portion of the JFEIS also states that "site specific data for the Poorman impoundment site are limited." *Id.* Although it does not explain why that data is limited, the record adequately explains why the Little Cherry Creek data was applied to the Poorman site.

Regardless of the applicability of the Little Cherry Creek data, Plaintiffs insist the defendants cannot credibly argue that gathering of baseline data and analysis could not have occurred at the Poorman tailings area and been made subject to public review under NEPA. Framed by Plaintiffs, the question is not whether the Cherry Creek data is accurate, but whether the information could have been obtained prior to completing the EIS. *Rock Creek II*, 703 F. Supp. 2d at 1181; 40 C.F.R. § 1502.22(a). Federal Defendants insist that Plaintiffs do not show that any "missing" data regarding the Poorman site to be "relevant to reasonably foreseeable significant adverse impacts" or "essential to a reasoned choice among alternatives." *See* 40 C.F.R. § 1502.22. Montanore further argues that the baseline data from the Little Cherry Creek site is a good or better surrogate than that used by agencies previously. *See Great Basin*, 844 F.3d at 1102 (endorsing use of air quality parameter data from a distant but comparable area for evaluation of the project site effects). Moreover, as Montanore points out,

48

the two sites actually overlap. *See* AR 41930 (site locations).

In *Northern Plains Resource Council*, the court held that the agency failed to take the requisite "hard look" under NEPA when it blamed its inability to obtain baseline data on rough terrain and private land ownership. 668 F.3d at 1085. The court was unpersuaded that the agency's excuses "relieved [it] of its requirement under NEPA to gather information before it can make an informed decision." *Id.* The court noted, however, had the agency attempted to obtain the data, that likely would have been sufficient. *Id.* The court further criticized the agency's reliance on "stale" data from ten to twenty years ago. *Id.* at 1085-86. Here, the sources relied upon indicate some of the information about the Poorman site may be dated. *See* AR109571-864 (1989 geotechnical report); AR80685-99 (1989 report); AR37454 (1986 Forest Service report). And, the agency relied extensively on data regarding the Little Cherry Creek site without explaining why such analysis could not be performed at the Poorman site. That said, the analysis discussed above shows there was not a complete dearth of data about to the Poorman site, unlike the situation in *Northern Plains*.

*Oregon Natural Desert Association* and *Great Basin* both provide useful guidance. In *Oregon Natural Desert Association*, the court concluded the agency violated NEPA when it assessed baseline conditions for sage grouse habitat in the

49

affected area based on sage grouse activity in nearby areas. 840 F.3d at 568-70. Dispositive of the court's conclusion was not the use of a similar, nearby site to assess data, but rather the *inaccurate* assessment of that data. *Id.* at 569-70. The court concluded that extrapolation of site data is not necessarily impermissible, so long as such extrapolation is "based on accurate information and defensible reasoning." *Id.* Relying on *Oregon Natural Desert Association*, the Ninth Circuit in *Great Basin* upheld an agency's use of air pollution baselines more than 100 miles away from the project area on the grounds that the data came from a rural area similar to the project area, the plaintiffs failed to show the agency's choice "rested on inaccurate information or indefensible reasoning," and the agency acknowledged the data's shortcomings. 844 F.3d at 1102.

Here, there is no indication, and Plaintiffs do not seem to argue, that the agency inaccurately applied the data from the Little Cherry Creek site to the Poorman site. Rather, the data is from a site that physically overlaps the selected Poorman site, and the record explains why the data is relevant to the selection of the Poorman site. Plaintiffs note that the EPA was once again critical of the approved Project, and recommended performing the necessary studies beforehand. *See* AR13163 (May 29, 2015 letter from EPA to Forest Service stating "EPA recommended this site evaluation work be completed prior to the completion of

the Final EIS because it will inform the design of the [tailings site] and the associated environmental impacts of the facility"); *see also* AR13157 (discussing lack of information regarding impact on water resources). As discussed above, however, the EPA's position is not dispositive of whether the Forest Service acted arbitrarily and capriciously. *Ctr. for Biological Diversity*, 833 F.3d at 1150.

The only argument that sounds in "inaccurate information" or "indefensible reasoning," *Great Basin*, 844 F.3d at 1102, is Libby Placer Mining's insistence that the Forest Service failed to evaluate the potentially catastrophic failure of the impoundment, (Doc. 60 at 20-21). Libby Place Mining maintains that the agency provided an explanation counter to the evidence when the ROD said the Poorman impoundment can be safe and secure where the JFEIS raised serious concerns. *See* JFEIS at 810, AR8687 (discussing failure of impoundment); JFEIS at 153, AR8013 ("The Poorman Tailings Impoundment Site would not provide sufficient capacity for 120 million tons of tailings without a substantial increase in the starter dam crest elevation if tailings were deposited at a density proposed in Alternative 2."). However, as argued by Federal Defendants, "embankment overtopping" was considered in risk assessment, AR163680 (third party report), which determined it to be an "extremely unlikely," AR173692, 173717 (risk chart), and the Poorman site capacity is twice the amount of expected recoverable resources, *see* JFEIS at

51

273, AR8133 (anticipated removal of 120 million tons). Because the agency

considered the risk and provided a reasoned explanation for its decision to proceed

with the site despite that risk, Libby Placer Mining's challenge lacks legal merit

even if it raises significant safety concerns.

Finally, Plaintiffs challenge the Forest Service's baseline analysis regarding

groundwater contamination at the Poorman site. During the Operations Phase, it is

estimated that a maximum of 25 gpm of water would seep to groundwater under

the tailings impoundment, altering water quality. JFEIS at 738, AR8615.

According to Federal Defendants, all seepage will be intercepted by the pumpback

wells located immediately downgradient of the Poorman Impoundment, ROD at

38, AR10559, and the Forest Service anticipates natural attenuation and removal

of metals in the tailings water, *see* JFEIS at 755, AR8632 (Table 131); JFEIS at

739-40, AR8616-17 (based on conditions at Troy Mine). Federal Defendants also

argue there is no indication DEQ will not grant a mixing zone (which would

happen during permitting process), and Plaintiffs' argument to the contrary is

speculative. *See* ROD at 38, AR10559.

Plaintiffs challenge the Forest Service's reliance on an underground bedrock

ridge as a means of preventing contaminated groundwater from migrating from

under the Poorman impoundment to the Little Cherry Creek wetlands. Federal

Defendants argue that contrary to Plaintiffs' claim, the Forest Service did not state

that mitigation depends on an apparent bedrock ridge but the JFEIS assumed the

opposite of bedrock ridge blocking migrating groundwater, *see* AR7991

(discussing plan to survey wetlands), AR9645-9744 (Agencies Conceptual

Monitoring Plans), and subsurface data from area will be collected during design

process of the Poorman Impoundment, JFEIS at M-78, AR10116. Moreover,

Federal Defendants argue Montanore is required to develop compensatory

mitigation that would create 7.5 acres of wetlands and 4.5 acres of upland buffers.

*See* JFEIS at 1028, AR8905. The Project also requires Montanore to monitor

water levels in wetland, JFEIS at C-39, AR9685, vegetation, JFEIS at 1025,

AR8902, and deploy appropriate mitigation, *id.*

Although mitigation measures cannot be used as a "proxy" for baseline data,

*N. Plains Resource Council, Inc*, 668 F.3d at 1084-85, the record shows adequate

analysis of the baseline of wetlands and anticipated impacts of the Project, *see*

JFEIS at 794, AR8671 (not identifying any incomplete or unavailable geotechnical

information); *see also* JFEIS Appx C, AR9689-92 (2009 Montanore Groundwater

Dependent Ecosystem inventory). The JFEIS discusses the hydrogeology of the

tailings impoundment and land application disposal areas. JFEIS at 579, AR8456-

57; AR191516-42 (third party hydrogeology report). The record evaluates and

53

discusses site conditions, including subsurface geotechnical features, enabling the decision makers to make a reasoned choice among alternatives. *See also* JFEIS at 794, AR8671.

Because the agency's choice did not rest on inaccurate information or indefensible reasoning, the use of data from the Little Cherry Creek site was not arbitrary and capricious. Moreover, the Forest Service did not act arbitrarily and capriciously when it concluded adequate baseline data existed to make a reasoned choice among alternatives regarding the Poorman site.

## C. Mitigation

Plaintiffs also challenge the JFEIS and ROD's postponed review of certain mitigation measures. Under NEPA's implementing regulations, an EIS must discuss "appropriate mitigation measures." 40 C.F.R. § 1502.14(f). The definition of "mitigation" includes minimizing environmental impacts, rectifying impacts by repairing, restoring, or rehabilitating the affected environment, reducing or eliminating the impact over time through preservation or maintenance, and compensating for the impact by providing substitute resources. 40 C.F.R. § 1508.20. The defendants argue that NEPA does not require a complete mitigation plan, *see Robertson*, 490 U.S. at 352, but that mitigation must only be discussed in sufficient detail to fully evaluate environmental effects, *Laguna*

*Greenbelt v. U.S. Dep't of Transp.*, 42 F.3d 517, 528 (9th Cir. 1994). They contend the JFEIS meets those requirements.

### 1.    **Wilderness Streams**

Plaintiffs first argue that the Forest Service does not have a mitigation plan to prevent the severe loss of flows and associated degradation in outstanding resource waters in the Wilderness. The mitigation measures presented in the record consist of concrete bulkheads, grouting, and buffers between overhead water and mining operations. JFEIS at 162, AR8022. Plaintiffs argue that the bulkheads do not provide necessary mitigation over the long term, and that the effectiveness of grouting is uncertain and likely to decline after 50 years. JFEIS at 336, AR10374. Although the JFEIS discusses leaving in "pillars" of stone to supplement bulkheads, JFEIS at 162, AR8022; JFEIS at 613, AR8490, Plaintiffs argue that measure has not yet been submitted or planned, JFEIS at 614, AR8491, and there is no evidence that they will last longer or be more efficient than proposed measures. Plaintiffs further argue that the public must be allowed to comment on the alternative barrier pillar design. Federal Defendants insist that because the agencies considered the modeling of the bulkheads to be an equivalent of the agencies' mitigation of leaving one or more barriers during the Operations Phase, *see* Draft EIS at 245, 253, AR3961, 3969, the proposed modification is well

within the scope of appropriate responses to comments, *see* 40 C.F.R. § 1503.4 (identifying modification of alternatives between EIS and FEIS as appropriate).

Federal Defendants argue that *Okanogan Highlands*, 236 F.3d at 475-76 (upholding general mitigation plans where actual adverse effects uncertain but EIS extensively considered the potential effects of the Project), and *Japanese Village, LLC v. Federal Transit Administration*, 843 F.3d 445, 470 (9th Cir. 2016) (upholding use of adaptive monitoring plans), are instructive here as both cases contain similar discussions of mitigation measures. *See* JFEIS at 610, AR8487 (recognizing the uncertainty of Project impacts); JFEIS at 611-15, AR8488-8492 (discussing the potential impacts in light of that uncertainty). Plaintiffs maintain that while a "final" mitigation plan may not be required, "[p]utting off an analysis of possible mitigation measures until after a project has been approved, and after adverse environmental impacts have started to occur, runs counter to NEPA's goal of ensuring informed agency decisionmaking." (Doc. 63 at 45-46 (quoting *Great Basin*, 844 F.3d at 1107).) In *Great Basin*, the court allowed the deferral of final mitigation plans because there was a "low probability and temporal remoteness of adverse impacts." 844 F.3d at 1107. Plaintiffs insist this case is distinguishable.

As discussed in *Okanogan Highlands*, the adequacy of a mitigation discussion is "one of degree." 236 F.3d at 476. Unlike the situation in *Great*

56

*Basin*, the record here shows Montanore and the Forest Service did not completely defer mitigation efforts until after the Project was approved. Rather, this mitigation discussion is comparable to *Okanogan Highlands*, where the Forest Service prepared an EIS for a mining project that would produce a mine-pit lake, concluded in the EIS that "seepage from the open pit is expected to have a low overall impact on ground water quality in the vicinity of the pit," but nonetheless discussed several mitigation measures, including monitoring. 236 F.3d at 471-75. As discussed above, the mitigation plan here includes both measures to counteract low flows—such as bulkheads, grouting, and pillars—and extensive monitoring. It is intended to be flexible to adapt to future problems, *see City of Carmel-By-The-Sea v. U.S. Dep't of Trans.*, 123 F.3d 1142, 1154 (9th Cir. 1997) (upholding flexible plan), but addresses potential impacts of the Project, *Okanogan Highlands*, 236 F.3d at 474-75. Although Plaintiffs challenge the efficacy of some of the proposed mitigation measures, *see also* AR13494 (EPA stating that "JFEIS does not propose adequate mitigation to offset impacts to aquatic resources that may result from flow changes and groundwater drawdown"), the agency discussed the measures' effectiveness, FEIS at 612-15, AR8489-92 (discussing buffers, grouting, concrete bulkheads, and pillars); *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009) (requiring

agency to discuss effectiveness of mitigation even in the face of uncertainty). The Forest Service took the adequate "hard look" at mitigation measures related to baseflow reductions of Wilderness streams.

### 2.    Poorman Site

Plaintiffs further challenge the lack of mitigation measures proposed for the Poorman Tailings Impoundment Site. Pursuant to the JFEIS, Montanore was not required to identify mitigation for three potential indirect effects of the Project: (1) hydrologic impacts on wetlands from pumpback system, (2) reduce of flow in Poorman and Little Cherry Creeks by the pumpback system, and (3) the effect on hydrological support in the upper watersheds of East Fork Rock Creek and East Fork Bull River. JFEIS at 1025, AR8902. Libby Placer Mining also argues that there are no proposed mitigation plans for dust, groundwater contamination, or improved stability of the Poorman site. *See* ROD at 36-39 AR10557-60 (discussing private property concerns). Federal Defendants claim that the Forest Service's selection of the Poorman site was a mitigation measure in-and-of itself because it had significantly less impact than other impoundment sites analyzed, emphasizing fewer impacts on wetlands, Riparian Habitat Conservation Areas, and the avoidance of permanent diversion of a perennial stream as discussed in the FEIS. *See* ROD at 31, AR10552. Federal Defendants further note mitigation

58

measures are proposed, including the installation of pumpback wells downgradient of the tailings impoundment to collect any seepage not captured by the drain system, ROD at 38, AR10559, the wetting of the tailings impoundment to prevent dust, ROD at 37, AR10558, air quality monitoring, ROD at C.2, AR10742-45, and measures to reduce noise, ROD at 5, AR10613.

Libby Placer Mining's challenge is primarily related to "dewatering," which Federal Defendants contend lacks merit because the flow in Libby Creek is expected to increase during all phases of the Project, FEIS Table 110, AR8546, and Poorman Creek is expected to increase during the Construction Phase, FEIS Table 109, AR8535, and decrease only slightly (0.18/19 cfs) during the Operation and Closure Phases, JFEIS Table 111, AR8539; JFEIS Table 112, AR8543; JFEIS Table 113, AR8546. Federal Defendants further insist that Poorman Creek is already dewatered under baseflow conditions, Aquatic BiOp at 102, AR221625, and any change under the Project is insignificant, *id.* at 48, AR212609 (explaining that Project effects would not change currently impassable stretches for bull trout). Federal Defendants maintain that where action impacts are insignificant, mitigation measures not required, citing *Transmission Access Policy Study Group v. F.E.R.C.*, 225 F.3d 667, 736 (D.C. Cir. 2000).

Federal Defendants' argument that the agency is not required to consider

mitigation because of the "insignificance" of the reduction is not persuasive given the fact that reductions in Poorman Creek are anticipated to exceed the 10 percent threshold for state water quality degradation. As argued by Plaintiffs, uncertainties concerning the extent of the impact do not relieve the Forest Service of its responsibility under NEPA to analyze mitigation. *See S. Fork Bank Council*, 588 F.3d at 727 (NEPA requires mitigation measures be evaluated "with sufficient detail to ensure that environmental consequences have been fairly evaluated"). The failure to consider mitigation in relation to the pumpback well system and baseflow reductions in Poorman Creek was arbitrary and capricious.

In its reply, Libby Placer Mining raises for the first time an argument regarding the agency's choice of, and mitigation measures related to, moving the primary Mine access road. Federal Defendants correctly contend that because that argument was only raised in the reply, it is not properly before the Court. *Dilley v. Gunn*, 64 F.3d 1365, 1367 (9th Cir. 1995).

**D.     Poorman Site Evaluation Criteria**

Finally, Libby Placer Mining challenges the Forest Service's application of evaluation criteria in selecting the Poorman site. Libby Placer Mining is specifically concerned about the site location as its property lies only 300 feet to the east. AR9509. Libby Place Mining argues that the Forest Service was

arbitrary and capricious in failing to apply a 2000-foot "buffer," which was applied to other potential alternative impoundment sites, to the Poorman and Little Cherry Creek sites as screening criteria for consideration in the EIS. It contends that if the 2000-foot buffer were applied to the Poorman site, it would have been eliminated from consideration as an alternative because of its proximity to Libby Placer Mining's private property. Montanore asserts that the 2000-foot "adjustment" was applied to the other potential sites to standardize the disturbance areas for the purposes of screening in light of the 1,500 to 2,000 acres already determined for the facilities proposed for the Poorman and Cherry Creek sites. *See* AR68018. According to Montanore, the 2000-foot adjustment was used at the other sites to make them more comparable to the Poorman and Cherry Creek sites, *see* JFEIS at 259, AR8119, AR158939, not as an independent buffer zone.

The agencies used three successive levels of screening to narrow the range of tailings impoundment options. *See* AR41930-44 (third party consultant report on screening process). For Level I screening, the agencies evaluated twenty-two sites, including the Little Cherry Creek site and the Poorman Creek site. *See* AR41928 (Figure 5, map of proposed sites). Libby Placer Mining insists the application of 2000-foot buffer was one of the criteria used for Level I screening purposes and used to *surround* the actual area of the proposed impoundment. *See*

AR41930; *see e.g.* AR68019 (showing buffer zone in relation to Crazyman Creek
and Upper Hoodoo Creek impoundment sites). The buffer was not applied,
however, to the Little Cherry Creek and Poorman Creek sites and the buffer on the
Poorman site is less than 2,000 feet on the southeast and east sides of the
impoundment footprint. *See* AR68019; *see also* JFEIS at 153, AR8013 ("Private
property not owned by [Montanore] is located 300 feet east of the southern two-
thirds of where the tailings dam alignment would be located.").

Libby Placer Mining argues that the 2000-foot buffer was important to the
agencies' consideration as it determined impoundment capacity on a preliminary
basis. *See* AR41931 (referencing capacity for expansion). The record indicates
the Poorman site has no room for expansion. *See* AR173701, 41379, 11419. The
close proximity of Libby Placer Mining's private land is also apparent, JFEIS,
Figure 18, AR9518, and the record further discusses the limiting role of the site's
relatively flat topography, AR38276, 41931. Libby Placer Mining insists that the
Forest Service's failure to apply the 2000-foot buffer to the Poorman site
ultimately allowed for the selection of an unsuitable impoundment site. In making
its argument, Libby Placer Mining relies on *Oregon Natural Desert Association*,
where the Ninth Circuit held the agency violated NEPA when it failed to gather
accurate baseline data on the sage grouse. 840 F.3d at 569-70. Libby Placer

Mining insists that similar to the situation there, the Forest Service's "inaccurate data and unsupported assumption [regarding the Poorman site] materially impeded informed decisionmaking and public participation." *Id.* at 570.

The defendants insist the risk assessment process identified unique risks based on proximity to private property and implemented risk management plans in light of those concerns. *See* AR173698-701 (March 2009 Risk Assessment) (also noting that the "facility does not have any room to expand" and "is also more at risk in terms of complexity of operations"). The record shows that the final four impoundment sites were around the same size, AR41942 (Little Cherry Creek (426 acres), Poorman (397 acres), Crazyman Creek (343 acres), Upper Hoodoo Creek (356 acres), and that the total disturbance areas are also similarly sized across the four, *see* AR68018 (mapping with buffer). Although Libby Placer Mining may disagree with the Forest Service's analysis, the record shows the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made in its application of the site evaluation criteria. Moreover, public participation was not materially impeded as the application of the 2,000-foot buffer was addressed during the public comment stage. *See* AR10134-36 (FEIS Response to Comments 323-16, -17, -18).

## CONCLUSION

The Forest Service acted arbitrarily and capriciously in approving the Project despite noncompliance with Montana nondegradation standards in violation of the Clean Water Act, the Organic Act, and NFMA. The Forest Service also violated NEPA when it did not consider mitigation measures for Poorman Creek. The Forest Service met its statutory obligations in all other respects.

Accordingly, IT IS ORDERED that the parties' motions for summary judgment (Docs. 35, 39, 48, 52) are GRANTED in PART and DENIED in PART. Plaintiffs' motions (Docs. 35, 39) are GRANTED as to their claims related to Montana's non-degradation standards under the Clean Water Act and Organic Act, their NFMA claim related to FW-DC-WTR-02 and the Inland Native Fish Strategy, and their NEPA claim related to mitigation of the Poorman site. The defendants motions (Docs. 48, 52) are GRANTED in all other respects. The matter is remanded for further review consistent with this opinion.

Dated this 30ᵗ day of May, 2017.

14:42 P.M

Donald W. Molloy, District Judge
United States District Court